# UNITED STATES of America,

### v.

## Peter POLIZZI, Defendant.

## No. 06–CR–22 (JBW).

United States District Court, E.D. New York.

April 1, 2008.

311

Benton J. Campbell, U.S. Attorney for the Eastern District of New York, by Allen Lee Bode, for the Government.

Mitchell J. Dinnerstein, Esq., Thomas Eddy, on the Brief, for Defendant Peter Polizzi.

## MEMORANDUM, ORDER & JUDGMENT

JACK B. WEINSTEIN, Senior District Judge:

TABLE OF CONTENTS

I. Introduction ......................................................... 319
 A. Constitutionality of Statute .................................... 320
 B. Unconstitutional Denial of Jury's Broad Power to Refuse Conviction ......... 322

II. Facts ............................................................... 323
 A. Defendant and the Crime ...................................... 323
 1. Childhood Sexual Abuse in Sicily .......................... 324
 2. Resulting Psychological Trauma ............................ 325
 B. Procedure ..................................................... 326
 1. Investigation .............................................. 326
 2. Arrest ..................................................... 327
 3. Indictment ................................................. 329
 4. Motion to Dismiss Indictment .............................. 329
 5. Jury Charge ................................................ 330
 a. Affirmative Defense of Insanity ........................ 330
 b. Mandatory Minimum Sentence ............................ 330
 6. Trial ...................................................... 331
 a. Polizzi's Testimony .................................... 332
 b. Dr. Lisa Cohen ......................................... 333
 c. Dr. Eric Goldsmith ..................................... 334
 d. Dr. N.G. Berrill ....................................... 337
 7. Jury Verdict ............................................... 339
 8. Post-Verdict Proceedings .................................. 339

III. Constitutional Objections to the Statute ......................... 341
 A. Fundamental Problem with Passive Receiving and Possessing Without Evil
 Intent as Charged Under Statute ............................. 341

**318**

1. Generally ....................................................... 341
2. Definitions ..................................................... 343
3. Operative Elements of the Receipt and Possession Statutes ............. 345
4. *X-Citement Video* .............................................. 349
5. *X-Citement Video* Does Not Control ............................. 351
6. Overbreadth .................................................... 353
7. Precedent ..................................................... 354
 a. Defining "Receipt" and "Possession" ........................ 355
 b. Inferring Intent from Non-Operative Facts ................... 357
8. Remedy ....................................................... 358
B. Cruel and Unusual Punishment ..................................... 358
 1. Is the Punishment Cruel? ..................................... 359
 2. Is the Punishment Unusual? ................................... 360
C. Disproportionate Penalty .......................................... 361
 1. Proportionality Analysis ...................................... 361
 2. Is Five Years Constitutionally Disproportional? .................. 364
 a. The Nature of Polizzi's Crimes and the Contemplated Penalty ........ 364
 i. Severity of Offenses ...................................... 364
 ii. Harm Caused by the Offenses .............................. 365
 iii. Severity of Punishment ................................... 366
 iv. Polizzi's Culpability ..................................... 368
 b. Punishment for Other Offenses in This Jurisdiction ................. 369
 c. Punishment for Similar Offenses in Other Jurisdictions .............. 370
D. Irrationality ..................................................... 372
 1. Generally .................................................. 372
 2. Federal Laws Criminalizing Receiving or Possessing Child Pornography
 Are Not so Irrational so as to Violate the Constitution ................. 374
E. Lenity .......................................................... 377
F. Free Speech ..................................................... 378
 1. History of Pornography ...................................... 378
 2. First Amendment Exceptions .................................. 380
 a. Obscenity ............................................... 380
 b. Sexually Oriented Expression .............................. 383
 c. Child Pornography ........................................ 384
G. Search and Seizure ............................................... 386
 1. Summary of Relevant Facts ................................... 386
 2. Fourth Amendment .......................................... 387
 3. Reasonable Expectation of Privacy ............................. 388
 4. Third-Party and Envelope–Content Doctrine ..................... 390
 5. Electronic Communication Privacy Act .......................... 392
 6. Probable Cause for Search of Home ............................ 394
 7. Policy Considerations ........................................ 396
H. Separation of Powers ............................................. 397
 1. Mandatory Minimums Historically and Today .................... 398
 2. The Judiciary's Power Under Article III ........................ 399
 3. Congress Has the Power to Enact Mandatory Minimums ........... 400
 4. Analysis of the Statute ...................................... 401
I. Jury Finding of Predicate Facts .................................... 402

IV. Unconstitutional Refusal to Inform Jury of Mandatory Minimum Incarceration ... 404
A. History and Context of Sixth Amendment ............................ 405
 1. Goebel ..................................................... 408
 2. Ryder Papers ............................................... 413
 3. Old Bailey Session Papers .................................... 417
B. Nineteenth- and Twentieth-Century Judicial Attempts to Restrict Sixth
 Amendment Jury Discretion ........................................ 420
C. Some Modern Attempts to Eliminate Jury Power Violate the Constitution .... 424
D. Recent Supreme Court Caselaw Rejects Attempts to Limit Jury's Power ..... 426
 1. Supreme Court Places a High Value on the Jury's Historic Sentencing Role 427

 2. Supreme Court Invalidation of Laws and Practice Incompatible with Historic Jury Role .......................................... 428
 3. Sentencing Cases Suggest that the Supreme Court Recognizes the Jury's Power to Moderate the Law's Harsh Effects ........................ 431
 E. Requirement of Jury Knowledge in View of the Unusual Situation, Statute and Punishment of Which the Jury Was Not Aware ...................... 433
 1. *Thomas* and *Pabon-Cruz* Are Premised upon a Now Inappropriate Attempt to Curtail Jury Powers .................................. 433
 a. *Thomas* ...................................................... 433
 b. *Pabon-Cruz* .................................................. 435
 i. Procedural History ........................................ 435
 ii. Post-*Booker*, *Pabon-Cruz*, *Thomas* and *Shannon* Require Reinterpretation ........................................ 437
 2. *Gilliam* Language Represents the Current General Role of the Informed Jury as Representative of Community Mores ...................... 438
 3. In Polizzi's Case, Informing the Jury of the Applicable Penalty Was Necessary Because of the Defendant's Unusual Background and the Unknown Punishment ........................................ 440
 F. Variability of Results Depending Upon Informed & Non-Informed Jurors .... 440
 G. Conclusion ........................................................ 443

V. Defendant's Motion to Inform the Jury of Mandatory Minimum Should Have Been Granted ............................................................ 443
 A. Defendant's Rule 33 Motion Should Be Granted ........................ 446
 B. Error Was Prejudicial .............................................. 448
 C. Sentence .......................................................... 448

VI. Conclusion .......................................................... 449
 A. Constitutionality of Statute ........................................ 449
 B. New Trial as to Counts One Through Twelve .......................... 449
 C. Sentence on Counts Fourteen Through Twenty–Four .................... 450
 D. Stay .............................................................. 450

Appendices ............................................................ 450
 A. Selected Bibliography on Historic Powers of Jurors When Sixth Amendment Was Adopted ...................................................... 450
 B. State Statutory Minimums and Child Pornography Statutes .............. 454
 C. Federal Statutory Minimums ........................................ 487

## I. Introduction

Defendant, Peter Polizzi, was charged with—and convicted after a jury trial of—twelve counts of receiving and eleven counts of possessing child pornographic images under 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B). The pictures were so sickenly loathsome as to lead inexorably to jury denouncement. *See* Superseding Indictment, Mar. 8, 2007, Docket Entry No. 35; Govt.'s Letter to Dismiss Count Thirteen, Aug. 27, 2007, Docket Entry No. 62. He has been in federal custody since October 5, 2007, when the jury delivered its verdict.

A conviction for receiving child pornography under 18 U.S.C. § 2252(a)(2) requires a mandatory minimum sentence of five years' imprisonment; the maximum is twenty years. 18 U.S.C. § 2252(b)(1). Ten years is the maximum for conviction for possession under 18 U.S.C. § 2252(a)(4)(B); there is no minimum. 18 U.S.C. § 2252(b)(2). Whether a charge based on the receipt and possession of the same picture is duplicative—because upon receipt via computer, possession necessarily begins—need not be addressed since the multiplicity of counts does not affect the sentence being imposed. *See* Parts V.C, VI.C, *infra*.

Before it rendered its verdict of guilty, the jury was not informed of the five-year mandatory minimum sentence a conviction on the receipt counts entailed despite the defendant's request for such an instruction. Told of the minimum after the verdict was received, a number of jurors expressed distress, indicating they would not have voted to convict had they known of the required prison term. They had assumed that the defendant would receive treatment, not long incarceration. *See* Part II.B.8, *infra*.

The jury rejected Polizzi's alleged affirmative defense of not guilty by reason of insanity. *See* Insanity Defense Reform Act of 1984 ("IDRA"), Pub.L. No. 98–473, 98 Stat.2057 (codified at 18 U.S.C. § 17). The defense was largely predicated on Polizzi's himself having been repeatedly and severely sexually abused as a child. *See* Part II.A, *infra*.

Defendant's background was positive. *See id.* He was brought to this country when he was a young teenager after a childhood in Sicilian poverty; had little formal education, yet, after teaching himself to play an instrument, led a popular local band; worked extremely long hours at menial labor as a boy, and then bought and built-up a successful restaurant; had a loving wife and five supportive lawfully engaged sons; lived in a fine home; was well respected in the community by the police, clergy and others; had no criminal record; viewed the charged pornography downloaded from the Internet alone in a double-locked room above his garage; and, upon his arrest, cooperated fully with the police, suggesting to them that whoever participated in producing these dreadful pornographic images should be prosecuted. *See* Parts II.A, II.B.1–2, *infra*.

Defendant now moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and for dismissal pursuant to Rule 29. Def.'s Mot. to Vacate J., Docket Entry No. 123. Two main issues are presented: First, are the statute and mandatory minimum sentence constitutional facially and as applied? *See* Part III, *infra*. Second, should the jury have been informed of the mandatory minimum before it began its deliberations? *See* Part IV, *infra*.

### A. Constitutionality of Statute

Although the constitutional arguments against enforcement of the statute facially and on the facts charged are powerful, each is rejected on the basis of precedent. Serious questions about constitutionality suggest that the appellate courts and Congress need to revisit these issues.

A fundamental problem is presented by the statute and charge. Passively "receiving" and passively "possessing" images sent over the Internet may lack the constitutionally required *scienter*. *See* Part III.A, *infra*. There is a limit to what life the courts can breathe into a statutory provision otherwise dead under the Constitution by incorporating judicially created scienter and mens rea qualifications. In view of appellate assumptions that the charged child pornography statute is valid, dismissal on the basis of unconstitutionality is denied. These assumptions need to be reconsidered on appeal.

There is merit to defendant's argument that the punishment violates the *Eighth Amendment*, but it cannot be said that the statute is unconstitutional because it is not both cruel *and* unusual. *See* Part III.B, *infra*. Neither can it be said that the punishment is unconstitutionally *disproportionate* to the crime charged. *See* Part III.C, *infra*. Congress has found that receipt and possession of child pornography is demeaning to the children depicted and increases the threat of sexual abuse of children. Utilization of the criminal law and the threat of heavy penalties to mini-

mize the risk of sexual abuse of children are appropriate and can be considered proportionate.

There is merit to defendant's argument that the heavy penalty is *irrational* in view of the specific charges, but it cannot be said that it is unconstitutionally so. *See* Part III.D, *infra.* It can be justified on a congressional view that criminalization of all aspects of the distribution chain will discourage people from downloading such images, deterring purveyors and those sexually abusing children. This argument of rationality is less persuasive than it would be were the purchase by a downloader an element of the offense charged—which it is not here—since the definition would then strike directly at the profit motive, a chief driving force of the current Internet traffic in child pornography images.

There is merit to defendant's contention that the *rule of lenity* requires interpretation of the applicable statute to exclude mere passive receipt and possession as charged. It is not appropriate, however, to declare invalid the receiving and possessing provisions charged since appellate courts have assumed they are valid despite their defects. *See* Part III.E, *infra.* The statutory provision requiring parsimony in punishment yields to specific sentencing provisions requiring a mandatory minimum. *Id.*

There is merit to defendant's assertion that the statute charged violates the *First Amendment* free speech protections of persons in their own homes viewing, reading, or hearing what they wish, but it cannot be said the statute is unconstitutional on this ground. *See* Part III.F, *infra.* Free speech may be limited by Congress should investigation demonstrate that it leads fairly directly to sexual abuse of children. Child pornography enjoys no prima facie First Amendment protection.

There is merit to defendant's argument that the investigation leading to his arrest was a violation of his *Fourth Amendment* right against unreasonable searches and seizures, but no motion to suppress was made, and it cannot be said it was unconstitutional given current statutes and precedent. *See* Part III.G, *infra.* Using computer forensics to secretly find out what a person is viewing in the privacy of his own home arguably violates constitutional protections, but it may be justified, as precedents suggest, by the lack of any expectation of privacy in the computer "address" of a receiver of images transmitted through the Internet.

There is merit in defendant's contention that mandatory minimums violate *separation of powers* by shifting part of the judicial discretional sentencing power from the courts to Congress and to the executive through its charging ability, but the statute cannot be held to be unconstitutional on that ground. *See* Part III.H, *infra.* Appellate courts repeatedly have recognized that sentencing is a shared power among the three branches and that the legislature may limit sentencing discretion through mandatory minimums and otherwise.

There is merit in defendant's argument that forcing the jury into a general verdict without informing it of the verdict's punitive implications violates the *jury's constitutional role* in finding predicate sentencing facts to provide a basis for sentencing enhancement as outlined in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and related cases, but there cannot be said to be unconstitutionality on that ground. *See* Part III.I, *infra.* The jury's general verdict of guilty, under the statute's operative elements, is the statutory basis for the minimum sentence.

### B. Unconstitutional Denial of Jury's Broad Power to Refuse Conviction

The American petit jury is not a mere factfinder. From the time the right to trial by jury was embedded in the Constitution as a guarantee to criminal defendants through the Sixth Amendment in 1791, it has been expected to bring to court much of the wisdom and consensus of the local community. *See* Part IV, *infra*. It has, when jurors deemed it necessary, stood as a guardian of the individual against the sometime cruel overreaching of government and its menials. Much of our modern procedural "reforms" have been designed to limit the jury's reach and power, increasingly shifting control to judges; these efforts have attempted unconstitutionally to transform the jury into a simple factfinder from its grander historical position under the Constitution as representative of the people in the courts.

Recent Supreme Court developments stress "originalism"—that is to say, the meaning at the time the relevant constitutional language was adopted. The approach has been applied to sentencing in a series of Supreme Court cases reviving the original meaning of the Sixth Amendment guarantee of trial by jury in criminal cases and the right of a defendant to be confronted with opposing witnesses. *See* Part IV.D, *infra*. The development is based upon what is believed to be colonial practice immediately preceding adoption of the Sixth Amendment, and the reception of then current British practice. *See* Part IV.A, *infra*.

Extrapolation of the recently emphasized constitutional principle requiring a jury finding of the facts needed to enhance a sentence requires courts to recognize that colonial and British juries in the late eighteenth century had power to control the finding of guilt in order to affect the sentence. In exercising its extensive discretion, the jury was expected to be aware of, and understand, the sentence that would follow from its decision. That jury power to know and act may not be eviscerated, as was done in this case by this court's error in failing to advise the jury of the five-year mandatory minimum sentence required on conviction of receipt of child pornography.

Although much of modern civil and criminal procedural rule-making has been devoted to controlling juries, *see* Part IV.C, *infra*, the emphasis on originalism by the Supreme Court in sentencing and confrontation requires enforcement of a basic element of the Sixth Amendment as originally understood: the jury of the vicinage, being aware of the sentencing implications of a finding of guilt, had the frequently exercised power to refuse to follow the law as construed by the court, and could acquit or downgrade the crime in order to avoid a sentence it deemed excessive.

The complexity of modern United States criminal law and the general public's lack of detailed knowledge of federal statutory provisions require that, in the few cases where necessary, the jury be informed of such matters as the required minimum term of incarceration that will follow from its verdict so that it can exercise its constitutionally mandated historic role. Cases which have rejected this view, on the ground that it permits a form of impermissible "nullification," have not followed the Sixth Amendment as it must be interpreted after recent Supreme Court originalist holdings. *See* Part IV.E, *infra*.

Consideration of jury power contemporaneous with the Sixth Amendment's adoption leads to the conclusion that this court committed constitutional error when it denied defendant's request to inform the jury of the statutory mandatory five-year minimum applicable to the receiving counts. A new trial on those counts, granted pursuant to defendant's Rule 33 motion, will be required to correct that prejudicial error.

*See* Part V, *infra.* The requested instruction might well have led to a hung jury or a verdict of not guilty or not guilty by reason of insanity.

This ruling on what the jury is entitled to know about sentencing is limited to that small group of cases where the jury would not be expected to know of the applicable harsh mandatory minimum. It would not, for example, appear to be applicable to robbery, terrorism or personal assaults with weapons where juries expect long prison terms to be imposed. It would also not apply where the defendant asked that the jury not be informed because of potential prejudice.

An acquittal on the receiving counts would not mean the defendant would go unwhipped of justice. Because they do not require a minimum sentence, the possession counts stand; they provide ample ground for serious non-mandatory penalties, including a substantial prison term, a heavy fine and a long period of supervised release. *See* Parts V.C, VI, *infra.* The instant trial and the attendant evidence and publicity have revealed a man who entertains himself by buying, downloading and viewing the most vile child pornography; the cost of his defense was considerable; and the loss of self-respect and the esteem of community and family constituted a devastating punishment. The criminal process and the trial are the modern equivalents of eighteenth-century branding, being put in stocks, or being carted about the community in shame. Defendant, whatever the ultimate outcome of the prosecution, is now publicly marked as morally culpable.

## II. Facts

### A. Defendant and the Crime

As described more fully below, Peter Polizzi, now fifty-four, immigrated here with his family from an impoverished area in Sicily when he was in his early teens,

speaking only Italian. Trial Tr. 164. With just a few years of schooling, as a young man he bought a restaurant in Queens, and over the next thirty-five years turned it into a valuable business. Along the way, he met and married the girl next door, *id.* at 169, had five successful sons who are all in college or college graduates, *id.* at 165, 1366, and bought a fine home.

Polizzi taught himself to play the guitar. He performed in a band at Italian weddings, *id.* at 169, 1018, until one of his band members was shot and killed in front of him during a robbery. *Id.* at 1022. A religious man, he attended church regularly. *Id.* at 907. In his free time, he organized his extensive collections of music, baseball cards, movies, comic books, and other "collectibles;" *see* Part II.B.6.b, *infra;* he placed great importance on being "nice and neat." Trial Tr. 748, 869.

His success was, in large part, the result of hard physical work, a strict, formalized routine with very long hours, and the help of his wife and children. *Id.* at 864, 1018 (noting that he regularly worked up to eighteen hours per day, seven days a week).

For some five years before his arrest in 2005, Polizzi regularly repaired to a double-locked room over his detached garage to view child pornography on his computer; eventually he possessed over 5,000 pictures, the vast majority of which were of young girls. *Id.* at 355, 859. Polizzi claimed he came across child pornography accidentally while looking for adult pornography, and was "shocked" by what he saw. *Id.* at 1046. He thought such "filthy" photos *should* be outlawed, but did not realize they *were* illegal; if they were forbidden, he asked himself, why were they freely available on the Internet? *Id.* at 1047, 1105 ("Now, I know it's wrong, but back then I didn't—I didn't know it was wrong. You say it was illegal, to me some-

thing that is there you see is not illegal, because if it's illegal what to stop, what is there is illegal [sic]?").

With what he testified as the goal of eventually turning his collection over to law enforcement, Polizzi downloaded all the photos he could find. *Id.* at 1047, 1070; *see id.* at 782. The images reminded him of being sexually abused multiple times as a child in Sicily, and he said he wanted to help those children he now saw suffering the same fate. *Id.* at 1046; *see* Part II.B.6.a, *infra.* Yet, with what he testified was fear of law enforcement (based upon his own abuse by Italian police officers), and hesitant to reveal his own sexually abused past of which his family knew nothing, he never notified any authorities. Trial Tr. 1048, 1071 ("Always, when I see the police I get anxiety attack, even now.").

There is no evidence that the defendant ever committed another crime. *See id.* at 165. Polizzi never sent any photos to anyone nor did he enter teenage chat rooms or attempt online solicitation. *Id.* at 534–38, 1366; *see id.* at 1058. Beyond his present convictions for receipt and possession of child pornography, no allegations of production or distribution of such images nor of any other improper conduct by the defendant have been made.

### 1. Childhood Sexual Abuse in Sicily

As a child, Polizzi was raped by his uncle, a family friend, and two Italian police officers. He also witnessed the murder of one playmate and the kidnapping of another by other police officers, possibly in connection with sexual abuse. Until he was arrested for the instant offense, Polizzi had not told anyone for over forty years of having been sexually abused. Based on defendant's testimony and out-of-court psychological examinations, it was assumed that defendant's described sexual abuse when he was a child took place. *See* Def.'s Letter 2 n. 3, Dec. 5, 2007, Docket

Entry No. 114 (reporting that it was generally accepted by most of the jurors that the incidents in Sicily did happen). Thus, expert evidence was not offered on the issue of his credibility regarding this fact. *Cf. generally* Christopher Slobogin, *Experts, Mental States, and Acts,* 38 Seton Hall L.Rev. 1009 (2008); Edward J. Imwinkelreid, *The Case Against Abandoning the Search for Substantive Accuracy,* 38 Seton Hall L.Rev. 1031 (2008).

Prior to leaving Italy at about age twelve, Polizzi and his family lived in a small rural village in Sicily, working as sharecroppers. Trial Tr. 941. At trial, Dr. Jane Schneider, a cultural anthropologist specializing in 1950s and 1960s Western Sicily, testified as to the general poverty, living arrangements, and economic structure of the region, lending general background support to Polizzi's account. *Id.* at 166, 721–37. She confirmed that Burgetto, Polizzi's village, was then a "very poor," "socially stratified" "rural town" of about 6,500 people, a peasant society with a feudal-like history of large estates and sharecroppers, *id.* at 728:

> The majority of the population had very little land or no land and they worked for or were sharecroppers of large landowners.... If they were fortunate they had a mule or maybe a donkey, they commuted to their fields sometimes on mule back.... The mules lived in the household with the family. A typical ... poor peasant's house was maybe one room or two rooms with perhaps alcoves for children to sleep in ... and adjacent to that would be the stall with the family's mule.

*Id.* at 729.

Dr. Schneider also described the corrupt carbina, the Italian national police force, and its officers, the carabinieri:

[T]he police in a rural town in those days would have been members of the car[b]ina and this is a quasi militarized national policing institution in Italy. . . . [T]he carabinieri would not have local ties . . ., you would be assigned to some community in Italy where you didn't have any local connection, so the carabinieri was for the most part outsiders to the communities in which they were policing. . . . [T]he police and carabinieri in Sicily, especially western Sicily, which got this history of large estates and the Mafia and so on, were very—had a very bad reputation, a reputation for corruption, reputation for not prosecuting organized crime, criminal offenses. . . .

*Id.* at 732–33. A poor peasant family, Polizzi and his six younger brothers and sisters shared what was little more than a hovel with the family's mule. *Id.* at 942.

Polizzi's nearby grandparents often cared for him. When staying at their house, he shared a bed with his teenage uncle, who repeatedly sexually molested him beginning when he was four years old. *Id.* at 952. At age seven, Polizzi was beaten and raped by his uncle, who threatened to kill him if he ever told anybody. *Id.* at 959–62. Despite the warning, he did tell his mother, only to be hit by her and accused of lying. *Id.* at 963.

A year later, Polizzi was raped again. Sent into the fields on an errand, a family friend—his brother's godfather—beat and sodomized him at knifepoint, similarly threatening to kill him if he said anything. *Id.* at 970–71. Polizzi later revealed the abuse to the village priest, whose only comment was "don't do that again, because God [is] going to punish you." *Id.* at 990; *see id.* at 1247.

The third and fourth incidents took place when he was nine. Walking home from school, he was grabbed by two Italian carabinieri, who raped him in a stable. After they finished, one of the officers took his service revolver, inserted it in Polizzi's anus and then his mouth, telling him that he and his family would be killed if he ever told. *Id.* at 975–79. Polizzi never went back to school, obtaining work in a bakery instead. *Id.* at 980.

Polizzi had two friends in the village, boys his age who had also been raped. *Id.* at 983–84. Playing hide and seek on the outskirts of town one summer night, they suddenly heard "screaming, running." *Id.* at 987. Polizzi froze under a bush, but his two friends decided to run, only to be caught by carabinieri. The police officers beat one of his friends, punching and kicking him to the ground, where he hit his head on a rock. "[A]s soon as [his friend] fell he didn't move no more." *Id.* at 988. The carabinieri fled, taking one boy with them and leaving the other dead. Polizzi never again saw the boy the police had taken away. *Id.* at 987–88. A year or two later, Polizzi left for the United States with his family.

### 2. Resulting Psychological Trauma

Although he achieved the American dream in many ways, Polizzi retained, according to his own testimony and that of experts, psychological scars from his childhood abuse. His wife and children did not know these secrets from his past. After the Sicilian priest, the next person Polizzi told about these rapes, some forty years later, was a counselor assigned after his arrest. *Id.* at 990, 1240, 1302. Polizzi's adult life was marked by post-traumatic stress and obsessive-compulsive disorders, though he never sought any mental health treatment. *Id.* at 791, 1209; *see* Part II. B.6.a, *infra.* Lacking self-awareness, he considered his behavior normal. *See* Trial Tr. 873; Part II.B.4.b, *infra.*

Polizzi also suffered head injuries from several car accidents in the early to mid–1990s where he lost consciousness. *See* Trial Tr. 1139–40. Because the only medi-

cal record introduced was a recent MRI scan that by itself did not reveal anything of significance, it is impossible to say how, if at all, the head trauma affected him. *See id.* at 1262–64, 1320.

The opposing experts at trial disagreed on the extent of his mental functioning and health. *See* Parts II.B.6.b-d, *infra*. Upon a retrial, the physical and psychological history of the defendant should be examined in greater depth.

### B. Procedure

#### 1. Investigation

The investigation leading to Polizzi's arrest and convictions began with an unsolicited spam email advertising a "private child porn club" received by a Long Island householder. Trial Tr. 182, 199. He forwarded it on February 21, 2005 to the Suffolk County Police Department, which promptly began a joint investigation with the Federal Bureau of Investigation ("FBI").

The email advertisement included a website address for those interested in joining the "club." Following this lead, the investigators were directed to a "join page." Entitled "Pedo Lovers 2004–2005," the join page contained thumbnail sized photographs of child pornography. *Id.* at 203. Using an undercover email account, the officers joined the "club," called "Hardcore." *Id.* at 201–55. It charged eighty-nine dollars for a thirty-day membership. *Id.* at 209.

Becoming a member of "Hardcore" was not a one-step process; multiple pieces of identity-confirming information, including name, address, credit card number, and a valid email address were required in order to receive a log-in ID number and password by subsequent email. Before receiving the club's actual website address, the agents had to find out from their credit card company the exact amount charged to the card and re-enter that information.

*Id.* at 219–20. Hardcore's membership conditions included the admonition not to talk about the "members area" with any authorities. *Id.* at 234. Access to the club's website was only possible with the correct web address, log in and password. *Id.* at 244.

Polizzi testified that at the time he joined the club, he did not have to go through any of these steps beyond entering his name and credit card number. He admitted that he had paid eighty-nine dollars for three thirty-day memberships to "Hardcore." *Id.* at 148, 155, 208, 215.

Tracking down the producers and subscribers of the site involved a complicated forensic process stretching across the world. The join page was found to be located in Asia, probably Hong Kong, but the subsequent money trail was traced back to New Jersey. *Id.* at 207. By looking up the registrant of the website, the agents discovered that the website contents were moving alternately between web host companies in Scranton, Pennsylvania and Fremont, California. *Id.* at 242, 247, 266. The companies had been paid with a valid Russian credit card. *Id.* at 267, 546.

On March 10, 2005, the FBI sent a "preservation letter" to the Scranton web host, ordering that the contents of the site be preserved as of that date. *Id.* at 251. On April 20, 2005, law enforcement officers executed a federal judicial search warrant on the host company for the Hardcore website's hard drives. *See* Govt.'s Letter 1, Mar. 19, 2008, Docket Entry No. 136; Part III.G, *infra* (discussing subpoenas and search warrants in Internet investigations). The hard drives seized contained the preserved data from March 10, 2005, as well as data from, and a copy of, the website as of the day of the search. Trial Tr. 256. Hard drives from the California web host were also seized through the use

of federal judicial search warrants and the site temporarily shut down. *See* Govt.'s Letter 1 n. 1, Mar. 19, 2008. Soon afterwards, Hardcore began operating from another web host on Christmas Island in the Philippines. The trail for the website's producers reached a dead end overseas in Russia. Trial Tr. 249, 269.

Executed as well was a federal judicial search warrant on the New Jersey company handling the website's credit card and other financial information. *See* Govt.'s Letter 1 n. 1, Mar. 19, 2008. Information from the hard drive seized there allowed law enforcement to track the money trail, but only as far as Belize. Trial Tr. 265.

Law enforcement used forensic software to make exact copies of the confiscated hard drives and preserve the data. *Id.* at 259. Because technicians noticed and avoided an encryption trap on the March copy, that data was intact. *Id.* at 261. On the April copy, however, much of the data—but not the "access log"—had been partially encrypted. *Id.* at 262. An access log records visitors to a website; Hardcore's log on the April copy had captured 900,000 Internet Protocol ("IP") addresses, some duplicative, for a ten-day period in March 2005. *Id.* at 263, 273. By using a computer program, the agents were able to organize the data by IP address, date, and time, revealing that the 900,000 IP addresses represented some 1,900 unique "customers." *Id.* at 264.

Relatively simple technology—a "who is" search—revealed which Internet Service Providers ("ISPs") owned and leased these IP addresses. To obtain the identities of Hardcore's customers, the ISPs were administratively subpoenaed by the FBI for the subscriber information of the users of the logged IP addresses. *Id.* at 264. (Two rounds of administrative subpoenas were required because the first set returned incorrect information; it turned out that the access log had a built in forty-

two minute delay, so a second round of subpoenas was necessary. *Id.* at 273–74.) Nine hundred of the website's customers were located in the United States. *Id.* at 553–54, 560.

One of the IP addresses listed on Hardcore's access log, 24.90.31.98, was eventually traced to Polizzi. *Id.* at 270. The access log for that IP address was eight pages long; some entries showed repeated access on March 28, 2005 at 2:21 p.m., using the "GET" command. *Id.* at 273. The "GET" command tells a computer to take a certain action. In this case, the computer using Polizzi's IP address was "getting" (downloading) a number of images in Hardcore's "archives girls" area. *Id.*

The "who is" search revealed that Time Warner Cable owned IP address 24.90.31.98. *Id.* at 273–75. In response to the administrative subpoenas, Time Warner identified Peter Polizzi of Queens as the user of that IP address on that date and time. *Id.* at 276. The agents then obtained a federal judicial search warrant for his home. *Id.* at 279; Govt.'s Letter 1–2, Mar. 19, 2008. A total of 168 judicial search warrant packets were ultimately issued based on the Hardcore investigation, leading to about seventy indictments, including Polizzi's. Trial Tr. 561.

### 2. Arrest

On November 16, 2005, FBI and local law enforcement agents arrived at defendant's home to execute a federal court ordered search warrant seeking computer equipment and evidence related to the possession of child pornography. *Id.* at 150, 208, 279. Arriving at 6:00 p.m. at the single-family residence, the agents had to wait almost two hours for Polizzi and his wife to arrive home from work at the restaurant. Trial Tr. 280. While pulling into their driveway, the couple was approached by the agents who identified

themselves and explained that they were there to search the house for child pornography pursuant to a warrant. *Id.* at 283. Polizzi said nothing, but nodded, opened the driveway gate for the agents, and drove inside.

The officers found nothing unexpected during their initial "safety search." Polizzi's wife became "hysterical" as the officers questioned the couple and their youngest son, then sixteen, in the kitchen, *id.* at 286, 296, 592–98, 742; she wondered whether whatever happened might have been caused by a friend of one of her sons. *Id.* at 286.

Polizzi fully cooperated with the agents, *id.* at 174, informing them that there was a family computer in the basement; it was seized. *Id.* at 285. This computer had no forbidden images on it. *Id.* at 518.

After fifteen to twenty minutes of trying to calm his "extraordinarily upset" wife, Polizzi told the agents there were additional computers in the detached garage. *Id.* at 276, 746; *see id.* at 1049. *But see id.* at 294. Two agents escorted him there, *id.* at 291–96; the two others remained behind with Polizzi's family to "make sure [his wife] was okay." *Id.* at 296.

On the staircase leading up to the rooms on the second floor of the garage, Polizzi informed the officers that "[t]his is where are [sic] I look at the children." *Id.* at 687. It was, he said, himself and not his sons who had downloaded the images. *Id.* at 313. Polizzi then asked them what could be done to stop the child abuse depicted: " 'What are we going to do about this?' " *Id.* at 1367, 1379. Inside the two upstairs rooms—one with two doorlocks and the other with three, to which he alone had keys—he showed the agents the computers they sought. *Id.* at 145–47, 300, 686.

Polizzi was then questioned by the agents. Upon being read Miranda warnings, *id.* at 306, he signed two forms stat-ing that he was waiving his rights and was willing to talk without an attorney present. *Id.* at 309, 312. Polizzi then gave the following statement, which the agents wrote down and he signed at 8:40 p.m. *Id.* at 156, 305–19.

I, Peter Polizzi, Senior, being duly sworn and deposed says I am 52 years old, having been born on . . . [19]53. I live with my family at . . ., Glendale, New York, with my family.

I am here giving this statement to Detective Forrestal and Special Agent Danielle Massineo having been made no threats or promises to do so. Some time in February or March, 2005, I received an email in my AOL email account, ppoli. . .@aol.com inviting me to join a website called "Hard Lovers." It was $79 or $89 to join and I had to use my credit card to join. I used my Master Card from Citibank; it's in my name. The number is. . . .

After I joined, I would visit ever [sic] couple of days. After I joined, I knew it was a child pornography website. I downloaded pictures and videos from this website. I keep the pictures on my external hard drive that's a Maxtor 300 gig that I bought new about six months ago. I have another external hard drive that I used and transferred everything over from an external drive that I also bought new.

The computer I used to go to, the . . . hard lovers website I had custom made at a computer store on Cypress and Weirfield. I had bought it new about two years ago. It was the black tower where I pointed to the Detective Forrestal at my desk. I'm not sure how may [sic] child pornography pictures I have but I have a lot. I know I'm a member of the site now and I downloaded this morning. I know I have of a lot. I know I'm a member of the site now and

I have Red [sic] something, I don't remember exactly, it's in my favorites. I used the same credit card number, the Citi Master Card to join. I don't send them out, it's only private. The different passwords of the websites are in my AOL email that I have so I know what they are.

I do have anti-virus software, it's in my computer, and I'm the only person that uses my computer. I keep it in a locked room upstairs that I only have access to. I have read the above two page handwritten statement and I swear that it is all true.

*Id.* at 317–18.

Over 5,000 digital images and some motion videos of child pornography (in addition to adult pornography) were found stored on the garage computers and three external hard drives. They had been downloaded over a period of at least four years, *id.* at 145–46, 349–50; the agents found a list of child pornography search terms dated June 9, 2001.

### 3. Indictment

Polizzi was later arrested and charged with twelve counts of receipt and twelve counts of possession of sixteen different photos and videos he had downloaded from the Hardcore website. *See* Arrest Warrant, Jan. 12, 2006, Docket Entry No. 4. The receipt counts charged him with receiving two illicit images on February 20, 2005, two on March 5, 2005, four on March 16, 2005, and four on March 20, 2005. The possession counts charged him with possessing on November 16, 2005, the day his home was searched, twelve prohibited images or videos. He was charged for both receipt and possession of several of the images: Counts One and Twenty were based on the same depiction, as were Counts Three and Eighteen, Four and Nineteen, Seven and Twenty–Three, Eight and Twenty–Four, Eleven and Twenty–One, and Twelve and Twenty–Two. *See*

Superseding Indictment, Docket Entry No. 35. Upon motion by the government, Count Thirteen was later dismissed. *See* Govt.'s Letter to Dismiss Count Thirteen, Docket Entry No. 62.

### 4. Motion to Dismiss Indictment

Defense counsel filed a Motion to Dismiss the Indictment, arguing that child pornography statutes were required to have an element of scienter—whether present in the language of the statute or implied by the courts, *see, e.g., United States v. X–Citement Video, Inc.,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)— to prevent the prosecution of the morally innocent. *See* Def.'s Mot. to Dismiss Indictment 1, Apr. 5, 2007 ("[T]he instant prosecution violates the United States Constitution because it seeks to prosecute defendant without the necessity of a culpable mental state or scienter requirement"); *see also* Def.'s Letter Br. 2, Mar. 14, 2008, Docket Entry No. 135 ("[T]he possibility that a defendant who had not actively sought prohibited visual depictions might still be convicted of knowingly receiving child pornography under § 2252(a)(2) . . . presents a potential pitfall to the statute's constitutionality."). Because Polizzi's history of child abuse and psychiatric conditions had caused him to passively hoard images without any "evil intent," the defense argued, his lack of moral culpability rendered the statute unconstitutional. *Id.* at 8–10. The government opposed, citing *X–Citement Video,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372, for the proposition that under "settled caselaw . . . the term 'knowingly' as used in 18 U.S.C. § 2252 does impose a scienter requirement mandating that a defendant have knowledge that the material at issue contains sexually explicit matter and that underage performers are depicted." *See* Govt.'s Reply, Apr. 19, 2007, Docket Entry No. 48. The mo-

tion was orally denied. Hr'g Tr. 8, Apr. 27, 2007.

### 5. Jury Charge

#### a. Affirmative Defense of Insanity

At trial the only contested issue was Polizzi's affirmative defense of legal insanity. *See* 18 U.S.C. § 17. Polizzi admitted collecting child pornography and described at length how and why he began to do so. He contended that his obsessive-compulsive disorder and hoarding behavior, combined with the trauma he re-experienced upon seeing the images of abused children, caused him to reflexively collect child pornography in a misguided attempt to "help the children." *See* Part II.B.6.b, *infra*.

The definition of "legal insanity" thus assumed importance, and, in particular, it raised the question of defendant's ability to appreciate the wrongfulness of his acts. The parties' proposed jury instructions on the issue were sharply contrasting. The court issued its own charge, to which there were no objections. *See United States v. Polizzi*, 545 F.Supp.2d 270 (E.D.N.Y.2008).

#### b. Mandatory Minimum Sentence

Before, during, and after trial, defense counsel repeatedly sought to have the jury informed of the five-year mandatory minimum sentence applicable to the receiving counts and objected to the lack of such an instruction. *See, e.g.,* Def.'s Letter, Sept. 7, 2007, Docket Entry No. 71 ("I do wish that the Court informs the jury of the statutory minimum and maximum sentences. I would leave it to the Court's discretion as to the most appropriate time to inform the jury."). The government opposed, arguing that a 2004 decision by the Court of Appeals for the Second Circuit, *United States v. Pabon–Cruz*, 391 F.3d 86 (2d Cir.2004), constituted binding authority preventing such an instruction. *See* Govt.'s Letter Br., Sept. 6, 2007, Docket Entry No. 70.

Given the proximity to trial and the parties' need to prepare sufficiently in advance, the court issued its decision from the bench denying Polizzi's motion. In light of *Pabon–Cruz*, 391 F.3d 86, the court ruled that it and the parties were prohibited from informing the jury of the sentence during the voir dire or trial. Hr'g Tr. 3, 19, Sept. 10, 2007. Had the court indicated that it would have informed the jury, the Court of Appeals for the Second Circuit almost certainly would have summarily granted a writ of mandamus filed by the government based upon *Pabon–Cruz*. *See* Part IV.E.1, *infra*. Because application for a writ would have delayed the case, the court declined to inform the jury of the applicable mandatory minimum and denied defendant's motion. *See* Hr'g Tr., Sept. 10, 2007.

Counsel for the defendant then requested an alternative instruction informing the jurors simply that a guilty verdict would necessarily result in imprisonment. It was also denied. *Id.* at 20 ("I would suggest, your Honor, that even instructing the jurors that there is a potential for prison or that there's a likelihood of imprisonment ...."); *see also id.* at 19 ("I would just say that ... I've read the [*Pabon–Cruz*] case and I understand the Court's feelings about it, is that I think it's very important for the Court to—for the jurors to understand the seriousness of the charges"). Granted instead was the government's *in limine* motion precluding any discussion by counsel of the mandatory minimum or maximum terms of imprisonment and the consequences of a verdict of legal insanity. *Id.* at 3.

At the close of the government's case, defendant's Rule 29 motion to set aside the verdict was denied. Trial Tr. 717; *see* Fed.R.Civ.P. 29. Rejected as well was defendant's motion at the close of the evi-

dence to dismiss based on an insufficient prima facie case. Trial Tr. 1329.

The jury was not informed before rendering its verdict of the sentence a conviction on the receiving counts entailed. It was specifically instructed that it should not consider sentencing when deciding on a verdict. *See* Jury Charge 21 ("The question of possible punishment of the defendant is of no concern to you and should not enter into or influence your deliberations. The duty of imposing sentence rests with the court.").

After trial, defendant renewed his objection to the court's decision not to grant the "defense request to present the jurors with information regarding the statutory minimum sentence in light of the Second Circuit opinion in *United States v. Pabon–Cruz*, 391 F.3d 86 (2d Cir.2004)." Def.'s Letter Br., Oct. 10, 2007, Docket Entry No. 87. In his Rule 33 motion for a new trial, *see* Fed.R.Crim.P. 33, Polizzi again protested the court's failure to so inform the jury:

> Since the advent of mandatory minimums, it can no longer be assumed that jurors are aware of the consequences of a guilty verdict.... The mandatory minimum can be communicated quickly and clearly in a brief sentence and it makes sense to protect the defendant from an undeserved draconian term.... To properly perform their role, jurors should be thus informed, when applicable, that a minimum sentence is mandated upon their finding of guilt.

Def.'s Mot. to Vacate J. 25–26, Docket Entry No. 123.

### 6. *Trial*

At trial, defendant's knowing receipt and possession of the pornographic images and the fact that the images depicted minors engaging in sexually explicit conduct were not disputed. The still photos and moving video were shown to the jury in brief flashes on a courtroom screen to avoid unnecessary prejudice.

To satisfy the federal Insanity Defense Reform Act ("IDRA"), Polizzi had to prove by clear and convincing evidence that he was legally insane when the offenses occurred: that he 1) had a severe mental disease or defect at the time he received and retained the images; and 2) as a result he had been "unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17.

Focusing on Polizzi's childhood sexual abuse through his testimony, the defense emphasized the abuse's lasting psychological effects as manifested in his post-traumatic stress and obsessive-compulsive disorders. Defendant contended that when he first accidentally came across the child pornography, he had re-experienced his own abuse and obsessively began to collect as many photos as he could—to help the children. Trial Tr. 1069–70 ("I have been collecting, the material that I've been collecting, every time I was on the internet, collect anything I find that was not appropriate to see it [sic], in my opinion should not be there, I save all of them, all the materials I come across."). According to defense counsel,

> Mr. Polizzi was doing what he believed to be right. He could not appreciate that downloading pictures of the children was wrong. What is wrong, what Mr. Polizzi knows is wrong ... is child abuse.... Mr. Polizzi, in a wrong way maybe, but in his way because of his psychological trauma, is trying to figure out a way to stop child abuse.

*Id.* at 1368; *see id.* at 782.

Two defense experts, Dr. Eric Goldsmith and Dr. Lisa Cohen, testified as to Polizzi's mental condition. Dr. Naftali Garcia Berrill provided expert evidence in rebuttal for the government. Their opinion on whether Polizzi was "legally insane"

was not permitted. *See id.* at 1215–16; Fed.R.Evid. 704(b) ("No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."). The experts, however, were permitted to opine on whether Polizzi "did or did not have the defect or disease relied upon as a defense." Jury Charge 19.

#### a. *Polizzi's Testimony*

Polizzi credibly testified without contradiction and in detail to the severe sexual abuse he had suffered in Sicily as a child. His distress in reliving the events was evident. A recess was required several times when he broke down while he was on the stand. Trial Tr. 1047; *see id.* at 959, 998. When the first charged photo was shown to the jury, Polizzi suffered an acute anxiety attack and was taken by ambulance to a hospital. *Id.* at 397–99. The trial continued the following day. To avoid another breakdown, Polizzi removed himself from the courtroom while the sixteen images of child pornography were shown to the jury. *Id.* at 405.

Polizzi testified that he had originally learned of Internet child pornography accidentally, in 2001 or before, through a "pop-up" while visiting an adult pornography website. *Id.* at 1046. " 'Pop-up' windows are windows containing notifications or advertisements that appear on the screen, usually without any triggering action by the computer user." *1–800 Contacts, Inc. v. WhenU.com,* 309 F.Supp.2d 467, 476 n. 18 (S.D.N.Y.2003). In his written statement to the police, he said he had later discovered the Hardcore website after receiving an email in his AOL account.

The images, he testified, shocked and horrified him. *See* Trial Tr. 1178, 1230.

Seeing such graphic depictions reminded Polizzi of being raped and molested in Sicily. *Id.* at 1046 ("Oh, boy. I see my childhood, the event of the abuse happened over and over."). Strangely, he believed he might be able to find a photograph of himself: "Oh, my God. When I used to see this material I used to see myself in there, I look for my picture and my uncles [sic]." *Id.* at 1048.

He said he knew that child pornography was wrong, but he believed the online images were legal. Had they been illegal, he reasoned, such "garbage" would not be available on the Internet. *Id.* at 1105. Hence he had used his real name, email address, street address, and credit card number to pay the membership fee to join Hardcore. *Id.* at 152, 276, 317, 368. Despite the fact that many websites themselves cautioned that their material "was not legal in many countries," *id.* at 155, 253, he contended that he had not understood that his acts—the downloading of the pictures—were wrong. *Id.* at 1090. He said one reason for his downloading was to stop other children from being abused as he himself had been abused. Hence his first statement to the FBI agents was, " '[w]hat are *we* going to do about this?' " *Id.* at 1367, 1379. What he meant by that question, he later explained, was that

> [W]hoever put this kind of material in there should be brought to justice because this is not right, because no one close to me should not have cause [sic] to others, because my life all the fear, all the nightmares, and everything else involved comes from this, and if it's nothing be done [sic] about this, a lot of innocent children will be raped because of this.

*Id.* at 1050.

Notwithstanding his desire to stop the depicted abuses, Polizzi never voluntarily

informed law enforcement or anyone else of his collection. *See id.* at 858, 1138, 1180, 1309. Polizzi asserted that he did not trust the police on such matters after his experiences with the Italian carabinieri. *Id.* at 1048. He could not go to the police because of "[m]any reason [sic]. The reason that I was abused in [sic] this carabinieri, which in this country mean the uniform of the police. Second, oh, boy, I been—I was at gun point by police...." *Id.*

Polizzi also knew that if he "share[d] that information I would tell my even [sic] sickness, which I kept for 45 years and I could not." *Id.* at 1047. In order to explain why he had collected the photos, he would have to reveal his childhood sexual abuse, something he felt was impossible.

45 years it's inside of me, this has been like something unexchangeable [sic], only people that went through this, what this come from or what this causes and where you go from this. This is something that you keep inside because you cannot share with anybody because it's very, very, very awful thing to share with anybody and I don't wish my worse [sic] enemy what happened to me, why because is [sic] this is wrong.

*Id.* at 1062. When the FBI showed up in his driveway, Polizzi said he was relieved.

[I]nside I had the feeling of joyness. Why? Because finally the stuff that I have turn it over or say to the police ... they will find it there. To me it was a kind of relief. I also said because now that they find out I have to tell my secret, which was very hard because now finally my wife know [sic] I had secret.

*Id.* at 1048–49. Even after his arrest Polizzi did not immediately disclose his childhood sexual abuse to the police or anyone else. Not until six months into his post-arrest counseling ordered by Pretrial Services did he speak with a therapist about

his childhood experiences, after learning of a woman who had spoken to her family about similar abuses with positive results. *Id.* at 1054.

When that happen, you know, make me felt [sic] that I was not alone in this, someone else be in the situation that I was, and regarding the information that we share there, by sharing this kind of information it was a kind of relief for her and I thought releasing this kind of information will be the same for me.

*Id.*

### b. *Dr. Lisa Cohen*

Dr. Lisa Cohen, a clinical psychologist at Beth Israel Hospital conducting research with individuals accused of child sex crimes, was the first expert to testify. *Id.* at 766–902. She had administered a battery of neuropsychological tests to Polizzi and interviewed him twice; she also interviewed one of his sons. *Id.* at 771, 875. Test results showed that Polizzi had significant "impairment of executive function," the "collection of cognitive abilities that have to do with being able to use judgment to think in complex ways, to think in flexible ways, to monitor one's own behavior, impulse control." *Id.* at 774. In the four cognitive functioning tests, his scores were quite low—between 0.1 and 10.8 percentile—which Dr. Cohen attributed to possible brain injuries from Polizzi's car accidents; they also "showed memory problems." *Id.* at 773–77, 870. His overall IQ score was considered "borderline range of average intelligence." *Id.* at 1280–83. Dr. Cohen also evaluated Polizzi using the Yale–Brown Obsessive Compulsive Scale ("YBOCS"), "the standard measure of obsessive compulsive disorder." *Id.* at 778.

Dr. Cohen's final diagnoses were "significant cognitive impairment," *id.* at 783, and "obsessive compulsive disorder character-

ized by severe hoarding" with "limited insight" as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV"). *Id.* at 882, 885. She did not evaluate Polizzi for post-traumatic stress disorder. *Id.* at 782, 882.

The "severe hoarding" Dr. Cohen identified referred to Polizzi's extensive and varied collections besides child pornography. In his rooms over the garage, Polizzi had collected and organized tens of thousands of baseball, soccer, hockey, frisbee, and football cards, movies, musical recordings, comic books, stamps, and coins; he had never sold any. *Id.* at 765, 860, 862; *see id.* at 900. Polizzi estimated he had 4,500 videos, 10,000 comic books, 10,000 baseball cards, 4,000 CDs, 4,500 coins, 3,000 stamps, 150 boxing cards, and 500 soccer cards. *Id.* at 888.

According to Dr. Cohen, Polizzi, like other hoarders, did not see his collecting as a problem. *See id.* at 889. He rationalized that his collections were "a good investment for his children," *id.* at 861, and talked with his sons of "one day" opening up a comic book store, *id.* at 749, 863, or a video store. *Id.* at 890. It was obvious, the expert declared, that such talk was only a dream; "people who hoard always think that they have a future use for the items that they're hoarding." *Id.* at 889.

Unlike most people with obsessive compulsive disorder ("OCD") who understand that their actions are not normal, Dr. Cohen found that "Polizzi had no insight into his obsessive compulsive disorder. He seemed to feel that it was all appropriate and reasonable behavior...." *Id.* at 873.

[N]o matter how many times I tried to explain the concept of obsessions and compulsions it was difficult for him to grasp. And the point of an obsession is that it should not make sense, it should be excessive and inappropriate. So he had a hard time differentiating from what was an appropriate concern and

what was an excessive, inappropriate concern.

*Id.* at 856.

In the face of the government's repeated insistence that Polizzi's low cognitive test results were due to his "malingering," Dr. Cohen declared that she did not find that Polizzi was exaggerating his symptoms. *See id.* at 789 (defining malingering as "the intentional and conscious flaring of mental symptoms in order to gain what they call secondary gains or primary gains to gain something else."). Although she did not administer any specific validity tests, *id.* at 897, 1260, her testing included internal validity components. *Id.* at 830. Based on her interviews with Polizzi and one son, Dr. Cohen concluded that "if anything, he seemed to be minimizing his problems and that was not in his interest. It would be in his interest to maximize his problems. So, in my mind, he was not trying to manipulate me to present him as sicker than he was." *Id.* at 905; *see id.* at 898.

#### c. *Dr. Eric Goldsmith*

Dr. Eric Goldsmith, Polizzi's expert forensic psychiatrist, testified that he had diagnosed Polizzi with post-traumatic stress disorder ("PTSD") resulting from the sexual abuse defendant had suffered as a child. *Id.* at 1130 ff. Of the three experts, Dr. Goldsmith had spent the most time evaluating Polizzi. He had interviewed separately four of defendant's sons as well as his wife. *Id.* at 1131; *see id.* at 1176. Dr. Goldsmith had also prescribed medication for Polizzi's acute anxiety and PTSD symptoms. *Id.* at 1174. Medication was necessary, defendant testified,

[S]ince I have this nightmares, a lot of nightmares actually, when you have those nightmares when you have, when you see ... photos so, you know, you smell certain smells, the events come back and I told this nightmare that I have and told me if I slept well, when

the time comes, when I go to sleep, I go to sleep very exhausted, because the crime that is involved, you know, the fear, it makes you, it takes everything out of you, which left you with very sadness and no kind of strength.

*Id.* at 1060.

Dr. Goldsmith corroborated Dr. Cohen's diagnosis of obsessive compulsive personality disorder as defined in the DSM–IV. *Id.* at 1134ff., 1186. He also found that Polizzi "has no awareness it is a problem for him." *Id.* at 1143. Polizzi was "very very difficult" to interview "because of his obsessive pathology[:] he ... gets stuck on a detail or particular issue and needs to retell the story over and over and over again...." *Id.* at 1136–37. It required "hours and hours" for Dr. Goldsmith to obtain a medical history.

> It is reflective of some significant obsession compulsive pathology. It explains his behavior of just downloading hundreds and hundreds of images. It explains his behavior of collecting thousands and thousands of baseball cards. It explains his routinized behavior, the styling of how he communicates and how it is just obsessive and obsessive and repetitive and repetitive.

*Id.* at 1139; *see also id.* at 779 (Dr. Cohen noting the difficulty of interviewing Polizzi). The jury had the opportunity to witness defendant's repetitive oral behavior firsthand on multiple occasions when Polizzi was on the stand. Dr. Goldsmith also found that "[h]e has memory problems. He has difficulty in providing really specific information about times and dates. There has been a real problem throughout the course of the interviews with him. He has misinterpretations of statements. Sometimes you would ask him a question, he really doesn't understand what you are asking him and you have to re-ask it in a different way." *Id.* at 1184.

During his first sessions with Dr. Goldsmith, Polizzi did not disclose what had happened to him in Sicily. This was not surprising to the doctor, given "the type of trauma that [Polizzi] experienced," because of the issues of "humiliation and shame and fear [that] pervade the adult mind" in such a victim of "severe child sexual abuse." *Id.* at 1136–37. When informed of the abuse, Dr. Goldsmith found Polizzi credible:

> And it is not only what he says, that he was abused, and how he says it, and how he gives it such rich detail, reflective of just a true autobiographical experience that's so convincing, but what is really convincing about why this is not a malingered post-traumatic condition is all of the clinical factors there follow the trauma and abuse that he could just not make up. It's the re-experiencing phenomena, the description of the flashbacks. It is not just saying I have flashbacks, but describing what he goes through in showing it to me in the office, when I interview him about this, and how literally his mind and body kind of separate and he begins to just follow like he's back in the experience that he shows all of this emotion that is just reflective of true experience.

*Id.* at 1153.

After Polizzi revealed his childhood sexual abuse, Dr. Goldsmith added a PTSD diagnosis, *id.* at 1157, which is considered a "major mental illness," based on the DSM–IV definition. *Id.* at 1257. In Dr. Goldsmith's opinion, Polizzi "when viewing child pornography on the Internet had a retraumatizing experience. In a regressed and obsessive state he downloaded and searched child pornographic images for evidence of victimization, something he had experienced as a child." Dr. Goldsmith's Addendum: Psych. Rep. 1, Jan. 2, 2007.

His ... level of sophistication, the way that his mind operates is again very concrete, extremely unsophisticated, old world ... when he first downloaded all of the information over the internet, he had this very unsophisticated idea, by taking it all down off the internet, it could be off the internet and nobody else could see it. Really just not sensible.... [T]he images overwhelms [sic] him emotionally and overwhelms any kind of rational thought that he had of what he was doing.

Trial Tr. 1162–63. His PTSD, the expert believed, had caused Polizzi to develop OCD: "[T]he obsessive pathology that he experiences, that he has in adult life, is really a way to control everything in his environment so that it doesn't hurt him." *Id.* at 1160.

Of sexual deviance in Polizzi Dr. Goldsmith found no trace. His first report, written before he learned of Polizzi's child abuse, did hypothesize that Polizzi had "possible low level deviant sexual arousal," but concluded he "[did] not confer high risk for future dangerous" and did not meet the DSM–IV criteria for pedophilia. *Id.* at 1150. At trial, Dr. Goldsmith explained why he had initially noted "low level sexual deviancy": because he had had no other explanation as to why Polizzi collected child porn. *Id.* at 1151–52.

[I]t seemed to me that the[re] credibly could be—could have been at that time some deviant interest, because individuals who are arrested for these crimes often have a large level of denial and don't share and admit to their deviance.... At that time Mr. Polizzi was presenting consistent with that and it just didn't make sense why he clicked on the images.

*Id.* at 1185. Once he learned of an alternative reason—Polizzi's childhood trauma—Dr. Goldsmith concluded that Polizzi in fact had no deviant sexual arousal.

In my previous report from June 9, 2006, I speculated that Mr. Polizzi's past behavior of downloading and viewing child pornography was perhaps related to sexually deviant thinking. However, after further assessment it is my opinion, with a reasonable degree of psychiatric certainty, that Pietro Polizzi's encounter with child pornography elicited a post-traumatic stress reaction. Pietro Polizzi credibly describes how the child pornography pictures triggered memories from the past. Consistent with his compulsive hoarding behavior he downloaded hundreds and hundreds of images. While viewing these images Pietro Polizzi describes it as if he was reliving his own childhood sexual abuse. He looked for signs of forced injuries on the victims and evidence for the perpetrators.

In summary, his behavior of downloading and viewing child pornography is directly related to his history of childhood sexual abuse and obsessive compulsive behavior. The images triggered painful traumatic memories that had been repressed for many years. This behavior was not related to sexually deviant thinking or pedophilia.... Mr. Polizzi does not pose a risk of sexual predatory behavior against children.

Dr. Goldsmith's Addendum: Psych. Rep. 5, Jan. 2, 2007; Trial Tr. 1169 ("[It's c]lear in my mind that he's not a pedophile ... He has no paraphilia [sexual interest in children in general], he has no deviant sexual arousal or interests.").

Like Dr. Cohen, Dr. Goldsmith did not believe Polizzi was malingering. Even though the doctor was aware that PTSD was frequently faked, Trial Tr. 1195 (noting that PTSD is "the most important area where malingering needs to be considered"), he concluded that "[n]one of the examiners and none of the testing and

none of the data from the clinical exam identified that [Polizzi] was malingering." *Id.* at 1147.

### d. Dr. N.G. Berrill

Dr. Naftali G. Berrill, a board-certified forensic psychologist, testified as the government's expert. *Id.* at 1217–1329. Polizzi initially attended Dr. Berrill's clinic for mandatory sex offender counseling as required by Pretrial Services. *Id.* at 1223. (Through a contract with the Department of Probation and Pretrial Services, Dr. Berrill's private practice assesses many defendants accused of sex offenses. *Id.* at 1221.) Polizzi participated in group counseling; Dr. Berrill did not treat him. *Id.* at 1240. Polizzi eventually requested that the court approve his transfer from the clinic to private counseling, citing the trauma he experienced during group therapy with other child sex offenders. It was approved. *See* Jan. 1, 2007 Order, Docket Entry No. 20.

After Polizzi had filed a notice of intent to raise the insanity defense, Dr. Berrill evaluated Polizzi for an hour at the government's request and administered several standard tests. One of his associated counselors wrote a report. Trial Tr. 1225, 1277. During his first interview with Dr. Berrill, Polizzi did not disclose his history of child abuse. *Id.* at 1229. Dr. Berrill later evaluated Polizzi again for an additional four hours during which Polizzi informed him of his past abuse; the doctor then wrote a second report himself, but never spoke with Polizzi's wife or sons. *Id.* at 1315.

Dr. Berrill initially diagnosed Polizzi as having an adjustment disorder with anxiety and possibly generalized anxiety disorder. *Id.* at 1232. Such conditions, in his opinion, "shouldn't interfere with someone's ability to think clearly." *Id.* at 1233. After the second interview, *id.* at 1244, his diagnosis remained the same: Polizzi had "no severe mental disease or defect," *id.* at 1243, 1246–48, only an "anxiety disorder." *See* Dr. Berrill, Psycho–Legal Eval. 20, Aug. 3, 2007.

On the witness stand, the doctor agreed that defendant had some obsessive-compulsive personality disorder "features," but not OCD itself. Trial Tr. 1255. Having OCD in any event does not prevent a person, in Dr. Berrill's opinion, "from being [able] to appreciate what they are doing or knowing . . . is wrong." *Id.*

Dr. Berrill considered Polizzi's history of child abuse irrelevant because "psychological testing . . . did not reveal a post-traumatic stress disorder." *Id.* at 1258, 1328. Had Polizzi suffered from PTSD, the doctor believed he would have avoided child pornography, not sought it out. The "criminal behavior" Dr. Berrill typically associated with PTSD, moreover, was an "explosive kind of behavior," not a prolonged quest. *Id.* at 1265.

His second report diagnosed Polizzi with "paraphilia" not otherwise specified (sexual interest in children in general), "hebophilia" (sexual interest in adolescents), and possible pedophilia (sexual interest in young children). *Id.* at 1233; *see* Dr. Berrill, Psycho–Legal Eval., Aug. 3, 2007. He gave no reasons for these conclusions in the report. Such diagnoses were appropriate, Dr. Berrill testified at trial, because

Based on one of the tests that we had given and based [on] Mr. Polizzi acknowledging that he was looking at both young kids and adolescents in terms of the child pornography that he collected, number one, the tests results suggested first and foremost he was likely interested in adolescent girls, that is referred to clinically as Hebephilia. . . . I wasn't really sure whether he was interested in young children. I really couldn't tell based on my interview with him. He denied or disavowed an interest in all of this but nonetheless, testing raised some

issues about teenagers and the fact that he collected pictures of kids who were younger than 10 raises a distinct possibility that was an area of interest. Trial Tr. 1233–34.

The doctor was concerned that Polizzi had "provided contradictory information during the evaluation," id. at 1301, denying all sexual interest in children, yet admitting he had collected child pornography for years. Polizzi had received a low score on the Abel Assessment, a test designed "to ascertain whether or not somebody is sexually interested in kids." Id. at 1297. He had "not endorse[d] items that reflect the types of rationalization or excuses frequently used by individuals sexually involved with kids," id. at 1300, but his answers on Dr. Berrill's Internet activity questionnaire were suspicious. There, Polizzi had checked several boxes indicating he had looked at child pornography "to avoid having sex with children" and "out of curiosity," which had raised concern in the doctor's mind. Id. at 1116–18. Dr. Berrill did not explain the questions to Polizzi nor did he ask him why he had marked the boxes. Id. at 1078, 1394.

On the stand, Polizzi described what he had meant by his checkmarks—that he looked at the photos "to avoid [stop] [child abusers from] having sex with kids"—and that he was "curious" to find out how the photos came to be on the Internet, i.e., to find out who was producing them. Id. at 1115–18 (testifying that he had "[c]uriosity what was up there, what was on that box. Why this was over there. Why this material. It is a lot of do you understand there's a lot of material, understand where this comes from, whose behind this, the curiosity, you know, why are they doing this.").

Although Dr. Berrill never mentioned malingering specifically in either of his reports, at trial he testified at length about Polizzi's possible exaggeration of his symptoms. Id. at 1248ff., 1322 ("I am not sure I said he was malingering. I said one has to imagine that that is a possibility."). The doctor pointed out that Polizzi's second MMPI–2 diagnostic test included several true-false answers reporting paranoid or delusional symptoms, which Polizzi had not reported on his first test a year before. Id. at 1251, 1327, 1253 ("[I]t raises the specter of, you know, Mr. Polizzi trying to exaggerate some of the symptoms he's having right now. He's exaggerating the level of distress or exaggerating the kinds of problems he is encountering."). Dr. Berrill did note that Polizzi had never complained of any delusions or hallucinations. Dr. Berrill, Psycho–Legal Eval. 18, Aug. 3, 2007. Because Dr. Cohen had not conducted any independent validity testing, Dr. Berrill considered her cognitive testing results "worthless." Trial Tr. 1260.

Dr. Goldsmith rejected those malingering-related concerns cited by Dr. Berrill. That Polizzi had answered a few multiple-choice questions in odd ways was irrelevant: "you can't take one question from 567 questions and make anything of it." Id. at 1211. Such multiple-choice tests "are not great at detecting PTSD," Dr. Goldsmith warned, "but they have some symptomatology that ... can come out with PTSD." Id. at 1205. Such tests were certainly not "substitute[s] for psychotherapy or psychiatric evaluations." Id. at 1211. To Dr. Goldsmith it "ma[de] perfect sense" that some of Polizzi's answers had changed over the course of the year; his PTSD symptoms had recently worsened because "as he tells the story, as he exposes the trauma ... that is when all of the symptoms come up, and that's when the nightmares come about." Id. at 1204. Polizzi "was not experiencing the active symptoms of post-traumatic stress disorder in May of 2006, when he first took the MMPI–2. While taking the second

MMPI–2 a year later, he was in the [midst] of a severe PTSD condition, talking about this with myself and other examiners, Dr. Berrill, bringing up all the active symptoms." *Id.* at 1212.

### 7. Jury Verdict

The jury found Polizzi guilty on all counts. During jury deliberations, it was evident from the questions it sent through the marshal that the jury had rather quickly decided the issue of guilt. Determining whether Polizzi had carried his burden of proving legal insanity took the jury several days during which jurors reviewed the exhibits concerning Polizzi's mental condition. *Id.* at 1439.

The jury ultimately rejected Polizzi's defense of legal insanity. It was justified in doing so. Despite defendant's mental problems, a jury could find that he was able to appreciate the nature and quality and the wrongfulness of his acts (i.e., downloading and possessing images of child pornography). *See* 18 U.S.C. § 17. At the time he obtained and viewed the images, Polizzi testified, he believed he was not violating the law or morality. *Once he was told his actions were illegal, he understood they were wrong.* *See* Trial Tr. 1047, 1105 ("Now I know it's wrong, but back then I didn't—I didn't know it was wrong"); *id.* at 667 ("When we [the police] explained the circumstances to him of what possessing child pornography was, what it actually meant, he was remorseful. He understood that it isn't just possessing pictures, we spoke to him about that. It wasn't just having these images and looking at them that, it was damaging children and he became remorseful."). Because "[i]gnorance of the law is no excuse," Jury Charge 9, defendant's mental problems did not support a verdict of not guilty by reason of insanity.

### 8. Post–Verdict Proceedings

After the jury was discharged, members of the jury—all of those jurors who spoke when invited to do so by the court—acknowledged the defendant's mental illness, recognized his need for mental health treatment, and felt that imprisonment was inappropriate in his case. *See* Trial Tr. 1454–59. Upon being informed by the court that Polizzi would mandatorily be subject to at least five years' imprisonment, *see* 18 U.S.C. § 2252(b)(1), the jurors who evinced an opinion declared they would have voted to find the defendant not guilty by reason of legal insanity—causing at least a mistrial—had they known of the mandatory minimum. They wanted treatment and close supervision to prevent a recurrence, not a long prison term.

THE COURT: You [the jury] are discharged. However, stay here for a moment, please.

I know this has been a difficult case for you, and some of you are nodding, and you don't have to answer the questions I'm going to put to you, but it might be helpful. Just answer, if you want to answer as to yourself, not as to what anybody else said, because everybody is entitled to privacy.

Now, the Supreme Court of the United States has suggested that for constitutional reasons th[at] juries participate much more heavily in the sentencing, although the sentencing does not suggest in any way how you should decide. As I told you, in considering your verdict, you should not consider that. I will do the sentencing, not you. You all recall that?

However, because these are somewhat difficult cases, and they do involve to some extent the morality and the views of the community, it might be helpful, if you wish, to indicate what you think under these circumstances that you have heard here, the penalty for a person like this defendant might be, in terms of incarceration or other punitive aspects.

Do you have any view, juror one?

JUROR NO. 1: No.

THE COURT: Two?

JUROR NO. 2: No.

THE COURT: Three?

JUROR NO. 3: No.

THE COURT: Four?

JUROR NO. 4: No.

THE COURT: Five?

JUROR NO. 5: No.

THE COURT: Six?

JUROR NO. 6: No.

THE COURT: Seven?

JUROR NO. 7: No.

THE COURT: Eight?

JUROR NO. 8: No.

THE COURT: Nine?

JUROR NO. 9: [sic].

THE COURT: Ten?

JUROR NO. 10: Yes, I do.

THE COURT: What's your view?

JUROR NO. 10: My view is that if it is at all possible—and I don't know if it is—I see no useful purpose to have Mr. Polizzi confined. I believe that there should be an alternative, if possible, other than confinement.

THE COURT: What would that alternative be?

JUROR NO. 10: Treatment.

THE COURT: Compulsory treatment?

JUROR NO. 10: Oh, absolutely.

THE COURT: Juror eleven?

JUROR NO. 11: I agree with him.

THE COURT: You agree with juror ten?

JUROR NO. 11: Yes.

THE COURT: Juror twelve?

JUROR NO. 12: No.

THE COURT: You prefer not to speak?

JUROR NO. 12: Yes.

THE COURT: Now, as we discussed during the earlier preparation for the case a problem that doesn't arise very frequently, and that's what's called jury nullification. The power of a jury, if it doesn't like a rule of law, to ignore the instructions and just acquit, or, conversely, to convict for a higher [sic] crime. That's called nullification, and the judge is not permitted and should not suggest to the jury nullification. In fact, I told you, you have to follow the law. You remember that?

THE JURORS: Yes.

THE COURT: But some jurors do under some circumstances we believe nullify.

Now, the question comes up in this way: Had you known that the penalty was five to 20 years, a minimum of five, maximum of 20, probably concurrent, not times 20, but for the total, would that have affected the verdict of any of you, raise your hands?

MR. BODE: I object, your Honor.

JUROR NO. 9: Yes, I also feel that incarceration would not serve in this case. I think the gentleman should receive treatment, compulsory, but that he should definitely receive treatment. I don't think justice is served for incarceration.

THE COURT: Would your verdict have been affected if you knew that there was a minimum of five years imprisonment[?]

JUROR NO. 9: Yes.

THE COURT: How would it have been affected?

JUROR NO. 9: Under all the circumstances, I would have probably gone not guilty by reason of insanity.

THE COURT: Anyone else?

JUROR NO. 2: I would have done the same.

THE COURT: You would have found him not guilty, if you knew what the total punishment was.

Anyone else wish to speak? Juror eleven?

JUROR NO. 11: I would not. I would have found him [not] guilty by reason of insanity.

THE COURT: You would have nullified, if you knew what the punishment was.

Do any of you wish to say anything else about this case? I know it was very difficult and I do want to thank you. I know you gave it a great deal of attention.

JUROR NO. 7: I also believe that Mr. Polizzi should not be incarcerated. I believe that mental health treatment should be the proper verdict for Mr. Polizzi.

Trial Tr. 1454–59. Defense counsel reports that he spoke with two of the jurors, Jurors No. 9 and No. 11, by telephone after the verdict and that they indicated to him there was nearly universal support among the jurors for a non-jail disposition for Mr. Polizzi due to the unique circumstances of his case. Def.'s Mem. of Law Regarding the Sentencing of Peter Polizzi 3 n. 2, Feb. 18, 2008, Docket Entry No. 127; Def.'s Letter 2 n. 3, Dec. 5, 2007, Docket Entry No. 114.

Pursuant to 18 U.S.C. §§ 3143(a)(2), 3142(f)(1)(A), and 3156(a)(4)(C), which require remand to await sentencing, defendant has been incarcerated without bail since the jury verdict.

Post-verdict, further briefs and oral argument on the Rule 33 motion for a new trial were presented. *See* Def.'s Mot. to Vacate J., Docket Entry No. 123; Govt.'s Br., Mar. 14, 2008, Docket Entry No. 134. The scienter issues were also thoroughly explored by the parties. *See* Govt.'s Br. at 2–6; Def.'s Letter Br., Mar. 14, 2008, Docket Entry No. 135.

### III. Constitutional Objections to the Statute

#### A. Fundamental Problem with Passive Receiving and Possessing Without Evil Intent as Charged Under Statute

##### 1. Generally

The provisions Polizzi is charged with violating and found guilty of are 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B). Sections 2252 and 2252A of Title 18 are functionally the same; both criminalize "knowingly" receiving or possessing child pornography, among other child pornography crimes. *Compare* 18 U.S.C. § 2252(a)(4)(B) *with* § 2252A(a)(5)(B); *compare* 18 U.S.C. § 2252(a)(2) *with* § 2252A(a)(2). Section 2252 was originally enacted in 1978, Pub.L. No. 95–225, § 2(a), 92 Stat. 7 (1978), as part of the Protection of Children Against Sexual Exploitation Act of 1977, the first federal statute prohibiting the use of children in pornographic materials. Pub.L. No. 95–225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251–52, 2256 (2006)). Section 2252A was added to Title 18 by Congress as part of the Child Pornography Prevention Act of 1996 and included expanded provisions concerning virtual child pornography, which were struck down as unconstitutional in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *see also United States v. Williams*, 444 F.3d 1286 (11th Cir.2006), *cert. granted*, —— U.S. ——, 127 S.Ct. 1874, 167 L.Ed.2d 363 (2007) (finding the pandering provisions of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub.L. No. 108–21, § 501, 117 Stat. 676, 676–78 (hereinafter PROTECT Act), enacted in response to *Free Speech Coalition*, unconstitutionally overbroad and vague). Precedents concerning both provisions must be considered on all issues of constitutionality.

An analysis of the operational elements of sections 2252(a)(2) and (a)(4)(B) suggested constitutional issues serious enough to necessitate the additional briefing requested by the court. *See* Ct.'s Order for Additional Briefing, Feb. 12, 2008, Docket Entry No. 125 (requesting assistance in preparation for ruling on defendant's Rule 29 and Rule 33 motions); Govt.'s Br., Mar. 14, 2008, Docket Entry No. 134; Def.'s Br., Mar. 14, 2008, Docket Entry No. 135.

The provisions may be void for vagueness and overbreadth because they appear to potentially criminalize innocent conduct. By its terms, the statute requires only knowledge, not intent. "[T]he government [is] only required to prove that [defendant] knowingly—not willfully—received or possessed the images." *United States v. Irving*, 452 F.3d 110, 122 (2d Cir.2006). Yet knowledge of the nature of the images may be acquired deliberately, or inadvertently, before or after receipt and possession. The statute makes no distinction between advertence and inadvertence. The possible passivity of computer-based possession and receipt poses by its lack of scienter a potential due process violation. The statute itself recognizes that it may constitute a lurking trap for the innocent; it includes a limited "safe harbor" provision, but one that is insufficient to comport with due process requirements. *See* 18 U.S.C. § 2252(c).

The statute's potential to criminalize benign conduct arises in the Internet context for computer-based crimes of possession and receipt. For traditional crimes of receiving and possessing (such as of drugs or stolen goods), proving knowledge is normally sufficient to establish scienter; you know, *before* you accept a packet of cocaine or a box off the back of a hijacked truck, that you are committing a crime by lifting up your arms, receiving, and taking possession. In contrast, defining Internet-facilitated computer "possession" and "receipt" as all-encompassing boundaries of criminality becomes conceptually challenging since the forbidden objects are bits of data in electromagnetic form that can be transferred instantaneously and automatically by wire or wirelessly, and stored automatically in a multitude of places and in various electronic forms.

Knowledge of the illegal nature of the contents of the electronic data may be obtained simultaneously with receipt or be acquired at a later time. Once child pornography images are viewed, the computer user knows he or she has received the pictures and knows he or she now possesses them, even if they were never sought or wanted. The danger that the statute criminalizes innocent conduct—accidental or unintentional receipt and possession—is grave, and the penalties steep.

Polizzi objected to the statute's lack of scienter in his pretrial Motion to Dismiss the Indictment. *See* Def.'s Mot. to Dismiss Indictment 1, Apr. 5, 2007 ("[T]he instant prosecution violates the United States Constitution because it seeks to prosecute defendant without the necessity of a culpable mental state or scienter requirement"). His motion was based on the argument that his mental condition had caused there to be "no knowing or volitional action [his] part." *Id.* at 10. That ground is different from the one now being discussed.

More to the point, he now contends that the passivity of the statutory requirements presents a potential constitutional pitfall. *See* Def.'s Br. 2, Mar. 14, 2008. Citing *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), the government argues in opposition that the required mens rea—knowing—as applied to the statute by *X–Citement Video* is sufficient; and the evidence showed that Polizzi actively sought out the

images he possessed. *See* Govt.'s Br. 4–5, Mar. 14, 2008.

Appellate court precedent reading criminal intent or an equivalent into the statute as a basis for approval appears to preclude this court from ruling the statute unconstitutional as applied and facially. *See, e.g., X–Citement Video, Inc.,* 513 U.S. at 78, 115 S.Ct. 464; *United States v. Matthews,* 209 F.3d 338, 351 (4th Cir.2000); *cf. United States v. Coreas,* 426 F.3d 615, 617 (2d Cir.2005) (per curiam) (denying petition for rehearing because the panel was forced by precedent to affirm defendant's conviction). Appellate courts should reconsider the constitutional issues of whether "knowledge" obtained when an image appears on the computer screen constitutes sufficient mens rea for section 2252 charges and, if not, whether an intent to acquire and possess child pornography requirement may be properly implied.

### 2. Definitions

As a preliminary matter, several technical words should be defined. Online child pornography (or any other electronic image) is typically received and viewed via email, downloading, or file sharing, or viewed on an Internet website. Unwanted or unsolicited emails, popularly termed "spam," are transmitted daily in the billions. *See United States v. Kelley,* 482 F.3d 1047, 1055–56 (9th Cir.2007) (Thomas, J., dissenting). Many carry commercial messages, are dubious or disguised in nature and origin, and contain pornographic images, including child pornography, or links to pornographic websites. *Id.* at 1056. In one study, "more than 40 percent of all pornographic spam either did not alert recipients to images contained in the message or contained false subject lines, thus 'making it more likely that recipients would open the messages without knowing that pornographic images will appear.'" *Id.* (quoting United States Senate Committee on Commerce, Science, and Transpor-

tation, CAN–SPAM Act of 2003, S. Rep. No. 108–102, at 4 (2003), 2004 U.S.C.C.A.N. 2348, 2351).

Opening files—whether received by email or available on a website—in order to view the images may be automatic or manual. Files deliberately downloaded from the Internet and intentionally saved by the user should be distinguished from files automatically stored by the web browser in temporary cache files. *See generally* Ty E. Howard, *Don't Cache Out Your Case: Prosecuting Child Pornography Possession Laws Based On Images Located in Temporary Internet Files,* 19 Berkeley Tech. L.J. 1227 (2004). "The term 'downloading' generally refers to the act of manually storing a copy of an image on the hard drive for later retrieval." *United States v. Romm,* 455 F.3d 990, 993 n. 3 (9th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1024, 166 L.Ed.2d 772 (2007). In contrast, "[t]he internet cache ... is an area [on the hard drive] to which the internet browser automatically stores data to speed up future visits to the same websites." *Id.*

While you surf the Internet, the computer's "web browsers keep copies of all the web pages that you view, up to a certain limit, so that the same images can be redisplayed quickly when you go back to them." *Id.* at 993 n. 1 (quoting Douglass Downing, et al., Dictionary of Computer and Internet Terms 149 (Barron's 8th ed.2003)). It is possible for sophisticated computer users to access and even "delete" the automatically stored internet cache files, but computer forensic experts are often able to discover any files so deleted. *See* Howard, *supra,* at 1228; Steve Silberman, *The United States of America v. Adam Vaughn,* Wired News, Issue 10.10, Oct. 2002, at 3 ("If your computer is searched, even files that have been

dragged to the trash or cached by your browser software are counted as evidence. Some offenders have been sent to jail for 'possessing' images that only a computer-forensics technician can see."). *But cf.* 18 U.S.C. § 2252(c) (providing for the limited affirmative defense discussed below).

For those concerned with protecting themselves or their families from inappropriate online material either from unsolicited emails or Internet websites, there is no effective way a computer user can block or screen all illicit images that are on, or can be sent through, the Internet. Fully protective technology does not exist. As Justice Stevens pointed out in 2003,

> The unchallenged findings of fact … reveal fundamental defects in the filtering software that is now available or that will be available in the foreseeable future. Because the software relies on key words or phrases to block undesirable sites, it does not have the capacity to exclude a precisely defined category of images. As the District Court explained:
>
> > [T]he search engines that software companies use for harvesting are able to search text only, not images. This is of critical importance, because [the challenged statute] covers only "visual depictions." Image recognition technology is immature, ineffective, and unlikely to improve substantially in the near future. None of the filtering software companies deposed in this case employs image recognition technology when harvesting or categorizing [web site addresses]. Due to the reliance on automated text analysis and the absence of image recognition technology, a Web page with sexually explicit images and no text cannot be harvested using a search engine. This problem is complicated by the fact that Web site publishers may use image files rather than text to represent words, i.e., they may use a file

that computers understand to be a picture, like a photograph of a printed word, rather than regular text, making automated review of their textual content impossible. For example, if the Playboy Web site displays its name using a logo rather than regular text, a search engine would not see or recognize the Playboy name in that logo.

> Given the quantity and ever-changing character of Web sites offering free sexually explicit material, it is inevitable that a substantial amount of such material will never be blocked. Because of this "underblocking," the [challenged] statute will provide [consumers] with a false sense of security without really solving the problem that motivated its enactment. Conversely, the software's reliance on words to identify undesirable sites necessarily results in the blocking of thousands of pages that "contain content that is completely innocuous for both adults and minors, and that no rational person could conclude matches the filtering companies' category definitions, such as 'pornography' or 'sex.' "

*United States v. American Library Association, Inc.,* 539 U.S. 194, 221, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (Stevens, J., dissenting) (footnotes and citations omitted). To Justice Stevens, any law that would "mandate[ ] this vast amount of 'overblocking' abridges the freedom of speech protected by the First Amendment" and constitute a "statutory blunderbuss." *Id.* Even though a plurality of the Court in *American Library* concluded that Congress could constitutionally require, as a condition for receipt of federal subsidies, public libraries to install Internet filtering software to block obscene images and child pornography, no one disputed filtering's substantial limitations.

A year later in *Ashcroft v. American Civil Liberties Union,* Justice Breyer repeated Justice Stevens' concerns:

> Filtering software, as presently available, does not solve the "child protection" problem. It suffers from ... serious inadequacies that prompted Congress to pass [other] legislation instead of relying on its voluntary use. First, its filtering is faulty, allowing some pornography material to pass through without hindrance.... [T]he software alone cannot distinguish between the most obscene pictorial image and the Venus de Milo. No Member of this Court [has] disagreed [with this proposition].
>
> ....
>
> [S]oftware blocking lacks precision, with the result that those who wish to use it to screen out pornography find that it blocks a great deal of material that is valuable.... The software "is simply incapable of discerning between constitutionally protected and unprotected speech." It "inappropriately blocks valuable, protected speech, and does not effectively block the sites [it is] intended to block."

Nothing in the District Court record suggests the contrary. No respondent has offered to produce evidence at trial to the contrary. No party has suggested, for example, that technology allowing filters to interpret and discern among images has suddenly become, or is about to become, widely available. Indeed, the Court concedes that "[f]iltering software, of course, is not a perfect solution to the problem."

*Ashcroft v. ACLU,* 542 U.S. 656, 684–86, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (citations omitted) (Breyer, J., concurring in the judgment).

Despite advances in technology, fully effective anti-child pornography software would probably have to eliminate all visual images, excluding content subject to First Amendment protection; otherwise, it would allow some forbidden material to get through. See extensive literature on screening to protect children using computers, e.g., Cheryl B. Preston, *Zoning the Internet: A New Approach to Protecting Children Online,* 2007 B.Y.U. L.Rev. 1417; Heidi Wachs, Note, *Permissive Pornography: The Selective Censorship of the Internet Under CIPA,* 11 Cardozo Women's L.J. 441 (2005); Jared Chrislip, *Filtering the Internet like a Smokestack: How the Children's Internet Protection Act Suggests a New Internet Regulation Analogy,* 5 J. High Tech. L. 261 (2005).

### 3. Operative Elements of the Receipt and Possession Statutes

■ It is only the operative words of the indictment and statute, the elements of the crime, and the operative facts constituting the criminal offense so defined that count in determining guilt, not what actually happened. Under what is sometimes called the " 'categorical approach,' " a court "look[s] to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Wala v. Mukasey,* 511 F.3d 102, 107 (2d Cir.2008) (quoting *Canada v. Gonzales,* 448 F.3d 560, 565 (2d Cir.2006)); *see James v. United States,* —— U.S. ——, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007); *Brooks v. Ricks,* No. 02–CV–1671, 2003 WL 22956962 (E.D.N.Y. Oct. 20, 2003); *People v. Olah,* 300 N.Y. 96, 89 N.E.2d 329, 330 (1949). As the Supreme Court put the matter in *James,*

> [We] employ the " 'categorical approach' " that this Court has taken with respect to other offenses.... Under this approach, we " 'look only to the fact of conviction and the statutory definition of the prior offense,' " and do not generally consider the "particular facts disclosed

by the record of conviction." *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (quoting *Taylor* [*v. United States,* 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)] ). That is, we consider whether the *elements of the offense* are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of this particular offender.

127 S.Ct. at 1593–94 (quotations omitted) (emphasis added).

■■■ The phrases "categorical approach," "operative facts," "elements of the offense," "fact that is of consequence to the determination of the action," and "essential elements of guilt" are used in describing a principle fundamental to American criminal law: the elements of a criminal statute cannot be expanded or narrowed by adding or subtracting from the operative elements of the offense. In *Olah,* the eminent expert on criminal practice, Judge Stanley H. Fuld, put the matter succinctly: "[T]he crime, i.e., the operative facts which constitute the criminal offense as defined by the statute, cannot be extended or enlarged by allegations in the indictment or by evidence at trial." 89 N.E.2d at 330. Each of "the essential elements of guilt," and only those essential elements, must be proven beyond a reasonable doubt. *See also In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (reversing a New York Court of Appeals' application of a lesser standard of proof in juvenile delinquency proceedings and adopting the dissenting view of Chief Judge Fuld) (quotations and citations omitted).

■■■ Evidence which does not tend to prove or disprove an operative fact is not relevant. As Rule 401 of the Federal Rules of Evidence puts the matter:

Rule 401. Definition of "Relevant Evidence"

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401. If evidence is not relevant, it is not admissible. *See* Fed.R.Evid. 402.

■■■ The crime must be clearly defined by the words of the statute since people are entitled to an essential protection of due process: notice of what are criminal acts. *See, e.g., Chicago v. Morales,* 527 U.S. 41, 58, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("[T]he purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law. 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.' " (quoting *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939))); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (vague laws "may trap the innocent by not providing fair warning."); Markus D. Dubber & Mark G. Kelman, American Criminal Law: Cases, Statutes, and Comments 107–53 (2005) (The Principal of Legality (*Nulla poena sine lege* )). If the offense is not defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," the statute may be void for vagueness. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Grayned,* 408 U.S. at 108, 92 S.Ct. 2294; *cf.* Brief of the National Coalition Against Censorship and the First Amendment Project as Amici Curiae, Supporting Respondent, *United States v. Williams,* 444 F.3d 1286 (11th Cir.2006), *cert. granted,* —— U.S. ——, 127 S.Ct. 1874, 167 L.Ed.2d 363

(2007) (No. 06–694) (concerning 18 U.S.C. § 2252A(3)(B)).

The operative elements of the charged statutes are discerned by reading the provisions. Section 2252(a)(4)(B) of Title 18 of the United States Code, prohibiting possessing, provides as follows:

(a) Any person who—

(4)(B) *knowingly possesses* 1 or more books, magazines, periodicals, films, video tapes, or *other matter* which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or *transported, by any means including by computer,* if—

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct

[shall be punished as provided in subsection (b) of this section].

18 U.S.C. § 2252(a)(4)(B) (emphasis added); *see also* 18 U.S.C. § 2252A(a)(5)(B).

■ Beyond the existence of matter containing child pornography images and an interstate nexus, the operative words are "knowingly possesses." Only knowledge of possession is required, not intent to possess. Thus, the words "and intentionally" in Polizzi's indictment were surplusage. *See* Superseding Indictment 3, Mar. 8, 2007, Docket Entry No. 35 ("[D]id knowingly and intentionally possess matter containing visual depictions, to wit: the images depicted in the following computer files . . . .").

■ Once a computer receives an illicit image by any method, whether spam email, intentional downloading, loading of a CD–ROM, file sharing, etc., the computer user possesses "matter" containing child pornography, even before viewing the electronic screen. The images are in the computer and available for viewing. When he or she intentionally or unintentionally sees the child pornography pictures, the user "knowingly possesses" them—even if the images were unsolicited, unwanted, or a complete surprise. The possession charged is purely passive.

Section 2252(a)(2) covers the receiving counts charged. It reads as follows:

(a) Any person who—

(2) *knowingly receives,* or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, *by any means including by computer,* or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2252(a)(2) (emphasis added); *see also* 18 U.S.C. § 2252A(a)(2).

■ Section 2252(a)(2) may be violated by any one of the following three forms of conduct or misconduct—1) knowing receipt; 2) knowing distribution; or 3) knowing reproduction of the prohibited visual depictions. The second and third can be assumed for the purposes of the present case to require affirmative action by the defendant.

■ The first, knowing receipt—the key operative element of one of the provi-

sions Polizzi is charged with violating—does not, by its terms, require illicit action by the defendant. It does not have as a requisite that the defendant sought the information. As in the possession charge, the words "and intentionally" in Polizzi's indictment are superfluous. *See* Superseding Indictment 1, Docket Entry No. 35. When "the government [is] only required to prove that [defendant] knowingly—not willfully—received or possessed the images," *Irving,* 452 F.3d at 122, the fact that a defendant may have "paid for," "sought out," "downloaded," or "viewed repeatedly for his own erotic pleasure," thousands of images over multiple years is not relevant to the issue of guilt of the crime charged. Those are not the operative words or acts charged as statutory violations in the indictment under the constitutionally required categorical or operative word approach.

Knowing receipt can be as passive as knowing possession in the computer context. For example, if a person is emailed an unsolicited prohibited visual depiction, when he logs on and opens his email, he "receives." If the person is already logged on to his email and his computer opens his email automatically, he "receives" without taking any action. As soon as he sees the child pornography, he knows he has received it and that he now possesses it. *See* Recent Cases, *Fourth Amendment—Search and Seizure—Ninth Circuit Upholds Issuance of Warrant Based on E-mail Recipient List—United States v. Kelley,* 482 F.3d 1047 (9th Cir.2007), 121 Harv. L.Rev. 1261, 1265 (2008) ("Anyone with an e-mail account can be the unwitting recipient of contraband—the recipient need not perform any act for a message to be sent and appear in his inbox."). If a defendant did not solicit the material and its appearance on his screen surprised him, *see* Part II.B.4.a, *supra,* he would have, by the act of turning on his computer, both "received" and "possessed" it.

Scholars have posited a variety of ways that a technologically-challenged web user could unknowingly or accidentally receive proscribed material. *See, e.g.,* Matthew James Zappen, Comment, *How Well Do You Know Your Computer? The Level of Scienter in 18 U.S.C. § 1462,* 66 Alb. L.Rev. 1161, 1165–76 (2003); Howard, *supra.*

Section 2252 does provide in part for an affirmative defense or "safe harbor" for some accidental or unintentional situations:

It shall be an affirmative defense to a charge of violating paragraph (4) of subsection (a) that the defendant—

(1) possessed less than three matters containing any visual depiction proscribed by that paragraph; and

(2) promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any visual depiction or copy thereof—

(A) took reasonable steps to destroy each such visual depiction; or

(B) reported the matter to a law enforcement agency and afforded that agency access to each such visual depiction.

18 U.S.C. § 2252(c); *see also* 18 U.S.C. § 2252A(d) (same, for charges of possession under section 2252A(a)(5)). But this affirmative defense is applicable only to a charge of possession of child pornography under section 2252(a)(4). It is no defense at all to receipt of child pornography as defined by section 2252(a)(2).

Putting aside the lack of an effective factual or legal defense against receipt, what if you open, without knowing in advance its contents or having sought it, a digital file which includes three thumbnail-sized images advertising a child pornography website? You now knowingly possess more than two illegal images that you nev-

er wanted—and section 2252(c)'s safe harbor offers no protection, even if you try to destroy the pictures or want to report them to the police.

Or suppose you are conducting an automatically recorded video-teleconference or viewing a live internet broadcast. The person at the other end, unrequested, flashes a series of pornographic pictures of children. Have you committed a crime by receiving? Do you commit a crime of possession by keeping the videotape or not throwing out your computer? Destroying such tapes, pictures, or files after the event will not avoid guilt—since the crime has arguably already been committed by receipt and possession. Smashing the computer in outrage at the images would support an obstruction of justice charge for destroying evidence. *Cf.* Daniel M. Gitner & Gabrielle S. Friedman, *Must a Firm Report Child Porn on a Company Server?*, N.Y.L.J., Nov. 15, 2007, at 4 ("While there is no explicit 'duty to report' spelled out in a statute, as a practical matter, not reporting means either (a) knowingly hanging on to the images, which is a felony, or (b) destroying the images without telling anyone. While option (b) . . . might sound like a good idea, it is not so simple. Not only is it difficult to completely remove images from a computer, but trying to do so could (and likely will) be interpreted as concealing the felony committed. . . ."). As one FBI agent put it, "One click, you're guilty. A federal offense is that easy." Silberman, *supra,* at 3.

A person has not done anything "morally wrong," or had "an evil intent," *X–Citement Video, Inc.,* 513 U.S. at 73 n. 3, 115 S.Ct. 464, simply because he passively received and possessed depictions of child pornography he did not seek. Yet there is no requirement of moral culpability in the statute. To require a person who has done nothing a layperson—or a congres-

sperson or a judge—would consider improper to promptly report to the police raises a self-incrimination problem squared. *See* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself"). First, he should not have to admit anything. Second, he should not have to admit anything when he has done nothing morally culpable. The "safe harbor" reporting requirement of section 2252(c) does not cure any statutory defect in a prosecution for receiving or possessing. In fact, from a constitutional point of view, it may exacerbate any defect.

### 4. X–Citement Video

That the statute as written lacks sufficient scienter to ensure violators had a relevant "intent" raises the specter of its facial unconstitutionality. *See* Def.'s Letter Br. 2, Mar. 14, 2008, Docket Entry No. 135 ("[T]he possibility that a defendant who had not actively sought prohibited visual depictions might still be convicted of knowingly receiving child pornography under § 2252(a)(2) . . . presents a potential pitfall to the statute's constitutionality."). Insufficient scienter poses a due process problem and a basis for deeming the statute void for vagueness and overbreadth.

In *X–Citement Video, Inc.,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372, the Supreme Court addressed a scienter challenge to section 2252, ultimately upholding the statute. The government argues *X–Citement Video* forecloses any argument on invalidity by its holding that "knowingly"—when applied to all of the elements of the offense—constitutes sufficient mens rea. *See* Govt.'s Reply at 6–7, Apr. 19, 2007, Docket Entry No. 48 (asserting "the term 'knowingly' . . . does impose a scienter requirement mandating that a defendant have knowledge that the material at issue contains sexually explicit matter and

that underage performers are depicted."). Nevertheless, *X–Citement Video*—while repairing one of the statute's scienter deficiencies—does not correct the passivity problem when applied to Internet receipt and possession. The nature of the serious problems posed is explored below.

Section 2252 prohibits any person from "knowingly" dealing in visual depictions of minors engaging in sexually explicit conduct. *See* 18 U.S.C. § 2252. While "knowingly" expressly modifies the prohibited actions of transporting, receiving, distributing, etc., it does not, based on the "most grammatical reading of the statute," *X–Citement Video*, 513 U.S. at 70, 115 S.Ct. 464, modify the independent clauses specifying "use of a minor" and "sexually explicit" content. By its plain words, section 2252 does not require that the defendant know that one of the performers was a minor or that the content of the material was even sexual. As long as the defendant knowingly dealt with the material, strict liability applies with regards to its sexual nature and the ages of those depicted.

Citing the "anomalies which result from this construction," *id.* at 68–69, 115 S.Ct. 464—postal carriers and kindly neighbors would be liable, for example, for delivering or storing unopened packages containing child pornography—the *X–Citement Video* Court concluded that "the term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers." *Id.* at 78, 115 S.Ct. 464. (In Polizzi's case, there was no question that he knew of the nature of the photographs and that they portrayed minors.) Congress could not have believed otherwise, the Court reasoned. In addition to the otherwise "positively absurd" results of a plain reading of the statute, two additional presumptions—"that some form of scienter is to be implied in a criminal statute even if not expressed, and that a statute is to be construed where fairly possible so as to avoid substantial constitutional questions"—argued in favor of implying mens rea to all elements of the crime. *Id.*

▮ Like the criminal statutes at issue in *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), and *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), section 2252 must require mens rea to avoid criminalizing innocent conduct. Criminal statutes must be construed "in light of the background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded.... [T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence." *Staples*, 511 U.S. at 605, 114 S.Ct. 1793 (citation and quotations omitted). For the typical offense, "an injury can amount to a crime only when inflicted by intention." *Morissette*, 342 U.S. at 250, 72 S.Ct. 240.

▮ Only narrow types of crimes, generally limited to "public welfare offenses," may omit mens rea. But,

[Section] 2252 is not a public welfare offense. Persons do not harbor settled expectations that the contents of magazines and film [or emails or Internet pages] are generally subject to stringent public regulation. In fact, First Amendment constraints presuppose the opposite view. Rather, the statute is more akin to the common-law offenses against the "state, the person, property, or public morals," *Morissette* [342 U.S. 246, 255, 72 S.Ct. 240, 96 L.Ed. 288 (1952)], that presume a scienter requirement in the absence of express contrary intent.

*X–Citement Video*, 513 U.S. at 71–72, 115 S.Ct. 464. The lengthy terms of imprisonment attached to section 2252 offenses ar-

gue, according to *X–Citement Video,* in favor of presuming a requirement of scienter. *Id.* at 72, 115 S.Ct. 464 (citing *Staples*'s concern with harsh penalties, and noting they are inappropriate for strict liability offenses); *see also Morissette,* 342 U.S. at 260, 72 S.Ct. 240. Despite the tortured grammar, application of "knowingly" to all elements of the offense is further supported, the majority reasoned, by "the axiom that a court will not interpret a statute in a way that would render it unconstitutional if a constitutional interpretation is supportable." *Matthews,* 209 F.3d at 351 (citing *Morissette* ).

*5. X–Citement Video Does Not Control*

Although in 1994 *X–Citement Video* did save the statute as it was being applied from being found facially unconstitutional, the expanding use of the Internet since then requires further analysis. The criminal act in *X–Citement Video* was the *mailing* across state lines of pornographic videotapes featuring an actress recently exposed as having been underage at the time the videos were made. *See* 513 U.S. at 66, 115 S.Ct. 464. In that traditional context of physical receipt and possession through the mails, the Court did not need to comment on whether "knowledge" *as applied to the actions of transporting, receiving, or distributing* constituted sufficient scienter. *See id.* at 68–69, 115 S.Ct. 464. To transport or distribute physical videotapes requires such affirmative actions as placing them in a box, buying postage, and mailing the package. To receive the tapes either through the mail or in person entails meeting with the transporter or arranging for delivery over the phone or in writing. Knowledge in these contexts can reasonably be construed to equal intent. By contrast, mere knowledge in the Internet world may or may not be malignant.

The failure of knowledge to constitute sufficient mens rea for computer-based crimes is intimately tied to the fact that the very definitions of "receipt" and "possession" become vague when dealing with electronic matter transmitted over the Internet. *See, e.g.,* Howard, *supra,* at 1272 ("It is not difficult to imagine cases where the wrong conceptual approach could result in over– or under-inclusiveness, especially as technology continues to evolve."). Designed and long used for crimes of physical property (such as drugs, stolen watches, or pornographic videotapes) where mens rea is evident, "receipt" and "possession" do not necessarily require scienter in a world where email may be automatically received, files can instantaneously download themselves, web pages shown for only a fraction of a second are automatically stored, and knowledge can first be acquired after the fact of receipt. *See, e.g., Fourth Amendment,* 121 Harv. L.Rev., *supra,* at 1265–66 (comparing the ease of unwitting receipt by email with the "very low" "likelihood that a person will unintentionally receive contraband drugs from a dealer he meets," and advocating that, for probable cause determinations, courts should distinguish the passive receipt of (potentially spam) email messages from reciprocal online interactions).

Judicial confusion over what exactly constitutes computer-based "possession" and "receipt" is evident from a brief perusal of other child pornography cases. Does looking at online child pornography, for instance, automatically entail possession? Receipt? *See United States v. Perez,* 247 F.Supp.2d 459, 484 n. 12 (S.D.N.Y.2003) ("Whether the [child pornography] statute reaches mere internet 'browsing' is something of an open question. The statute does not criminalize 'viewing' the images, and there remains the issue of whether images viewed on the internet and automatically stored in a browser's temporary file cache are knowingly 'possessed' or 'received.' "); Howard, *supra,* at 1266–68.

Does receipt of illicit images via computer automatically result in possession? *See United States v. Kamen*, 491 F.Supp.2d 142, 152 (D.Mass.2007) (establishing that possession is a lesser included offense of receipt of child pornography as a matter of law). Or does possession result in receipt? *See United States v. Romm*, 455 F.3d at 998 ("[W]hether [defendant] 'received' the images in his cache depends on whether he knowingly took possession of them."). What is the difference, if any, between possession and receipt? Must the pictures be saved or downloaded to the hard drive to establish possession, or can they be stored temporarily on internet cache files? *Compare United States v. Stulock*, 308 F.3d 922, 925 (8th Cir.2002) (defendant could not be "guilty of possession for simply having viewed an image on a web site, thereby causing the image to be automatically stored in the browser's cache, without having purposely saved or downloaded the image.") *with Romm*, 455 F.3d at 999 (upholding conviction based on forty deleted images from the internet cache). Does possession continue after the computer user deletes—out of revulsion for the images—all normally accessible (but perhaps not all inaccessible hard drive) computer files? Application of the statute requires an exceptionally high appreciation of the abstract concepts involved, one not likely to be within the ken of the average layperson.

Because it involved mailing and was rendered before the Internet became ubiquitous and online child pornography was regularly prosecuted, *X–Citement Video* does not control the instant case. A knowledge element is normally sufficient, as it was in *X–Citement Video*, to establish mens rea when dealing with physically palpable objects. For the particular computer crimes of receipt and possession of electronic files, a mens rea element of more than mere knowledge is constitutionally required because of the evanescent, ephemeral nature of the images and technology. *See generally* Zappen, *supra* (dangers from inadequate statutory definitions of requisite scienter arising from technologically inadvertent but innocent behavior in use of computers).

The Supreme Court has not yet decided these computer-based questions. In *X–Citement Video*, the Court never "expressly h[e]ld that § 2252, as so construed [by the Court], passed constitutional muster." *Matthews*, 209 F.3d at 351. Nor did it address the question whether "the statute also requires the government to prove that a defendant acted with a bad motive." *Id.* The Court has not yet passed on the constitutionality of the statute, on whether it requires an evil intent, or on its potential to criminalize innocent computer-based possession and receipt.

One post-*X-Citement Video* challenge to the statute's lack of scienter discussed above has been considered, and rejected, by the Court of Appeals for the Fourth Circuit. In *Matthews*, 209 F.3d 338, the defendant—an award-winning journalist who claimed to be researching a news story on child pornography—argued:

> [I]f § 2252 is interpreted to require only receipt or transmission of images known to be child pornography [the scienter requirement implied under *X–Citement Video* ], the statute violates the Due Process Clause because it contains no criminal intent requirement, even though nothing suggests that Congress desired such a harsh result.
>
> . . .
>
> Matthews asserts that the absence of a bad motive or evil intent mens rea requirement in the statutory language poses a constitutional problem with § 2252. He maintains that the lack of such a criminal intent requirement in the wording of the statute does not eliminate it as an element of the offense absent clear

evidence that Congress intended such a result. He also argues that, particularly in light of the possibility that an Internet user could innocently view child pornography, the requisite mens rea must reflect a bad motive or evil intent in order to target those who produce and trade child pornography for profit-motivated or prurient purposes.

209 F.3d at 350 (quotation marks and citations omitted). In deciding against the defendant, the appellate court concluded—incorrectly it is submitted—that "it seems unlikely that Matthews' mens rea argument survives *X–Citement Video*." *Id.* at 351. The court found that the Constitution does not "mandate that the statute be interpreted to require proof that a defendant acted with a bad motive or evil intent." *Id.* (citing *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), which upheld recklessness as a sufficient scienter requirement for an Ohio child pornography statute).

In sum, by arguing that conviction under § 2252 requires the government to prove that a defendant trafficked in child pornography with a bad motive or evil intent to cause the social harm of the offense, Matthews attempts to insert the term "willfully" into the statute. The Constitution does not compel this. If Congress had intended to require "willfulness," it certainly could have drafted a statute so stating. It did not do so. The scienter requirement Congress did choose—"knowingly"—evidences no intent to exempt "innocent" use of child pornography from prosecution.

*Id.* at 352; *see United States v. Irving*, 452 F.3d 110, 122 (2d Cir.2006) ("[T]he government [is] only required to prove that [defendant] knowingly—not willfully—received or possessed the images.").

*Matthews* dealt with the problem posed by intentional traffic in child pornography, though for benign purposes. The appellate court arguably appropriately found that Congress, in criminalizing all child pornographic materials, did not provide any exceptions for their "innocent use" by researchers or journalists. The statute was not designed, however, to criminalize non-malign accidental or unintentional exposure to child pornography, as evidenced by the statute's limited safe harbor provision, which the *Matthews* court dismissed in a footnote without analysis. *Matthews*, 209 F.3d at 349 n. 7. Because of the potential for accidental passive computer-based receipt and possession of child pornography through the Internet, the insertion of the scienter requirement of "willfully" or "intentionally" into the statute is constitutionally compelled to replace Congress's chosen mens rea, "knowingly." (Even under this reading of the statute, the defendant in *Matthews* would still be guilty.)

### 6. Overbreadth

Any challenge for lack of scienter would be closely related to an overbreadth challenge under the First Amendment. Polizzi has standing to argue the statute is unconstitutionally broad. *See Federal Election Commission v. Wisconsin Right to Life, Inc.*, —— U.S. ——, ——, 127 S.Ct. 2652, 2670, 168 L.Ed.2d 329 (2007) ("The Government may not suppress lawful speech as the means to suppress unlawful speech."); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (entertaining facial challenge to child pornography statute because of a failure to distinguish actual from virtual child); *X–Citement Video, Inc.*, 513 U.S. 64, 78–79, 115 S.Ct. 464, 130 L.Ed.2d 372; Richard H. Fallon, Jr., et al., Hart and Wechsler's The Federal Courts and the Federal System 170–99 (5th ed.2003). Because an overly broad statute may chill free speech, which has "transcendent value to all society," *Gooding v. Wil-*

*son,* 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), and can be enforced in discriminatory ways, *see, e.g., Board of Airport Commissioners v. Jews for Jesus, Inc.,* 482 U.S. 569, 571, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), courts must be attuned to the dangers of criminalizing First Amendment protected activities such as Internet browsing or viewing adult pornography. *See Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403; *X–Citement Video,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372; *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

■ Although child pornography itself is not constitutionally protected speech, *see* Part III.F, *infra,* virtually all other Internet activity is. While section 2252 *by its terms* does not outlaw any First Amendment speech, it *indirectly* criminalizes protected activities by its potential to impose severe incarceratory punishments on the unintentional results of such activities, i.e., the accidental computer-based receipt and possession of child pornography via the Internet. After learning of the mandatory minimum and the lack of a defense for accidental use, one of this court's interns, for example, refused to google "child pornography filtering," for justifiable fear of committing a crime. Recall that *Matthews* involved research by a journalist.

To support an overbreadth claim in the First Amendment context, Polizzi must establish that the statute is "substantially overbroad." *See, e.g., Ferber,* 458 U.S. at 766–74, 102 S.Ct. 3348; *Broadrick v. Oklahoma,* 413 U.S. 601, 610–18, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). As the above discussion demonstrates, the receiving and possessing by computer provisions of section 2252 lack constitutionally required scienter as an element of the crime.

The statute as written and charged in the indictment is so broad, ambiguous and devoid of a critical mens rea requirement as to warrant a ruling that it is both unenforceable and unconstitutional. Despite the Supreme Court's holding in *X–Citement Video,* in the computer context the operative element of "knowledge" is not enough to infer evil intent; virtual strict liability applies. When accidental or unsought receipt and possession of electronic files via the Internet can occur readily, the statute's "knowledge" requirement is insufficient to protect against due process violations. The charged provisions of sections 2252(a)(2) and (a)(4)(B) criminalizing receipt and possession respectively are substantially overbroad. "Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.'" *Grayned,* 408 U.S. at 109, 92 S.Ct. 2294 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)).

### 7. Precedent

Examining other child pornography cases is useful to demonstrate both the difficulties courts have faced in defining knowing computer-based receipt and possession as well as their proposed resolutions of the dilemmas: when faced with a defense claim that there was no actual receipt or possession or that the defendant was unaware of the images, courts have either conflated knowledge with intent or implied an intent requirement where none exists in the words of the statute—without stating they are doing so. Recognizing the statute's deficiencies and utilizing the "presumption in favor of a scienter requirement [applying] to each of the statutory elements that criminalize otherwise innocent conduct," *X–Citement Video,* 513 U.S. at 72, 115 S.Ct. 464, courts have thus read into section 2252 an intent requirement when none exists. Looking to circumstantial evidence—non-operative and non-charged actions—to infer intent may avoid

as-applied challenges in individual cases. But such an approach would not affect the facial unconstitutionality of the statute. The following cases demonstrate how courts have decided whether a defendant's actions constitute "possession" or "receipt" and whether they were "knowing" on the basis of the defendant's overall conduct and its level of intentionality.

### a. Defining "Receipt" and "Possession"

The confusion over the definitions of "receipt" and "possession" is illustrated by the courts' split over whether online viewing of child pornography necessarily implies possession, receipt, neither, or both:

> Whether the [child pornography] statute reaches mere internet "browsing" is something of an open question.... The statute does not criminalize "viewing" the images, and there remains the issue of whether images viewed on the internet and automatically stored in a browser's temporary file cache are knowingly "possessed" or "received."

*Perez*, 247 F.Supp.2d at 484 n. 12. In *Stulock*, 308 F.3d at 925, for example, the defendant was convicted of knowing receipt but acquitted of knowing possession after a bench trial. In the district court's view (not challenged on appeal), because the "possession charge specified only the images found in the browser cache," defendant could not be "guilty of possession for simply having viewed an image on a web site, thereby causing the image to be automatically stored in the browser's cache, without having purposely saved or downloaded the image." *Id.*

The Court of Appeals for the Tenth Circuit "upheld a conviction for possession of files automatically stored in a browser cache because the defendant's 'habit of manually deleting images from the cache files established that he exercised control over them.'" *Perez*, 247 F.Supp.2d at 484 n. 12 (quoting *United States v. Tucker*, 305 F.3d 1193, 1198 (10th Cir.2002)). In *Tuck-*

*er*, defendant appealed from a conviction of one count of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B), challenging the sufficiency of evidence that he "knowingly possessed":

> Tucker maintains that he did not possess child pornography but merely viewed it on his Web browser. He concedes, however, that he knew that when he visited a Web page, the images on the Web page would be sent to his browser cache file and thus saved on his hard drive. Yet, Tucker contends that he did not desire the images to be saved on his hard drive and deleted the images from his cache file after each computer session.

*Tucker*, 305 F.3d at 1204 (footnote omitted) (despite defendant's deleting the internet cache files, computer forensic experts were able to find evidence of the images in his computer). *Tucker* rejected defendant's argument based on the ordinary, dictionary meaning of "possession:"

> The statute does not define possession, but in interpreting the term, we are guided by its ordinary, everyday meaning. *See Johns v. Stewart*, 57 F.3d 1544, 1555 (10th Cir.1995). Possession is defined as "the holding or having something (material or immaterial) as one's own, or in one's control." Oxford English Dictionary (2d ed.1989); *see also United States v. Simpson*, 94 F.3d 1373, 1380 (10th Cir.1996) (defining "knowing possession" in drug context as encompassing situations in which an individual "knowingly hold[s] the power and ability to exercise dominion and control" over the narcotics (quotation omitted)). Tucker contends that because he did not personally save, or "download," the images to his hard drive, he had no control over them.

*Id.*

The defendant in *Tucker* "possessed" the images because he "had control over

the files present in his Web browser cache files." *Id.* at 1204 & n. 15 (citing testimony from law enforcement that a person could access a cache file and "do almost anything with it"). The appellate court also emphasized that the defendant had *intentionally* sought out and viewed child pornography *knowing that the images would be saved on his computer, even if only temporarily;* thus "his possession was voluntary." *Id.* at 1205 (emphasis supplied). But the court "offer[ed] no opinion on whether the mere viewing of child pornography on the Internet, absent caching or otherwise saving the image, would meet the statutory definition of possession." *Id.* at 1204 n. 15. Neither did the court "address the question whether an individual could be found guilty of knowingly possessing child pornography if he viewed such images over the Internet but was ignorant of the fact that his Web browser cached such images." *Id.* at 1205 n. 16.

The Court of Appeals for the Ninth Circuit has adopted for computer crimes the Tenth Circuit's traditional definition of possession as "dominion and control."

> We begin with the text.... We interpret the term "knowing possession" *according to its plain meaning,* and presume Congress intended to apply traditional concepts of possession. "Possession" is "[t]he fact of having or holding property in one's power; the exercise of dominion over property." Black's Law Dictionary 1183 (7th ed.1999). Thus, to establish possession, " '[t]he government must prove a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over [it].' "

*Romm,* 455 F.3d at 999 (citations omitted). Like the defendant in *Tucker,* the defendant in *Romm* viewed child pornographic images online; "his computer automatical-

ly saved copies of the images to his 'internet cache,' " and he later deleted those images. *Id.* at 993. Based on forty images deleted from his internet cache and two other deleted images, the defendant was convicted of knowingly receipt and possession. *Id.; see* 18 U.S.C. §§ 2252A(a)(2), (a)(5)(B). The appellate court more or less equated online viewing—however brief—with possession because of the automatically saved internet cache files:

> Romm concedes there was sufficient evidence for the jury to find he acted with the requisite mental state of knowingly, but rather contends that the act he committed was merely the viewing of child pornography, not the possession or receipt of it. We disagree. In the electronic context, a person can receive and possess child pornography without downloading it, *if he or she seeks it out and exercises dominion* and control over it. *See United States v. Tucker,* 305 F.3d 1193, 1204 (10th Cir.2002) .... Here, we hold Romm exercised dominion and control over the images in his cache by enlarging them on his screen, and saving them there for five minutes before deleting them. While the images were displayed on Romm's screen and simultaneously stored to his laptop's hard drive, he had the ability to copy, print, or email the images to others. Thus, this evidence of control was sufficient for the jury to find that Romm possessed and received the images in his cache.

*Romm,* 455 F.3d at 997–98 (emphasis supplied). Note that in effect the court added "seeks it out" as an operative phrase to the statute.

Both *Tucker* and *Romm* are examples of judicial attempts to apply concepts from traditional criminal law (e.g., "knowing possession of illegal drugs") to computer

possession. But, as already demonstrated, it is inappropriate to carry over "traditional" notions of possession, such as driving a hijacked truck on city streets to the "capturing" of video images by the click of a computer key in private.

*Romm* also shows how slight, if any, the differences are between computer possession and receipt. In Internet use, receipt and possession may constitute the same act. *See, e.g., id.* at 998 ("[W]hether Romm 'received' the images in his cache depends on whether he knowingly took possession of them."); *United States v. Kuchinski,* 469 F.3d 853, 861 (9th Cir. 2006) ("[A] person does knowingly receive *and* possess child pornography images when he seeks them out over the internet and then downloads them to his computer.") (emphasis added); *cf. Romm,* 455 F.3d at 999 ("[A] defendant who downloads child pornography can be prosecuted for knowing possession of child pornography."); *Kamen,* 491 F.Supp.2d at 152 (establishing that possession is a lesser included offense of receipt of child pornography as a matter of law).

This conflation of receipt and possession raises a problem of duplicity where both are charged as to the same document since the same click achieves both. *But see, e.g., United States v. Skotzke,* No. 06–20475, 2007 WL 1584219, at *4 (E.D.Mich. May 31, 2007) ("[T]he offense of receipt targets those who intentionally seek out child pornography because such behavior contributes to the demand and the survival of the child pornography industry .... Accordingly, a consumer who purchases child pornography for his own use may be charged with receipt, and this is not multiplicitous of a charge of possession."). Polizzi did not object to the potential duplicity of the charges. *See United States v. Murray,* 618 F.2d 892, 896–99 n. 8 (2d Cir.1980) (objection prior to trial needed). There is no need at this stage of the proceedings to rule on duplicity since the guilty verdict on the receiving counts is set aside. *See* Part IV.B, *infra.*

### b. Inferring Intent from Non–Operative Facts

Most courts have avoided the "knowing" problem by looking to other evidence to infer knowledge—in effect, an unauthorized expansion of the statutes' "operative" words. The seeking out of child pornography, for instance—a factor on which both *Romm* and *Tucker* relied—is not an element of the crime. Whether a defendant sought the images should have made no difference in determining what were operative elements of the statute, though it may have had a bearing on discretionary aspects of the sentence. That the government can prove a defendant has viewed certain images more than once is likewise non-operative. Viewing on multiple occasions is not an element of possessing, so it should have made no difference under the statute whether defendant viewed the images one or more times. *See United States v. Dean,* 135 F.Supp.2d 207 (D.Me. 2001) (where the defendant claimed that his AOL account had been hacked, the court allowed the government to present evidence of viewing, perhaps in part because multiple viewing was relevant to the credibility of his hacking defense). In *United States v. Sanchez,* for example, defendant was convicted of knowing possession of child pornography based on images he had deleted from his internet cache. 59 M.J. 566 (A.F.C.C.A.2003), *decision summarily aff'd in part, rev'd in part on other grounds,* 60 M.J. 329 (C.A.A.F.2004), *review granted,* 60 M.J. 331 (C.A.A.F.2004). The court rejected his lack of knowledge claim based on other evidence indicating "these remnants of images of child pornography were not surprising." Defendant had subscribed to e-groups of nude teen websites, and he had received images by a

personally-addressed email, which had been opened and forwarded. "Surprise" is not an element of the crime, so it should have made no difference under the statute whether the defendant was or was not surprised.

Neither is the intentional or unintentional storage of images an element of section 2252(a)(2) prohibiting receipt. In *Irving*, the Second Circuit Court of Appeals rejected an insufficiency of evidence claim on the ground that the government had proved knowing possession and receipt, despite defendant's contention that someone else could have saved the illicit images and placed them onto his hard drive. 452 F.3d 110. The court relied on the fact that seventy-five files found were stored in a "My Documents" folder. *Id.* at 122. Storing images is not an element of the crime of receiving charged, so whether the elements were stored deliberately or not should make no difference on a receiving charge, though it may have been relevant to the credibility of his claim of lack of knowledge.

### 8. Remedy

■ Although a court may impose a "limiting construction" on a statute "in considering a facial challenge," it may do so "only if the statute is readily susceptible to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). If the statute is not readily susceptible of such an interpretation, then the Court will "not rewrite a law to conform it to constitutional requirements." *Id.* at 884–85, 117 S.Ct. 2329.

Interpretation of the statute to meet constitutional requirements in a case such as the present one is dubious. *Cf. Reno*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (constitutionality of provision prohibiting transmission of obscene or indecent communications by means of telecommunications device to persons under age eigh-

teen saved from facial overbreadth challenge by severing term "or indecent" from statute *pursuant to its severability clause* ); *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (in receiving child pornography prosecution, government did not establish that defendant, who had received mailings from the government purporting to be from organizations asserting individual rights, was predisposed to commit the offense). Interpretations of *X–Citement Video* have twisted the statute's grammar by reading "knowingly" to apply to all elements of the crime. Since knowingly has now been shown to be insufficient, a court would have to replace knowingly with intentionally or insert a more specific definition of computer-based receipt and possession, such as receipt after ordering, after exchanging, after payment, etc., to comply with due process requirements. Such a rewriting of the statute would exceed any court's authority.

The statute charged contains no definition of "receipt" or "possession," and no other mens rea element beyond "knowingly." The case is unlike others in which courts "have construed a statute narrowly because the text or other source of congressional intent identified a clear line that [a court] could draw." *Reno*, 521 U.S. at 884, 117 S.Ct. 2329. Were the court writing on a clean slate it would declare the statute unconstitutional and dismiss the indictment.

### B. Cruel and Unusual Punishment

Because the Eighth Amendment requires a punishment to be both "Cruel *and* Unusual" to be unconstitutional, U.S. Const. amend. VIII (emphasis added), cruelty and unusualness must be separately considered.

### 1. Is the Punishment Cruel?

■ Imprisonment of at least five years for this defendant *is* cruel. Few jurors or others would send a psychologically stunted man who: had suffered vicious sexual abuse as a child; without much of a formal education, had taught himself to play and collect music; had owned and operated a popular Italian restaurant; had established a home and family with a loving wife and children; and had earned the trust of his neighbors, to prison for five years because he repaired to a locked room in his garage to watch child pornography received on his computer. As one juror explained, Polizzi needed treatment, not a destructive long prison sentence. *See* Part II.B.8, *supra*; *cf.* *Hudson v. McMillian*, 503 U.S. 1, 16, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Blackmun, J., concurring) ("I do not read anything in the Court's opinion to limit injury cognizable under the Eighth Amendment to physical injury. It is not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment.").

The cruelty we accept towards those different from ourselves, such as prisoners and criminal defendants, has been traced by some scholars back to American slavery, where the utmost cruelty was tolerated legally and socially. Jeremy Waldron, Foreword to Colin Dayan, The Story of Cruel & Unusual, at xv-xviii (2007). Slaves being thought of as non-human, there were few inhibitions against mistreating them as fellow persons. *Cf.* The Golden Rule, "Do onto others as you would have them do onto you," *as quoted in Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir.1990). Despite the Civil War and the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments making former slaves legally equal with free people, our ingrained attitude towards freedom to abuse "others" endures. *Cf.* U.S. Const. amend. XIII, § 1 ("Neither slavery nor involuntary servitude, *except as a punishment for crime* ... shall exist within the United States ...." ) (emphasis added). Minimum sentences are exemplars, however removed in time and place from that attitude towards slaves. *See generally* Dayan, *supra.*

In its earlier cases, the Supreme Court defined "cruelty" of punishment in terms of barbaric or tortuous treatment. *See Gregg v. Georgia*, 428 U.S. 153, 170, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see, e.g., Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345 (1878) ("[I]t is safe to affirm that punishments of torture ... and all others in the same line of unnecessary cruelty, are forbidden by that amendment"). *Gregg*'s "unnecessary and wanton infliction of pain" standard has been the "settled rule" in modern times. *Hudson*, 503 U.S. at 5, 112 S.Ct. 995. Capital punishment, for example, is not "cruel and unusual" unless it results in the unnecessary and wanton infliction of pain (or is grossly disproportionate to the crime, *see* Part III.C, *infra* ). *Gregg*, 428 U.S. at 170, 177–78, 96 S.Ct. 2909. Without delving into Eighth Amendment doctrine, suffice it to say that in terms of imposing punishment, a sentence of imprisonment for five years is not necessarily constitutionally "cruel," however excessive it might seem to the laity in the context of a particular case. It does not approach, for example, the eighteenth-century British practice of "anatomization," permitting the defendant's body to be cut up after hanging to create added problems in the culprit's afterlife. *See* Bruce P. Smith, *English Criminal Justice Administration, 1650–1850: A Historiographic Essay*, 25 Law & Hist. Rev. 593, 609 (2007). Nonetheless, for the sake of discussion, in the context of the present case and defendant, a five-year

prison term, it is assumed, would be considered by most people to be cruel.

### 2. Is the Punishment Unusual?

A five-year mandatory minimum is not unusual. There are many instances in this country where cruelty in punishment is adopted by Congress as a policy: the 100-to-1 sentencing weight ratio for cocaine base (crack) versus powder cocaine, which has punished the Black more than the White community; capital punishment, unique in the western world, which has been abandoned even in large parts of this country; and excessively rigid guideline sentences that have overfilled our prisons and denuded minority communities of males in their prime years, contributing to a destructive culture sending young men down the pipeline of crime and early death. *See, e.g.,* Adam Liptak, *More than 1 in 100 Adults Are Now in Prison in U.S.: Inmate Population is Highest in the World,* N.Y. Times, Feb. 29, 2008, at A14 (since 1987 the national prison population has nearly tripled, with great taxpayer burden); *cf.* Dayan, *supra,* at 15 (quoting an American abolitionist in reference to an 1822 Mississippi "slave law": "And it is only an unusual punishment which is forbidden! The masters and overseers have only to repeat their excessive punishments so frequently that they become 'usual', and the statute does not apply to them!").

The cruelty and injustice of mandatory minimums are widely recognized. In a speech to the American Bar Association, Justice Kennedy noted that he could "accept neither the necessity nor the wisdom of federal mandatory minimum sentences. In too many cases, mandatory minimum sentences are unwise and unjust." Anthony M. Kennedy, Assoc. Justice, Supreme Court of the United States, Address at A.B.A. Annual Meeting (Aug. 9, 2003) (requesting the Association urge Congress to repeal mandatory minimums). Because of their very commonality "in a world of stat-utorily fixed mandatory sentences for many crimes," *Blakely v. Washington,* 542 U.S. 296, 331, 124 S.Ct. 2531, 159 L.Ed.2d 403 (Breyer, J., dissenting), "[s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

In the federal system, many drug crimes, firearms offenses, and child sex crimes entail mandatory minimums and many offenders are sentenced under them every year. *See* Appendix B, *infra* (state mandatory minimum sentences for child sex offenses); Appendix C, *infra* (mandatory minimums in federal statutes). There are "at least 171 individual mandatory minimum provisions currently in the federal criminal statutes." Ricardo H. Hinojosa, Chair, United States Sentencing Commission, Statement Before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security 2 (June 26, 2007), *available at* http://www.ussc.gov/testimony/6_26_07.pdf (hereinafter Hinojosa). For fiscal year 2006, 20,737 federal offenders were convicted on 33,636 counts of violating statutes carrying minimum penalties:

> Of these 33,636 counts of conviction, the overwhelming majority (94.4%) were for drug offenses (27,898 counts of conviction, or 82.9%) and firearms offenses (3,864 counts of conviction, or 11.4%). Most of the 171 mandatory minimum provisions rarely if ever were used in fiscal year 2006, with 68 such provisions not used at all.

*Id.* at 2.

Faced with a mandatory minimum, some defendants are more willing to test their case in open court because they run little risk of a higher sentence. Ninety-five percent (95.7%) of all federal offenders in

fiscal year 2006 pled guilty; four percent (4.3%) of all offenders were convicted after trial. *Id.* at 5. Those offenders convicted under a statute carrying a mandatory minimum penalty went to trial slightly more often than general offenders: ninety-three percent (93.2%) pled guilty, and 6.8% were convicted after trial. *Id.*

Over six hundred people were convicted of sex crimes carrying a mandatory minimum sentence in 2006. *Id.* at 8 tbl.3. Violations of 18 U.S.C. § 2252, containing the two subsections under which Polizzi was convicted, totaled 949 counts. *Id.* at app. B.

> Criminal sexual abuse, pornography, and prostitution offenses represent a small percentage of the overall federal caseload. In fiscal year 2006, 605 criminal sexual abuse, pornography, and prostitution offenders were convicted of statutes carrying a mandatory minimum penalty, which represents 2.9 percent of all offenders convicted of such statutes and 38.6 percent of the 1,569 criminal sexual abuse, pornography, and prostitution offenders in fiscal year 2006. Of these 605 offenders, 13 offenders (2.1%) were sentenced without regard to and below the statutory mandatory minimum penalty because of a substantial assistance motion by the government under 18 U.S.C. § 3553(e).

*Id.* at 14.

Defendants facing possible mandatory minimum sentences have few options to negotiate a lower sentence. Because of the substantial assistance and safety valve provisions, either alone or in combination with one another, "7,812 drug offenders altogether (or 47.8% of the 16,334 drug offenders) were sentenced without regard to and below the mandatory minimum." *Id.* at 9. In contrast, only 2.1% of sex offenders were able to obtain a non-mandatory minimum sentence. *Id.* This discrepancy may arise in part because of sex offenders' ineligibility for 18 U.S.C. § 3553(f)'s safety valve provision as well as their inability to provide "substantial assistance" towards prosecutions of other crimes; receivers and possessors like Polizzi have no valuable information to give law enforcement since their transactions take place anonymously over the Internet. *See* 18 U.S.C. § 3553(e) (sentence below statutory minimum permitted "to reflect a defendant's substantial assistance," upon motion by the government). Even where defendants may be sentenced without regard to a statutory minimum, courts seem loath to reduce sentences in the area of sexual abuse prosecutions. *Id.* at 14–15 (noting that 31 offenders in this category were eligible for a sentence below the statutory minimum in 2006, but 18 (58.1%) received a sentence at or above the statutory minimum).

Even though many would characterize some mandatory minimum sentences as "draconian," the Supreme Court has repeatedly upheld their constitutionality, including: 1) a sentence of 25 years to life, under the California "Three Strikes Law," for shoplifting three golf clubs, imposed on a defendant with a long minor criminal history and four previous burglary/robbery felony convictions, *Ewing v. California,* 538 U.S. 11, 17–20, 30–31, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003); 2) two consecutive 25–year–to–life sentences for two counts of petty theft under the same California statute, *Lockyer v. Andrade,* 538 U.S. 63, 77, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); 3) life imprisonment without possibility of parole for possessing more than 650 grams of cocaine, *Harmelin,* 501 U.S. 957, 961, 996, 111 S.Ct. 2680, 115 L.Ed.2d 836; and 4) a life sentence, for a defendant convicted under a recidivist statute of fraudulent use of a credit card in the amount of $80, passing a forged check for $28.36, and obtaining $120.75 by false pretenses, *Rummel v. Estelle,* 445 U.S. 263, 264–66, 283,

100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). The Court also recently denied certiorari where a defendant with no adult criminal history received 55 years for three counts of possessing (but not using or displaying) a handgun in connection with distribution of a relatively small amount of marijuana, *United States v. Angelos,* 433 F.3d 738 (10th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 723, 166 L.Ed.2d 561 (2006), despite an amicus brief signed by over a hundred former U.S. Attorneys General, retired federal judges, and high ranking Department of Justice officials. Brief for 163 Individuals as Amici Curiae Supporting Appellant, *United States v. Angelos,* No. 04–4282, 2005 WL 2347343 (10th Cir. June 22, 2005). A petition for certiorari is now pending in the case of an errant soldier who wants to return to fight for the United States in Iraq, and who all (except his own lawyer) agree should not be sentenced to prison, but who received a mandatory five-year sentence. *United States v. Lett,* 483 F.3d 782 (11th Cir.2007), *petition for cert. filed,* 76 U.S.L.W. 3444 (U.S. Feb. 12, 2008) (No. 07–1042); *see* Adam Liptak, *Finding 11–Day Sentence Not Too Little, But Too Late,* N.Y. Times, Feb. 12, 2008.

Given widespread use of mandatory minimums in this country, a five-year mandatory minimum sentence for receiving child pornography is not constitutionally unusual, despite the widespread view that Congress ought to reconsider their widespread statutory use. *See* Appendix C, *infra; see also* Hinojosa, *supra,* at 1–2.

### C. Disproportionate Penalty

■■■ The Eighth Amendment's Cruel and Unusual Punishment Clause, in addition to prohibiting wantonly painful or unique punishments, also prohibits sentences that are grossly disproportionate to the crime committed. *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) ("The final clause prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed."). Five years' imprisonment is not so disproportionate to the crime of "receiving" child pornography as to be unconstitutional under the Eighth Amendment. The offense—in the abstract and assuming some degree of evil intent— could be found by Congress to constitute a serious threat to children, supporting a reasonably harsh utilization of the criminal law to deter and minimize sexual abuse of youngsters.

As applied to Polizzi, a sentence of five years would be considered by many to be shockingly disparate, given the unique circumstances of his case. But, because application of the mandatory minimum would not be considered unconstitutionally grossly disproportionate, defendant's constitutional challenge on this ground fails.

### 1. Proportionality Analysis

■■■ Proportionality analysis requires an evaluation of the relationship of the offense to the punishment. It takes into account the offender's culpability. *See, e.g., Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (giving the example that a life sentence imposed for overstaying a parking meter would be found to be so disproportionate to the crime that it would constitute the type of cruel and unusual punishment forbidden by the Eighth Amendment).

■■■ Whether proportionality analysis applies in non-capital cases such as those involving mandatory minimum sentences is unclear. *Compare Ewing v. California,* 538 U.S. 11, 20, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (O'Connor, J., concurring in part and concurring in judgment) ("The Eighth Amendment, which forbids cruel and unusual punishment, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" (quoting *Harmelin,* 501 U.S. at 996–97, 111 S.Ct.

2680 (Kennedy, J., concurring in part and concurring in judgment))) *with Harmelin,* 501 U.S. at 996, 111 S.Ct. 2680 ("We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."). For noncapital cases, it is only an "extraordinary case" where "the gross disproportionality principle reserves a constitutional violation." *Lockyer v. Andrade,* 538 U.S. 63, 76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *see, e.g., Solem,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (holding unconstitutional a sentence of life imprisonment for the passing of a bad check by a convicted felon); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) (invalidating a sentence of twelve years' imprisonment in chains and at hard labor for the crime of falsifying a public document); *Humphrey v. Wilson,* 282 Ga. 520, 652 S.E.2d 501 (2007) (finding cruel and unusual a ten-year sentence for a 17–year-old having consensual oral sex with a 15–year-old).

The Supreme Court has "not established a clear or consistent path for courts to follow" in applying proportionality analysis. *United States v. Cunningham,* 191 Fed.Appx. 670 (10th Cir.2006) (quoting *Lockyer,* 538 U.S. at 72, 123 S.Ct. 1166). In 1983, *Solem* established a three-part test for determining whether a sentence is unconstitutionally disproportionate:

> The court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Solem,* 463 U.S. at 292, 103 S.Ct. 3001.

Eight years after *Solem,* the Supreme Court refined proportionality analysis in *Harmelin,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836. Although there was no majority decision, seven Justices agreed that the Eighth Amendment included a proportionality principle. Since *Harmelin,* courts have generally applied Justice Kennedy's analysis in his concurrence. *See, e.g., United States v. Angelos,* 433 F.3d 738, 753 (10th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 723, 166 L.Ed.2d 561 (2006) ("Justice Kennedy's opinion in *Harmelin* ... sets forth the applicable Eighth Amendment proportionality test."). Justice Kennedy first identified "common principles that give content to the uses and limits of proportionality review":

> All of these principles—[1] the primacy of the legislature, [2] the variety of legitimate penological schemes, [3] the nature of our federal system, and [4] the requirement that proportionality review be guided by objective factors—inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids [5] only extreme sentences that are "grossly disproportionate" to the crime.

*Harmelin,* 501 U.S. at 1001, 111 S.Ct. 2680. Subsequently, Justice Kennedy applied a modified-*Solem* test: A court must initially consider the nature of the crime and its relation to the punishment imposed. Only if that analysis gives rise to an inference of disproportionality should a court then consider the punishment for other offenses in its jurisdiction and the punishment for similar offenses in other jurisdictions. *See, e.g., id.* at 1005, 111 S.Ct. 2680 (declining to perform any comparative jurisdictional analysis because the gravity of the prisoner's offense—possessing more than 650 grams of cocaine—was not grossly disproportionate to his sentence of mandatory life in prison without possibility of parole).

■ Justice Kennedy also warned that courts should be reluctant to invalidate sentencing schemes under the disproportionality principle. An overly aggressive approach is not consistent with our scheme of federalism. *See id.* at 1000, 111 S.Ct. 2680. Both states and the federal government must have the freedom to experiment in matters of criminal policy. *See id.* Holding a sentencing law unconstitutional involves a rejection of the judgment of a legislature, which in some sense entails rejecting the moral judgment of the community it represents. *See id.* at 1006, 111 S.Ct. 2680; *see also Arizona v. Berger,* 212 Ariz. 473, 134 P.3d 378, 385 (2006) (en banc), *cert. denied,* —— U.S. ——, 127 S.Ct. 1370, 167 L.Ed.2d 159 (2007) (noting that *Solem,* in which the Supreme Court invalidated a judicially-imposed sentence, did not involve the "traditional deference" that courts must afford legislative policy choices). Courts must show restraint when wielding the powerful and blunt disproportionality club.

### 2. Is Five Years Constitutionally Disproportional?

Under these principles, Polizzi's sentence is not unconstitutionally disproportionate. Polizzi's unique circumstances—most notably the private and passive nature of the crime, his abused childhood, his mental problems, and the severe penalty he faces—might be considered by many to give rise to an inference of gross disproportionality. Polizzi is "the rare case in which [this] threshold comparison" is probably met, making intrajurisdictional and interjurisdictional analyses appropriate. *Harmelin,* 501 U.S. at 1005, 111 S.Ct. 2680. Yet, after consideration of Polizzi's punishment with those he would receive in this jurisdiction for comparable offenses as well as those he would receive in other jurisdictions for the same crimes, it is apparent that a sentence of five years' imprisonment cannot be found to be unconstitutionally disproportionate. He would receive more than five years in many state courts and for many other similar federal crimes.

#### a. The Nature of Polizzi's Crimes and the Contemplated Penalty

■ Under *Harmelin,* the initial inquiry is to compare the seriousness of the offense to the harshness of the proposed penalty—whether the mandatory five-year prison sentence is grossly disproportionate to Polizzi's offense of possessing and receiving via the Internet the charged images depicting minors engaged in sexually explicit conduct. "In weighing the gravity of the offenses, the court should consider the offenses of conviction and the defendant's criminal history, as well as 'the harm caused or threatened to the victim or society, and the culpability of the offender.'" *United States v. Angelos,* 345 F.Supp.2d 1227, 1257 (D.Utah 2004), *aff'd,* 433 F.3d 738 (10th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 723, 166 L.Ed.2d 561 (2006) (quoting *Solem,* 463 U.S. at 292–94, 103 S.Ct. 3001) (footnote omitted).

##### i. Severity of Offenses

Polizzi's sentence-triggering criminal conduct, as statutorily defined and charged, is his passively receiving and possessing multiple images of child pornography from the Internet in his personal computers in private. Measured by the applicable statutory terms of punishment, defendant's receipt of the images has been judged by Congress to be more serious than his passive possession. *Compare* 18 U.S.C. § 2252(b)(1) (five-year minimum) *with* 18 U.S.C. § 2252(b)(2) (up to ten years, or a fine).

Certainly, Internet transfer of child pornography is serious. It arguably causes great harm. *See* Part III.D, *infra.* Here, however, there is no statutory charge of

production, distribution, or overt encouragement of commercialization of child pornography, nor allegations of any other improper conduct by the defendant. *Cf.* Dr. Goldsmith's Rep., June 9, 2006 (finding that Polizzi did not meet the DSM–IV criteria for pedophilia and was not at risk for abusing children). Despite the fact that receipt and possession of child pornography are classified as "violent crimes" (at least in terms of release and detention pending judicial proceedings), *see* 18 U.S.C. § 3156(a)(4)(C), Polizzi himself did not engage in any violence or threats of violence in furtherance of, or in connection with, his receipt or possession. "It is well-established that crimes marked by violence or threat of violence are more serious and that the absence of direct violence affects the strength of society's interest in punishing a particular criminal." *Angelos,* 345 F.Supp.2d at 1258. Polizzi's passive receipt and possession—which is what was charged—of child pornography is far less serious than the advertisement or distribution of child pornography.

The Supreme Court has noted that there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.'" *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (citation omitted). Those findings, if they refer to all types of sex offenders under the statutes, are debatable. They fail to take into account differences between voyeurs and pederasts, for example. *See, e.g.,* Parts III.C.2.a.ii, III.D.2, *infra.* In the instant case, the defendant appears not to present a risk of overt action. *See* Dr. Goldsmith's Rep., June 9, 2006 (finding no risk of continued collection of child pornography). Polizzi has no criminal history, and although he did collect child pornography for some five years before his arrest, he "know[s] it's wrong."

Trial Tr. 667, 1105. His sincerity was evident at trial.

### ii. Harm Caused by the Offenses

The seriousness of Polizzi's offenses cannot be fully understood without considering any resulting harm to individual victims or society. Measuring the harm caused by receipt of child pornography pictures in private is difficult. Looking at such pictures alone in a private, locked room is—in its most immediate sense—non-violent and victimless. Yet the simple existence (and thus any possession) of pornographic images may cause "the child victims continuing harm by haunting the children in years to come." *Berger,* 212 Ariz. 473, 134 P.3d 378 (quoting *Osborne v. Ohio,* 495 U.S. 103, 111, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990)); *see also Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 249, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) ("Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being."); *United States v. Sherman,* 268 F.3d 539, 547 (7th Cir.2001) ("The possession, [and] receipt . . . of child pornography directly victimizes the children portrayed by violating their right to privacy . . . .").

Receiving such images contributes to their proliferation. The receipt and possession of child pornography—to the extent that there is a commercial component, *see* Part III.D, *infra*—harm society by increasing demand and supporting the distribution chain. Such confounding factors warranting a higher sentence were not charged in the instant case and thus do not support an automatic high statutory minimum term of imprisonment. They might, on balance, warrant a substantial discretionary prison sentence since the defendant's three eighty-nine dollar credit card payments to join the Hardcore website and download the charged images contributed

to the market in child pornography, financially supporting and encouraging the producers and distributors. Because Congress has found "[t]he prevention of sexual exploitation and abuse of children [to] constitute[ ] a government objective of surpassing importance," *New York v. Ferber*, 458 U.S. 747, 757, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), it has an interest "in attempting to stamp out this vice *at all levels* in the distribution chain." *Osborne*, 495 U.S. at 110, 110 S.Ct. 1691 (emphasis added); *see also* The PROTECT Act of 2003 (listing congressional findings).

Criminalizing possession of child pornography could be seen as the equivalent of criminalizing the possession of illegal drugs, except that possession in the drug context is physical and active, while, as charged in this child pornography case, possession may be passive. *Cf.* Part III.A, *supra*; *Harmelin*, 501 U.S. at 1002, 111 S.Ct. 2680 (possessing 650 grams of cocaine constitutes a grave threat to society because such an amount yielded "between 32,500 and 65,000 doses" and because "[p]ossession, use, and distribution of illegal drugs represents 'one of the greatest problems affecting the health and welfare of our population' "); *Berger*, 212 Ariz. 473, 134 P.3d 378 (rejecting defendant's contention that child pornography was a "victimless" crime because of its equivalence to cocaine possession).

### iii. Severity of Punishment

Five years in a federal prison is a substantial punishment. *Cf. Solem*, 463 U.S. at 289, 103 S.Ct. 3001 ("[A] single day in prison may be unconstitutional in some circumstances."). Polizzi will be labeled a sex offender while in prison and may have to be kept in protective custody. *See, e.g., Arnold v. County of Nassau*, 252 F.3d 599, 601 (2d Cir.2001) (noting that "sex offenders in the protective custody ward are segregated from the general inmate population" and placed in protective custody because "they are at greater risk of assault by other inmates"). Incarceration and registration will be especially difficult for Polizzi given his mental problems and childhood sexual abuse.

Although five years in prison would be a severe penalty for Polizzi, a five-year sentence imposed pursuant to the mandatory minimum would in fact be substantially less that the sentence recommended for him under the Sentencing Guidelines for receiving child pornography: 135 to 168 months. The high guideline sentence adopted by specialists in criminal sentencing—members of the Sentencing Commission—suggests that a five-year mandatory sentence is not disproportionate.

His punishment must be considered with other penalties. Polizzi's chastening will not be over at the end of his prison term or even of his term of supervised release. Upon his release from prison, he will have to register as a sex offender under both federal and New York law. Each have different, if overlapping, provisions.

Pursuant to the Sex Offender Registration and Notification Act, Title 1 of the Adam Walsh Child Protection and Safety Act of 2006, Pub.L. No. 109–248, 120 Stat. 587 (codified at 42 U.S.C. §§ 16901 *et seq.*) (hereinafter Adam Walsh Act), Polizzi is a "tier I sex offender." *See* 42 U.S.C. § 16911(5)(A) (defining the term "sex offense" to include federal offenses under Chapter 110 of Title 18, which includes 18 U.S.C. § 2252); § 16911(2) (defining the term "tier I sex offender"). As a tier I offender, he will be subject to federal reporting requirements for fifteen years, § 16915(a)(1), with the possibility of early termination after ten years under specified limited circumstances. § 16915(b). Beginning before his release from prison, § 16913(b)(1), Polizzi must register in every jurisdiction where he lives or works. § 16913(a). Any change of residence or

employment must be reported in person within three business days. § 16913(c). Polizzi will have to appear in person every year to be photographed and to verify that his information on file remains accurate. § 16916(1). Failure to timely register exposes him to additional prison time. § 16913(e). Law enforcement must notify any area children's organizations as well as any individuals requesting notification upon any changes in registration.

Registration information for the new National Sex Offender Registry, *see* § 16919—most of which will be publicly available on the National Sex Offender Public Website, *see* §§ 16918, 16920—includes name, social security number, address, place of employment, and car information. § 16914(a). His fingerprints, DNA, criminal history, physical description, and driver's license will be in the Registry. § 16914(b). The National Sex Offender Public Website

> [S]hall include relevant information for each sex offender and other person listed on a jurisdiction's Internet site. The Website shall allow the public to obtain relevant information for each sex offender by a single query for any given zip code or geographical radius set by the user in a form . . . .

§ 16920; *see also* Corey Kilgannon, *Woman with a Mission: Keeping Tabs on Sex Offenders*, N.Y. Times, Mar. 18, 2008, at B5.

To be eligible for federal grant money, states must, under the Act, ensure public access to this information:

> [E]ach jurisdiction shall make available on the Internet, in a manner that is readily accessible to all jurisdictions and to the public, all information about each sex offender in the registry. The jurisdiction shall maintain the Internet site in a manner that will permit the public to obtain relevant information for each sex offender by a single query for any

given zip code or geographic radius set by the user.

§ 16918(a). Some tier I offenders may be excluded from state websites, but not persons in Polizzi's situation. Because possession of child pornography is considered a "specific offense against a minor," his information must be included. § 16918(c)(1); § 16911(7)(G).

New York state sex offender registration requirements are similar to the federal requirements. The New York Sex Offender Registration Act ("SORA"), N.Y. Corr. Law §§ 168 *et seq.* (McKinney 1996), established the state Sex Offender Registry. *See* http://criminaljustice.state.ny.us/nsor/. SORA was enacted to assist local law enforcement agencies and to protect communities by: 1) requiring sex offenders to register with the State, and, 2) providing information to the public about certain sex offenders living in their communities. Persons convicted of specific federal crimes, including all federal offenses under 18 U.S.C. § 2252, must register with New York State. *See* N.Y. Corr. Law § 168–a(2)(d); § 168–b (listing types of registration information required); § 168–f. Under the New York registration system, Polizzi would presumably be classified as a Level 1 (low risk) offender; his exact classification would be determined after a hearing upon his release from prison. *See* § 168–l (establishing a board of examiners to determine risk level). Level 1 offenders are required to register for twenty years. *See* § 168–h(1). Information for Level 1 offenders, under current New York State law, is not available to the public. *See* § 168–q. This is likely to change pursuant to the Adam Walsh Act, assuming New York complies in order to receive federal law enforcement money. New York law also requires Polizzi to report any Internet accounts. *See* § 168–b(1)(a).

Unlike some other states and municipalities, neither the federal government nor New York State restricts where Polizzi may live or travel. *See, e.g.,* Marcus Nieto & David Jung, The Impact of Residency Restrictions on Sex Offenders and Correctional Management Practices: A Literature Review 3 (2006) (twenty-two states and hundreds of municipalities have enacted some form of residency restrictions prohibiting sex offenders from living within a certain distance of schools, daycare centers, or places where children congregate; some communities have enacted "banishment ordinances" excluding sex offenders altogether); Jamie Fellner, *The Wrong Sex Offender Laws: Although Popular, California's Residency Restrictions and Registries Do Little to Protect Children,* L.A. Times, Sept. 18, 2007 (noting that under California's new Proposition 83, sex offenders released from prison are barred from living within 2,000 feet of any school or park); Jessica Fusco, *Stricter Rules for Sex Offenders Approved,* Utica Observer–Dispatch, Oct. 10, 2007 (barring certain sex offenders from living in or even entering areas within 1,500 feet of parks, playgrounds, schools and child-care centers in Oneida County, New York). Polizzi may also have conditions attached to his supervised release limiting contact with computers or children.

As a registered sex offender, Polizzi's penalty for his crime will extend until his required period of registration ends. Some courts have characterized sex offender registration as non-punitive. *See Smith,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (holding that Alaska sex offender registration statute was not intended as additional punishment for someone convicted of a sexual offense and thus did not violate the Ex Post Facto Clause, but rather was a civil regulation imposed for the narrowly defined interest in protecting public safety). So too, with much the same reasoning, was branding or incarcer-ation of a witch, defined out of the realm of punishment. Bengt Ankarloo & Stuart Clark, Witchcraft and Magic in Europe 172–73 (1999). It is hard to think of a more severe scourging than publically marking someone as a sex offender, requiring that his personal information be available on demand to the public and that all neighborhood schools and children's organizations be notified whenever he gets a new car or updates his driver's license. *See, e.g.,* Fellner, *supra* ("There is ample evidence . . . that unfettered access to registries can and does lead to extensive harassment and sometimes violence against former offenders."); *cf.* Nathaniel Hawthorne, The Scarlet Letter (1850).

### iv. *Polizzi's Culpability*

In comparing the severity of his offenses to that of his contemplated punishment, Polizzi's culpability is a critical factor. Five members of the jury publicly questioned Polizzi's culpability (although not his guilt). There was strong support among the jurors for a non-jail sentence due to the unique circumstances of his case: he was not culpable enough in the minds of some of them to go to prison. *See* Part II.B.8, *supra.* Polizzi embodies the rags-to-restaurant owner successful immigrant archetype. He has no criminal history. Trial Tr. 165. His professed reason for searching for child pornography had some non-criminal roots in his enduring psychological trauma from his severe childhood sexual abuse in Sicily, including being sexually assaulted by his uncle, a family friend, and two police officers (as well as witnessing the murder of his friend by other police officers). *See* Part II.A.1, *supra.* To the extent that members of the jury had in mind mental health treatment rather than long incarceration, they apparently credited defendant's testimony. *See* Def.'s Letter 2 n. 3, Dec. 5, 2007, Docket Entry No. 114 (reporting that it was gen-

erally accepted by most of the jurors that the incidents in Sicily did happen, that jail would serve no purpose, and that Polizzi should receive psychiatric counseling in lieu of prison); *cf.* Richard B. Krueger, *The New American Witch Hunt: Demonizing Sex Offenders by Passing Tough, Mindless Laws Rather than Treating Them Makes Little Sense,* L.A. Times, Mar. 11, 2007. Also see the many filed letters from the community supporting leniency in sentencing the defendant.

There is little doubt that childhood sexual trauma psychologically scarred Polizzi. At trial, the parties disputed the exact nature and extent of Polizzi's diagnoses, but no one seriously denied that he was suffering from some kind of post-traumatic stress. *See* Part II.B.6, *supra.* That the jury did not believe his mental illnesses rose to the level of legal insanity under the federal Insanity Defense Reform Act, 18 U.S.C. § 17, does not imply that his culpability is the same as a defendant with no mental health problems. *Cf. Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (prohibiting the execution of juveniles); *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (barring the execution of developmentally disabled defendants because their cognitive and behavioral impairments reduce moral culpability and the ability to appreciate the deterrent effects of criminal sanctions). The insanity defense is extremely narrow and "rarely successful, with less than half of one percent of trials actually resulting in exculpation due to insanity." Helen Shin, *Is the Death of the Death Penalty Near?,* 76 Fordham L.Rev. 465, 492 (2007). It is "often an inadequate safeguard for mentally ill defendants." *Id.* Polizzi's own history of sexual victimization and his serious mental health problems do not morally or legally excuse his crime, but they probably con-

tributed to its commission and lessen his culpability.

Because of Polizzi's unique circumstances, the private, passive nature of his crime, lack of criminal history, low risk of recidivism, psychological disabilities, and reasons for searching for child pornography, the mandatory minimum of five years' imprisonment is sufficiently severe so that, under *Harmelin,* there is an inference of gross disproportionality. Whether his sentence violates the Eighth Amendment, however, depends upon the second and third *Harmelin* factors, requiring an intra– and extra-jurisdictional comparison. *See Harmelin,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836.

### b. Punishment for Other Offenses in This Jurisdiction

A comparative analysis of other federal punishments for similar offenses reveals that a five-year term of imprisonment is not disproportionate. Two comparisons are useful: first, with other sentences that have been imposed for possession-related crimes, and second, with the mandatory minimums that apply to other child sex crimes. *See Solem,* 463 U.S. at 291, 103 S.Ct. 3001 (noting that if within the same jurisdiction, "more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive.").

In other contexts where federal law punishes possession of a forbidden object, sentences can run much higher than five years. Possession of drugs or a firearm can, for instance, result in very lengthy sentences pursuant to other federal mandatory minimums or harsh sentencing guidelines. *See, e.g.,* Appendix C, *infra*; 21 U.S.C. § 844(a) (five years for possession of more than five grams of cocaine base); *Logan v. United States,* —— U.S. ——, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007) (sentencing defendant to fifteen years on a felon-in-possession of a firearm charge); *Angelos,* 345 F.Supp.2d at 1258 (imposing

fifty-five years for possession of a firearm while distributing marijuana).

For other child sex crimes, federal law mandates prison terms that are as long as, or longer than, the one at issue here. *See also* Appendix C, *infra.* A second conviction for possession of child pornography, for example, requires a ten-year minimum. *See* 18 U.S.C. § 2252A(a)(5). Persons who employ or persuade a minor to engage in the production of child pornography are subject to a fifteen-year mandatory minimum. Sexual abuse of a child under twelve requires thirty years. *See* 18 U.S.C. § 2241(c). But the grading of punishments is not fine-grained. Distribution of child pornography, for instance, an arguably more culpable act, is subject to the same five-year mandatory minimum term under 18 U.S.C. § 2252(b)(1) as receipt. *See* Part III.D.2, *supra.* Despite discrepancies, it cannot be said that a five-year sentence is excessive in comparison to those required for other federal crimes.

### c. Punishment for Similar Offenses in Other Jurisdictions

Disproportionality analysis requires a court to examine the punishments for similar offenses in other jurisdictions to determine whether the applicable penalty is grossly excessive. In such an inquiry it is helpful to look at what types of sentences Polizzi would have received under state law for similar offenses. *See* Appendix B, *infra.* This analysis cuts strongly in favor of the statute's constitutionality, since Polizzi could have received a comparable sentence in many states.

Had Polizzi been prosecuted in New York State courts, his conviction for possession—New York state does not criminalize receipt—of child pornography would be a class E felony, which carries a minimum sentence of one year's imprisonment and a maximum of four. *See* N.Y. Penal Law § 70.00; § 263.11. (In New York, all child pornography crimes, including pro-

ducing, directing, and promoting, entail the same one-year minimum term, though they have different maximums. *See* § 70.00.) *See also, e.g.,* Nate Schweber, *41 Arrested in New Jersey on Child Pornography Charges,* N.Y. Times, Oct. 5, 2007, at B4 (noting that the maximum penalty for possession of child pornography in New Jersey is eighteen months); Hillary Wool, *Former Valedictorian Is Guilty in Child Porn Case,* Dartmouth.com News, Sept. 26, 2006 (state defendant received two years of prison and five years of probation).

An analysis of child pornography offenses as punished by state law, *see* Appendix B, *infra,* reveals that the federal penalties for receipt and possession of child pornography are similar to—and not far in excess of—those of many states. In recent years, most states have enacted stricter and more punitive laws for child pornography and related offenses, especially those involving computer crimes. *See* Eric R. Diez, *"One Click, You're Guilty": A Troubling Precedent for Internet Child Pornography and the Fourth Amendment,* 55 Cath. U.L.Rev. 759, 765–66 & n. 31 (2006). State statutory schemes primarily prescribe sentences in one of two ways: within the text of the statute itself, or, by designating the offense as a specific class of felony or misdemeanor. If the language of the statute indicates that the sentence is mandatory or the prescribed term for the specific class is mandatory, (i.e., "shall"), the offense is treated below and in Appendix B as having a mandatory minimum. Medians are based upon all states which prescribe a minimum term of incarceration either specific to the child sex offense or the prescribed class of offense.

Forty-nine states now criminalize simple possession of child pornography. Nebraska, which criminalizes only possession with

intent to distribute, is the exception. *See* Child Pornography Prevention Act, Neb. Rev.Stat. §§ 28–1463.01–.05 (criminalizing only possession with intent to "rent, sell, deliver, distribute, trade, or provide to any person" child pornography). Twenty-two out of the forty-nine states prescribe mandatory minimum sentences for possession. Five of these twenty-two provide for statutory mandatory minimums specific to child sex offenses. *See* Ga.Code Ann. § 16–12–100(2)(g)(1) (five years); La.Rev.Stat. Ann. § 14:81.1(E) (two years); Miss.Code Ann. § 97–5–35 (five years); Mont.Code Ann. § 45–5–625 (four years if the child depicted is under sixteen years of age, and 100 years if the child is under twelve); Nev. Rev.Stat. § 200.730 (one year). The seventeen other states' mandatory minimum sentences correspond to those provided for specific classes of felonies. *See, e.g.,* Ala. Code § 13A–12–192 (classifying possession as a Class C felony, which carries a thirteen-month mandatory minimum). Minimum mandatory terms of imprisonment range anywhere from six months (Indiana and Ohio) to 100 years (Montana). The median mandatory minimum sentence is two years.

In comparison to the forty-nine states criminalizing possession, only thirteen prohibit the knowing or intentional receipt of child pornography; two of the thirteen criminalize only receipt with intent to distribute, sell, etc. The mandatory minimum sentences for simple receipt range from six months' imprisonment (Ohio), Ohio Rev.Code Ann. § 2907.321, to ten years (Arizona, if the child depicted is under fifteen), Ariz.Rev.Stat. Ann. § 13–3553. Four of the eleven states that criminalize both receipt and possession prescribe the same punishments for both. The median mandatory minimum sentence for receipt is four years.

The median mandatory sentence for possession with intent is five years, which is

equal to that provided by federal law. *See* 18 U.S.C. § 2252(a)(3). For receipt, the states' median mandatory sentence of four years is comparable to the federal five-year minimum. It is striking, however, that only eleven states criminalize receipt without intent (and only thirteen criminalize any form of receipt). In thirty-nine states, Polizzi would appear to be liable for possession only, with a median two-year mandatory minimum, substantially less than the five years he faces under federal law for receipt.

Possession of child pornography in some foreign jurisdictions is subject to penalties similar to those in the United States. In England, the possession of child pornography carries a maximum term of five years' imprisonment, but no mandatory minimum. Criminal Justice Act, 1988, Ch. 33, § 160 (Eng.). In Hong Kong, the possession of child pornography may be punished by up to five years on indictment or two years on summary conviction. Prevention of Child Pornography Ordinance, (2003) Cap. 579, 3 (H.K.). The Canadian federal criminal code does not criminalize receipt, but does criminalize the possession of, and access to, child pornography. For the former, the mandatory minimum is forty-five days (conviction by indictment) or fourteen days (summary conviction); the maximum for possession is five years or eighteenth months for access. *See* Canada Criminal Code, R.S.C., ch. 46 § 163.1 (1985); *see also* Wade Riordan Raaflaub, Parliamentary Information and Research Service, Library of [Canadian] Parliament, *Mandatory Minimum Sentences* (Jan.2006), http://www.parl.gc.ca/information/library/PRBpubs/prb0553–e.pdf.

■ Given the similarities between state and federal mandatory minimum sentences, the federal statute is not disproportional. Federal law is significantly more lenient than that of several states. *See,*

*e.g., Berger,* 134 P.3d at 385 (holding that a sentence of twenty consecutive ten-year prison terms for twenty counts—three less than Polizzi—of possession of child pornography for a defendant with no criminal history did not constitute cruel and unusual punishment because when viewed separately, each ten-year sentence was not grossly disproportionate to the crime of possession).

That most states do not follow federal law in separating receipt from possession is not dispositive of the issue of proportionality. It does, however, give weight to the argument that receipt is enough of an equivalent to possession that criminalizing both is redundant, and that penalizing them differently is irrational.

A sentence of five years' imprisonment cannot be said to violate the Cruel and Unusual Clause's proportionality principle so long as the statute of conviction itself is valid and some implied non-passive element of mens rea is assumed. As demonstrated in Part III.A, *supra,* the receiving provision is arguably unconstitutional. But the required minimum sentence would not be so grossly disproportional as to be unconstitutional. Polizzi's sentence, in comparison to those provided for other federal crimes, is not constitutionally excessive and would not violate the Eighth Amendment.

### D. Irrationality

#### 1. Generally

■ Defendant and others have argued that the federal laws criminalizing child pornography are irrational and therefore unconstitutional. These arguments are not tenable. Under rationality review, a statute will be deemed constitutional unless there is "no reasonable basis" on which the Act can be upheld, or Congress has acted in a "patently arbitrary or irrational way." *See, e.g., U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166,

176, 177, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). This standard is not exacting. *See Dallas v. Stanglin,* 490 U.S. 19, 24–25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (noting that rational basis scrutiny is one of the "most relaxed" and "tolerant" forms of judicial scrutiny). A statute must be upheld if it constitutes a rational means to an end that may be legitimately pursued by government, i.e., that a reasonable ground for its enactment can be found, regardless of whether Congress actually had that rationale in mind when enacting the statute. *See, e.g., Fritz,* 449 U.S. at 178–79, 101 S.Ct. 453 ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . . .'") (quoting *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)). First Amendment considerations, which require a higher level of scrutiny, do not apply to child pornography. *See* Part III.F, *infra.*

■ Here, there are a number of concerns that rationally could have led—and apparently did lead—Congress to pass child pornography legislation. The legislature has a legitimate interest in protecting the nation's children. "It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *Osborne v. Ohio,* 495 U.S. 103, 109–10, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (quoting *New York v. Ferber,* 458 U.S. 747, 756, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)); *Ferber,* 458 U.S. at 757, 102 S.Ct. 3348 ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."). Both through its initial production and ongoing publication, child pornography harms and demeans those abused. *See Osborne,* 495 U.S. at

111, 110 S.Ct. 1691 (noting that the materials' continued existence "haunts the children in years to come."). Images depicting child pornography, it is thought, can be used by pedophiles "to seduce other children into sexual activity." *Ferber*, 458 U.S. at 760, 102 S.Ct. 3348; *see also* S.Rep. No. 104–358, at 13 (1996) ("Child molesters and pedophiles use child pornography to convince potential victims that the depicted sexual activity is a normal practice; that other children regularly participate in sexual activities with adults or peers."). To discourage pernicious international conspiracies and trade, prohibiting "this vice at all levels in the distribution chain," *Osborne*, 495 U.S. at 110, 110 S.Ct. 1691, may be "[t]he most expeditious if not the only practical method of law enforcement . . . to dry up the market for this material." *Ferber*, 458 U.S. at 760, 102 S.Ct. 3348. Criminalizing possession, moreover, encourages the destruction of existing images. *Osborne*, 495 U.S. at 111, 110 S.Ct. 1691. Enforcement of laws criminalizing the production, distribution, and possession of child pornography is rationally related to these goals; appellate courts have repeatedly upheld such criminal statutes based on these reasons. *See, e.g., Osborne*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98; *Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113; *Connection Distributing Co. v. Keisler*, 505 F.3d 545 (6th Cir.2007).

Whether child pornography actually encourages its viewers to commit further physical sexual offenses has been disputed. The first congressionally-funded study, the 1970 Presidential Commission on Obscenity and Pornography, suggested no link between the two. The Effects Panel, The Impact of Erotica, Report of the Commission on Obscenity and Pornography 169 (1970). Almost twenty years later, a second Commission came to the opposite conclusion. U.S. Dep't of Justice, Attorney General's Commission on Pornography, Final Report (1986); Glen O. Robinson, *The Electronic First Amendment: An Essay For the New Age*, 47 Duke L.J. 899, 960–61 (1998); *see also* Report of the U.S. Senate Permanent Subcommittee on Investigations on Child Pornography and Pedophilia (1986) ("No single characteristic of pedophilia is more pervasive than the obsession with child pornography. The fascination of pedophiles with child pornography and child abuse has been documented in many studies and has been established. . . ."). One recent report notes that child pornography may encourage sexual aggression by viewers, although research (and research subjects) is limited by the nature of the material:

The type of pornography believed to play a role in the etiology of socially learned sexual aggression is child pornography. This is different from rape pornography in that the victimized character is a child rather than a woman, but there may still be a considerable level of sexual violence or aggression toward the victimized character. Social learning theory proposes that a select group of individuals may view or read child pornography and subsequently develop sexual interest in children similar to those portrayed in the pornographic material. These individuals would observe models engaging in the sexual abuse of young children and would internalize this behavior as an acceptable form of sexual interaction.

Research on the applicability of child pornography to social learning theory has been somewhat limited, however. Unlike studies using rape pornography, child pornography has not been shown to research participants to elicit sexual arousal. Instead, researchers have relied on child molesters' reports of their use of various pornographic materials. Child molesters have reported increased usage of child pornography prior to

committing their offenses. Recent research has suggested that use of child pornography is a reliable indicator of sexual interest in children, perhaps more so than previous offenses against children or other sexually deviant behaviors. Across these studies, offenders have reported the use of pornography to desensitize themselves, overcome their inhibitions, and arouse themselves in preparation for the sexual victimization of a child. Child pornography also appears to reduce empathy toward child victims . . . , much in the same way that rape pornography reduces empathy or compassion for female victims. Portrayals of enjoyment on the part of the child victim, or a lack of negative consequences for the perpetrator, may help reinforce the pedophile's views of children as an obtainable or appropriate sexual target.

Jill D. Stinson, Bruce D. Sales, & Judith V. Becker, Sex Offending, Causal Theories to Inform Research, Prevention and Treatment 87 (2008). It should be noted, however, that "no direct evidence of causality" has been found. *See* U.S. Dep't of Justice, Project Safe Childhood, Protecting Children from Online Exploitation and Abuse 12 (2006). While hard data is difficult to come by, "the U.S. Postal Inspection Service reports that about one-third of the 2,713 people it has arrested on child exploitation charges since 1997—arguably a skewed sample—also committed 'contact offenses' against children." *See* Jerry Markon, *Crackdown on Child Pornography: Federal Action, Focused on Internet, Sets Off a Debate*, Wash. Post, Dec. 15, 2007, at A1.

Based upon available evidence, Congress could make rational findings that: 1) publishing pictures of children in pornographic poses is demeaning to those abused, and abuse is compounded by publication; 2) publishing, particularly on the Internet, encourages predation by viewers; and 3)

dealing in child pornography is an international entrepreneurial crime, difficult to ferret out and to deter, requiring criminalization of, and high penalties for, the entire industry, including consumers. Given the dangers involved, these findings permit holding that the charging statutes and mandatory penalties applicable to the instant case pass rationality review.

2. *Federal Laws Criminalizing Receiving or Possessing Child Pornography Are Not so Irrational so as to Violate the Constitution*

Other arguments against the rationality of 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B) arise from the fact that 1) they criminalize all possession and receipt of child pornography, without distinguishing between those defendants who pay for the materials and those who do not; and 2) they distinguish between possession and receipt, punishing the latter much more harshly than the former. These challenges fail. Congress's decision to ban all types of possession could rationally have been based on the conclusion that a total prohibition would more quickly and fully destroy the market for child pornography. And, as many courts have concluded, Congress could have rationally decided that receipt is a more serious crime than possession.

Criminal responsibility for receipt and possession does not require any "purchase" or "commercial" element. Congress specifically eliminated the original commercial purpose requirements from many provisions of the statute in 1984. *See* Pub.L. No. 98–292, 98 Stat. 204 (1984). Added in 1990, the possession subsection never included a commercial element. *See* Pub.L. No. 101–647, 104 Stat. 4818 (1990). Because of the "unique realities of the child pornography market," *see United States v. Holston*, 343 F.3d 83, 85–86 (2d Cir.2003), Congress recognized that much

of the trafficking and production sought to be curbed is non-commercial in nature. *See id.* at 86 ("Generally the domestic material is of the 'homemade' variety, while the imported material is produced by commercial dealers.") (quoting H.R. Rep. 98–536, 1984 U.S.S.C.A.N. 492, 508). Traders or lenders who do not exchange or transport materials for a commercial purpose, but rather to broaden their "collections," constitute an "appreciable number" of child pornography traffickers. 1984 U.S.S.C.A.N. at 508. Whether "those who initiate or carry out these schemes have a profit motive or commercial purpose" is irrelevant to the children whose abuse is depicted. *Id.* at 502–03. Given the serious dangers posed by all types of child pornography, deference owed to the legislature under rationality review supports the conclusion that the lack of a commercial requirement does not sustain a viable constitutional challenge.

A more serious constitutional problem arises from section 2252's criminalization of both receipt and possession. Especially in the Internet age, receipt and possession may constitute the same act. *See* Part III.A, *supra*; *cf. United States v. Davenport*, 519 F.3d 940 (9th Cir.2008) ("[S]imultaneous conviction for both receipt and possession of [the same] child pornography violates the Fifth Amendment's prohibition on double jeopardy"; receipt and possession are multiplicitous); *United States v. Kamen*, 491 F.Supp.2d 142, 152 (D.Mass. 2007) (establishing that possession is a lesser included offense of receipt of child pornography as a matter of law); *cf. United States v. Farrelly*, 389 F.3d 649, 657 (6th Cir.2005) (recognizing, in context of discussion of an earlier guideline version, that receipt is more properly connected with possession than with trafficking); *United States v. Skotzke*, No. 06–20475, 2007 WL 1584219, at *5 (E.D.Mich. May 31, 2007) (noting placement in the current Guidelines of U.S.S.G. § 2G2.2(b)(1), an

ameliorative provision applicable where receipt is devoid of intent to distribute). *But see Kamen*, 491 F.Supp.2d at 150 ("[R]eceipt necessarily entails possession, but possession of child pornography does necessarily require receipt."); *Skotzke*, 2007 WL 1584219, at *4 ("[T]he offense of receipt targets those who intentionally seek out child pornography because such behavior contributes to the demand and the survival of the child pornography industry .... Accordingly, a consumer who purchases child pornography for his own use may be charged with receipt, and this is not multiplicitous of a charge of possession."). A single mouse click opening an email can render a person guilty of both receipt and possession. *See United States v. Kuchinski*, 469 F.3d 853, 861 (9th Cir. 2006) ("[A] person does knowingly receive *and* possess child pornography images when he seeks them out over the internet and then downloads them to his computer.") (emphasis added); *United States v. Romm*, 455 F.3d 990, 998 (9th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 1024, 166 L.Ed.2d 772 (2007) (defining receipt of child pornography as "knowingly [taking] possession"). Because the guilty verdict on the receiving counts is set aside, *see* Part IV.B, *infra*, any potential duplicity objections are moot, as noted in Part III.A, *supra*; they may be raised at retrial of the receiving counts on a double jeopardy motion.

To create separate offenses for receipt and possession—with a mandatory minimum applicable to one but not the other—arguably does not represent the most lucid or internally consistent punitive scheme. That few federal offenses entail mandatory minimums, *see* Appendix C, *infra*, while most permit sentences in accordance with post-*Booker* judicial discretion, does present an opportunity for unfairness in individual cases. Yet the legislature's decision to enact mandatory minimums for some

offenses but not others does not make a specific mandatory minimum sentence irrational. *See United States v. Vargas*, 204 Fed.Appx. 92, 95 (2d Cir.2006) ("[T]here is no right to individualized sentencing, and Congress may constitutionally prescribe mandatory sentences or otherwise constrain the exercise of judicial discretion so long as such constraints have a rational basis."). Even the lack of longer mandatory minimums for arguably more serious crimes can be justified as rational. *See, e.g., United States v. Pabon–Cruz*, 391 F.3d 86, 93 n. 9 (2d Cir.2004) (noting that the district court, among other things, "found that the disparity between the mandatory minimum sentence imposed on Pabon–Cruz for the advertising count and the lack of a mandatory minimum sentence for the more serious crimes of creation of child pornography or of sexual abuse of children was 'not irrational,' because there is less need for mandatory minimum sentences for violent crimes that judges are inclined to punish harshly.").

Given the similarities between computer-based receipt and possession, it might be more rational to classify and punish them similarly under 18 U.S.C. § 2252(b)(2), subject to a statutory incarceration term of zero to ten years. Most courts that have confronted the disparity in punishment between the two offenses have concluded, however, that it is rational because of receipt's closer links to the marketplace. *See, e.g., United States v. Watzman*, 486 F.3d 1004, 1009 (7th Cir. 2007); *United States v. Myers*, 355 F.3d 1040 (7th Cir.2004) ("It is certainly not irrational to punish more severely the person who knowingly receives such material, because it is that person who is creating and/or perpetuating the market for such material."); *United States v. McElheney*, 524 F.Supp.2d 983, 1001 (E.D.Tenn.2007) ("Someone who merely possesses child pornography is not as active in the market as someone who receives child pornogra-

phy, so there is a rational basis for Congress's decision to impose different sentences for those offenses.").

By this reasoning, receipt is a more serious offense than possession, and the distribution or sale of child pornography should be punished even more harshly than receipt. Yet, as another example of section 2252's odd penalty structure, a defendant who actively distributed illicit images would be subject to the same mandatory minimum as one prosecuted for passive receipt. A defendant found to have *distributed, reproduced with intent to distribute, shipped, or transported* the same 5,000 images as Polizzi received, perhaps by emailing hundreds of people or shipping boxes of videotapes, could be sentenced to the same five-year mandatory minimum (though the recommended guideline sentence would be higher). *See* 18 U.S.C. § 2252(a)(2) ("[A]ny person who ... knowingly *receives, or distributes*, any visual depiction [of a minor engaged in sexually explicit conduct] or knowingly *reproduces any visual depiction for distribution* ... shall be punished" by at least five years' imprisonment under section 2252(b)(1)) (emphasis added); § 2252(a)(1) (shipping and transporting). Polizzi could have been running a child pornography business out of his garage, earning great sums of money by selling the images worldwide, and would be still subject to the same five-year mandatory minimum.

The statute does seem to lack a relationship between degree of heinousness and amount of punishment. In drafting criminal statutes, however, Congress is not held by the Constitution to a precise calculus of harm and risk. Based on the rationale and precedent distinguishing receipt from possession and finding the former more severe, it cannot be said that the hierarchic penalty organization of this statute is

irrational. Including a mandatory minimum sentencing scheme in the statutory regulation of child pornography in order to advance the legitimate governmental interest of protecting children is not irrational.

*E. Lenity*

 A canon of statutory interpretation, the rule of lenity requires that in construing an ambiguous criminal statute, a court should resolve any ambiguity in favor of the defendant. *See, e.g., Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980); *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("[W]here there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant."). *See generally* Markus D. Dubber & Mark G. Kelman, American Criminal Law: Cases, Statutes, and Comments 123–53 (2005).

The doctrine of lenity is based upon the concern that statutes provide fair warning of what conduct is criminalized:

> The rule of lenity concerns situations in which a legislature fails to give notice of the scope of punishment by leaving "a grievous ambiguity or uncertainty in the language and structure of the statute, such that even after a court has seized everything from which aid can be derived, it is still left with an ambiguous statute," *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), in which case the rule of lenity tips the scales in favor of the defendant by requiring the court to impose the lesser of two penalties.

*Sash v. Zenk,* 439 F.3d 61, 64 (2d Cir.2006) (quotation omitted); *see, e.g., United States v. Pabon–Cruz,* 391 F.3d 86 (2d Cir.2004) (applying rule of lenity; ambiguity led to pro-defendant interpretation); *see also* Part III.A, *supra* (discussing the need for statutory clarity to avoid vagueness and overbreadth concerns).

It is the legislature—rather than a judge—that ought to specify what acts are prohibited. *See Bass,* 404 U.S. at 348, 92 S.Ct. 515 (noting that the rule of lenity protects the principle that "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity"). Given the harshness of modern sentencing guidelines and statutory penalties, however, some have advocated lenity's resurgence. *See, e.g.,* Elkan Abramowitz & Barry A. Bohrer, *The Rule of Lenity in Sentencing,* N.Y.L.J., Mar. 4, 2008, at 4 ("[W]ith mandatory minimum sentences . . . , criminal justice may be well-served by revisiting the applicability of the rule of lenity to a sentencing process still replete with ambiguity and prone to undue severity in more than the occasional case.").

But the lenity doctrine—at least in its traditional application of choosing the lesser of two ambiguous penalties—does not apply here. The five-year mandatory minimum term of imprisonment for receiving child pornography and the ten-year maximum for possession are clear. *But see* Part III.A, *supra* (noting the statute's ambiguity regarding the required mens rea).

Neither does 18 U.S.C. § 2252 nor any other mandatory minimum provisions contain an implicit reasonableness limitation, which other courts have used in applying the principle of lenity. *See Zadvydas v. Davis,* 533 U.S. 678, 682, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review."). Although it might be better policy if mandatory minimums were "presump-

tively reasonable" but rebuttable, *id.* at 701, 121 S.Ct. 2491, Congress has exercised its constitutional power not to choose that route.

The rule of lenity does not stand between Polizzi and conviction. In the area of child sex offenses, Congress's design appears to run counter to the principle Congress has expressed elsewhere that sentences should be no harsher than necessary to accomplish goals such as general deterrence. *Compare* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary") *with* § 3553(b)(2) (in child crimes and sexual offenses, "the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless . . .," omitting the "sufficient, but not greater than necessary" language of subdivision (a)). *But see United States v. Selioutsky,* 409 F.3d 114, 117 (2d Cir.2005) ("[T]he *Booker* rationale requires us to consider subsection 3553(b)(2) to be excised."). While *Selioutsky* may have accomplished death by excision of 18 U.S.C. § 3553(b)(2), its ghost whispers from the grave Congress's special desire for heavy penalties in sexual offenses against children. Like Hamlet, we ignore the spectral reminder of congressional concern for children at our peril.

### F. Free Speech

■ There is a sharp difference between our legal control through the criminal law of pornography depicting adults and that involving children. The former has been gradually loosened and the latter tightened. A brief review of the diverging developments in the context of free speech doctrine is required to understand how the deep aversion for child pornography has been reflected in a society increasingly tolerant of flaunting adult sexuality.

■ Despite the ringing pronouncement of the First Amendment, U.S. Const. amend. I. ("Congress shall make no law abridging the freedom of speech, or of the press."), our freedoms related to speech are not absolute, particularly when public morals or private reputation may be endangered. *See Roth v. United States,* 354 U.S. 476, 482, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) ("The guaranties of freedom of expression in effect in 10 of the 14 states which by 1792 had ratified the Constitution, gave no absolute protection for every utterance."); *Robertson v. Baldwin,* 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897). The Supreme Court has historically identified libel, fighting words, and obscenity as categories of speech over which the government has some regulatory power. While child pornography is a category of "speech" that may constitutionally be controlled, *see* Part III.F.2.b, *infra; see, e.g., New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 860–66 (16th ed.2007), nonobscene adult pornography is not.

### 1. History of Pornography

The term pornography is derived from the Greek word, *pornographos,* which translates to the "writing of harlots." Webster's 3d New International Dictionary 1767 (1993). An 1864 definition traces the word's roots to the ancient pictorial representations of the wild celebrations of the Greek god Bacchus. An American Dictionary of the English Language (1864) ("licentious painting employed to decorate the wall of rooms sacred to bacchanalian orgies, examples of which exist in Pompeii"), *as quoted in* Oxford English Dictionary, Compact Edition (New ed., 1991). Pornography now refers to "(1) a description of prostitutes or prostitution or (2) a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement." *Id.*

Different societies have had widely ranging views on what constitutes acceptable sexual relationships between children and adults, children and other children, and among adults of different and the same genders. *Cf., e.g.,* Anthony Everitt, Augustus: The Life of Rome's First Emperor 47, 149–50 (Random House, N.Y. 2006) (describing Julius Caesar's rumored affair with his grand-nephew; Roman sexual mores apparently freely allowed affairs with slaves and noncitizens of either sex, including children). Views on what delineates the bounds of acceptable pornography also change, as anyone is aware who visits the excavations of Herculaneum—long buried by ashes from Mount Vesuvius—where exuberant pornography is visible. The works of great Renaissance and early Impressionist artists immortalized the images of children as sexual objects. *See Massachusetts v. Oakes,* 491 U.S. 576, 593, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989) (Brennan, J., dissenting) ("Many of the worlds greatest artists—Degas, Renoir, Donatello, to name but a few—have worked from models under 18 years of age"). In any event, a stroll down the recently renovated Greek and Roman galleries of the Metropolitan Museum of Art would illustrate the point.

A fascination with sex and pornography among the elite in modern times is not unknown. *See, e.g.,* Richard Aldous, The Lion and the Unicorn: Gladstone vs. Disraeli 52–54 (1st Am. ed.2007) (describing former British Prime Minister William Gladstone's sexual perversions, for which he regularly scourged himself in private penance). The daily press routinely reveals similar sexual eccentricities among some current American leaders. Many less eminent American visitors to Europe carried home supplies of "French pictures" and sexually explicit writings after World War I. *Cf. United States v. One Book Entitled Ulysses by James Joyce,* 72 F.2d 705, 706–07 (2d Cir.1934).

A perusal of newspaper stands in cities like New York or Copenhagen would reveal the continuing widespread interest in sexuality and pornography. *See, e.g.,* Elaine Sciolino, *A Library Exhibition Not for the Children's Room,* N.Y. Times, Jan. 16, 2008, at E1. Media attention focused on the issue in August 1995 when Calvin Klein released a controversial advertising campaign for his line of jeans critics referred to as the "kiddie porn" campaign. Amy Adler, *The Perverse Law of Child Pornography,* 101 Colum. L.Rev. 209, 251–52 (2001). The billboards, television and magazine advertisements featured photographs of adolescents posed in provocative positions. *Id.* at 252. While the clothing advertisements were dropped following the threat of criminal investigation, they proved to be an economic success, boosting sales and creating a collector's market for the print advertisements. *Id.* at 253. Billboards, motion pictures and catalogs for clothing retailers continue to demonstrate the fascination of some with the subject. *See, e.g.,* James E. Bristol, *Free Expression in Motion Pictures: Child Sexuality and a Satisfied Society,* 25 Cardozo Arts & Ent. L J. 333, 363–64 (2007). Pornography lives in art galleries through the oeuvre of artists like John Currin, whose most recent work is derived from images he obtained from pornographic websites. Calvin Tomkins, *Lifting the Veil,* New Yorker, Jan. 28, 2008, at 58 (containing a reproduction of a vivid painting of a group of pubescent females pleasuring themselves sexually).

Widespread legislative concern with child pornography as an American problem did not emerge until the late 1970s. Adler, *supra,* at 230. Earlier, the use of children in pornography was regulated by the same laws as governed obscenity and the adult pornography industry. Barbara Campbell, *Officials Consider Child Pornography Hard to Prosecute,* N.Y. Times,

Jan. 15, 1977, at 19. In response to growing public pressure, Congress passed the Protection of Children Against Sexual Exploitation Act of 1977. Pub.L. No. 95–225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251–52, 2256 (2006)).

Throughout the 1980s and 1990s, the courts struggled to square the guarantees of the Constitution with congressional attempts to meet what was considered to be a serious national problem in production and distribution of child pornography. *See, e.g., United States v. Williams,* —— U.S. ——, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *United States v. X–Citement Video,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *Oakes,* 491 U.S. 576, 109 S.Ct. 2633; *Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113. Increased use of the Internet in the 1990s greatly expanded the ways in which child pornography could be created, spread, and viewed. With each passing decade, the legislature has responded with more punitive measures, casting an ever wider and finer net. Brenda M. Simon, *First Amendment: Internet Crime Statutes: Child Pornography: United States v. Hilton,* 14 Berkeley Tech L.J. 385, 396–97 (1999); *see, e.g.,* Adam Walsh Act of 2006; PROTECT Act of 2003; Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009.

### 2. First Amendment Exceptions

One of the prominent justifications advanced in support of the right to free speech is the need to pursue truth in a free market allowing the exchange of ideas. *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) ("[T]he ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out."); John M. Kang, *Deliberating the Divine: On Extending the Justification From Truth to Religious Expression,* 73 Brook. L.Rev. 1, 3, 6 (2007). *But see American Booksellers Association v. Hudnut,* 771 F.2d 323, 330–31 (7th Cir.1985) ("[T]he Constitution does not make the dominance of truth a necessary condition of freedom of speech.... Under the First Amendment, however, there is no such thing as a false idea, so the government may not restrict speech on the ground that in a free exchange truth is not yet dominant." (quotations and citations omitted)).

Exclusion of some categories of speech from First Amendment protection is premised upon the rationale that some speech, such as some forms of obscenity, does not contribute to the pursuit of truth or the exchange of political and social ideas and accordingly does not merit constitutional shelter. *Roth,* 354 U.S. at 485, 77 S.Ct. 1304 ("It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942))); *see Ex Parte Jackson,* 96 U.S. 727, 736, 24 L.Ed. 877 (1877).

#### a. Obscenity

"Obscenity" originally encompassed a broad range of works—including, for instance, newspaper advertisements for massage—on the ground that they would possibly promote "impure sexual relations." *Dunlop v. United States,* 165 U.S. 486, 501, 17 S.Ct. 375, 41 L.Ed. 799 (1897). Defined

by contemporary community standards, it no longer necessarily includes all forms of sexual speech; as emphasized in *Roth*, "sex and obscenity are not synonymous." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 78, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Brennan, J., dissenting) (quoting *Roth*, 354 U.S. at 487, 77 S.Ct. 1304). Today the law of obscenity refers narrowly to works that explicitly "depict or describe sexual conduct." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Child pornography is a subset of obscenity. *See id.* at 20 & n. 2, 93 S.Ct. 2607.

Supreme Court decisions as early as the nineteenth century acknowledged congressional power to restrict obscenity, but failed to question the underlying premise of the constitutionality of such regulation. *Dunlop*, 165 U.S. at 500–01, 17 S.Ct. 375; *United States v. Chase*, 135 U.S. 255, 261–62, 10 S.Ct. 756, 34 L.Ed. 117 (1890); *Ex Parte Jackson*, 96 U.S. at 736. The definition of obscenity adopted by many of the earliest courts was that of *Regina v. Hicklin*, 3 L.J.Q.B. 360 (1868), predicated on "whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences and into whose hands a publication of this sort may fall." *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 485 n. 7, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962) (quoting *Hicklin*); Stephen Gillers, *A Tendency to Deprave and Corrupt: The Transformation of American Obscenity Law from Hicklin to Ulysses II*, 85 Wash. U.L.Rev. 215 (2007).

Whether a federal or state statute regulating obscene speech violates the First Amendment was directly addressed in 1957 by the Supreme Court in *Roth*, 354 U.S. at 479–81, 77 S.Ct. 1304. While recognizing that the fundamental freedoms of speech and press "contributed greatly to the development and well-being of our free society," *Roth* found obscenity to fall outside the bounds of protected speech because it encroaches upon "more important interests" in social order and morality. *Id.* at 484. *But cf. Smith v. California*, 361 U.S. 147, 155–60, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (Black, J., concurring) ("What are the 'more important' interests for the protection of which constitutional freedom of speech and press must be given second place?"). The *Roth* Court defined speech as obscene "if, considered as a whole, its predominant appeal is to prurient interest, *i.e.*, a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters." *Roth*, 354 U.S. at 487 n. 20, 77 S.Ct. 1304 (citations omitted). Whether a work's dominant theme appealed "to prurient interest" was to be judged by the average person, applying contemporary community standards. *Id.* at 489, 77 S.Ct. 1304.

Lower courts struggled in applying the *Roth* test. Susan G. Caughlin, Note, *Private Possession of Child Pornography: The Tensions Between Stanley v. Georgia and New York v. Ferber*, 29 Wm. & Mary L.Rev. 187, 189–90 (1987). The Supreme Court recognized its own difficulty in explicating precisely what speech is "obscene." As Justice Potter Stewart acknowledged in his well-known concurring opinion in *Jacobellis v. Ohio*,

It is possible to read the Court's opinion in *Roth v. United States* ... in a variety of ways. In saying this I imply no criticism of the Court, which in those cases was *faced with the task of trying to define what may be indefinable.* ... I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description.... But *I know it when I see it.*

378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) (emphasis added); *see also Miller*, 413 U.S. at 22, 93 S.Ct. 2607; *Redrup v.*

*New York,* 386 U.S. 767, 770–71, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967); *Memoirs v. Massachusetts,* 383 U.S. 413, 418–21, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

 After over a decade of wrestling with the *Roth* decision, the Supreme Court constructed a new definition of obscenity in *Miller,* which continues to govern. *Miller* reworked the *Roth* test as follows:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, ... (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller,* 413 U.S. at 24, 93 S.Ct. 2607.

*Miller* incorporates and clarifies a combination of earlier rather vague definitions. The reliance on "contemporary community standards" in its first prong is derived from Judge Learned Hand's early twentieth-century definition, which asked jurors to consider local community views when determining whether a work was obscene:

> If there be no abstract definition, such as I have suggested, should not the word "obscene" be allowed to indicate the present critical point in *the compromise between candor and shame at which the community may have arrived here and now?* . . . .
>
> Nor is it an objection, I think, that such an interpretation gives to the words of the statute a varying meaning from time to time. Such words as these do not embalm the precise morals of an age or place; while they presuppose that some things will always be shocking to the public taste, the vague subject-matter is left to the gradual development of general notions about what is decent. A

jury is especially the organ with which to feel the content comprised within such words at any given time, but to do so they must be free to follow the colloquial connotations which they have drawn up distinctively from life and common speech.

*United States v. Kennerley,* 209 F. 119, 121 (S.D.N.Y.1913) (emphasis added).

It is not clear whether the community described by Judge Hand referred to the city, state, other local group, or "society at large" at a particular point in time. Half a century later in *Jacobellis,* Justice Warren argued that the proper reference was the local community, not the nation as a whole. *Jacobellis,* 378 U.S. at 200–01, 84 S.Ct. 1676 (Warren, J., dissenting) ("But communities throughout the Nation are in fact diverse, and it must be remembered that, in cases such as this one, the Court is confronted with the task of reconciling conflicting rights of the diverse communities within our society and of individuals."). A characterization that might reflect the views of circumspect groups in some geographic areas of the country would not mirror the attitudes of parts of the metropolitan New York community. Enormous societal divergences present severe problems in creating a uniform national criminal legal structure that does not unfairly penalize individuals and localities in our heterogeneous society. Juries of the venue and prosecutorial discretion generally provide some flexibility.

 Since they fall outside the ambit of the First Amendment, Congress may regulate obscene materials in some ways. The Supreme Court has approved federal and state criminal statutes regulating the *distribution* of obscene materials. *Miller,* 413 U.S. at 36–37, 93 S.Ct. 2607 (California statute prohibiting the dissemination or exhibition of obscene materials); *Ginsberg v. New York,* 390 U.S. 629, 631, 645, 88

S.Ct. 1274, 20 L.Ed.2d 195 (1968) (New York statute criminalizing sale of obscene materials to minors); *Roth*, 354 U.S. at 485, 77 S.Ct. 1304 (federal statute criminalizing the mailing of obscene publications). Legislation criminalizing the private *possession* of obscene material, however, is unconstitutional. *Stanley v. Georgia*, 394 U.S. 557, 559, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). *But cf. Osborne*, 495 U.S. at 111, 110 S.Ct. 1691 (approving a state law regulating the private possession of child pornography).

Justice Marshall addressed the distinction in *Stanley;* while the states and the federal government both have an important interest in regulating the *commercial* distribution of obscene material, they do not have the same interest in controlling the right to receive information and ideas. *Stanley*, 394 U.S. at 563–64, 89 S.Ct. 1243. The right to be free of government intrusion except in very limited circumstances is fundamental in our society. *Id.* at 564–65, 89 S.Ct. 1243 ("If the *First Amendment* means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government power to control men's minds."). We live with the fundamental incongruity that we may have rights to see material in private which no one may legally provide.

*b. Sexually Oriented Expression*

■■■■■ Difficulties in defining obscenity out of First Amendment protection are carried over to other forms of sexually oriented expression. *See, e.g., Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). *Content-based* regulations of protected speech, enacted for the purposes of restraining certain kinds of speech, presumptively violate the First Amendment. *City of Renton v. Playtime Theatres*, 475 U.S.

41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). *Content-neutral* regulations of protected speech, not enacted for the purposes of suppressing expression, are subject to review under a four-factor test laid out in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *see also White River Amusement Pub, Inc. v. Hartford*, 481 F.3d 163, 169 (2d Cir.2006) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)). *But cf. Miller*, 413 U.S. at 24, 93 S.Ct. 2607 (applying a different three-part test to speech unprotected by the First Amendment). "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673.

■■■■ Under *O'Brien*, a regulating ordinance may be valid if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the restriction is not greater than is essential to the furtherance of the government interest. *Id.* at 377, 88 S.Ct. 1673. A ban on public nudity or nude dancing, for example, may appear to be an unconstitutional content-based regulation, but if one of the purposes of the ordinance is to avoid negative secondary effects, it may be considered content neutral, and hence valid. *Pap's A.M.*, 529 U.S. at 289, 291, 120 S.Ct. 1382; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567–68, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). To meet the test's second prong, a municipality must show that it relied upon evidence that it " 'reasonably believed to be relevant' to the problem of negative secondary effects." *White River Amuse-*

*ment Pub, Inc.,* 481 F.3d at 171 (quoting *Playtime Theatres,* 475 U.S. at 51, 106 S.Ct. 925). Examples include an increase in crime rates, a decrease in property values, and a diminution in the quality of the city's neighborhoods. *City of Los Angeles v. Alameda Books,* 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002).

While the speech regulated by federal obscenity and child pornography laws is deemed unprotected by the First Amendment, there are similarities with regulations concerning expression such as nude dancing. The secondary effects of private viewing of nude dancing in one's home probably does not raise crime rates, lower property values, or lower the quality of the city's neighborhoods. The Supreme Court in *Stanley v. Georgia* found no grounds to uphold regulation of private possession of constitutionally unprotected speech. 394 U.S. at 559, 89 S.Ct. 1243 (rejecting a state law criminalizing the possession of adult pornography). *But cf. Osborne,* 495 U.S. at 111, 110 S.Ct. 1691 (approving a state law regulating the private possession of child pornography).

### c. Child Pornography

■■■ The law governing child pornography has developed differently from that controlling adult pornography. Not all adult pornography is obscene, and only that which is obscene may be constitutionally regulated. *See generally Miller,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419. Whether adult pornography constitutes obscenity turns upon application of the *Miller* test. *Ferber,* 458 U.S. at 761, 102 S.Ct. 3348. In contrast, child pornography does *not* need to be found obscene to be regulated. *Id.* at 760–61, 102 S.Ct. 3348. All child pornography, whether non-obscene or obscene, viewed privately or distributed commercially, may be criminalized by Congress because of its direct links to child sexual abuse. *See* Part III.C.2.ii, *supra* (discussing harm caused by the offenses).

■■■ Private possession of child pornography may thus be criminalized, even if private possession of obscene materials may not. *Compare Osborne,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98, *with Stanley,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542. Distinguishing *Stanley,* the *Osborne* Court based its holding on the ground that the state's interest in "safeguarding the physical and psychological well-being of a minor" is compelling enough to override the right of the individual to possess the materials. *Osborne,* 495 U.S. at 109–10, 110 S.Ct. 1691 (approving an Ohio statute criminalizing the possession and viewing of child pornography) (citations and quotations omitted); *see* Part III.D, *supra* (discussing Congress's rationale for banning all such images). *But cf. id.* at 131, 139–40, 110 S.Ct. 1691 (Brennan, J., dissenting) (suggesting that not only was the statute sufficiently overbroad to prohibit photographs of "toddlers romping unclothed," it impinged upon the constitutional rights of citizens to think and view what they wish in their own homes).

Over the past thirty years, Congress has substantially and repeatedly strengthened criminal laws prohibiting the production, dissemination, promotion and possession of child pornography. The first federal statute prohibiting the use of children in pornographic materials, The Protection of Children Against Sexual Exploitation Act of 1977, Pub.L. No. 95–225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251–52, 2256 (2006)), was limited to matter determined to be obscene by a jury under *Miller.* Federal anti-child pornography statutes have since been amended nine times. In 1982, the Supreme Court determined that child pornography could be categorically excluded from the domain of First Amendment protection, regardless of whether the speech was obscene. *Ferber,* 458 U.S. at 756, 102 S.Ct. 3348 ("States are entitled to greater leeway in

the regulation of pornographic depictions of children."); *see also, e.g., United States v. Matthews*, 209 F.3d 338, 339 (4th Cir. 2000) (journalist's First Amendment defense rejected where child pornography is at issue). The *Ferber* decision allowed states and the federal government to amend their legislation to include "non-obscene" child pornography. *See, e.g.,* Pub.L. No. 98–292, 98 Stat. 204 (1984) (eliminating the requirement that the material be found obscene for the statute to apply). After the Supreme Court approved a state law criminalizing the private possession of child pornography in the 1990 *Osborne* decision, Congress immediately amended the federal statute to include a similar provision. *See* Pub.L. No. 101–647, 104 Stat. 4818 (1990).

The growth of the Internet has intensified legislative and executive branch attention. Federal prosecutors have now virtually abandoned prosecutions for adult obscenity, but increased prosecutions involving children. *See, e.g.,* Jason Krouse, *The End of the Net Porn, Despite Big Talk Federal Efforts Against Adult Obscenity Online Have Withered,* 2008 A.B.A. J. 52, 55 (Feb.2008) (noting that of federal attorneys contacted, "not one said it had any inclination to pursue anything other than child obscenity cases."). The FBI has made "cybercrime," most of which is child pornography, its "third-highest priority behind counterterrorism and counterintelligence." Jerry Markon, *Crackdown on Child Pornography: Federal Action, Focused on Internet, Sets Off a Debate,* Wash. Post, Dec. 15, 2007, at A1. Many states have followed suit, creating legislation criminalizing the distribution, promotion, production, and possession of child pornography. *Osborne,* 495 U.S. at 110–11, 111 n. 6, 110 S.Ct. 1691; *see* Appendix B, *infra.*

Expansive regulatory and enforcement efforts have not gone without criticism.

*See, e.g., United States v. Williams,* 444 F.3d 1286, 1290 (11th Cir.2006) (Congress may be "burn[ing] down the house to roast the pig." (quotation marks omitted)), *cert. granted,* —— U.S. ——, 127 S.Ct. 1874, 167 L.Ed.2d 363 (2007). To save the statute from an overbreadth challenge based upon lack of scienter a majority of the Supreme Court in 1994 declined to follow the statute's "most grammatical reading," *X–Citement Video,* 513 U.S. at 70, 115 S.Ct. 464, over a strong dissent that such a reading "establishes a severe deterrent, not narrowly tailored to its purposes, upon fully protected First Amendment activities." *Id.* at 86, 115 S.Ct. 464 (Scalia, J., dissenting); *see* Part III.A, *supra.* One recent amendment prohibits evidence seized (e.g., computers, hard drives, etc.) in child pornography cases from leaving the confines of a secure government facility, *see* Pub.L. No. 109–248, 120 Stat. 629–30 (2006); by giving the government unlimited access to the evidence and denying defendants the same opportunity, the provision arguably creates an "uneven playing field" and calls into question defendants' rights to due process and a fair trial. Adam Liptak, *Locking Up the Crucial Evidence and Crippling the Defense,* N.Y. Times, Apr. 9, 2007, at A10.

Courts have struck down legislative provisions dealing with child pornography that have gone too far. *See, e.g., Connection Distributing Co. v. Keisler,* 505 F.3d 545 (6th Cir.2007) (holding overbroad and facially invalid a federal recordkeeping requirement for images showing sexually explicit conduct, designed to ensure those depicted are over 18); *Williams,* 444 F.3d 1286 (finding the federal statute's "pandering" provision to be facially unconstitutional on vagueness and other grounds). In 2002, the Supreme Court was forced to declare a child pornography regulation unconstitutionally overbroad and vague in *Ashcroft v. Free Speech Coalition,* 535 U.S.

234, 258, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). The Child Pornography Prevention Act had proscribed the possession or distribution of images that *appear* to depict minors, i.e., the depiction of "an idea— that of teenagers engaging in sexual activity—that is a fact of modern society and has been a theme of art and literature throughout the ages." *Id.* at 246, 122 S.Ct. 1389. Approving such a provision, the Court reasoned, would be akin to criminalizing the use of "cartoons, video games, and candy, that may be used for immoral purposes, yet we would not expect those to be prohibited because they can be misused." *Id.* at 251, 122 S.Ct. 1389; *see also Federal Election Commission v. Wisconsin Right to Life, Inc.,* — U.S. —, 127 S.Ct. 2652, 2670, 168 L.Ed.2d 329 (2007) (discussing *Free Speech Coalition*).

The perceived importance of implementing legislation to curb the exploitation and harm of the nation's children is substantial. The lengths to which Congress and the States have gone to achieve this purpose require evaluating fundamental rights. *See* U.S. Const. amend. I; *Williams,* 444 F.3d at 1300. *See also generally Arizona v. Berger,* 212 Ariz. 473, 134 P.3d 378 (2006) (en banc), *cert. denied,* — U.S. —, 127 S.Ct. 1370, 167 L.Ed.2d 159 (2007). Considering the ongoing debate respecting the appropriate balance between the private rights to view pornography or engage in other First Amendment activities and the need to protect children, the instant case does not provide an appropriate vehicle for declaring defendant's convictions unconstitutional on First Amendment grounds.

### G. Search and Seizure

Two Fourth Amendment issues are raised by the government's investigation of Polizzi: (1) whether Polizzi had a reasonable expectation of privacy in the personal, identifying information he submitted to Time Warner Cable in order to receive Internet service so as to render unconstitutional the government's administrative subpoena to Time Warner to obtain Polizzi's identity; and (2) whether the government had probable cause to support a federal judicial search warrant of Polizzi's home because of Internet activity linking him to a child pornography website. *See* Part II.B.1, *supra.*

Because these issues have not been timely raised by the parties, this court has limited information as to the details of the investigation leading to Polizzi's arrest. By failing to make a pretrial motion to suppress and by not including any such argument in his pending Rule 33 motion, defense counsel seems to have conceded that there was no Fourth Amendment violation. The issue is discussed now to avoid a subsequent collateral challenge to the judgment on the ground of inadequacy of counsel or of an error so egregious that the court should have raised it on its own motion.

Obtaining Polizzi's identity without a warrant from Time Warner, his Internet Service Provider ("ISP"), did not violate any reasonable expectation of privacy under federal law. It is only remotely possible that there was an insufficient basis for a finding of probable cause for the judicially issued search warrant for his home and computers. Despite the importance of Fourth Amendment issues potentially involved in an investigation leading to a computer-based prosecution, the present case does not provide a basis for a finding of a search and seizure constitutional violation. The issue is touched on below.

### 1. Summary of Relevant Facts

Multiple searches were conducted by law enforcement agents in the investigation leading to Polizzi's arrest. *See* Part II.B.1, *supra.* Two federal judicial warrants were issued to seize computer equipment with connections to the targeted

child pornography website "Hardcore," and a third for Polizzi's home and electronics. *See id.*; Govt.'s Letter 1–2, Mar. 19, 2008, Docket Entry No. 136. Much of the investigation in the case was the result of good detective work requiring no judicial warrants. *See* Part II.B.1, *supra.* The only warrantless physical "search" was that of Polizzi's ISP subscriber information, which was obtained by the FBI using an administrative subpoena. *See id.*; Govt.'s Letter 1–2, Mar. 19, 2008. Polizzi's arrest several months after the judicially authorized search of his home occurred pursuant to a court-ordered arrest warrant. *See* Part II.B.1, *supra.*

After identifying a child pornography site from an unsolicited tip from a layperson and running down the probable source and destinations of the pornography, agents obtained and executed a federal judicial search warrant on the site's web host to seize hard drives containing the site's contents. *See id.* Pursuant to a second federal judicial search warrant, agents seized other hard drives at a different location containing the site's financial information and credit card history. *See id.* The website's content hard drives revealed, after analysis, access log records listing the Internet Protocol ("IP") addresses for 1,900 unique users. *See id.* The IP address eventually linked to Polizzi's computer had used the website enough times to create an eight-page access log. *See id.* Through reliance on a relatively simple technology—a "who is ?" query— the ISPs providing the logged IP addresses were identified and administratively subpoenaed to disclose the identities of the users of these addresses. *See id.* A computer registered to Polizzi's Time Warner Internet account was determined to be one such user. *See id.*

Agents then obtained and executed a judicially-issued search warrant for Polizzi's home, seeking computer equipment and evidence related to the possession of child pornography. *See* Parts II.B.1–2, *supra.* Over 5,000 images of child pornography were found on Polizzi's computers and exterior hard drives after seizure and analysis. *See* Part II.B.2, *supra.*

### 2. Fourth Amendment

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures,* shall not be violated, and *no Warrants shall issue, but upon probable cause,* supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added). Government conduct, even if intrusive in the ordinary sense, is not considered a "search" or "seizure" within the meaning of the Fourth Amendment unless the person targeted has "a reasonable expectation of privacy" in the places searched or items seized. *See Kyllo v. United States,* 533 U.S. 27, 32–33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (explaining the "twofold requirement" to finding an expectation reasonable: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' ")). Without a reasonable expectation of privacy, no warrant is required.

When government authorities wish to conduct a search or seizure of a person or object where a reasonable expectation of privacy does exist, they generally must first obtain a warrant from a judicial officer. To obtain a judicial warrant, the government must demonstrate probable cause. Probable cause requires a

"'fair probability,'" under the totality of the circumstances, "'that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (reaffirming the "flexible, easily applied" "totality-of-the-circumstances" standard, under which the "issuing magistrate is simply to make a practical, common-sense decision" in light of "all the circumstances set forth in the affidavit before him.")). Individualized, rather than generalized, suspicion is required. *See Chandler v. Miller*, 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997)

■■■ Even in circumstances where a judicial search warrant is not required, the government must satisfy some formal process—usually that required to obtain a subpoena—before interfering with a person's privacy in a targeted way. *See, e.g.,* Fed.R.Crim.P. 17(a), (c) (providing that the government may compel a third party to produce documentary evidence and other objects by way of a subpoena issued in a criminal "proceeding" "by the clerk under the seal of the court."). When no Fourth Amendment interests are implicated, a "case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued." *United States v. Miller*, 425 U.S. 435, 444, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The nonjudicial administrative subpoena or requests for documents issued during a police investigation are discussed below.

■■ Applicable statutes can suggest whether an expectation of privacy is reasonable. For the online world, one statute, the Electronic Communication and Privacy Act ("ECPA"), 18 U.S.C. §§ 2510–

2711, is particularly important to the legitimacy of government warrants and subpoenas. The ECPA was enacted in 1986 in order to "update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S.Rep. No. 99-541, at *1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555; *see* Mark Elmore, *Big Brother Where Art Thou, Electronic Surveillance and the Internet: Carving Away Fourth Amendment Privacy Protections,* 32 Tex. Tech L.Rev. 1053, 1065–66 (2001) (describing origins of the Act). "[The] ECPA provides the statutory framework governing the interception of electronic communications under the Wiretap Act [Title I of the ECPA] and access to stored electronic communications under the SCA [Stored Communications Act]." Katherine A. Oyama, *E-mail Privacy After United States v. Councilman: Legislative Options for Amending ECPA,* 21 Berkeley Tech. L.J. 499, 499–500 (2006). In general, the ECPA grants the government broad liberty to search online materials by defining electronic privacy narrowly. It allows the government to obtain IP addresses through the use of administrative subpoenas; no warrant is required. A warrant is necessary, however, to obtain the contents of an electronic communication.

## 3. Reasonable Expectation of Privacy

The ECPA was enacted before the Internet was commonly used and this chronology may affect expectations of privacy. If Polizzi had a reasonable expectation of privacy in the subscriber information he submitted to Time Warner to establish his Internet account, then the FBI's warrantless administrative subpoena of Time Warner would have been unconstitutional, despite any ECPA provisions to the contrary. But under federal law such an expectation on his part would not have been reasonable.

There is "no talisman" for determining whether a privacy expectation is objectively reasonable. *See O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). "[C]oncepts of real or personal property law" and conventional attitudes towards privacy are instructive. *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492 (noting factors that "the Court has given weight to," including "the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion." (quotations omitted)). The "operational realities" of a space may play a role; at least in the workplace, employee expectations of privacy in "offices, desks, and file cabinets ... may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *Id.* at 717, 107 S.Ct. 1492.

The Court has been more inclined to find a privacy interest reasonable when a person has the right or practical ability to exclude others and has regularly, or at least deliberately, exercised that right. *See Kyllo*, 533 U.S. at 40, 121 S.Ct. 2038 ("[T]he Fourth Amendment draws .... 'not only [a] firm but also [a] bright' " "line at the entrance to the house" (citation and quotations omitted)); *Katz*, 389 U.S. at 353, 88 S.Ct. 507 (finding that defendant had a reasonable expectation of privacy in his telephone conversation even though the listening device affixed to the outside of the public phone booth involved no physical intrusion); *see also Ex parte Jackson*, 96 U.S. 727, 733, 24 L.Ed. 877 (1877) (explaining, in dicta, that the contents of sealed postal letters are protected against warrantless searches due to the fundamental privacy interest involved).

If the asserted zone of privacy is ordinarily exposed to, or readily accessible by, others, a legitimate privacy interest may be found lacking. *See Florida v. Riley*, 488 U.S. 445, 450–51, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (finding no reasonable privacy expectation in open property to the extent that it is feasibly observable from airspace); *California v. Greenwood*, 486 U.S. 35, 40–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (holding no reasonable privacy expectation in trash discarded at the curb of someone's house for pickup); *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (exposing a person's closed luggage to a "trained canine" for drug detection purposes in a public place does not constitute a search); *Katz*, 389 U.S. at 351, 88 S.Ct. 507 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Information thought to be private but voluntarily disclosed to a third party is not protected under the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 743–44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (no reasonable expectation of privacy in numbers dialed on a telephone due to the risk assumed that the phone company will disclose this information to the government); *Miller*, 425 U.S. at 437, 96 S.Ct. 1619 (bank account records do not command a privacy interest).

Under the "envelope-content" doctrine, a person who reveals information to a third party may nonetheless maintain a legitimate privacy interest in the data if it is of a substantive nature or otherwise qualifies as "content," and the third party is utilized merely to deliver the information or facilitate its communication. *See Katz*, 389 U.S. at 361, 88 S.Ct. 507 (phone company as a facilitator of the phone conversation); *Ex parte Jackson*, 96 U.S. at 733 (postal service as the deliverer of a

sealed letter). "Address" information, intended for the third party, is not protected.

Statutes have been considered by the Court as bearing on the question of whether society accepts a subjective privacy expectation as reasonable. *See, e.g., Miller,* 425 U.S. at 442–43, 96 S.Ct. 1619 (noting that Congress "assumed" that "information kept in bank records" lacked "any legitimate expectation of privacy" when enacting the then-applicable "Bank Secrecy Act," "the expressed purpose of which [was] to require records to be maintained because they have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings." (quotation marks and citation omitted)).

Of particular relevance is the EPCA, considered in evaluating privacy expectations in information submitted to ISPs. *See United States v. Hambrick,* 55 F.Supp.2d 504, 507 (W.D.Va.1999), *aff'd,* 225 F.3d 656 (4th Cir.2000) ("For Fourth Amendment purposes, this court does not find that the ECPA has legislatively determined that an individual has a reasonable expectation of privacy in his name, address, social security number, credit card number, and proof of Internet connection. The fact that the ECPA does not proscribe turning over such information to private entities buttresses the conclusion that the ECPA does not create a reasonable expectation of privacy in that information."). Terms of service agreements between customers and businesses have been considered relevant to characterization of privacy interests. *See e.g., Freedman v. America Online, Inc.,* 412 F.Supp.2d 174, 181 (D.Conn.2005) (considering the customer's contract with his ISP in assessing the reasonableness of the asserted privacy interest); *United States v. Maxwell,* 45 M.J. 406, 417–18 (C.A.A.F.1996), *aff'd,* 46 M.J. 413 (C.A.A.F. 1996) (holding that defendant had a limited privacy interest in sent email messages in

light of the ISP's privacy policy, but noting that "implicit promises or contractual guarantees of privacy by commercial entities do not guarantee a constitutional expectation of privacy.").

### 4. Third–Party and Envelope– Content Doctrine

Both the third-party and the envelope-content doctrines weigh heavily against the reasonableness of any expectation of privacy that Polizzi may have had in the information used to ferret him out. Polizzi voluntarily gave Time Warner, a third party, his personal information necessary to obtain the ISP's services. IP "addresses" are generally considered envelope—not content—information. Information knowingly disclosed to a third party generally falls outside of the protections of the Fourth Amendment under the "third-party doctrine." Through disclosure, a person takes the risk that a third party may share the information with the government, defeating any asserted privacy interest. *See Smith,* 442 U.S. at 745, 99 S.Ct. 2577; *Miller,* 425 U.S. at 443, 96 S.Ct. 1619; *see also* Matthew D. Lawless, Note, *The Third Party Doctrine Redux: Internet Search Records and the Case for a "Crazy Quilt" of Fourth Amendment Protection,* 11 UCLA J.L. & Tech 2, 10–12 (2007) (describing history of doctrine). *But cf. New Jersey v. Reid,* 194 N.J. 386, 945 A.2d 26, 31–32, 33–34 (2008) (holding that the New Jersey Constitution, which "affords [New Jersey] citizens greater protection against unreasonable searches and seizures" than the Fourth Amendment, "protects an individual's privacy interest in the subscriber information he or she provides to an Internet service provider."). As elaborated by the Supreme Court,

[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if

the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Miller,* 425 U.S. at 443, 96 S.Ct. 1619. That a person lacks knowledge that the third party would disclose the information to the government is of limited constitutional significance. Of greater import is whether a person should reasonably expect that the third party is amenable to such disclosures. *Smith,* 442 U.S. at 745, 99 S.Ct. 2577.

The envelope-content doctrine operates as an exception to the otherwise broad coverage of the third-party rule. If the information disclosed can be properly characterized as "content" due to its substantive nature (i.e., not intended for recordkeeping or instructional purposes), and the third party is not the designated recipient but is employed as a professional provider of transmittal services to forward the information to some other party, constitutional privacy protections apply to the contents. *See Katz,* 389 U.S. at 354, 88 S.Ct. 507 (finding protectable the "contents" of an audio conversation occurring in a public telephone booth); *Ex parte Jackson,* 96 U.S. at 733 (contents of sealed letters protected). As would be expected, an enclosed message commands greater privacy protection than the address displayed on the envelope used to send the message; a person may reasonably expect more privacy in an actual telephone conversation than in the numbers dialed. *See* Lawless, *supra,* at 16–26 (discussing the application of the exception).

The Supreme Court has applied the third-party doctrine to find no expectation of privacy in information submitted to a business or public utility in order to maintain an account or receive some service. *See Miller,* 425 U.S. at 442, 96 S.Ct. 1619; *Smith,* 442 U.S. at 743–45, 99 S.Ct. 2577.

In *Miller,* a bank depositor was found not to have a reasonable expectation of privacy in financial data "voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business," *Miller,* 425 U.S. at 442, 96 S.Ct. 1619, because the Court found the customer had "*take[n] the risk*" that the bank would disclose the information to the government. *Id.* at 437, 443, 96 S.Ct. 1619 (emphasis added). The same assumption-of-risk rationale was invoked in *Smith,* where the Court held there is no reasonable privacy interest in dialed telephone numbers, even those on a home phone. A person "*assume[s] the risk* that the [phone] company [will] reveal [these numbers] to police." *Smith,* 442 U.S. at 743–45, 99 S.Ct. 2577 (explaining that an asserted privacy interest is defeated when the company has recording facilities and is "free to record" the information. The Court also alluded to the non-content nature of dialed phone numbers: In order "to complete the call," this "numerical information," must be conveyed to the phone company.).

Although the Supreme Court has not yet directly indicated whether a person has a reasonable privacy interest in personal information submitted to ISPs in order to receive Internet and email service, the reasoning of *Miller* and *Smith* supports the conclusion that no such reasonable expectation exists. In *United States v. Hambrick,* 225 F.3d 656, 2000 WL 1062039 (4th Cir. Aug. 3, 2000), the Fourth Circuit Court of Appeals faced a situation virtually identical to Polizzi's. The court held that the police subpoena of an ISP to identify the user of a particular IP address suspected of unlawful activity did not constitute a Fourth Amendment search because the third-party doctrine foreclosed any expectation of privacy, especially when the information constituted "mere[ ] third-party business records." *Id.* at 2000 WL 1062039, at *1–4; *see also, e.g., Freedman,*

412 F.Supp.2d at 181 (noting that "courts have universally found that, for purposes of the Fourth Amendment, a subscriber does not maintain a reasonable expectation of privacy with respect to his subscriber information"); *United States v. Cox,* 190 F.Supp.2d 330, 332 (N.D.N.Y.2002) (same). The *Hambrick* court concluded that "the account information given to the ISP in order to establish the e-mail account ... is non-content information" in which a person has no privacy interest. *Hambrick,* 2000 WL 1062039, at *4 (citing *Smith,* 442 U.S. at 741, 99 S.Ct. 2577). Based on the third-party and envelope-content doctrines embodied in federal case law, Polizzi had no reasonable expectation of privacy in the information he submitted to Time Warner. Codifying these doctrines as applied to the realm of electronic communications, the Electronic Communications Privacy Act ("ECPA") prevents any valid Fourth Amendment claim.

### 5. Electronic Communication Privacy Act

Continuing the envelope-content distinction, the ECPA provides less protection to "[r]ecords concerning electronic communication service[s]" than to the "contents of [an] electronic communication." *See* 18 U.S.C. § 2703. It affords different levels of protection to electronically transmitted information depending on the type of information and the method by which it is accessed by the government or another third party. Two general trends are observable: (1) content receives greater protection than non-content information, and (2) more formal process is required to intercept or otherwise unilaterally retrieve information than to receive it directly from an electronic communication service.

The most security against government interception is accorded to substantive communications. *See* § 2511(1)(a); § 2510(4) (defining "intercept" as the "acquisition of the *contents* of any ... elec-

tronic ... communication" (emphasis added)). Interception must be conducted pursuant to a judicial surveillance order based on findings of probable cause and upon a showing that alternatives are not readily available. *See* §§ 2516, 2518(1)(c), (3); *see also* Orin S. Kerr, *Internet Surveillance Law After the USA PATRIOT Act: The Big Brother That Isn't,* 97 Nw. U.L.Rev. 607, 621 (2003) (describing an intercept order as a "super search warrant" (quotation omitted)). By contrast, stored communications generally may be obtained through a warrant, or through an administrative subpoena if prior notice is given to the subscriber. §§ 2703(a), (b), (d).

A properly issued administrative subpoena does not require probable cause or judicial approval. *See* Oyama, *supra,* at 508 (citing Daniel J. Solove, *Reconstructing Electronic Surveillance Law,* 72 Geo. Wash. L.Rev. 1264, 1284 (2004)). It is sufficient to show "specific and articulable facts" for believing the communications sought are "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d); *see also* Solove, *supra,* at 1284 (describing how the federal subpoena power has been analogized to a "blank check").

The least protection is afforded to ISP subscriber information retrievable from the user's electronic communication service. This information may be obtained, without providing any notice, by administratively subpoenaing the service:

*A provider of electronic communication service[s] ... shall disclose to a governmental entity the—(A) name; (B) address; (C) local and long distance telephone connection records, or records of session times and durations; (D) length of service ...; (E) telephone or ... other subscriber number or identity, including any temporarily assigned network address;* and (F) means and

source of payment ... (including any credit card or bank account number) of a subscriber to or customer of such service *when the governmental entity uses an administrative subpoena authorized by a Federal or State statute* [or acts pursuant to other specified means].

18 U.S.C. § 2703(c)(2) (emphasis added). In an emergency, an electronic communication service may "divulge" to a governmental entity both record information and the contents of a communication. *See, e.g.,* 18 U.S.C. § 2702(b)(7) ("appear to pertain to the commission of a crime"); § 2702(b)(8) ("an emergency involving danger of death or serious physical injury"); § 2702(c)(6) ("National Center for Missing and Exploited Children").

The Supreme Court and the Second Circuit Court of Appeals have not addressed the constitutionality of § 2703 of the ECPA or related sections addressing the retrieval by the government of electronically communicated information through means other than interception. Other courts have used the ECPA as additional justification to uphold warrantless subpoenas of ISP subscriber information. In *Freedman,* the district court cited three factors in concluding that an ISP subscriber lacked a legitimate privacy interest in his account information: (1) "the distinction between the content of electronic communications, which is protected, and non-content information ... which is not;" (2) the service agreement between the subscriber and ISP, putting the subscriber on general notice of the possibility of disclosure; and (3) the language of the ECPA, which expressly permits ISPs to disclose subscriber information to nongovernmental third parties and also to the government, under restrictive conditions. *See Freedman,* 412 F.Supp.2d at 181–83 (referring to 18 U.S.C. § 2701 *et seq.*) (holding that an America Online ("AOL") subscriber did not have an "objectively reasonable" expectation of privacy in personal, identifying information "voluntarily exposed to AOL employees in the normal course of business").

It was reasonable for the law enforcement officers investigating Polizzi's activities to conclude that they did not need a valid judicial search warrant to obtain his subscriber's identity from Time Warner, even if the defendant "believed that [Time Warner] would not disclose his identity." *See id.*

 Neither would the government have needed a judicial warrant to obtain Polizzi's email address. *See United States v. Forrester,* Nos. 05–50410, 05–50493, 2007 WL 1952390, *6, 2008 U.S.App. LEXIS 202, at *22–23 (9th Cir. July 6, 2007) (concluding that government surveillance of email addresses, which is "conceptually indistinguishable from government surveillance of [envelope information on] physical mail" does not constitute a Fourth Amendment search). It is the visible exposure of physical or electronic addresses to the service provider which enables receipt of a desired service; as the intended recipient of the address information, the service provider cannot be expected to preserve its confidentiality. *See United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir.2004) (citation omitted); *see also Maxwell,* 45 M.J. at 417. No expectation of privacy exists for other similar online transactional information, such as a user's Internet search history. *See United States v. Allen,* 53 M.J. 402, 409 (C.A.A.F.2000) (ISP records of customers' visited websites not protected from warrantless searches).

ISP subscriber information is conveyed *to* a service provider in order to be used by the provider, whereas the body of an email is conveyed *through* a service provider, for consumption by some other party, as directed by the sender's specification of email addresses. Courts have generally found a reasonable expectation of privacy

in the email messages themselves. *See, e.g., Maxwell,* 45 M.J. at 417–18 (analogizing email messages to sealed postal letters and telephone conversations, and concluding that "the transmitter of an e-mail message enjoys a reasonable expectation that police officials will not intercept the transmission without probable cause and a search warrant."); *Warshak v. United States,* No. 06–CV–357, 2006 WL 5230332, *5, 2006 U.S. Dist. LEXIS 50076, at *13–17 (S.D.Ohio July 21, 2006) (expectation of privacy in emails not necessarily unreasonable), *aff'd in part, modified in part, remanded by* 490 F.3d 455 (6th Cir.2007), *vacated by* 2007 U.S.App. LEXIS 2341 (6th Cir. Oct. 9, 2007). Once an email message arrives at its destination, any privacy expectation that the intended recipient of the Internet communication will not reveal it dissipates. *Lifshitz,* 369 F.3d at 190 (explaining that Internet users "would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose expectation of privacy ordinarily terminates upon delivery of the letter") (citations and quotations omitted); *see also Maxwell,* 45 M.J. at 417 (as with postal letters, once an email message "is received and opened," its "destiny ... lies in the control of the recipient ..., not the sender, absent some legal privilege.").

Polizzi's Fourth Amendment rights were not violated by the government's warrantless administrative subpoenaing of identifying information he submitted to Time Warner.

### 6. Probable Cause for Search of Home

In order to lawfully search Polizzi's home for evidence of child pornography, law enforcement officers had to obtain a search warrant from a neutral judicial officer to comply with the Fourth Amendment. A judicial warrant must be issued "if there is probable cause to search for and seize ... property," Fed.R.Crim.P. 41(d)(1), which is defined as "contraband, fruits of crime, or other items illegally possessed" or "property designed for use, intended for use, or used in committing a crime." Fed.R.Crim.P. 41(c)(2)-(3). The warrant must describe with particularity the place to be searched and the items to be seized. "There must be a showing of probable cause to believe that the items are at the place or probable cause against a suspect and a probability that the items are at a place controlled by the suspect." Moore's Federal Practice, Criminal Procedure § 641.11. Because "search warrants are directed not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found[, ... t]he owner of the property searched need not be suspected of having committed a crime, and property of a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant." *Id.* Authorization to search a suspect's home may be obtained even without direct observation of criminal behavior at the home. *Id.*

No higher standard is required for materials alleged to be presumptively protected by the First Amendment. *New York v. P.J. Video, Inc.,* 475 U.S. 868, 874, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986). Search warrants permitting the seizure of "assorted pornographic videotapes, assorted pornographic magazines, [and] assorted devices" do not implicate any special Fourth Amendment rights. *United States v. Layne,* 43 F.3d 127, 132–33 (5th Cir.1995) (search warrant listing computer software and hardware, computer disks and disk drives as items to be seized from defendant suspected of child pornography was not overly broad, although it did not restrict items to those related to suspected crime, since images discovered, including deleted images, could not be easily obtained through on-site inspection). *But*

see *Marcus v. Search Warrants*, 367 U.S. 717, 738, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) (Black, J., concurring) (disallowing a warrant for the search and seizure of "all 'obscene' materials" located at a particular place because a main purpose of the Fourth Amendment was to bar government use of such broad general warrants) (citation omitted).

■ In the instant case there was sufficient basis for a finding of probable cause to issue a judicial warrant for the search of Polizzi's residence and computers. The IP address found on Hardcore's hard drives that was eventually linked to Polizzi's computer had accessed the paid-members-only website enough times and downloaded enough images to create an eight-page log. In *United States v. Lacy*, 119 F.3d 742 (9th Cir.1997), the Ninth Circuit found probable cause in a similar situation, where "the affidavit reported that an individual had telephoned a Danish computer bulletin board system and downloaded at least two files containing child pornography. The telephone calls were traced, by telephone records, to the defendant's home. Hence, there was specific information that the defendant's home telephone was used to download at least two images of child pornography." *United States v. Perez*, 247 F.Supp.2d 459, 483 (S.D.N.Y.2003) (summarizing *Lacy*). *Compare also, e.g., United States v. Coreas*, 419 F.3d 151 (2d Cir.2005), *cert. denied*, 547 U.S. 1192, 126 S.Ct. 2861, 165 L.Ed.2d 895 (2006) (less than probable cause) *and Perez*, 247 F.Supp.2d at 481 (granting suppression motion because defendant's subscription "to a website where unlawful images of child pornography could be downloaded" did not support a "fair probability" that contraband would be found at the home) *with United States v. Kelley*, 482 F.3d 1047 (9th Cir.2007) (sufficient probable cause) *and United*

*States v. Martin*, 418 F.3d 148 (2d Cir. 2005) (same).

There remains a tension between the public's sense of Fourth Amendment protections and the intense forensic searches of the Internet for violators of child pornography laws. As Judge Chin described this sense of disquiet in *Perez*,

On the one hand, child pornography and the sexual abuse of children are crimes that have been fueled by the internet.... On the other hand, when law enforcement gathers information about the activity of individuals on the internet, the potential for unreasonable intrusions into the home—the chief concern of the drafters of the Fourth Amendment—is great. This case demonstrates the tension that can exist: the Government argues, in essence, that it had probable cause to search the homes and seize the computers of thousands of individuals merely because they entered their email addresses into a website where images of child pornography were available, even without any proof that the individuals uploaded, downloaded or discussed the images, or otherwise participated in the website.

247 F.Supp.2d at 461; *see Kelley*, 482 F.3d at 1058 (Thomas, J., dissenting) ("I well understand our government's motivation. Child pornography is a scourge on our nation. But every hour, millions of unsolicited and deceptively disguised emails are sent to innocent computer users. Lowering our standards of probable cause to permit government intrusion into private residences based solely on proof of mere transmittal of unsolicited email constitutes an unwarranted erosion of the Fourth Amendment."); *Coreas*, 419 F.3d at 151 ("Child pornography is so repulsive a crime that those entrusted to root it out may, in their zeal, be tempted to bend or even break the rules. If they do so, however, they endanger the freedom of all of us.").

### 7. Policy Considerations

Whether in the online context Fourth Amendment doctrine, both case law and statutory interpretation, sufficiently protects the average citizen's "reasonable" privacy expectations is unclear. Most protections are construed narrowly in order to reduce any expectation of privacy in much of what a person does or says online. This construction may not comport with contemporary practices and popular conceptions. Anecdotal evidence of the kind of foolish and flip statements made in many emails, which come back to haunt the writer, strongly imply that when the author hits the send key, there is an expectation that the only person who will view this information is the intended recipient. This understanding may be even stronger when a person uses his own computer to relay the information and acts within the exclusivity of his own home—that cherished bastion of privacy and security. See Reid, 945 A.2d at 32–33 ("ISP records .... are integrally connected to essential activities of today's society. [I]t is hard to overstate how important computers and the Internet have become to everyday, modern life.... [W]hen users surf the Web from the privacy of their homes, they have reason to expect that their actions are confidential."). Scholarly field investigations to determine the public's actual expectations, as contrasted with judges' constructive expectation doctrine, would be useful as a basis for policy-making.

To peremptorily exclude this method of communication from the protections of the Constitution, because it does not follow the formalities of eighteenth-century communication by letters utilizing sealing wax and signet rings of the wealthy, seems out of place in a modern democracy such as ours which favors privacy as well as almost universal freedom of communication. There is probably still a residual belief among some in this country that gentlemen and ladies do not read other's mail—or email. See Respectfully Quoted: A Dictionary of Quotations 287 (Suzy Platt, ed., 1989) (quoting Henry Lewis Stimson, Secretary of State under President Herbert Hoover).

It seems unrealistic and impolitic to deny Fourth Amendment privacy rights on the ground that the information communicated is not substantive in nature, given that people may not distinguish, in any meaningful way, between content and envelope information in the Internet context. It may be impossible to make a clear distinction; certain online information, such as email subject headings and Internet search queries, may arguably qualify as either or both. Cf. Lawless, supra, at 18–21 (noting difficulty of applying the content-envelope distinction to Internet search records given the sheer variety of inquiries and complexity of information exchange dynamics).

Law enforcement agencies and their sources of information cannot always respect this distinction in practice. See, e.g., Eric Lichtblau, Through an Error, FBI Gained Unauthorized Access to Email, N.Y. Times, Feb. 17, 2008, at 1 (describing instances where the FBI mistakenly gained access to content information: "A technical glitch gave the FBI access to the e-mail messages from an entire network— perhaps hundreds of accounts or more— instead of simply the lone e-mail address that was approved by a secret intelligence court as part of a national security investigation.... A report in 2006 by the Justice Department inspector general found more than 100 violations of federal wiretap law in the two prior years by the Federal Bureau of Investigation, many of them considered technical and inadvertent."). Whether information is characterized as content or non-content often must be determined not ex-ante but ex-post after it is

obtained, since the information cannot be qualitatively assessed until it is actually reviewed. *Cf. id.* at 18–19. The long history of the third-party doctrine—removing constitutional protection to information disclosed to a third party on the ground that the third party has the technical ability to disclose the information to the government—may not be compatible with the typical expectations of the general populace, notwithstanding its sophistication and computer savviness.

Given the present state of the law, there is no ground to strike the forensic evidence in the instant case, particularly since a motion to suppress on Fourth Amendment grounds was not timely made.

### H. Separation of Powers

The Framers of the Constitution deliberately divided the powers of government among the three separate branches: the executive, legislative, and judiciary. *See* U.S. Const. art. I, § 1, art. II § 1, art. III § 1. It "enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Federal sentencing is not assigned explicitly by the Constitution to any one branch. *See Mistretta v. United States,* 488 U.S. 361, 364, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The task has been shared among the three. *See id.* Sentencing, when the Constitution was adopted, was largely the province of judge and jury. *See* Part IV, *infra.* But the judiciary has never held sentencing to be purely within its own constitutionally delegated powers. *See, e.g., Chapman v. United States,* 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). The executive through its charging power also has a large degree of control over sentences.

Two decades ago, federal Sentencing Guidelines developed in the name of consistency, uniformity, and fairness stripped trial judges of much of their historical discretion and mandated a somewhat robotic application of rigid, highly complex rules. In 2005 the Supreme Court restored broad judicial discretion in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), declaring the federal Sentencing Guidelines unconstitutional if viewed as mandatory rather than advisory, and implementing appellate review for reasonableness. Necessarily, more input into sentencing was afforded juries. *See* Part IV, *infra.* The *Booker* line of cases had no effect on statutory mandatory minimum sentencing, which limits judicial discretion.

There is a current concern that statutory mandatory minimums have shifted too much power from the judiciary to the executive. Justice Kennedy has declared:

> Under the federal mandatory minimum statutes a sentence can be mitigated by a prosecutorial decision not to charge certain counts. There is debate about this, but in my view, a transfer of sentencing discretion from a judge to an Assistant U.S. Attorney, often not much older than the defendant, is misguided. Often these attorneys try in good faith to be fair in the exercise of discretion. The policy, nonetheless, gives the decision to an assistant prosecutor not trained in the exercise of discretion and takes discretion from the trial judge. The trial judge is the one actor in the system most experienced with exercising discretion in a transparent, open, and reasoned way. Most of the sentencing discretion should be with the judge, not the prosecutors.

Anthony M. Kennedy, Address at the American Bar Association Annual Meeting (Aug. 9, 2003); *cf. United States v. Sanco Grant III,* 524 F.Supp.2d 1204, 1215–16

(C.D.Cal.2007) (summary of some criticisms of mandatory minimums).

Justice Breyer has also voiced his concerns that mandatory minimum sentences are not only responsible for a shift in power away from the courts, but also have acted to undercut the current sentencing regime:

> Mandatory minimum sentences are fundamentally inconsistent with Congress' simultaneous effort to create a fair, honest, and rational sentencing system through the use of Sentencing Guidelines. Unlike Guideline sentences, statutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency. They rarely reflect an effort to achieve sentencing proportionality—a key element of sentencing fairness that demands that the law punish a drug "kingpin" and a "mule" differently. They transfer sentencing power to prosecutors, who can determine sentences through the charges they decide to bring, and who thereby have reintroduced much of the sentencing disparity that Congress created Guidelines to eliminate.

*Harris v. United States,* 536 U.S. 545, 570–71, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (Breyer, J., concurring in part and concurring in the judgment) (citations omitted).

### 1. Mandatory Minimums Historically and Today

"Since the beginning of the Republic, Congress and the States have enacted mandatory sentencing schemes." *Harmelin v. Michigan,* 501 U.S. 957, 1006, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (citing *Mistretta,* 488 U.S. at 363, 109 S.Ct. 647; *United States v. Grayson,* 438 U.S. 41, 45–46, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Ex parte United States,* 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916)); *see also Grayson,* 438 U.S. at 45, 98 S.Ct. 2610 ("In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature. Each crime had its defined punishment.") (citations omitted). The fixed sentence system did not last.

The 1951 Boggs Act created the first modern day federal mandatory minimum sentences, five– and ten-year terms for certain drug offenses. Pub.L. No. 82–255, 65 Stat. 767 (1951) (repealed 1970). In 1970, Congress repealed almost all federal mandatory minimum sentences for drug offenses as part of the Comprehensive Drug Abuse and Control Act of 1970. *See* Sentencing History Repeating?, FAMM-Gram (Families Against Mandatory Minimums), Spring 2007, at 1. Beginning in the mid–1970s, states began experimenting with higher maximum sentences, more use of statutory minimums, and long fixed sentences for repeat offenders. *See, e.g.,* Mich. Comp. Laws § 333.7401 (1978) (repealed 1998) (establishing a mandatory minimum penalty of life without parole for delivery of 650 grams of heroin or cocaine); 1973 N.Y. Laws 276, 277, 278, 676 (collectively known as the Rockefeller Drug Laws, establishing mandatory minimum sentences of fifteen years to life for certain drug offenses). Mandatory minimums on the federal level were readopted by Congress in 1986. Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (codified as amended at 21 U.S.C. § 801 (2006)).

Today, federal statutory mandatory minimums are common for drug crimes, firearm possession, and sex offenses. *See* Appendix C, *infra;* Adam Walsh Child Protection and Safety Act, Pub.L. No. 109–248, 120 Stat. 587 (2006) (increasing mandatory minimums for violent crimes against children, sex trafficking of chil-

dren, and sexual offenses against children); Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009 (1996); Anti–Drug Abuse Act of 1986 (imposing five– and ten-year mandatory minimum terms of imprisonment for possession of certain quantities of crack cocaine); Armed Career Criminal Act of 1984, Pub.L. No. 98–473, 98 Stat. 2185 (1984) (requiring imposition of a 15–year prison sentence for an individual with prior serious drug or violent felony convictions); 18 U.S.C. § 924(c)(1) (providing increasing mandatory minimum sentences for firearms use in connection with drug transactions and violent crimes); 21 U.S.C. § 841(b)(1) (prescribing five– and ten-year minimum sentences for various offences of drug manufacture and distribution); 21 U.S.C. § 960(b) (penalizing the importation and exportation of certain drugs by five– and ten-year minimums).

### 2. The Judiciary's Power Under Article III

Article III of the Constitution reserves to the judiciary the power to decide all "cases" and "controversies." U.S. Const. art. III, § 2. In *Mistretta*, the Supreme Court recognized that while the separation of powers is "essential to the preservation of liberty," the Framers did not intend for the three branches to remain autonomous. *Mistretta*, 488 U.S. at 379, 109 S.Ct. 647; *see also* Michael Buescher, *Rebuilding the Safety Mechanism: Does U.S.C. § 3553(e) Violate the Separation of Powers?* 76 Fordham L.Rev. 1065, 1088 (2007). The Supreme Court has recognized that Congress has the power to fix the sentence for a federal crime. *Mistretta*, 488 U.S. at 364, 109 S.Ct. 647. Laws that impose mandatory minimums remove discretion from the judiciary to "impose a sentence sufficient, but not greater than, necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a).

Extensive use of mandatory minimums has created grave problems in criminal justice system administration. Under these statutes, a defendant convicted of a particular crime faces what is sometimes an unnecessarily harsh sentence which the judge is powerless to adjust. These minimums are sometimes out of proportion to penalties set by otherwise controlling guidelines. In practice, the bounded discretion of judges is replaced with the unbounded discretion of the prosecutor to choose whether to charge a crime subject to a mandatory minimum or waive the minimum.

Statutes that impose mandatory minimums shift the power to sentence largely to the legislative and executive branches. With mandatory minimum sentencing programs, the legislative branch effectively decides on punishment. *See* Buescher, *supra*, at 1066–67. The executive has nearly exclusive power to decide to bring a charge that carries with it a mandatory minimum sentence, and to determine whether a judge can consider the defendant's cooperation significant enough to warrant a downward departure. *Id.* If a defendant is found guilty of a crime that carries a statutory minimum sentence, and the prosecutor has determined that he or she should not be eligible for a downward departure, a judge has no discretion but to impose at least the mandatory minimum sentence. *But cf. United States v. Sanco Grant III*, 524 F.Supp.2d 1204 (C.D.Cal. 2007) (mandatory minimum did not apply under Due Process Clause because defendant was a peripheral offender and government instigated the crime to place it within the ten-year category).

The combination of mandatory minimum penalties, rigid guidelines, elimination of parole, and reduced use of probation or other nonincarceratory sanctions has resulted in the United States punishing of-

fenders much more severely than other nations and having more people per capita in prison. The cost has been unnecessarily great to offenders, their families, the community, the corrections system, and taxpayers.

### 3. Congress Has the Power to Enact Mandatory Minimums

 Whatever their impolitic nature, statutory mandatory minimums are presumptively constitutionally valid. "One of the first principles of constitutional adjudication [is] the basic presumption of the constitutional validity of a duly enacted state or federal law." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 60, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring). Congress's constitutional powers include the power to enact mandatory minimum sentences. "It is beyond question that the Legislature 'has the power to define criminal punishments without giving the courts any sentencing discretion.'" *Harmelin,* 501 U.S. at 1006, 111 S.Ct. 2680 (Scalia, J., concurring) (quoting *Chapman v. United States,* 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)).

 Though mandatory minimum penalties may be unsoundly aggrandizing the power of the executive and legislative branches, the Supreme Court and Second Circuit Court of Appeals precedents establish that the power to sentence does not lie in the hands of the judiciary alone. Since the initial institution of the practice of widespread imprisonment in the United States, the legislature has assumed major responsibility for prescribing periods of incarceration for offenses. *See Grayson,* 438 U.S. at 45, 98 S.Ct. 2610. The Supreme Court has recognized the power of Congress to do so.

> [T]he authority to define and fix the punishment for crime is legislative and includes the right in advance to bring within judicial discretion, for the purpose of executing the statute, elements of consideration which would be otherwise beyond the scope of judicial authority, and that the right to relieve from the punishment, fixed by law and ascertained according to the methods by it provided, belongs to the executive department.

*Ex Parte United States,* 242 U.S. at 42, 37 S.Ct. 72; *see also Chapman,* 500 U.S. at 467, 111 S.Ct. 1919; *Mistretta,* 488 U.S. at 364, 109 S.Ct. 647; *United States v. Cunningham,* 191 Fed.Appx. 670, 675 (10th Cir.2006). The Supreme Court and circuit courts have also recognized the right of the legislature to deny the courts *any* sentencing discretion. *Cunningham,* 191 Fed.Appx. at 675 (quoting *Chapman,* 500 U.S. at 467, 111 S.Ct. 1919); *Geraghty v. United States Parole Commission,* 719 F.2d 1199, 1211 (3d Cir.1983) ("Circumscribing the judiciary's authority as to what length of imprisonment may be imposed has been found to be a proper invasion of that branch's authority.").

The Court of Appeals for the Second Circuit has expressly recognized that sentencing is not a power solely within the confines of the judicial branch:

> "Sentencing is not inherently or exclusively a judicial function," *Geraghty,* 719 F.2d at 1211, and "the sentencing function long has been a peculiarly shared responsibility among the Branches of government and has never been thought of as the exclusive constitutional province of any one Branch." *Mistretta,* 109 S.Ct. at 664 (citing *United States v. Addonizio,* 442 U.S. 178, 188–89, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979)). In *Mistretta,* the Supreme Court reaffirmed that "the scope of judicial discretion with respect to a sentence is subject to congressional control." 109 S.Ct. at 650 (citing *Ex parte United States,* 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916)). In

fact, as appellant concedes, Congress can constitutionally eliminate all discretion in sentencing judges by establishing mandatory sentences, *id.* at 650–51, and thus has the power to preclude sentencing judges from giving any consideration to a defendant's cooperation.

*United States v. Huerta,* 878 F.2d 89, 93 (2d Cir.1989) (holding that 18 U.S.C. § 3553(e), which limits judicial authority to impose a sentence below the statutory minimum, is not a violation of the separation of powers). It has rejected the argument that mandatory minimum sentences violate the separation of powers doctrine. *United States v. Sanchez,* 517 F.3d 651 (2d Cir.2008); *United States v. Vargas,* 204 Fed.Appx. 92 (2d Cir.2006) (unpublished). It declined an opportunity to revisit this decision even in light of recent changes in sentencing jurisprudence and the growth in judicial *de facto* sentencing power:

> To the extent the decision to charge crimes carrying mandatory minimum sentences allows the Executive Branch to exercise some control over a defendant's sentence, that control continues to derive from legislative decisions that are well within Congress's authority to make. *See Mistretta v. United States,* 488 U.S. at 364, 109 S.Ct. 647. Accordingly, this panel has no reason to revisit *Huerta*'s holding that imposition of a mandatory minimum sentence does not violate separation of powers.

*Vargas,* 204 Fed.Appx. at 94.

In *Vargas* the defendant argued that *Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, supports a finding that mandatory minimums are unconstitutional, and, consequently, *Huerta* should be reconsidered. *Vargas,* 204 Fed.Appx. at 94 ("Vargas contends that *Booker* 'foreshadowed' a finding that mandatory minimums are unconstitutional 'by emphasizing the importance of judicial discretion, the Judiciary's ability to consider all relevant fac-

tors in order to impose a sentence, and the dangers of expanded Executive power.' "). The court rejected the notion. *Id.* at 95 ("[*Booker*] did not foreshadow the end of, or otherwise cast doubt on the constitutionality of, mandatory minimum sentences."). It suggested that if the defendant believed *Booker* provided an incentive to the legislative and executive branches to rely increasingly on mandatory minimums, the concern should be voiced to Congress. *Id.*

#### 4. Analysis of the Statute

Scholars conclude that the Supreme Court has adopted two main methods of analyzing statutes under the separation of powers doctrine: functionalism and formalism. Buescher, *supra,* at 1080; Peter L. Strauss, Symposium: *Bowsher v. Synar: Formal and Functional Approaches to Separation of Powers Questions—A Foolish Inconsistency?,* 72 Cornell L.Rev. 488, 489 (1987).

The functional approach, as adopted by the majority in *Mistretta,* inquires whether "one branch ... assumes a function that is more properly entrusted to another." Buescher, *supra,* at 1084 (quoting *INS v. Chadha,* 462 U.S. 919, 963, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (Powell, J., concurring)). Considered is the extent to which an act "prevents the [branch] from accomplishing its constitutionally assigned functions." *Chadha,* 462 U.S. at 1000, 103 S.Ct. 2764 (White, J., dissenting). The method is flexible, allowing blurring between boundaries of the three branches so long as power over a branch's core function is not usurped by another. *See* Strauss, *supra,* at 489.

The formalist approach, as exemplified by the majority opinion in *Chadha,* is more rigid. It invalidates a law that does not keep a branch within its "prescribed sphere of power," allowing less commingling of functions. Buescher, *supra,* at

1080. This approach requires a two-step analysis: first, characterizing the power being exercised, and second, determining whether that power is within the appropriate branch. *Id.*

In evaluating sentencing statutes, the Supreme Court has employed a functional approach. *See Mistretta,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714. *But see id.* at 426–27, 109 S.Ct. 647 (Scalia, J., dissenting) ("[A]s its name suggests, [the Constitution] is a prescribed structure, a framework, for the conduct of government. In designing that structure, the Framers themselves considered how much commingling was, in the generality of things, acceptable, and set forth their conclusions in the document.... Consideration of the degree of commingling that a particular disposition produces may be appropriate at the margins, where the outline of the framework itself is not clear."). As the majority noted in *Mistretta,*

> [W]hile our Constitution mandates that "each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others," the Framers did not require— and indeed rejected—the notion that the three Branches must be entirely separate and distinct.

*Id.* at 380, 109 S.Ct. 647 (citations omitted). *See also* Monograph, Reform of Court Rule–Making Procedures 53 (1977) ("There has never been a fully compartmentalized separation of powers.").

The Court of Appeals for the Second Circuit has also applied functionalism in assessing sentencing statutes for violations of the separation of powers doctrine. *See Huerta,* 878 F.2d at 92 ("Instead, courts are to employ a 'flexible understanding of separation of powers.' In *Mistretta,* the Supreme Court .... directed courts to 'up[hold] statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment.' ") (citations omitted); *see also Vargas,* 204 Fed.Appx. at 94 (citing *Huerta* and *Mistretta* and rejecting separation of powers argument).

■ A conviction for receiving child pornography under 18 U.S.C. § 2252(b)(1) requires a mandatory minimum sentence of five years' imprisonment. This minimum was established by the legislature in a 1986 amendment. Pub.L. No. 99–500, 100 Stat. 1783–75 (1986); Pub.L. No. 99–591, 100 Stat. 3341–75 (1986). It was charged by the executive in the form of the United States Attorney. *See* Superseding Indictment, Mar. 8, 2007, Docket Entry No. 35. Applying the functional analysis to the statute in this case would render no different result than that in *Huerta* and *Vargas.* On the basis of current precedent, a court may not declare the mandatory minimum sentence applicable in the instant case unconstitutional on separation of powers grounds.

## I. Jury Finding of Predicate Facts

■ Imposing the mandatory minimum sentence of five years would not violate the jury's required role in findings providing a basis for sentencing enhancement. Assuming the statute is valid, the jury found proven beyond a reasonable doubt all the predicate facts necessary to warrant the minimum sentence prescribed by 18 U.S.C. § 2252(b)(1).

■ The jury's required role in finding facts necessary to support a criminal conviction and a basis for sentencing enhancement is prescribed by the Fifth and Sixth Amendments. The Sixth Amendment provides that in criminal proceedings, "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const.

amend. VI. The Fifth Amendment guarantees that no one will be deprived of "life, liberty, or property ... without due process of law." U.S. Const. amend. V. Together these Amendments require "criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (citing *Sullivan v. Louisiana,* 508 U.S. 275, 277–78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

Mandatory minimum sentences represent a rigid, numerical approach to offenses that vary enormously in extent and culpability, even for violations of the same statutory provision. Former wooden application of the Sentencing Guidelines, a semirigid approach, has now been rejected by the Supreme Court. *See Gall v. United States,* —— U.S. ——, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Instead of a by-the-numbers application, the Supreme Court requires that sentencing be on an "individualized assessment based on the facts presented" in light of section 3553(a) factors. *Gall,* 128 S.Ct. at 596, 598; *see* 18 U.S.C. § 3553(a) (requiring a sentencing court to consider seven factors, including the nature and the circumstances of the offense, the history and characteristics of the defendant, the need to deter future criminal acts by others and by the defendant, and the defendant's need for educational or vocational training, medical care, or other correctional treatment).

In 2005, the Supreme Court considered whether the Sixth Amendment is violated "by the imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact ... that was not found by the jury or admitted by the defendant." *Booker,* 543 U.S. at 229, 125 S.Ct. 738. It is well settled, the Court noted, that the Constitution protects "every criminal defendant 'against conviction except upon proof beyond reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Id.* at 230, 125 S.Ct. 738 (quoting *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).

The defendant in *Booker* was charged with possession with intent to distribute at least 50 grams of crack cocaine base. *Id.* at 227, 125 S.Ct. 738. The jury heard evidence that he had 92.5 grams of crack in his duffel bag, and found him guilty of violating 21 U.S.C. § 841(a)(1), which requires a ten-year minimum sentence. *Id.* A guideline calculation based on the 92.5 grams found by the jury called for a range of 210 to 262 months in prison. *Id.* At post-trial sentencing, the district court concluded by a preponderance of evidence that Booker possessed an *additional* 566 grams of crack and that he had obstructed justice. *Id.* Because of the then-mandatory nature of the Guidelines, if the court found additional aggravating facts by a preponderance of the evidence, it was obliged to impose a sentence based upon the enhanced range. *Id.* at 227, 125 S.Ct. 738. Based upon those two judicial findings, the guideline range increased to 360 months to life. *Id.* The judge imposed a sentence of thirty years, nine years greater than the minimum sentence required by the jury's findings. *Id.*

*Booker* held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to the jury beyond a reasonable doubt." *Id.* at 244, 125 S.Ct. 738. It found that the statutory provision mandating fixed appli-

cation of the Guidelines, 18 U.S.C. § 3553(b)(1), violated the Sixth Amendment. *See id.* at 245.

In 2007 the Court reaffirmed *Booker*'s rationale and emphasized sentencing court discretion by rejecting the Eighth Circuit's rigid, numerical "proportionality test" based upon the Guidelines. *Gall,* 128 S.Ct. at 594–95 ("reject[ing] . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range [and] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence."). At the same time it ruled that the Anti-Drug Abuse Act of 1986's 100–to–1 ratio treating one gram of crack as the equivalent of 100 grams of powder cocaine for sentencing purposes was not required under the Guidelines. *Kimbrough v. United States,* ─── U.S. ───, 128 S.Ct. 558, 568, 169 L.Ed.2d 481 (2007). *Kimbrough* relied on *Booker*'s declaration that the Guidelines were advisory. *See id.* at 569–74.

None of these recent cases put in question application of a minimum statutory requirement effective on a general finding of guilt. Neither the Fifth nor Sixth Amendment required a further jury specific finding of predicate facts in addition to the general verdict finding Polizzi guilty as charged. In its general verdict, the jury found all the operative facts necessary to constitute a crime which requires a five-year sentence. *See* 18 U.S.C. § 2252(b)(1).

## IV. Unconstitutional Refusal to Inform Jury of Mandatory Minimum Incarceration

 Defendant's request that the jury be informed of the five-year mandatory minimum should have been granted. A brief historical review demonstrates the right of the jury in this case under the Sixth Amendment of the Constitution to know the sentencing impact of its decision—a right shared by the defendant.

Two distinguished interpreters have noted that "translation is a dialogue between two languages." Richard Pevear & Larissa Volokhonsky, *Preface* to Leo Tolstoy, War and Peace xiv (Richard Pevear & Larissa Volokhonsky trans., 2007). It might similarly be said that in construing the Sixth Amendment courts are engaged in a conversation across four centuries— the eighteenth, nineteenth, twentieth, and twenty-first—about the meaning of this grand constitutional provision.

A district judge faced with current constitutional issues might prefer a nuanced interpretative technique such as that of Justice Breyer, which takes account of significant historical changes in sociology, technology, politics and legal systems. *See* Essay, *The Role of Judges in a Government Of, By, and For the People,* 30 Cardozo L.Rev. (forthcoming 2008) ("Justice Breyer's nuanced view of the need for flexibility in interpreting the Constitution makes him a 'member' of the American Metaphysical Club, allowing for a more pragmatic and effective administration of justice than a stiff and abstract approach" (citing Stephen Breyer, Active Liberty: Interpreting our Democratic Constitution (2006))).

A majority of the Supreme Court now favors another method. Under Justice Scalia and the Court's approach to the Sixth Amendment, judges must look to criminal practices of the Thirteen Colonies and England in 1791, when the amendment was adopted. *See* Parts III.I, *supra,* and IV, *infra* (discussing effect of current hearsay and sentencing decisions of the Supreme Court). Judges today must largely put aside the caveats of Professor Julius Goebel, Jr. and other historians about difficulties in understanding the vagaries of colonial practice. *See, e.g., Unit-*

*ed States v. Khan,* 325 F.Supp.2d 218, 226 (E.D.N.Y.2004) ("The Constitution requires that we apply 1780 jury practice in our courts. Yet any attempt to fully understand and apply eighteenth-century rules for juries in twenty-first century federal sentencing is bound to be somewhat chimerical."); Essay, *The Role of Judges, supra* (criticizing some of the historiography of Supreme Court originalism). Reception of British law before and at the time of the Declaration of Independence makes contemporary English practice particularly important in construing the Sixth Amendment. *See, e.g.,* Julius Goebel, Jr., Cases and Materials on the Development of Legal Institutions 298–329 (7th ed.1946).

Interpreting and extrapolating from the eighteenth century is particularly difficult since original materials are hard to come by and the technological, political, and legal contexts in each of the Thirteen Colonies were then so different from what they are today. Yet it appears fairly clear, from a review of legal and historical scholarship on eighteenth-century colonial and English criminal practice, that the petit juries of 1791 would have been aware of any harsh sentence imposed mandatorily upon a finding of guilt of a particular crime. It is equally apparent that a jury so apprised would have been expected to deliver a verdict of not guilty or of guilty of a lesser crime had it believed the punishment excessive for the crime actually charged and proved.

### A. History and Context of Sixth Amendment

The Sixth Amendment was adopted in 1791 as one of the first matters of business of the new republic, guaranteeing the right of a defendant "[i]n all criminal prosecutions ... [to] trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. IV. It was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt. In later years this fundamental power of the jury—and the right of the accused—has been termed the power to "nullify." The negative connotations of this characterization of the jury's power and responsibility ignore history and the meaning of the Sixth Amendment.

When a jury refuses to convict on the basis of what it thinks is an unjust law as applied, a misconceived prosecution, or an excessive penalty, it is performing exactly its role imposed by the Sixth Amendment. As the following discussion demonstrates, these powers of the jury were exercised consistently by jurors before, and for many years after, the Sixth Amendment was adopted. *See, e.g.,* Appendix A, *infra;* Jeffrey Abramson, We, The Jury: The Jury System and the Ideal of Democracy 30–31, 63–64, 67–77 (1994); The Complete Juryman: Or, a Compendium of the Laws Relating to Jurors 194–202, 246–47 (1752); Clay S. Conrad, Jury Nullification: The Evolution of a Doctrine 13–63 (1998); William L. Dwyer, In the Hands of the People: The Trial Jury's Origins, Triumphs, Troubles, and Future in American Democracy 62–72 (1st ed.2002); The English-mans Right: A Dialogue Between a Barrister at Law and a Jury–Man 10–35 (1680); Norman J. Finkel, Commonsense Justice: Jurors' Notions of the Law 24–31 (1995); Thomas Andrew Green, Verdict According to Conscience: Perspectives on the English Criminal Trial Jury 1200–1800, at 153–99 (1985); John Hostettler, The Criminal Jury Old and New: Jury Power From Early Times to the Present Day 30–32, 48, 70–72, 92–103, 112–14, 121, 133–34 (2004); Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review 28–29 (2004); Leonard W. Levy, The Palladium of Justice: Origins of Trial by Jury 69–105 (1st ed.1999).

Introduced by James Madison as a promised quid pro quo for approval of the Constitution by the people of the States, the Sixth Amendment's right to a jury trial in criminal cases solidified and ratified the primary power of the petit jury as one of essential institutions upon which the people's liberties would depend. It was expected to limit the kind of governmental overreaching that led to the Revolutionary War. *See, e.g.,* Abramson, *supra,* at 28–29, 32 (1994); Kramer, *supra,* at 29–34, 70, 157; Shannon C. Stimson, The American Revolution in the Law: Anglo–American Jurisprudence Before John Marshall 142–43 (1990).

For the Framers, there would have been no need to go back before the Magna Carta for support in the "courts of conscience." *See, e.g.,* Andrew J. Parmenter, *Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification,* 46 Washburn L.J. 379, 380 (2007). They could look to recent and contemporary juries, such as those in the well-known trials of Lilburne, Penn, and Zenger, which had refused to convict when authorities insisted that the law required them to do so.

In the mid-seventeenth century, Colonel John Lilburne had been repeatedly acquitted in England of the crime of distributing pamphlets critical of the British government. *See The Trial of Lieutenant–Colonel John Lilburne, in* 4 Cobbett's Collection of State Trials 1270, 1320, 1466 (Old Bailey 1649). In his second trial he asked the jury to acquit if it found capital punishment too severe. It responded by finding him "not guilty of any crime worthy of death," thus directly involving itself in the issue of punishment. *Id.* at 197. Lilburne was released and even financially compensated.

The Quakers, William Penn and William Mead, were prosecuted in London in 1670 for preaching to an unlawful assembly and for breach of the peace. *Trial of Penn and Mead, in* 6 Cobbett's Collection of State Trials 950 (London, T.C. Hausard 1810). After the jury acquitted Mead of all charges and found Penn not guilty of disturbing the peace, it was deprived of food, water and heat. Despite these coercive tactics, the jury still refused to find guilt, and was fined. Some jurors, including a man named Bushell, refused to pay; they were imprisoned, until ordered released by the Chief Justice on the ground that the jury in effect determines the law when deciding by general verdict. *Bushell's Case,* 124 Eng. Rep. 1606, 1012–13 (1670).

One of the most famous of the colonial cases in which juries frustrated the crown and its judges was the *Trial of John Peter Zenger. See* T.B. Howell, *The Trial of Mr. John Peter Zenger in* 17 A Collection of State Trials 675 (1735). In 1735, a jury acquitted Zenger after his counsel argued that truth was enough basis to refuse to convict even though the jury had been charged to the contrary. Anti-monarchist writings are sprinkled with encomiums for the *Zenger* and other defiant juries. *See* Parmenter, *supra,* at 384 nn. 53–61 and accompanying text. For other like cases, *see, e.g.,* Leonard W. Levy, The Palladium of Justice: Origins of Trial by Jury 55 ff. (1999). The right to trial by jury incorporated in the Constitution by the Sixth Amendment was thus envisaged as a check against overreaching by the new federal government.

The power of colonial and British jurors depended in large measure upon the fact that they were from the vicinage, were well-informed and self-confident property owners, *see, e.g.,* Randolph A. Jonakit, The American Jury System 107–09 (2003), and knew the essentials of the local criminal law and its punishments. *See, e.g.,* Abramson, *supra,* at 22–29, 32, 34–35

("[J]urors did not even need to rely on a judge's instructions to know the common law of the land"); Neil Vidmar & Valerie P. Hans, American Juries: The Verdict 49 (2007) (noting that John Adams "remarked that the common law was known by everyone and 'imbibed with the Nurses Milk and first Air' and that, accordingly, '[i]n many cases judges gave the jury no instructions on the law' " (quoting 1 The Legal Papers of John Adams 230 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965))).

Jury power not to convict was extensively exercised when the punishments that would be expected to follow from conviction were deemed excessive. *See, e.g., Furman v. Georgia,* 408 U.S. 238, 245-47 (1972) (Douglas, J., concurring); 4 William M. Blackstone, Commentaries on the Laws of England *342–44 (1769) (noting with approval that juries often found the value of stolen goods to be less than twelvepence in order to avoid the mandatory death penalty for theft of goods worth more than twelvepence, calling such practice "pious perjury"); Conrad, *supra,* at 20; Dwyer, *supra,* at 49; Green, *supra,* at 28–29, 35–44; Leon Radzinowicz, A History of English Criminal Law and Its Administration from 1750: The Movement for Reform 1750–1833, at 93–97 (1948) (discussing elimination of capital charges by "pious perjury"). Exercise of the power to reduce the sentence presupposed a knowledge of the expected punishment.

It is not strange that jurors should, in the second half of the eighteenth century, know details of criminal law and punishment—matters of punishment of which many of our present jurors do not know and are deliberately kept from knowing. Criminal law then was much simpler than today, now requiring tomes of highly abstruse, convoluted definitions and extraordinary combinations of statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms, treatment for mental health and other problems in and out of prison, sentencing guidelines, caselaw and local practice. It would have been inconceivable, for example, that a New York jury of 1791 trying a child pornography video case (were there such a case) would not know—as this jury did not—that conviction required a five-year minimum term of prison and an even higher term under applicable federal guidelines. It is hardly likely that a present jury would be aware of the fact that "receiving" one illicit image called for at least a five-year term in prison while "possession" of 5,000 such depictions would permit probation.

Practice received from eighteenth-century England varied among, and within, the separate colonies. Much of it has not been, and cannot be, fully known or understood in its details. Yet modern courts cannot ignore the former predominant jury power to control sentences because judicial views beginning after the Jacksonian period have gradually eroded the influence of colonial reality. *See* Parts IV.B–C, *infra; see also, e.g., Bryant v. State,* 163 Ga.App. 872, 296 S.E.2d 168, 169–70 (1982) (citing early cases); *Stevenson v. State,* 289 Md. 167, 423 A.2d 558, 569–70 (1980); *Commonwealth v. Leno,* 415 Mass. 835, 616 N.E.2d 453 (1993) ("declin[ing] to require an instruction on jury nullification" in accordance with the prevailing view, though "recogniz[ing] that jurors may return verdicts which do not comport with the judge's instructions"); *State v. Bonacorsi,* 139 N.H. 28, 648 A.2d 469, 470 (1994) ("While recognizing the prerogative [of a jury to nullify], we have nonetheless consistently held that jury nullification is neither a right of the defendant, nor a defense recognized by law." (citation omitted)); *State v. Ragland,* 105 N.J. 189, 519 A.2d 1361, 1373 (1986) ("It will not do for defendant to recite the acknowledged virtues of jury independence when what is really approved is the dark side of jury nullification."); *People v.*

*Douglas,* 178 Misc.2d 918, 680 N.Y.S.2d 145, 151 (N.Y.Sup.Ct.1998) (history of power of jury not to convict in New York); *State v. Lang,* 46 N.C.App. 138, 264 S.E.2d 821, 828 (1980), *rev'd on other grounds,* 301 N.C. 508, 272 S.E.2d 123 (1980); *State v. Champa,* 494 A.2d 102, 104 (R.I.1985); *Walls v. Commonwealth,* 38 Va.App. 273, 563 S.E.2d 384, 387 (2002); Green, *supra;* Samuel K. Dennis, *Maryland's Antique Constitutional Thorn,* 92 V. Pa. L.Rev. 34 (1943); Dierdre A. Harris, *Jury Nullification in Historical Perspective: Massachusetts as a Case Study,* 12 Suffolk U.L.Rev. 968, 970–74 (1978); Gary J. Jacobson, *The Right to Disagree: Judges, Juries and the Administration of Criminal Justice in Maryland,* 1976 Wash. U.L.Q. 571 (1976); Stanton D. Krauss, *An Inquiry into the Right of Criminal Juries to Determine the Law in Colonial America,* 89 J.Crim. L. & Criminology 111, 212–14 (1998) (Rhode Island). For a selective bibliography, see Appendix A, *infra. See also, e.g.,* Barbara J. Shapiro, Beyond Reasonable Doubt and Probable Cause: Historical Perspectives on the Anglo–American Law of Evidence (1991); Lance Cassak & Milton Heumann, *Old Wine in New Bottles: A Reconsideration of Informing Jurors About Punishment in Determinate—and Mandatory—Sentencing Cases,* 4 Rutgers J.L. & Pub. Pol'y 411, 420–37 (2007) (modern federal cases narrowing the scope of jury discretion must be revisited in view of recent Supreme Court cases); Teresa L. Conaway, Carol L. Mutz, & Joann M. Ross, *Jury Nullification: A Selective Annotated Bibliography,* 39 Val. U.L.Rev. 393 (2004) (articles, some books, cases and state constitutions); Note, *The Changing Role of the Jury in the Nineteenth Century,* 74 Yale L.J. 170, 170–92 (1964) (at the outset of the nineteenth century the jury was regarded as a mainstay of liberty and an integral part of democratic government, but outmoded by the end of the century); Parmenter, *supra,* at 380–97 (tracing history of the nullification doctrine from the Magna Carta to O.J. Simpson and beyond); Arie M. Rubenstein, Note, *Verdicts of Conscience: Nullification and the Modern Jury Trial,* 106 Colum. L.Rev. 959, 967–72 (2006); Steve J. Shone, *Lysander Spooner: Jury Nullification and Magna Carta,* 32 Quinnipiac L.Rev. 651, 669 (2004) (endorsing powerful "theoretical arguments" for jury nullification over "the more modern attempts to find precedents or constitutional authority for the practice in the extensive, but somewhat repetitive law journal literature."). *See also generally State v. Poulin,* 277 A.2d 493 (Me.1971); *Commonwealth v. Feaser,* 1999 PA Super 1, 723 A.2d 197 (1999); *State v. Findlay,* 171 Vt. 594, 765 A.2d 483, 488–89 (2000).

Two authors stand out in their reliability and usefulness in understanding the colonial jury's knowledge and control of sentencing: Julius Goebel, Jr., and John H. Langbein.

### 1. Goebel

Although there has been extensive recent historical research on the subject, the preeminent analysis of colonial practice continues to be that of the late Julius Goebel, Jr. (George Welwood Professor of Legal History at Columbia University School of Law) and T. Raymond Naughton (of the New York Bar): Law Enforcement in Colonial New York (1944) (hereinafter "Goebel"). Some quotations from Goebel's seminal work demonstrate that the vicinage and property requirements for jurors—that they be local "freeholders," responsible men having some stake in the community—assumed the jury's knowledge of the law and awareness of its power to control penalties.

The policy of the Province [of New York] respecting the qualifications of persons who were to do jury service was patterned on the English, that is to say,

freeholding was taken as the basic standard.

*Id.* at 466.

The English statutes had long set for petit jurors a high property qualification. This policy, which rested upon the presumed higher responsibility and intelligence of propertied persons, had found expression in a series of statutes going back to the fifteenth century. In 1699 the colonists, perhaps under the influence of a recent English act, by statute fixed upon a house with ten acres freehold in the country, a dwelling house or personal estate of £50 in New York City and Albany. This statute was continued and revived until the year 1741 when in a new and elaborate act the qualification was set at a freehold in lands, tenements or rents of the value of £60. In New York City (and later Albany) the alternative of a personal estate of like value would serve to qualify a man. As the preamble shows this was done to approximate somewhat the modern "blue ribbon" standard. A body of fairly substantial persons was assured.

*Id.* at 467 (footnotes omitted).

The chief obstacle [to conviction by government] was the necessity of using (even for trials at bar) juries of the vicinage who did not always convict when they should have. In many of the cases where crown rights were involved, the defendant was a person of power and standing in the community. The juries were picked from the freeholders, as we have intimated the very class most likely to entertain the reasonable doubt when a squire-in-chief was in the dock.

*Id.* at 221.

Freeholder opinion and conviction made the jury an instrumentality of great independence, the more to be reckoned with as the judges were many of them men of small or mediocre parts. This was perhaps the most interesting outcome of the tedious process of making trial practice conform to English models, for it contributed largely to *the feeling in Revolutionary times that of all incidents of criminal justice trial by jury should remain inviolate.*

*Id.* at 679 (emphasis added).

The several constitutions of the state [of New York] from 1777 onward have all contained the provision that trial by jury as "heretofore used" or guaranteed should remain inviolate. These words are a direct reference to the pre-Revolutionary practices which, musty though they be, it behooves the citizen to know.

The Charter of Liberties of 1683 [New York's first constitution] which the Crown rejected had provided that all trial should be by twelve men, "asneer as may be peers or Equals" of the neighborhood in the country "where the same should arise and grow." ... The [New York] Judicature Acts of 1691 and 1692 also contained provisions that no man's rights or property should be determined (except as facts were admitted or there had been default) unless the facts be found by verdict of twelve men of the neighborhood. This safeguard was also contained in Bellomont's judiciary ordinance. Although the jury of the vicinage was revered as a constitutional fundamental, like all fundamentals it was subject to vicissitudes for, as we have seen, summary jurisdiction was expanded, and the colonists took great pains to require a property qualification for jurors. With one detail, however, there was little tampering, viz., the necessity of trial by the vicinage. Indeed from the viewpoint of the inhabitants this was the chief *raison d'être* ....

*Id.* at 603 (footnotes omitted).

After being tried in a well-publicized trial and found guilty of treason in 1702, Nicholas Bayard, a former commanding

officer of the New York militia and mayor of New York under British rule, appealed to the British Crown based on irregularities in the jury composition—i.e., the jurors' ignorance of the law:

> In his petition and "appeal" to Queen Anne, Nicholas Bayard stated among other things that he had been "convicted by an illegal petty jury of Aliens and Dutch unduely returned and *very ignorant of the English Laws* and Language".... Among the affidavits taken by John Bridges and Samson Shelton Broughton, under the Queen's order of reference for the collection of evidence in connection with the Bayard appeal, are statements of some of the petit jurors who had joined in the verdict declaring Bayard guilty of high treason. Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors, made oral statements as follows, confirming the allegations made by Bayard in his petition: "... these Depon doe owne their great Ignorance of the Laws of England at that time not knowing what was High Treason ... the Foreman ... Did assert it was High Treason ... to disturb the peace good and quiet of this Government and that Colonell Bayard had disturbed the peace by the addresses and eight or nine jurors were for clearing ... Bayard but were perswaded by the foreman."

*Id.* at 604 n. 7 (emphasis added).

The impact of the Bayard case upon New York politics outlasted the lifetime of the participants, and it may be that publication of the proceedings and especially their inclusion in [Howell's] *State Trials* [one preeminent source on seventeenth-, eighteenth-, and nineteenth-century case law] kept alive recollections respecting the issues over the jury. In any event, it is striking that through the rest of the colonial period the visne was treated with tenderness so that only on a few occasions was a venue changed, and then specifically because the neighborhood was prejudiced against a defendant.

Beyond the circumstances of particular cases, beyond even the colonists' own legislation lurked the deep-seated feeling—and feeling it was—that the common law was controlling in this fundamental matter of the jury, and that nothing could avail to diminish the rights of Englishmen, even if expatriate, in respect thereto.

*Id.* at 605.

That colonial and British juries had great power to decide the law is demonstrated by the practice of counsel, in closing arguments, to highlight not the facts but the law of the case.

> Most of the early examples of defendants' closing ... contain little or no comment on the evidence. Neither Nicoll nor Emott in their closing for Colonel Bayard dwelt upon the glaring omissions in the Crown's case, but devoted themselves to a discussion of the law.

*Id.* at 660 (footnote omitted).

It is obvious that the jury derived most of its guidance as to the weight and effect of the evidence and as to the law from the arguments of counsel. Under these circumstances it is understandable that, as in the Makemie and the Zenger cases, the jury might encroach upon the judicial function and settle whether as a matter of law a particular accusation was a crime....

After the charge, the jury was left to deliberate on its verdict, a process which might be accomplished without [leaving the courtroom]. Usually ... the jury withdrew and a constable was sworn to attend. The constable's oath required:

> You shall well and truly keep every person sworn of this inquest together in some private and convenient Room without Meat, Drink, Fire or Candle

light. You shall suffer no person whatever to speak to them or any of them, neither shall you yourself speak to them or any of them unless to ... [know] if they are agreed on their verdict.

The common law apparently proceeded on the theory that conscience-searching best went forward with a little fasting.

*Id.* at 669 (footnotes omitted).

The jury's right to decide the law—or rather how the law would apply to the case at bar—could take several forms. The jury could acquit an obviously guilty defendant. Through "special" or "partial" verdicts, a jury could convict, but on a lesser charge—murder becoming manslaughter and larceny shrinking from grand to its petty form. "Not infrequently the juries in New York would return special verdicts, and apparently, as we have seen in the Makemie and Zenger cases, it was regarded as the privilege of the jury to decide whether or not it would so do." *Id.* at 676 (footnotes omitted).

Often juries returned special verdicts convicting on a lesser charge in order to make the defendant eligible for "benefit of clergy," i.e., immunity from hanging. Jury lenity was often motivated by the desire to avoid conviction on a capital charge if the crime or the offender was felt not deserving of death. "[A] system of mitigated sanctioning ... by which a person convicted of a less serious crime was spared capital punishment," the benefit of clergy allowed a first-time offender to instead be branded on the thumb. John H. Langbein, The Origins of the Adversary Criminal Trial 193 (2003) (hereinafter Langbein, Origins); *see* Goebel, *supra,* at 192–93. Branding, which visibly labeled a person a felon, also ensured that the convict could not again take advantage of "his once-in-a-lifetime privilege to invoke the doctrine of benefit of the clergy." Langbein, Origins,

*supra,* at 193. Goebel discusses such special verdicts at length:

The verdicts ... are illustrative of one of the most important aspects of the jury's prerogative—*the power to effect a mitigation in the severity of the law by verdicts which would let off an obvious offender with penalties less than the worst of the charges against him* would make inevitable. This power was not confined to the selection of a relatively innocuous count on which to return a conviction, but extended, as indicated above, to a finding of an offense less in degree than that charged in the indictment. The importance of this rule in the case of felonies was obvious, since it was possible thus for the defendant to pray clergy and escape the rigor of the otherwise inevitable judgment of life and limb. The rule was essential where a homicide, by misadventure or in self-defense, was involved since the limitations of criminal pleading required that facts in extenuation or excuse be put in evidence and the jury give its verdict thereon....

....

... John Fisher was indicted in April term, 1698, for murder, but on April 7, 1698, "the jury ... finde the prisoner not guilty of murder but homicide and by misadventure and that he did not flea for it." Huybert Vendenberg was tried on an indictment for murder on March 12, 1713/14 and "the jury find the defendant not guilty of murther but guilty of Chance Medley onely." Jacob Koole and two others were indicted for manslaughter and were tried on October 22, 1754, when

the jurors find that the prisoners are not guilty nor is either of them guilty of the Felony charged in the indictment ... nor did either of them flie for it. But the Jurors say that the

prisoners did on the day charged in the indictment ... shoot and discharge a gun ... into some Reeds ... to kill a Bear ... not knowing or mistrusting that the said Cornelius Vanck was in the said Reeds ... [and that the said Cornelius was killed by three wounds] ... by misfortune and that the prisoners nor either of them had any goods or chattels to their knowledge at the time of the crime charged in the indictment ... Ordered discharged ...

A curious case was that of Frederick Locidon (Lowden?), who was arraigned on an indictment of "killing se defendendo," and was also arraigned on a coroner's inquest for manslaughter. He was tried on August 3, 1764, and "the jury without going from the bar find the prisoner not guilty of manslaughter but guilty of homicide in his own defense and that he did not fly for it to their knowledge," whereupon the court ordered him discharged.

We have noticed many cases where defendants indicted for murder were merely convicted of manslaughter. Peter Mullinder was tried on March 13, 1712/13, on an indictment for murdering Henry Clarke and "The Jury find the defendant guilty of manslaughter and that he had no goods or chattels lands or tenements at the time of the felony committed or since to their knowledge." Patrick Kreamer was arraigned on a coroner's inquest for the murder of Martinus Cregier, and was also arraigned on an indictment for manslaughter. He was tried on both charges and "the jurors find the prisoner not guilty of murder on the coroner's inquest and guilty of manslaughter on the indictment and that he had no goods or chattels to their knowledge."

Another situation where mitigation could be effected were those cases where grand larceny was charged. It had long been settled in England that where an indictment charged the stealing of goods of a certain value above 12*d.*, the jury might find the defendant guilty but could find the value of the goods to be less than 12*d.* Verdicts of this sort were usual in New York, and there is evidence that the colonists added some variations as where persons indicted for burglary were merely found guilty of felonious stealing.

Goebel, *supra,* at 673–75 (footnotes omitted) (emphasis added). Upon the return of a guilty verdict, juries could also mitigate the sentencing implications for a defendant's family. By finding an offender guilty but penniless, the jury could avoid turning his family into paupers; otherwise forfeiture of property to the crown apparently was mandatory.

The jury's finding with respect to a convicted prisoner's property may also have something to do with the alleviation of the law's severity. The return as to flight, chattels and tenements was essential to establish the royal forfeitures, and the year and day in felony cases. In New York, however, we have found only three cases where the jury found goods. In 1733, Edward King was convicted of murder and the jury at Circuit found "he had no goods chattels lands or tenements at the time of the murder but what are in the coroners hands." A convicted counterfeiter in 1756 was found to have a horse and saddle valued at £5, and John Allen, indicted in 1775 for "larceny from the person privilly was found to have a Jersey bill of credit, a *Johannis* and a guinea, of goods and chattels." The failure otherwise to find chattels is not completely explained by the fact that felons were often from the poorest class. We think it likely that owing to the feeble growth of exchequer powers in New York, the juries, as a persistent matter of policy for the pur-

pose of relieving the families of felons and the general burden of poor relief, deliberately avoided finding forfeitures. *Id.* at 676 (footnotes omitted). Repeated references by juries to the lack of goods owned by the defendant prevented such forfeitures.

According to Goebel, New York juries could, in sum, provide mercy in a variety of ways:

> We have spoken of the grooves in which *the jury might exercise its charity:* the verdict in thefts for amounts under the 12*d.* boundary between grand and petit larceny, and the privilege of finding manslaughter, self-defense or accident upon indictments for murder. These prerogatives the juries in New York did not hesitate to assert, and to these old and established powers of mitigation may be added, perhaps, the avoidance in New York of the incidents of felony judgment by the persistent finding of no goods or tenements. Of considerably greater significance than these possible interferences of the jury, but connected therewith in the case of verdicts for crimes of a less degree when murder, burglary, arson, highway robbery and certain others were charged, is the mitigation obtained by benefit of clergy.

*Id.* at 751 (footnote omitted) (emphasis added).

### 2. Ryder Papers

Responsible scholarship supports Goebel's conclusions that an informed jury had power to refuse to convict or to convict of a lesser crime when it deemed the potential punishment excessive. *See* Appendix A, *infra.* One of the most useful windows into the eighteenth-century jury's control over sentencing is through the notebooks of Sir Dudley Ryder, an Old Bailey criminal trial judge from 1754 to 1756 (hereinafter "Ryder"). *See* John H. Langbein, *Shaping the Eighteenth–Century Criminal Trial: A View from the Ryder Sources,* 50 U. Chi. L.Rev. 1 (1983) (hereinafter Langbein, *Ryder Sources* ). Judge Ryder's trial notes reveal the jury's knowledge of the punishments that would follow from its findings—often because judges told it precisely what they would be. Apparently other judges and juries were taking parallel courses, so that Ryder's notes may be taken as typical. *Id.* at 2.

Like the early New York juries described by Goebel, London juries could precisely tailor their verdicts by acquitting, convicting of lesser crimes, or "downsizing" the amounts found to have been stolen; thus avoided were harsh punishments, such as death by hanging, hanging plus dismemberment to make afterlife more difficult, or transportation out of England to a colony as an indentured servant. By the time Sir Ryder presided, the courts and parliament had manipulated the benefit of clergy concept to mitigate the death penalty so literate males could commit, in most cases, one felony (for which their thumb was branded on conviction) without fear of the death penalty. *Id.* at 37–41.

A critical issue in many of Ryder's larceny, theft, and shoplifting cases was the amount stolen, which determined whether the offender, if guilty, would live or die. At one time the defining cutoff for theft as grand larceny was a shilling:

> Grand larceny, defined as theft of goods or money worth more than a shilling, was by far the most commonly prosecuted offense at the Old Bailey. Hence, *in theory,* practically every accused at the Old Bailey was on trial for his life. No feature of English criminal law became more notorious, or aroused more indignation, than the nominally capital character of small thefts. A seventeenth-century tractitian reproached English law in the following words,

which were echoed incessantly in reformist literature down into the nineteenth century: "Doest thou value the life of a man no more than so as to cut it off for the value of a garment, yea even of a pair of shoes or stockings or a shirt or any other thing above such a piece of money"?

*Id.* at 36 (emphasis in original). Importantly, the amount stolen was determined by the jury—not by the judge, the prosecutor, or the evidence. After 1713, when the clergy defense was withdrawn by law from shop and home thefts of forty shillings or more, jury valuations for property taken of exactly thirty-nine shillings (or four shillings and ten pence, for five-shilling capital crimes) increased, allowing defendants to pray clergy and avoid the noose. The resulting "downsizing" practice is reflected in much the same way as the current debate on modern jury "nullification."

An act of 1699 withdrew clergy from shoptheft of goods to the value of five shillings or more; an act of 1713 withdrew clergy from thefts of goods to the value of forty shillings or more committed in dwelling houses. Since most thefts would have occurred in shops and homes, and many would have extended to property of such values, these two acts would have inflicted a heavy toll of capital punishment if fully enforced. In practice, these and the other statutes that withdrew clergy from crimes of larceny on condition of circumstance or amount were invoked relatively sparingly. The victim could and often did "undercharge" by declining to charge the circumstances or amount that made the offense nonclergyable. Further, when the victim charged the offense fully, the jury could convict of a lesser and clergyable offense. The jury could "downcharge" by convicting of simple larceny while refusing to find that the theft occurred in the shop or dwelling house or

that it had been committed by means of breaking and entering; or the jury could "downvalue" by finding the worth of the stolen goods to be below the respective five- and forty-shilling ceilings. The recurrent verdicts of four shillings ten pence and thirty-nine shillings in Old Bailey trials are telltale signs of this process, bringing the offenses within the benefit of clergy in order that the offenders be transported rather than executed.

*Id.* at 40–41 (footnote omitted).

But how was a jury to know of the particular cut-off for the particular crime? Doubtless some jurors knew already, from prior jury service or general knowledge; John H. Langbein, *The Criminal Trial Before the Lawyers*, 45 U. Chi. L.Rev. 263, 284 (1978) (hereinafter Langbein, *Criminal Trial*) ("The juries were laden with veterans, who needed less instructing" than modern American juries); often, however, Judge Ryder made sure to so instruct them:

Ryder sometimes found time to jot down a little of what he was telling the jury. John Taplin was tried before Ryder in October 1754 on an indictment charging theft from a dwelling house of a watch, valued at forty shillings, and of more than twenty guineas in money. The OBSP [Old Bailey Session Papers, *see infra*] report of the outcome is a curt as possible, "Guilty 39s.," meaning that the jury convicted him but determined the combined value of what was stolen to be thirty-nine shillings (less than two guineas, hence well below the value charged in the indictment). Ryder's notes explain why. "The jury found him guilty to [the] value of 39s., which they did *after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy*. It is by Act of 12 Ann." Ryder

thus records his own role in guiding the jury's prerogative of "valuing" the loot. Because the statute of 1713 to which Ryder refers withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense. *The convention of the day, immortalized in Blackstone's phrase as the jury's "pious perjury," was that the jury could "downvalue" the goods,* in this instance to thirty-nine shillings, in order to consign the convict to a lesser sanction of transportation for seven years. Langbein, *Ryder Sources, supra,* at 22 (footnotes omitted) (emphasis added).

Another example, ... occurs when Ryder explains the verdict in the case of Daniel Malone and Richard Dudley, charged with stealing several pounds' worth of rigging from a vessel on the Thames.... Ryder reports the verdict, guilty to the value of 39 shillings, and adds:

> Note: They found it to that value being under 40s. because it was in reality a crime, if of 40s. value, without benefit of clergy. For the clergy is taken away from felony in stolen goods on board a vessel in a navigable river of 40s. value, but not if under it ... [by] the statute of 24 G.2 [24 Geo. 2, ch. 45 (1751) ] and so would be only simple felony.

> *Ryder must have instructed the jury* about this special statute, which set a 40–shilling ceiling on benefit of clergy for river thefts, and he may have done it *in a manner that invited the "downvaluing" that results.*

*Id.* at 23 n. 79 (emphasis added).

The result of routine downsizing of the crime by the jury is dramatically revealed by a Langbein sample of 171 cases: Fifteen showed a jury finding of forty shillings or more while fifty-three were for just under forty shillings resulting in a much lower punishment. *Id.* at 42. This "downsizing" ran through the system right down to the original complaint. "It also seems plausible that officials advised victims in some cases to undercharge on the ground that the jury would downcharge if the indictment attempted to charge fully." *Id.* at 51. Judges themselves engaged in downsizing in misdemeanor cases tried at quarter sessions without a jury.

Downsizing or downvaluing goods was one way in which a jury could return a special or a partial verdict in property cases. Referring to the same sample cases, Langbein writes: "In thirty-nine of our 171 cases, involving forty-four accused, the jury returned what we call (following Beattie) a 'partial verdict.' The jury convicted the accused, but only in part; the jury convicted him of a less serious offense than the indictment charged, either by downcharging or by downvaluing the goods." *Id.* at 52 (footnote omitted). For example, "Old Bailey juries [would] return petty larceny verdicts in grand larceny cases when they chose to downvalue goods to below one shilling, which is one of the forms of 'partial verdict.' " *Id.* at 42 (footnote omitted).

The juries were thoughtful and responsible in exercising their own form of clemency through partial verdicts:

> Partial verdicts did not occur randomly across the various types of offenses. Rather, juries distinguished, first, according to the seriousness of the offense, and second, according to the conduct and character of the accused in a particular case. Some offenses were seldom or never the subject of partial verdicts, in others partial verdicts were routine, but in most the matter was more circumstantial.

Thus, in our sample, partial verdicts were not returned in any of the cases of livestock theft and highway robbery. Livestock theft was peculiar in that the offense was defined in a way that did not lend itself to a viable form of downcharging—the accused either stole the horse (or other beast) or not, and the governing statute did not further condition the capital sanction on the value of the animal or on any aggravating circumstance that the jury could manipulate in a partial verdict. Highway robbery could be downcharged—a jury could convict of theft not on the highway—but this did not happen much and not at all in our sample.

By contrast, we find the juries all but invariably downvaluing in pickpocket cases that were charged capitally (at a shilling or above). There were nine such cases in the four Ryder sessions. The juries downvalued below a shilling in eight but convicted capitally in the last.

Most of the major property crimes fell between these extremes of offenses routinely subjected to partial verdicts and offenses never so treated. The quality of the evidence in the individual case became more important than the type of offense. The juries were lenient in dealing with persons indicted of shoptheft and theft from dwelling houses above the capital sums. The only cases not downcharged or downvalued were those in which the evidence indicated the offenders were professionals or gang members. The juries were quite unashamed about returning partial verdicts even in situations involving thefts of money, in which downvaluing became transparent fiction. We noticed in another connection the case of John Taplin, indicted for stealing twenty-one guineas in money and a watch. The jurors valued this loot at thirty-nine shillings, and with the active connivance of

Dudley Ryder, who recorded that *they did it "after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy."* Favorable evidence also motivated the juries fairly frequently to downvalue from grand to petty larceny in order to turn transportation into whipping, especially when the goods were of relatively small amount or when the accused was a married woman or a family man. The jurors took a harsher attitude towards burglary and breaking and entering, being more reluctant to prevent the capital sanction from being imposed.

*Id.* at 53–54 (footnotes omitted) (emphasis added). Important to a jury's decision to downsize or acquit was the nature of the defendant, as Ryder likely pointed out to the jury:

Occasionally, the Ryder notes attribute a rationale for the jury's verdict that we suspect originated in his instruction. Thus, in a case in which a child was acquitted of a theft, Ryder notes after the verdict: "Her father on my examining him said she was 12 years old excepting one month. The only color for finding her Not Guilty was her age, which made it a matter for their judgment whether she had sufficient discretion to be guilty of felony."

*Id.* at 23.

What is particularly significant for our purposes is that the jury—often after being informed of the precise effect of their decision on the sentence—was in effect deliberately deciding the sentence.

The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict. Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, *sentence is what was at stake* when these cases were "contested."

*Id.* at 55 (emphasis added). Langbein's most fascinating conclusion is just this: that the jury's primary function was, as a practical matter, to determine punishment rather than guilt.

Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. *To the extent that trial had a function* in such cases beyond formalizing the inevitable conclusion of guilt, *it was to decide the sanction. These trial were sentencing proceedings.* The main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping.

*Id.* at 41 (emphasis added).

Much of the Ryder materials are supported by those of Professor Goebel, discussed above, as well as the extensive collections listed in Appendix A, *infra.* That there were variations among the colonies, some of which gave the juries less power than others, does not reduce the enormous weight of evidence contemporary with the adoption of the Sixth Amendment demonstrating the jury's critical sentencing role based on its knowledge of the punitive effects of possible verdicts. *See, e.g.,* Laura I. Appleman, *The Lost Meaning of the Jury Trial Right,* Jan. 17, 2008, http://ssrn.com/abstract=1084960 (analysis of various state practices to demonstrate why juries determined all critical aspects of punishment; the paper, while published electronically, is not quoted because it is in non-final form). *See also generally* Douglas Greenberg, *Crime, Law Enforcement, and Social Control in Colonial America,* 26 Am. J. Legal Hist. 293 (1982) (placing varying colonial law enforcement practices in historical context).

### 3. Old Bailey Session Papers

Another study by Professor Langbein based upon the more superficial Old Bailey Session Papers ("OBSP"), a group of "reports" from the mid 1670s to the mid–1730s, supports much of the scholarly conclusions about jury sentencing power. John H. Langbein, *The Criminal Trial Before the Lawyers,* 45 U. Chi. L.Rev. 263 (1978). The OBSP confirm the criminal practices—and the primary nature of the jury as a sentencing body—described by Goebel and Ryder. Repeatedly, the court informed defendants they should not plead guilty because on such a plea hanging was mandatory, while a quick trial would permit the jury to mercifully downgrade the offense. *Id.* at 279–80.

Significantly for our inquiry, juries were more likely to know beforehand—or be informed by the judge—of the effect of their verdicts on punishment. The same English jury would try multiple cases so that the "substantive criminal law held few mysteries for these experienced jurors." *Id.* at 277. "When instructing a jury, the judge possessed what seems to have been a wholly unrestricted power to comment on the merits of the case. . . . [T]he judge had no hesitation about telling the jury how it ought to decide." *Id.* at 285. Despite more extensive instructions and commentary from the bench, court control over jury knowledge and conclusions was much less stringent than it is today. *Id.* at 272 ff. Both judges and jurors could recommend royal mercy through pardon upon a guilty verdict. *Id.* at 297.

Summing up on the issue before us, Professor Langbein states:

[T]he jury of that time had a large role in what we think of as sentencing, that is, in *determining the sanction.* In a

significant fraction of the cases that went to trial, the real issue was whether the jury would choose to exercise its power to "value" stolen goods in ways that would affect the applicable sanction. *It was understood that the value that the jury assigned was fictional, and that the jury was in truth deciding whether to rescue the culprit from the ordinary sanctions* of transportation and death by so characterizing the crime that only a lesser sanction could be invoked. If the goods were valued below 12 pence (in practice the Old Bailey juries used the figure of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict escaped with a whipping or a short jail term. Under certain circumstances the jury could, by valuing goods below other monetary ceilings, bring the culprit under the rubric of benefit-of-clergy, for which the sanction was branding in the thumb. The decision between finding an accused guilty of murder or manslaughter, which also belonged to the jury, can be seen as the choice between capital punishment and branding. It could be argued that in all these situations *the jury was in reality discharging a sentencing function,* and even today we expect sentencing officers to consult past conviction evidence. But we have seen that the OBSP show that the juries were using past conviction evidence to determine guilt, and with no constraint from the bench. Furthermore, modern juries have the power to affect the sanction by not convicting on all counts or by finding only a lesser included offense, yet we do not, on that account, deem them sentencing officers entitled to learn of the accused's criminal record.

Another possibility is that it was not thought feasible to apply a rule of exclusion to past conviction evidence, since *already-branded defendants necessarily carried their thumbs into court.* But

many of the former offenses that are laid to Old Bailey defendants would not have left them branded, branding itself was sometimes proved by record, and *in any event the judges could have devised, had they cared to, a routine that would have kept defendants' hands out of jurors' sight.*

*Id.* at 303–04 (footnotes omitted) (emphasis supplied).

In a more recent book, The Origins of Adversary Criminal Trial (2003), John H. Langbein recapitulates much of what were the jury's powers on sentencing.

*Trial as a Sentencing Proceeding*

The sentencing practices of the later seventeenth and eighteenth centuries were a powerful source of pressure on the defendant to speak at his trial. Our modern expectation is that sentencing will occur in a separate post-verdict phase, after the trial has determined guilt. Furthermore, in jury-tried cases, we expect the judge, not the jury, to exercise whatever sentencing discretion the law might bestow. In early modern times, however, these *divisions of function in sentencing matters between trial and post-trial, and between jury and judge, were less distinct. The trial jury exercised an important role in what was functionally the choice of sanction* through its power to manipulate the verdict by convicting on a charge that carried a lesser penalty. (A vestige of this power to mitigate the sentence survives in modern practice, when the jury convicts of a lesser included offense, or when it convicts on fewer than all the counts that are charged and proved).

The practice of juries convicting only of a lesser charge, or "downvaluing" stolen goods in order to make the offense less serious, and especially in order to mitigate against the death penalty, was immortalized in Blackstone's as "pious

perjury" to describe these verdicts that convicted the defendant but reduced the sanction.

In the Elizabethan–Jacobean period partial verdicts were relatively uncommon. It was the development of alternatives to the death penalty in the eighteenth century, especially the system of transportation to the New World for a term of penal servitude, that allowed partial verdict to burgeon. Transportation became the sanction for offenses that fell within the rubric of benefit of clergy, giving the jury an effective choice between convicting an offender in a manner that would lead to the imposition of capital punishment or in a way that would result in transportation. For example, if the jury convicted a defendant of burglary, the punishment was death; but if, on the same facts, the jury convicted of the partial verdicts involved transportation: When the jury valued stolen goods at less than a shilling (invariably at 10d.), the offence became petty rather than grand larceny, for which the common sanction was whipping. In a sample of London cases from the Old Bailey in the 1750s I found that the juries returned partial verdicts in nearly a quarter of the cases. For a few offenses, like picking pockets, the juries all but invariably downvalued, expressing a social consensus that the capital sanction was virtually never appropriate. At the opposite end of the spectrum were a few property crimes, especially highway robbery and gang-style burglary, that were regarded as so menacing that juries virtually never mitigated the capital sanction. Across the broad range of property crimes, however, jury discretion held sway. In deciding whether to return verdicts of mitigation, juries distinguished, first, according to the seriousness of the offenses, and second, according to the conduct and character of the accused.

*The jury's power to mitigate sanctions profoundly affected the purpose of the criminal trial* for those many offenses in which the jury might return a partial verdict. Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In many cases, perhaps most, the accused had been caught in the act or with the stolen goods or otherwise had no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. Because *the main purpose of defending such a case was to present the jury with a sympathetic view of the offender and of the circumstances of the crime that would encourage a verdict of mitigation,* the criminal defendant labored under an enormous practical compulsion to speak in his own defense. By structuring *sentencing as an incident of the trial,* the procedure foreclosed the defendant from participating in what was in function his sentencing hearing unless he spoke about the circumstances of the offense. To be sure, character witnesses could and did carry some of this burden for the defendant in some cases; it was not impossible to remain silent and still obtain jury leniency. But it was a grave risk that few defendants had the stomach to undertake. Thus, the same factors that caused the procedure to prefer trials over guilty pleas also induced criminal defendants at trial to speak to their knowledge of the events.

The partial verdict system abated slowly, toward the end of the eighteenth century and during the early decades of the nineteenth century, as the sanction of imprisonment replaced transportation. The modern system of post-verdict judicial sentencing arose in response to many factors. The movement

to revise the substantive criminal law by consolidating and rationalizing the categories of offenses invited the grading of sentences according to severity. This development was deeply connected to the appearance of imprisonment as the routine punishment for cases of serious crime. The older sanctions, death and transportation, had lent themselves to jury manipulation, because they came as "either-or" choices. Because the new sanction of imprisonment for a term of years was all but infinitely divisible, it invited the concept of the sentencing range, which transferred to the judge the power to tailor the sentence to the particular offender.

*Id.* at 57–60 (footnotes omitted) (emphasis added).

With the advent of mandatory minimum sentences, however, federal juries today again face—albeit often unknowingly—"either-or" choices similar to those facing the British and colonial juries of 1791. To fully exercise their historical function, juries today must understand the two eithers; they cannot rely on the court to mitigate because it is bound by the statutory minimum term of imprisonment.

### B. Nineteenth– and Twentieth–Century Judicial Attempts to Restrict Sixth Amendment Jury Discretion

That the eighteenth-century practice of the jury's right to decide the law—or to decide how the law applies to particular defendants in light of the severity of punishment—was incorporated into the Sixth Amendment's right to "trial by jury" is illustrated by the 1794 Supreme Court case, *Georgia v. Brailsford,* 3 U.S. 1, 3 Dall. 1, 1 L.Ed. 483 (1794). The jury, sitting in original jurisdiction because the State of Georgia was a party, *see* U.S. Const. art. III, § 2, was charged as follows by Chief Justice John Jay:

It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that *by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.* On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. *But still both objects are lawfully, within your power of decision.*

3 U.S. at 4 (emphasis added). With justices who had been instrumental in framing the Constitution, the Supreme Court of 1794 accepted the jury's power and right to decide both the facts and the law of a case—and to be so instructed by a judge. *Brailsford*'s ruling was attenuated in the late nineteenth century.

Two major Supreme Court Justices' opinions in the nineteenth century have language relied upon by subsequent courts as restricting the Sixth Amendment's jury discretion and right to know the effect of its decision. They are Justice Story's in the Circuit Court of the District of Massachusetts, *United States v. Battiste,* 24 F. Cas. 1042 (C.C.D.Mass.1835) and the first Justice Harlan's in *Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895).

*Battiste* is distinguishable from modern anti-nullification cases because Justice Story's statement was made in the context of preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a

person technically guilty. Justice Harlan's, sixty years later, contains a long and learned analysis. It restricts the effect of the historical Sixth Amendment by preventing the jury from finding the lesser of the crimes of murder or manslaughter—the difference between death or life for the prisoner.

Modern historical research demonstrates that the equally long and learned dissent of Justice Gray in *Sparf* had the history of the Sixth Amendment right. He wrote:

> Until nearly forty years after the adoption of the Constitution of the United States, not a single decision of the highest court of any State, or of any judge of a court of the United States, has been found, denying the right of the jury upon the general issue in a criminal case to decide, according to their own judgment and consciences, the law involved in that issue—except the two or three cases ... concerning the constitutionality of a statute. . . .
>
> It must frankly be admitted that in more recent times, beginning with ... Mr. Justice Story's charge to a jury in 1835 in *United States v. Battiste*, 2 Sumn. 240, 24 F. Cas. 1042, the general tendency of decision in this country (as appears by the cases cited in the opinion of the majority of the court) has been against the right of the jury.

156 U.S. at 168, 15 S.Ct. 273.

It would be an example of inordinate tediousness and supererogation to rehearse again the superb historical analyses of Justices Harlan and Gray that include detailed statements of the views of such luminaries as Thomas Jefferson, James Madison, Alexander Hamilton, John Marshall, John Jay, Samuel Chase, Joseph Story, Lemuel Shaw, Lord Coke, Lord Bacon, John Milton, and John Adams; details of cases such as *Anthes, Bushel, Zenger, Penn & Meads, Burr*, and others; as well

as the Magna Carta and statutes adopted on both sides of the Atlantic. *Cf., e.g.,* The Three Trials of William Hone (Tegg ed. 1876) (three different juries refused to convict in three different trials despite judicial instructions); *Bushell's Case, in* 6 Howell's State Trials 999 (1670); *Penn & Mead's Case, in id.* at 951 (1670) (jury refusing to convict William Penn of unlawful assembly despite threats from judge); James Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger (1963).

Justice Harlan's majority opinion was well designed to produce a more efficient court system calculated to deal with the growing complexity of the law; the much improved training and professionalism of bench and bar; a lay public increasingly out-of-touch with the law's details; and a desire to provide predictable rules protecting our growing national industry and commerce. In addition, courts following *Sparf* appear to reflect a pervasive fear that our heterogeneous jurors, unbound by common principles of morality, education and dedication to the law, may deviate too far from judicial views of the rule of law unless juries are tightly controlled. This lack of faith in the good sense of juries is not generally shared by trial judges who deal with them on a daily basis.

Whatever the judicial system's evaluation of modern juries and their proper role, the Supreme Court has recently instructed us that in matters of sentencing as well as hearsay, it is necessary to go back to the practice as it existed in 1791 to construe the meaning of constitutional provisions such as the Sixth Amendment. Justice Gray dissenting in *Sparf* seems to have hit both the modern and ancient marks exactly. Judges are forcefully reminded in *Crawford v. Washington*, reevaluating the constitutional right of confrontation and the limits on the use of "testimonial" hearsay, that no matter how

long and firm a precedential line of Supreme Court cases, if analysis shows it was ill-based historically it must be abandoned. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

It is worthwhile recalling that the author of the majority opinion in *Sparf* was the first Justice Harlan. His minority opinion in *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), which approved over his strong dissent the doctrine of separate but equal, degrading African–Americans, was adopted more than a half century later in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), overruling *Plessy*. By contrast, Justice Harlan's *Sparf* majority ruling limiting jury power is in effect overruled now, more than a century later, by the recent *Booker* line of cases, essentially adopting the minority conclusion in *Sparf*. It is not particularly significant that the same 1890s Supreme Court appears to have been wrong—by our present standards—on two important cases, but it is notable that the Supreme Court feels called upon now to overrule major precedents going back to the late nineteenth century based upon a revised historical analysis.

As for Justice Story's early eighteenth-century opinion—*Battiste*, the first significant federal case seeming to limit Sixth Amendment discretion—it lends little support to *Sparf*. *Battiste*, 24 F.Cas. 1042, was a capital case charging a violation of the 1820 United States statute outlawing international trade in slaves; Justice Story held that, on the facts, the defendant had committed no crime. *See id.* at 1044, 1046. He held that the mere transportation of those already enslaved from one part of the Portuguese enclaves in Africa to another was internal carriage, not the kind of international trade outlawed by the statute. *Id.* at 1045–46.

In the course of his dispositive analytical opinion on the statute's meaning, Justice Story declared that in criminal and civil cases,

[The jury's] verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact. In each, they have the physical power to disregard the law, as laid down to them by the court. But *I deny, that, in any case, civil or criminal, [jurors] have the moral right to decide the law according to their own notions, or pleasure.* On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court. This is the right of every citizen; and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury. Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was. On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may required. Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or

ignorance, or accidental mistake, to interpret it. If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial. But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion. It is not, indeed, an occasion, on which there is any reason to doubt, that an intelligent jury can understand the principles of law applicable to the subject, as well as the court; for they are the principles of common sense. And as little reason is there, in my view, to suppose, that they can operate injuriously to the real merits of the case of the prisoner.

*Id.* at 1043 (emphasis added).

Since Battiste *was being protected by the court* against an incorrect interpretation of the statute by the jury that could have harmed a guiltless defendant, Story had the obligation to prevent exercise of jury discretion against the law. This is the law today—as it must be—under the Federal Rules of Criminal Procedure which grant courts broad discretion to prevent a criminal conviction unfounded under the law. No one challenges the power of the judge to prevent an unlawful conviction, and the lack of right of the jury *to convict* against the law.

*Battiste* does not address what was the practice and conceded power of the jury *to refuse to convict* even when the judge instructed that the law required conviction. That view was inherent in the Sixth Amendment even though judges in the late-nineteenth, twentieth and twenty-first centuries were increasingly trying to control juries by limiting their power and prerogative not to convict or to convict of a lesser crime to reduce the sentence. Placing the pejorative characterization of "nullification" on the jury's Sixth Amendment power does not define it out of existence.

Evisceration of felony death penalties—as well as of the Fugitive Slave Acts in the North—continued well into the nineteenth century, leading ultimately to considerable reduction in the number of capital offenses since the draconian penalties could not be enforced. *See* John Clark, *The Social Psychology of Jury Nullification*, 24 Law & Psychol. Rev. 39, 43–44 (2000). Increased pressure on the judiciary to assert control denied it by the Sixth Amendment was created by growing diversification of the jury pool and reluctance of juries to convict, for example, in labor unrest cases, liquor prohibition cases, cases of White violence against Blacks, Vietnam War resister cases, and consensual statutory rape cases involving members of the armed forces in World War II. *See, e.g., United States v. Dougherty*, 473 F.2d 1113, 1136–37 (D.C.Cir.1972) (denying nullification instruction, over strong dissent for clergy who had ransacked a napalm chemical plant); *see also, e.g.*, Parmenter, *supra*, 393–96 nn. 143–74 (discussing the Marion Barry, Rodney King, Menendez brothers, O.J. Simpson and "Bronx" juries).

The notoriety of the *Dougherty* case at the time of Vietnam War unrest was probably sufficient to make a nullification charge unnecessary to apprise the jury of its power. *See* Parmenter, *supra*, 389–90. By contrast, the current lack of awareness of the many statutory based minimum sentence requirements renders juries vapid by lack of awareness of the effects of their verdicts. *See id.* at 402–416 nn. 231–370 (illustrating the increasing frustration of courts at jury refusals to convict, leading to increasing pressure by courts on juries not to nullify, including threats of contempt, removal of a nullifying juror, and

instructing the jury that they could not nullify); *see also* Appendix B, *infra.*

Consistent modern judicial attempts to water down the Sixth Amendment, *see* Part IV.C, *infra,* have not escaped notice by academics and other scholars whose commentary has been generally critical of limitations on Sixth Amendment jury power to dispense mercy. *See, e.g.,* Appendix A, *infra;* Akhil Reed Amar, *The Bill of Rights as a Constitution,* 100 Yale L.J. 1131, 1191–99 (1991) (noting that juries had power to declare laws unconstitutional and calling that argument "strong," but cautioning that "I do not mean to suggest that I am wholly persuaded"); David C. Brody, Sparf *and* Dougherty *Revisited: Why the Court Should Instruct the Jury of Its Nullification Right,* 33 Am.Crim. L.Rev. 89, 105 (1995) ("The time has come for the Supreme Court to reconsider its decision in *Sparf,* as well as the question of whether the jury should be instructed of its nullification power."); Paul Butler, *Racially Based Jury Nullification: Black Power in the Criminal Justice System,* 105 Yale L.J. 677, 679 (1995) (arguing that African–American jurors should nullify in some cases to combat racism in criminal justice system); David N. Dorfman & Chris K. Iijima, *Fictions, Fault, and Forgiveness: Jury Nullification in a New Context,* 28 U. Mich. J.L. Reform 861, 900– 01 (1995) (arguing that jury nullification is a "popular check on executive and judicial discretion"); Arie M. Rubenstein, Note, *Verdicts of Conscience: Nullification and the Modern Jury Trial,* 106 Colum. L.Rev. 959 (2006) (basing argument in favor of jury nullification on recent Supreme Court jury right cases); Alan W. Scheflin, *Jury Nullification: The Right to Say No,* 45 S. Cal. L.Rev. 168, 224 (1972) ("Preservation of . . . the right to nullify . . . [is] essential to a restoration of the vaunted stature the judicial system should occupy."); Alan W. Scheflin & Jon M. Van Dyke, *Merciful Juries: The Resilience of* *Jury Nullification,* 48 Wash & Lee L.Rev. 165, 166 (1991) ("[O]ur judicial system would be better served if judges instructed jurors of their true powers."); Ran Zev Schijanovich, *The Second Circuit's Attack on Jury Nullification in United States v. Thomas: In Disregard of the Law and the Evidence,* 20 Cardozo L.Rev. 1275, 1278 (1999) ("*Thomas* is unsound both as a matter of law and as a matter of policy."); Chaya Weinberg–Brodt, *Jury Nullification and Jury–Control Procedures,* 65 N.Y.U. L.Rev. 825 (1990) (arguing for refocusing arguments regarding nullification on defendants' rights and reconsidering doctrines that impede nullification). *But see* Pamela Baschab, *Jury Nullification: The Anti–Atticus,* 65 Ala. Law. 110, 114 (2004) ("Jury nullification, no matter how you slice it, is at bottom a desecration of the basic premise that we are all equal under the law."); Leo P. Dreyer, *Jury Nullification and the Pro se Defense: The Impact of Dougherty v. United States,* 21 U. Kan. L.Rev. 47, 60–63 (1972–73) (arguing against allowing instructions to juries regarding their power to nullify); Andrew D. Leipold, *Rethinking Jury Nullification,* 82 Va. L.Rev. 253 (1996) (arguing that jury nullification has a larger cost than is normally realized and that the Sixth Amendment does not protect the right of jury nullification); Richard St. John, *License to Nullify: The Democratic and Constitutional Deficiencies of Authorized Jury Lawmaking,* 106 Yale L.J. 2563 (1997) (criticizing legislative proposals to authorize jury nullification).

## C. Some Modern Attempts to Eliminate Jury Power Violate the Constitution

Since the late nineteenth century, jury power has increasingly been suppressed in favor of judicial control in both civil and criminal trials through case law and amendments to the statutes and rules gov-

erning the trial process. This trend—especially since the 1990s—is so strong that one commentator considers it "war." *See* Andrew J. Parmenter, *Nullifying the Jury, The Judicial Oligarchy Declares War on Jury Nullification*, 46 Washburn L.J. 379 (2007). That the courts of three out of the four states that grant juries the power in criminal cases to decide both law and fact "have eviscerated any literal translation of these constitutional provisions" is one such example. *Id.* at 391; *see* Ga. Const. art. I, § 1, para. x1(a) (1998); Ind. Const. art. I, § 19 (1999) ("In all criminal cases whatever, the jury shall have the right to determine the law and the facts."); Md.Code Ann., Const. art. 23, Declaration of Rights (same).

Reasons for this trend are beyond the scope of this opinion, but hypotheses include "changes in the American psyche, transitioning a young republic with revolutionary zeal and distrust for governmental authority into a mature democracy" more concerned with law and order; professionalization of the legal profession and prioritizing law over facts; fears of an increasingly diverse jury pool due to the twentieth-century opening up of jury service, particularly with an influx of immigrants to the country; and the need to have a uniform predictable national law and its enforcement that would favor the growth of national commerce. *See id.* at 386–87; *see also Husain v. Springer*, 494 F.3d 108, 138 (2d Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1658, 170 L.Ed.2d 356 (2008); *Monroe v. Kuhlman,* 436 F.Supp.2d 474, 480 (E.D.N.Y.2006), *aff'd,* 248 Fed.Appx. 223 (2d Cir.2007) (suggesting that causes include "'the reluctance to expand the powers of totally passive and unenlightened juries stems from three sources: (1) the tremendous inertia of long-standing legal tradition; (2) a basic distrust of juries; and (3) trial attorneys' and judges' fear of loss of control of the trial process.'" (quoting Mark

A. Frankel, *Legal Institutions: A Trial Judge's Perspective on Providing Tools for Rational Jury Decision–Making,* 85 Nw. U.L.Rev. 221, 222 (1990))).

Relying on *Sparf v. United States,* judges have generally refused to inform juries of their full powers, including their power to nullify. Nullification instructions, historically common, are no longer given. It is generally accepted that defendants have no right to such a charge. Yet *Sparf*—supposedly the bedrock case against jury nullification—adopted no such holding:

> Harlan's opinion did not preclude judges from rendering nullification instructions or allowing nullification arguments in proper circumstances, it did not require judges to mislead jurors about their power to judge the law, and it did not sanction a judicial denial of the jury's nullification power, either by instruction or interference. *Sparf* only held that it was not reversible error to instruct the jury that it would be wrong to disregard the court's instruction as to the law. In fact, the trial judge in *Sparf* informed the jury that it had the "physical power" to render a verdict contrary to his instructions.

Parmenter, *supra,* at 388 (footnotes omitted).

Not only are juries not informed of their constitutional and historic power to nullify, judges increasingly issue directive and authoritative jury instructions, which increase judicial control over jurors. *See* B. Michael Dann, *"Must Find the Defendant Guilty" Jury Instructions Violate the Sixth Amendment,* 91 Judicature 12 (2007) (stating that a "survey of the states' and federal circuits' corresponding jury instruction language reveals that 24, almost 40 percent, of state courts and federal circuits use the command 'must' or its equivalent ('shall' or 'duty') to point juries

to verdicts of guilty when all of the elements of the alleged crime have been proven. Another 7, or 13 percent, use the milder admonition 'should' to steer the jury's decision to guilt."). Some judges have gone as far as to tell jurors they have a legal obligation to apply the law, that they could face sanctions upon nullification, and that they "had a duty to notify the court if any juror expressed intent 'to disregard the law.'" *See* Parmenter, *supra,* at 404, 409.

Judicial control over potential and actual members of the jury has steadily increased. Voir dire, in practice since the Fugitive Slave Acts, is used to weed out potentially nullifying jurors. *See* Parmenter, *supra,* at 398 (citing Lysander Spooner, Trial by Jury (1852)). The Court of Appeals for the Eleventh Circuit has upheld a trial court's sua sponte dismissal of a juror because the juror knew the jury had the power to nullify. *United States v. James,* 203 F.3d 836 (10th Cir.2000).

Dismissals for cause based on jurors' beliefs still result, especially in death penalty cases, in pro-conviction jury panels not fairly selected as a cross-section of the community. *See, e.g., Uttecht v. Brown,* —— U.S. ——, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (approving a trial court's decision to dismiss a juror for cause after finding that the juror's ability to impose the death penalty was substantially impaired, even though he indicated that he would follow the law as instructed by the judge).

Since the 1990s, there has been a growing trend towards discharging jurors who may nullify. *See* Parmenter, *supra,* at 402–10 (citing cases). The court in *United States v. Thomas,* 116 F.3d 606 (2d Cir. 1997), discussed further in Part IV.E.1, *infra,* utilized Federal Rule of Criminal Procedure 23(b) to approve removal of a juror during deliberations, thus allowing the return of an eleven-person verdict, citing as "good cause" the juror's possible nullificatory intent. Other circuits have followed *Thomas. Id.* After *Thomas,* judges might well feel empowered to disqualify potentially nullifying jurors at both voir dire and trial under Rule 24(c). *See* Fed.R.Crim.P. 24(c)(1) ("The court may impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties.").

### D. Recent Supreme Court Caselaw Rejects Attempts to Limit Jury's Power

Those who would limit the powers historically exercised by juries must now consider the Supreme Court's *Booker–Apprendi* line of sentencing decisions, *see United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its reinvigoration of the Confrontation Clause in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). These decisions bear on the question of whether juries should be informed of the sentences that would result from guilty verdicts. They emphatically reaffirm three propositions that support the argument that juries can be trusted with this information. First, the right to a jury trial is a fundamental constitutional right; it provides a check on the courts, executive, and legislature equivalent to that of the voter on elected officials. Second, the Supreme Court, in interpreting the Sixth Amendment, relies on criminal practice the Court believes existed in the late eighteenth century. Third, the Supreme Court is willing to overturn long-established federal law, with some measure of reasoned disregard for the consequences of doing so, when it determines that precedent impinges on the powers historically exercised

by juries (or, in *Crawford,* the historical scope of the confrontation right). These three principles make it inappropriate to cavalierly and without analysis treat jurors' power to refuse to convict (or to be informed of mandatory minimums) as improper.

### 1. Supreme Court Places a High Value on the Jury's Historic Sentencing Role

The Supreme Court's recent line of sentencing decisions have not left much doubt of the Court's belief that the right to a jury as embodied in the Sixth Amendment is one of the Constitution's most cherished liberties. These cases have addressed varying permutations of the same question: When must facts that enhance the possible punishment of a defendant be proved beyond a reasonable doubt to a jury?

The Court first addressed this issue in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), when it used the constitutional issue avoidance canon to sidestep the question. *Id.* at 239, 248, 251–52, 119 S.Ct. 1215. Fifteen months later, in *Apprendi,* it held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. It then applied this holding to a range of situations. Most notable is *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), in which one majority opinion concluded that statutory provisions mandating the U.S. Sentencing Guidelines were unconstitutional, *id.* at 226–27, 244, 125 S.Ct. 738; a different majority then effectively rendered the Guidelines advisory rather than mandatory. *Id.* at 245, 125 S.Ct. 738; *see also Blakely v. Washington,* 542 U.S. 296, 305, 313, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (holding unconstitutional Washington state sentencing proce-

dure); *Ring v. Arizona,* 536 U.S. 584, 592–93, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (invalidating law allowing trial judge to find aggravating factors necessary to impose capital punishment).

The rationale supporting these decisions was that the courts could not be allowed to make factual findings that would enhance a sentence that must be imposed if that practice would infringe upon the Sixth Amendment right to a jury trial. *See, e.g., Blakely,* 542 U.S. at 305–06, 124 S.Ct. 2531 ("Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial.... Without [*Apprendi*] the jury would not exercise the control that the Framers intended."). When explaining its reasoning, the Supreme Court took pains in each case to stress the importance of the jury's appropriate constitutional powers and its essential role within the Constitution's system of checks and balances. Repeatedly, the Court relied upon strong language. Thus, in *Jones,* it quoted Blackstone:

Identifying trial by jury as "the grand bulwark" of English liberties, Blackstone contended that other liberties would remain secure only "so long as this palladium remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make) but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and courts of conscience. And however convenient these may appear at first, (as doubtless all arbitrary powers, well executed, are the most convenient), yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay

for their liberty in more substantial matters."

*Jones,* 526 U.S. at 246, 119 S.Ct. 1215 (quoting 4 W. Blackstone, Commentaries on the Laws of England 342–44 (1769)); *see also Apprendi,* 530 U.S. at 477, 120 S.Ct. 2348 (stating that jury right is meant to " 'guard against a spirit of oppression and tyranny on the part of rulers' " and is " 'the great bulwark of [our] civil and political liberties' " (quoting 2 J. Story, Commentaries on the Constitution of the United States 540–541 (4th ed. 1873))).

Justice Scalia's majority opinion in *Blakely* contains language to the same effect: "[The jury] right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely,* 542 U.S. at 305–06, 124 S.Ct. 2531; *see also Booker,* 543 U.S. at 238–39, 125 S.Ct. 738 ("The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury in criminal cases.").

Perhaps the most evocative of the recent Supreme Court writings concerning the jury is an opinion by Justice Scalia in a non-sentencing case, *Neder v. United States,* 527 U.S. 1, 10, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that harmless error rule applies to failure to submit issue of materiality to the jury). In that opinion, Justice Scalia called juries the "spinal column of American democracy." *Id.* at 30, 119 S.Ct. 1827 (Scalia, J., concurring in part and dissenting in part). He continued:

> Perhaps the Court is so enamoured of judges in general, and federal judges in particular, that it forgets that they (we) are officers of the Government, and

hence proper objects of that healthy suspicion of the power of government which possessed the Framers and is embodied in the Constitution. Who knows?—20 years of appointments of federal judges by oppressive administrations might produce judges willing to enforce oppressive criminal laws, and to interpret criminal laws oppressively—at least in the view of the citizens in some vicinages where criminal prosecutions must be brought. And so the people reserved the function of determining criminal guilt *to themselves,* sitting as jurors. It is not within the power of us Justices to cancel that reservation.

*Id.* at 32, 119 S.Ct. 1827 (emphasis in original); *see Blakely,* 542 U.S. at 307, 124 S.Ct. 2531 (addressing "the plausibility of the claim that the Framers would have left definition of the scope of jury power up to judges' intuitive sense of how far is too far," the Court found "that claim not plausible at all, because the very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury."). These passages confirm that the modern Supreme Court attributes great value to defendants' Sixth Amendment right to trial by a jury—with power to prevent sentences it deems excessive.

### 2. Supreme Court Invalidation of Laws and Practice Incompatible with Historic Jury Role

Recent sentencing opinions show that the Supreme Court is willing to strike down precedents and statutes that impinge on the historical functions of the jury. The opinions do so in the teeth of arguments that pro-jury doctrines could have adverse consequences, such as reducing the efficiency of adjudicatory process, creating unfair sentencing disparities, and throwing the federal criminal courts into disarray. A similar tale is told by *Craw-*

*ford* and the current interpretation of the Confrontation Clause of the Constitution.

The Supreme Court's decisions in its recent sentencing cases were based on the need to prevent the erosion of the historical function of the jury. The cases forced the Court to "face ... the issue of preserving an ancient guarantee under a new set of circumstances .... in a meaningful way guaranteeing that the jury would still stand between the individual and the power of the government under the new sentencing regime." *Booker,* 543 U.S. at 237, 125 S.Ct. 738. The Court's "answer [was] not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance." *Id.* at 237, 125 S.Ct. 738; *see, e.g., Blakely,* 542 U.S. at 305, 124 S.Ct. 2531; *Apprendi,* 530 U.S. at 518, 120 S.Ct. 2348 ("Today's decision, far from being a sharp break with the past, marks nothing more than a return to the *status quo ante*—the status quo that reflected the original meaning of the Fifth and Sixth Amendments." (Thomas, J., concurring)); *see also, e.g.,* Bertrall L. Ross, *Reconciling the Booker Conflict: A Substantive Sixth Amendment in a Real Offense Sentencing System,* 4 Cardozo Pub.L. Pol'y & Ethics J. 725, 728 (2006) ("[I]n a system based on a punishment model, the jury has a constitutionally protected substantive role to play in checking government power.").

The resulting *Booker–Apprendi* line of cases was founded largely on the Court's interpretation of the jury's role in sentencing in early American and English cases. *See, e.g., Apprendi,* 530 U.S. at 478–83, 120 S.Ct. 2348. Its approach to the Sixth Amendment is useful for our purposes since, if the Court were to examine the case law of that period on juries' power to find the law and refuse to convict, it would be compelled to determine that the jury's Sixth Amendment powers over sentencing were then well-established.

These cases demonstrate that the Supreme Court holds the jury right in such high esteem that it was willing to invalidate widespread accepted sentencing practice, even though critics portended that dire consequences would result. In response to Justice Breyer's dissenting argument in *Apprendi* that the majority's solution would be unworkable, Justice Scalia noted that it was constitutionally required:

I feel the need to say a few words in response to Justice Breyer's dissent. It sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. (Judges, it is sometimes necessary to remind ourselves, are part of the State—and an increasingly bureaucratic part of it, at that.) The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free.

. . . .

In Justice Breyer's bureaucratic realm of perfect equity, by contrast, the facts that determine the length of sentence to which the defendant is exposed will be determined to exist (on a more-likely-than-not basis) by a single employee of the State. It is certainly arguable (Justice Breyer argues it) that this sacrifice of prior protections is worth it. But it is not arguable that, just because one thinks it is a better system, it must be, or is even more likely to be, the system envisioned by a Constitution that guarantees trial by jury. What ultimately demolishes the case for the dissenters is that they are unable to say what the right to trial by jury *does* guarantee if, as they assert, it does not guarantee—what it has been assumed to guarantee throughout our history—*the*

*right to have a jury determine those facts that determine the maximum sentence the law allows.* They provide no coherent alternative.

*Apprendi,* 530 U.S. at 498–99, 120 S.Ct. 2348 (Scalia, J., concurring) (emphasis added). Justice Scalia's majority opinion in *Blakely* sounded the same theme:

> Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury.

*Blakely,* 542 U.S. at 313, 124 S.Ct. 2531.

Lest he be misunderstood, Justice Scalia repeated the argument in *Booker*:

> We recognize, as we did in *Jones, Apprendi,* and *Blakely,* that in some cases jury factfinding may impair the most expedient and efficient sentencing of defendants. But the interest in fairness and reliability protected by the right to a jury trial—a common-law right that defendants enjoyed for centuries and that is now enshrined in the Sixth Amendment—has always outweighed the interest in concluding trials swiftly.

*Booker,* 543 U.S. at 243–44, 125 S.Ct. 738.

Concern about changes in practice and precedent is not a ground for ignoring the Constitution. Some have lamented the Court's sentencing revolution as threatening to throw the federal system of criminal justice into disarray. *See, e.g., United States v. Penaranda,* 375 F.3d 238, 247–48 (2d Cir.2004) (en banc) (warning of "an impending crisis in the administration of criminal justice in the federal courts"); Richard G. Kopf, *The Top Ten Things I Learned From* Apprendi, Blakely, Booker, Rita, Kimbrough, *and* Gall, OSJCL Amici: Views From the Field (Jan.2008), http://moritzlaw.osu.edu/osjcl/blog/Articles_1/kopf–final–12–28–07.pdf ("It is telling and painfully obvious that not a single Justice ever had to look a federal defendant in the eye while not knowing what law to apply."). One commentator even suggested that "the *Blakely* decision disrupts nearly every (seemingly established) aspect of current sentencing law and practice." Douglas Berman, *Supreme Court Cleanup in Aisle Four:* Blakely *Is Too Big and Messy to Ignore,* Slate, July 16, 2004, http://www.slate.com/id/2104014/. In point of fact, the changes required by *Booker* and its siblings have proven easy to implement and have reduced practice problems while enhancing due process.

*Crawford*'s reinvigoration of the Confrontation Clause reflects a similar jurisprudential shift. The Court had previously held, in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that the Confrontation Clause did not prohibit courts from admitting an unavailable witness's statement against a criminal defendant if there were "adequate indicia" of the statement's reliability, at least under some circumstances. 448 U.S. at 66, 100 S.Ct. 2531 (quotations omitted). In *Crawford,* the Court reviewed English and early American historical materials, determining that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53–54, 124 S.Ct. 1354. The Court then adopted this as constitutional doctrine, reversing *Roberts,* a precedent that had been the law for more than twenty years. *Id.* at

63–69, 100 S.Ct. 2531. It took this path even though some, including Chief Justice Rehnquist, argued that it could result in the exclusion of reliable evidence and impair the truth-finding process. *Id.* at 73–75, 100 S.Ct. 2531 (Rehnquist, C.J., concurring in the judgment). *Crawford* has not proven disruptive, even though some argue that it is based in part on dubious historical analysis. *See* Essay, *The Role of Judges in a Government Of, By, and For the People,* 30 Cardozo L.Rev. (forthcoming 2008) (citing historians' views). Implementation of *Crawford* has created no insuperable problems.

Implications of the *Booker* and *Crawford* interludes in our constitutional history are apparent in the instant case. As in the sentencing cases, modern practice has eroded a power historically reserved to the jury, to wit, the power to refuse to convict or to modify its decisions based upon its knowledge of sentencing implications. Supposed efficiency—which is an objection largely based on phantoms of chaos—cannot trump the Constitution.

3. *Sentencing Cases Suggest that the Supreme Court Recognizes the Jury's Power to Moderate the Law's Harsh Effects*

The argument for informing the jury of sentencing implications proceeds by some degree of analogy, but there is language in some of the sentencing cases that directly addresses the issue of jury nullification. In *Jones,* the Court was faced with the question of whether a federal statute should be interpreted to create three distinct offenses or a single crime that carried three different maximum penalties, with two of the maximums only applicable if a judge (not a jury) made certain factual findings. *Jones,* 526 U.S. at 229, 119 S.Ct. 1215. The Court chose the former reading, concluding that the alternative would raise serious constitutional doubts. *Id.* at 239–40, 119 S.Ct. 1215. In determining that there would be a constitutional issue raised if the statute were to be read to allow federal courts to impose higher sentences based on findings of fact not made by a jury, Justice Souter's majority opinion noted that

The question might well be less serious than the constitutional doubt rule requires if the history bearing on the Framers' understanding of the Sixth Amendment principle demonstrated an accepted tolerance for exclusively judicial factfinding to peg penalty limits. But such is not the history. To be sure, the scholarship of which we are aware does not show that a question exactly like this one was ever raised and resolved in the period before the Framing. On the other hand, *several studies demonstrate that on a general level the tension between jury powers and powers exclusively judicial would likely have been very much to the fore in the Framers' conception of the jury right.*

*Id.* at 244, 119 S.Ct. 1215 (emphasis added). In support of this assertion that the Framers did not want to leave too much power in the hands of the judiciary, the Court's first example of a check on the judiciary was what today would be called jury nullification:

Even in this system, however, competition developed between judge and jury over the real significance of their respective roles. *The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power* when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences. This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included

offenses, manifestations of what Blackstone described as "pious perjury" on the jurors' part.

*Id.* at 245, 119 S.Ct. 1215 (emphasis added).

The Court then discussed various attempts to limit the power of the jury, but it soon returned to the concept of nullification. It continued:

A second response to the juries' power to control outcomes occurred in attempts to confine jury determinations in libel cases to findings of fact, leaving it to the judges to apply the law and, thus, *to limit the opportunities for juror nullification. Ultimately, of course, the attempt failed, the juries' victory being embodied* in Fox's Libel Act in Britain, see generally T. Green, Verdict According to Conscience 318–55 (1985), and exemplified in John Peter Zenger's acquittal in the Colonies, see, e.g., J. Rakove, Original Meanings 300–02 (1996). It is significant here not merely that the denouement of the restrictive efforts left the juries in control, but that the focus of those efforts was principally the juries' control over the ultimate verdict, applying law to fact (or "finding" the law, see, e.g., id. at 301), and not the factfinding role itself. There was apparently some accepted understanding at the time that the finding of facts was simply too sacred a jury prerogative to be trifled with in prosecution for such a significant and traditional offense in the common law courts. That this history had to be in the minds of the Framers is beyond cavil. According to one authority, the leading account of Zenger's trial was, with one possible exception "the most widely known source of libertarian thought in England and America during the eighteenth century." L. Levy, Freedom of Speech and Press in Early American History 133 (1963). It is just as much beyond question that Americans of the period perfectly well understood the lesson that the jury right could be lost not only by gross denial, but by erosion.

*Id.* at 246–48, 119 S.Ct. 1215 (emphasis added) (footnotes omitted). The *Jones* Court went on to conclude that the Framers' concern with erosion of the jury's power supported doubts about the constitutionality of allowing judges to impose higher penalties based on judicial fact finding. *See also Apprendi,* 530 U.S. at 479 n. 5, 120 S.Ct. 2348 (noting that "juries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant" (citing *Jones,* 526 U.S. at 245, 119 S.Ct. 1215)).

To be sure, these passages do not flatly state that the Sixth Amendment encompasses any sort of right to jury nullification. But it is telling that when the Court recognized a need to expound upon the historical ability of juries to check the judiciary, its first resort was to cite the jury's power to refuse to convict (or to convict of a crime that carried a lesser sentence). Also telling is the fact that the Court discussed the *Zenger* trial, thought by many to be one of the prime examples in support of the historical argument in favor of nullification. *Jones,* 526 U.S. at 246–47, 119 S.Ct. 1215; *see* Part IV.A, *supra.* Finally, rather than denigrate the *Zenger* case, the Court cited a commentator who labeled it the "most widely known source of libertarian thought" in eighteenth-century America. *Jones,* 526 U.S. at 247, 119 S.Ct. 1215. It is hard to come away from this passage with anything other than a conclusion that the Court accepts the view that jury exercise of its power to ameliorate sentencing laws too harsh in limited circumstances such as the instant

case is one of the consequences of the Sixth Amendment.

### E. Requirement of Jury Knowledge in View of the Unusual Situation, Statute and Punishment of Which the Jury Was Not Aware

A completely distinct division between the roles of judge and jury as is said to be embodied in *Sparf* is unsupported historically, *see* Parts IV.A–C, *supra*, and now, post-*Booker*, it is unsupportable legally. *See* Part IV.D, *supra*. Providing jurors sentencing information would enable the jury to more effectively fulfill its historical Sixth Amendment role as the conscience of the community and guardian against government oppression. An analysis of *Sparf's* Second Circuit recent progeny, *Thomas* and *Pabon–Cruz*, is illustrative of the approach now required, especially in comparison with the Court of Appeal's expansive—and more historically apt—language regarding the nature of the jury's role in *Gilliam*. *Compare United States v. Pabon–Cruz*, 391 F.3d 86 (2d Cir.2004) *and United States v. Thomas*, 116 F.3d 606 (2d Cir.1997) *with United States v. Gilliam*, 994 F.2d 97 (2d Cir.1993).

#### 1. Thomas and Pabon–Cruz Are Premised upon a Now Inappropriate Attempt to Curtail Jury Powers

It is no criticism to point out that the statements of the Court of Appeals in *Thomas* and *Pabon–Cruz* suggesting strict limitations on information which may be made available to a jury must now be read in the light of Supreme Court cases reinterpreting the Sixth Amendment.

##### a. Thomas

*Thomas* is an example of the former judicial attempts to control the jury's mercy-dispensing powers, one of many discussed in Part IV.C, *supra*. The *Thomas* court did not simply discourage—as many other courts have done—jury nullification; it seemed to go further in suggesting that

a trial court may dismiss a potentially nullifying juror during jury deliberations. *See* Ran Zev Schijanovich, *The Second Circuit's Attack on Jury Nullification in United States v. Thomas: In Disregard of the Law and the Evidence*, 20 Cardozo L.Rev. 1275, 1277 (1999) ("The Second Circuit's holding represents perhaps the most far-reaching action taken by the federal courts to suppress the jury's prerogative to refuse to follow the law 'based on its own sense of justice or fairness' in reaching a verdict."). The *Thomas* court's assertion that its ruling was "one fully consistent with our history and traditions," *Thomas*, 116 F.3d at 622, might have been supported by a broad reading of late nineteenth– and twentieth-century cases. But it cannot stand in light of colonial history and practice at the time the Sixth Amendment was adopted, as that history must be interpreted pursuant to twenty-first century Supreme Court jurisprudence.

In *Thomas*, the defendants were convicted by an eleven-person jury after the trial court dismissed the twelfth juror during jury deliberations pursuant to Rule 23(b)(3)'s "just cause" provision, after finding that the juror "was purposefully disregarding the court's instructions on the law—in effect, that the juror intended to acquit the defendants regardless of the evidence of their guilt." *Thomas*, 116 F.3d at 608; *see* Fed.R.Crim.P. 23(b)(3) ("After the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror."). On appeal, the Court of Appeals declared "a deliberating juror's intent to nullify constitutes 'just cause' for dismissal" under Rule 23 (as long as certain high evidentiary standards were met). *Thomas*, 116 F.3d at 612. It declared the presiding judge had a duty to dismiss such a juror. *Id.* at 616. But because it was not "clear beyond doubt"

that the dismissed juror in *Thomas* had not simply been unconvinced by the prosecution's case, the appellate court vacated the judgment and ordered a new trial. *Id.* at 608–09.

The Court of Appeals for the Second Circuit's dictum in *Thomas* that trial courts have a duty to dismiss potentially nullifying jurors was based on its

> [C]ategorical[ ] reject[ion of] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent. Accordingly, we conclude that a juror who intends to nullify the applicable law is no less subject to dismissal than is a juror who disregards the court's instructions due to an event or relationship that renders him biased or otherwise unable to render a fair and impartial verdict.

*Id.* at 614 (citation and footnote omitted). Before it categorically rejected the possibility of jury nullification, the *Thomas* court briefly reviewed—but ultimately found unpersuasive—nullification's history as a form of "tolerable civil disobedience" as exemplified in *Zenger*, *id.* at 614, and the "long and complicated history of juries acting as judges of the law as well as the evidence" in the "Anglo–American legal system," *id.* at 614–15; the various procedural rules that serve to protect jury verdicts from outside inquiry (e.g., secrecy of deliberations, general verdicts, inconsistent verdicts), *id.* at 615; the jury's part in "'introduc[ing] a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions,'" *id.* (quoting *U.S. ex rel. McCann v. Adams*, 126 F.2d 774, 776 (2d Cir.1942) (Hand, J.)); and the federal courts' common acknowledgment of the "de facto *power* of a jury to render general verdicts 'in the teeth of both law and facts.'" *Id.* (quoting *Horning v. District of Columbia*, 254 U.S. 135, 138, 41 S.Ct. 53,

65 L.Ed. 185 (1920)). But, because jury nullification can lead to a "sabotage of justice," *id.* at 616 (quoting Randall Kennedy, *The Angry Juror*, Wall St. J., Sept. 30, 1994, at A12) (referring to acquittals of White defendants by White juries in 1960s civil rights trials) and existing Supreme Court precedent—*Sparf v. United States*, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895)—the Court of Appeals for the Second Circuit concluded that "trial courts have the duty to forestall or prevent [potential nullification], . . . where it does not interfere with guaranteed rights or the need to protect the secrecy of jury deliberations, by dismissal of an offending juror from the venire or the jury." *Id.* at 616 (citations omitted).

Most respectfully, it is submitted that *Thomas* no longer expresses the law in view of current Supreme Court rulings. That Rule 23(b)'s "just cause" provision may be used to dismiss a potentially nullifying juror is dubious in view of what appears to be the design of the 1983 amendment to Rule 23 of the Federal Rules of Criminal Procedure to dismiss only those jurors who are unable to continue to serve due to sudden physical illness or mental stress. *See* Advisory Committee Notes, Fed.Crim.Code and Rules 119 (Thomas/West 2007) ("[O]ne of the jurors is seriously incapacitated or otherwise found to be unable to continue service upon the jury"); Schijanovich, *supra*, at 1309–13. Application of the *Thomas* test—to permit judicial inquiry to determine whether jurors are simply unconvinced by the evidence or intent on nullification—inevitably destroys the essential secrecy of jury deliberations, as the court itself acknowledged. *See Thomas*, 116 F.3d at 621 ("Where . . . as here, a presiding judge receives reports that a deliberating juror is intent on defying the court's instructions on the law, the judge may well have no means of investigating the allega-

tion without unduly breaching the secrecy of deliberations."). Because it is difficult to distinguish between a "juror who favors acquittal because he or she is purposefully disregarding the court's instructions on the law, and the juror who is simply unpersuaded by the Government's evidence," dismissal of jurors will, in some cases, necessarily violate a criminal defendant's right to a unanimous jury verdict. *Id.* at 621 ("[T]o remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict."). Despite the appellate court's serious efforts to develop a "balancing test" in *Thomas,* its approach does not guarantee protection of constitutional rights of jurors or of defendants.

In any event, because it is based primarily on *Sparf*—now largely abrogated by *Booker, see* Parts IV.A–E, *supra*—the *Thomas* ruling exceeds the power of judges under the Sixth Amendment to control juries. That it is a criminal jury's duty "to take the law from the court and apply that law to the facts as they find them," *id.* at 615 (quoting *Sparf,* 156 U.S. at 102, 15 S.Ct. 273), is a far cry from holding that it is the court's duty to dismiss a juror favoring mercy. The law does not countenance interference with the jury's essential function, one of which, even the *Thomas* court admitted, is to "provid[e] play in the joints that imparts flexibility and avoid[] undue rigidity ... [and] act[] as a safety valve for exceptional cases, without being a wildcat or runaway institution." *Thomas,* 116 F.3d at 622 (quoting *United States v. Dougherty,* 473 F.2d 1113, 1134 (D.C.Cir.1972) (quotation marks omitted)).

Despite *Thomas's* current lack of foundation, other appellate courts (both before and after *Booker* ) have followed its conclusion. The Court of Appeals for the Eleventh Circuit has approved the dismissal of a potentially nullifying juror under Rule 23(b)'s just cause provision, applying a "beyond reasonable doubt" standard to ensure that a juror may only be excused "when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence." *United States v. Abbell,* 271 F.3d 1286, 1302 (11th Cir.2001) (per curiam). And the Court of Appeals for the Third Circuit went as far as to declare that "courts *agree* that a district court has the authority to dismiss a juror—even during deliberations—if 'that juror refuses to apply the law or to follow the court's instructions.'" *United States v. Kemp,* 500 F.3d 257, 303 (3d Cir.2007), *cert denied,* —— U.S. ——, 128 S.Ct. 1329, 170 L.Ed.2d 138 (2008) (quoting *Abbell,* 271 F.3d at 1302) (emphasis added).

While *Thomas* purports to protect jurors and defendants by providing that "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request," *Thomas,* 116 F.3d at 621–22 (citing *United States v. Brown,* 823 F.2d 591, 596 (D.C.Cir.1987)) (emphasis omitted), other courts have facilitated juror dismissal by requiring only "any *reasonable* possibility." *See, e.g., Kemp,* 500 F.3d at 303 (emphasis added); *United States v. Symington,* 195 F.3d 1080, 1087 (9th Cir.1999). These courts are not in step with current Supreme Court practice on the Sixth Amendment.

#### b. Pabon–Cruz

##### i. Procedural History

Following its *Thomas* decision, the Court of Appeals for the Second Circuit failed to recognize the jury's historic Sixth Amendment mercy-dispensing powers in *Pabon–Cruz,* 391 F.3d 86. Like Polizzi, the defendant, an eighteen-year-old college student majoring in computer science, had no criminal history. *Id.* at 88. He was charged with advertising to distribute or

receive images of child pornography and receiving or distributing child pornography. The advertising charge then carried a ten-year mandatory minimum sentence. *Id.*

Before trial, both parties made in limine motions. Offering to stipulate that the files found on the defendant's computer were child pornography, the defense moved to preclude showing the jury any of the pornographic images. The government moved to preclude the jury from learning of the ten-year mandatory sentence. Viewing the motions as related, the district court denied both:

> I must say, I find both sides a little bit inconsistent in that respect. The defense seems to want the jury to make some kind of a judgment about whether the penalty is appropriate for the conduct without letting the jury see what the conduct consists of. On the other hand, the government, which had the opportunity to have a fact finder who would be bound to apply the law and the evidence, chose a fact finder, I assume, because it wanted a judgment of the community, and yet it doesn't want the community to know what it is actually judging about or what the consequences of its judgment are.

*Id.* at 90. Indicating that it would inform the jury of the sentence to be imposed on defendant if convicted of the advertising offense but would not allow the defense to argue nullification, *id.*, the trial court explained its reasoning:

> But I think there is a difference between saying that the court does not and cannot approve of nullification, and ignoring the fact that juries have historically played this role. I think they are only appropriately able to play that role when they do it against a backdrop of stern admonitions that they are not supposed to do it. I think it is an act of civil disobedience if they do it. And they should not be given any encouragement or any condonation or any instruction that suggests to them that it is legally permissible for them to violate their oath as jurors. On the other hand, historically jurors have sometimes done that, and the judgment of history is sometimes that when they do that, they are in effect lawless and evil, and at other times the judgment of history is that they've done the right thing.
>
> . . . .
>
> I would not expect the average juror to be very tempted to civil disobedience in light of the seriousness of the conduct shown here and the strength of the evidence against the defendant.
>
> But in the unlikely event that members of the jury were so troubled that they decided to acquit in the face of the court's instruction, in violation of their oaths, and on the face of the evidence in the case, that, it seems to me, would constitute a significant exercise of the historic function of the jury and one that the jurors could never imagine if they had no notion of the seriousness of this offense in terms of punishment.

*Id.* at 90–91

The government promptly filed an application in the Court of Appeals for the Second Circuit for an emergency stay and writ of mandamus. *Id.* The court granted the writ in an unpublished summary order, which stated in its entirety:

> IT IS HEREBY ORDERED that the petition for a writ of mandamus is granted. Challenges to a proposed jury charge may properly be considered on a petition for a writ of mandamus. The District Judge's proposed jury instruction regarding the penalties the defendant faces if convicted is a clear abuse of discretion in light of binding authority. *See Shannon v. United States,* 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459

(1994); *United States v. Thomas*, 116 F.3d 606 (2d Cir.1997). IT IS FURTHER ORDERED that the stay of trial proceedings is hereby lifted.

*Id.* at 91–92.

Pabon–Cruz appealed after a jury verdict of guilty. In the published decision on the direct appeal, *United States v. Pabon–Cruz*, 391 F.3d 86 (2d Cir.2004), the Second Circuit acknowledged that the issue was different from that recognized on mandamus:

> [T]he pertinent question on appeal is not whether that [mandamus] ruling was correct, but whether defendant was denied the benefit of a charge he requested to which he was legally entitled. Accordingly, *even if we believed the earlier panel was incorrect in forbidding the District Court from instructing the jury on the sentencing consequences, the conviction remains sound* unless the instructions actually given by the District Court were in error or the defendant had a legal entitlement to the instruction he was denied.

*Id.* at 94 (emphasis added). Finding no reversible error in the charge, the Court of Appeals for the Second Circuit supported its reasoning by an explanation relying on its previous opinion in *Thomas* and adopting the Supreme Court's "fully persuasive dicta" in *Shannon v. United States*, 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994):

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentences on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is there-fore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion.

*Pabon–Cruz*, 391 F.3d at 94–95 (quoting *Shannon*, 512 U.S. at 579, 114 S.Ct. 2419).

The appellate court in *Pabon–Cruz*, it is respectfully suggested, too broadly interpreted *Shannon*. *Shannon* had held that a defendant had no legal right to a charge informing a jury of the consequences of a not guilty by reason of legal insanity verdict (commitment to a mental asylum). *Pabon–Cruz* interpreted *Shannon's* holding to mean that defendants have "no legal right to a charge informing the jury of [any of] the sentencing consequences of its decisions." *Id.* at 94. Because *Thomas* had held that jurors have "no right" to engage in nullification—although they do have the power to do so—trial "courts have the duty to forestall or prevent such conduct." *Id.* at 95 (citing *Thomas*, 116 F.3d at 616). Hence, the *Pabon–Cruz* court concluded that the defendant had no right to a jury instruction informing the jury of the ten-year mandatory minimum sentence and strongly implied that trial courts were forbidden to so instruct or allow juries to be so informed.

### ii. *Post*-Booker, Pabon–Cruz, Thomas *and* Shannon *Require Reinterpretation*

*Pabon–Cruz*, *Thomas*, and *Shannon* were all issued without guidance from *Booker* and the sea change in Sixth Amendment and sentencing practice it required. As demonstrated in Part IV.D, *supra*, courts must now interpret Sixth Amendment questions in light of the jury's role in colonial times, when juries knew of—or were informed by the court of—the applicable sentences and had the recog-

nized ability to dispense mercy. *Cf. Pabon–Cruz,* 391 F.3d at 90 (criticizing the district court for deciding to inform the jury of the ten-year mandatory minimum, after noting that "juries have historically played this role ... and at ... times the judgment of history is that they've done the right thing"). Any dicta adverse to the holding in the instant case in *Pabon–Cruz, Thomas* and *Shannon* have now been effectively rejected by the Supreme Court. *See, e.g., Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

### iii. Pabon–Cruz *Applied to Polizzi*

At Polizzi's trial, the jury was not informed—despite defendant's request—of the five-year mandatory minimum sentence consequent to a guilty verdict. This decision was based on the government's argument before trial that *Pabon–Cruz* controlled and required denial of the request as a matter of law. If the trial court had indicated that it would inform the jury or allow the defendant to inform the jury of the mandatory minimum sentence, the government would almost certainly have sought an emergency stay and a writ of mandamus from the Court of Appeals for the Second Circuit, which likely would have been summarily granted following *Pabon–Cruz.* Because of recent Sixth Amendment Supreme Court constitutional jurisprudence, this court's finding that *Pabon–Cruz* precluded it from issuing Polizzi's requested jury instruction on sentencing was incorrect. Polizzi did have a Sixth Amendment right to a jury informed of the five-year minimum. *See* Part V, *infra.*

Technically, even if *Pabon–Cruz* withstood analysis post-*Booker,* the decision would not constitute binding authority on a *trial court's discretion* to inform a jury of a mandatory minimum sentence. The writ of mandamus granted by the Court of Appeals for the Second Circuit in *Pabon–Cruz* was an unpublished summary order.

*United States v. Pabon–Cruz,* No. 02–3080 (2d Cir. Oct. 11, 2002); *see Pabon–Cruz,* 391 F.3d at 86. Summary orders do not have precedential value. 2d Cir. Local Rule 32.1(b). The Court of Appeals' subsequent published decision after the defendant appealed his guilty verdict only addressed the question whether the defendant was legally entitled to a jury charge describing the mandatory minimum. The issue was not whether the trial court has the power and discretion to inform the jury, in a charge or otherwise, of the mandatory minimum. *See id.* at 95 n. 11 ("Because the issue is not before us, we intimate no view as to whether, or in what circumstances, a trial judge may inform the jury of the relationship between punishment and offense."). Despite this technical distinction, since the overall tenor of *Pabon–Cruz* was fairly clearly opposed to Polizzi's proposed jury instruction in the instant case, this court declined *as a matter of law* to issue the proposed instruction on sentencing impact to the jury, a decision that this court now recognizes was in error. Even under *Pabon–Cruz* it arguably had discretion to grant the charge.

### 2. Gilliam *Language Represents the Current General Role of the Informed Jury as Representative of Community Mores*

In comparison with *Thomas* and *Pabon–Cruz,* language of the Court of Appeals for Second Circuit more in keeping with the jury's traditional function is that in *United States v. Gilliam,* 994 F.2d 97 (2d Cir. 1993)—putting aside the validity of its holding. In *Gilliam,* the defendant appealed from a guilty jury verdict on a felon-in-possession charge, protesting the trial court's failure to force the government to accept his proposed stipulation to an entire *element* of the offense. Before trial, defendant had offered to stipulate that he not only had a prior felony convic-

tion—the facts stipulating the predicate element of the crime—as allowed by *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), but that he was a felon as defined under the applicable felon-in-possession statute. Acceptance of the proposed stipulation would have prevented the jury from learning the nature of the statute under which Gilliam was being tried: all the jury would have had to determine was whether the defendant possessed a gun at the time the government alleged. The trial court opted not to require the government to accept the defendant's proposed stipulation, and the Second Circuit affirmed, emphasizing the potential harm to the traditional "role of the jury":

> But there is harm done by his proposal, harm to the judicial process and the role of the jury in determining the guilt or innocence of the accused as charged. *Gilliam's proposal violates the very foundation of the jury system.* It removes from the jury's consideration an element of the crime, leaving the jury in a position only to make findings of fact on a particular element *without knowing the true import of those findings.* ... *The jury speaks for the community in condemning such behavior, and it cannot condemn such behavior if it is unaware of the nature of the crime charged.*

*Gilliam*, 994 F.2d at 100 (emphasis added).

Just as juries, according to *Gilliam*, cannot condemn behavior when they are unaware of all elements of the offense, to understand the full "nature of the crime" in our society juries must be aware of the severity of the consequences of its verdicts. Comprehending the "true import of [a jury's] findings," *id.* at 101, necessarily entails knowledge of a mandatory penalty in cases such as the one now before the court. That the jury in Polizzi should have been informed of the applicable mandatory minimum sentence is driven home by other language in *Gilliam*:

> Our constitution guarantees the accused the right of a trial by a jury of his peers, primarily *in order to ensure that the accused is judged by prevailing community mores.* As Judge Learned Hand stated, the *institution of the jury "introduces a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions."* As representatives of the people, the jurors can rebuke the accused for violation of community standards, morals, or principles. *See, e.g., Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (*"[O]ne of the most important functions any jury can perform ... is to maintain a link between contemporary community values and the penal system. ..."*). *The jury is the oracle of the citizenry in weighing the culpability of the accused,* and should it find him guilty it condemns him with the full legal and moral authority of the society. The public listens with rapt attention to the jury's pronouncement of guilt or innocence, for in that singular moment the convictions and conscience of the entire community are expressed.

*Id.* at 101 (emphasis added). Mandatory minimums reduce the impact of local community values on the penal system. *Cf. United States v. Lucania,* 379 F.Supp.2d 288 (E.D.N.Y.2005) (Sifton, J.), *aff'd in part, vacated in part sub. nom United States v. Cavera,* 505 F.3d 216 (2d Cir. 2007); Daniel Richman, *Federal Sentencing in 2007: The Supreme Court Holds— The Center Doesn't,* 117 Yale L.J. (forthcoming 2008) (text at n. 144) (decentralization, federal enforcement with deference to local state law and practice and jury of community (citing *United States v. Brennan,* 468 F.Supp.2d 400 (E.D.N.Y.2007))); Charles P. Sifton, *Themes and Valuations:*

*The Relationship Between National Sentencing Standards and Local Conditions,* 5 Fed. Sent'g Rep. 303 (1993); Essay, *The Role of Judges in a Government Of, By, and For the People,* 30 Cardozo L.Rev. (forthcoming 2008).

To ensure that the accused is judged by prevailing community mores in connection with "the penal system," a jury applies its own judgment regarding the defendant's culpability to determine whether the acts in question fit both society's definition of the crime and the socially-approved punishment. As the *Gilliam* opinion declared, the jury is not a mere factfinder:

> *Without full knowledge of the nature of the crime, the jury cannot speak for the people or exert their authority. If an element of the crime is conceded and stripped away from the jury's consideration, the jurors become no more than factfinders.* The jury must know why it is convicting or acquitting the defendant, because that is simply how our judicial system is designed to work.

*Id.* at 101 (emphasis added). If the jury is unaware of the severity of a sentence, they become no more than menial factfinders rather than spokespersons for the community, as *Gilliam* and the Sixth Amendment ruled they must be.

*3. In Polizzi's Case, Informing the Jury of the Applicable Penalty Was Necessary Because of the Defendant's Unusual Background and the Unknown Punishment*

It must be emphasized that not all juries need to be, or perhaps should be, informed of applicable sentences. The discretion of the trial court will be exercised responsibly in accordance with colonial and British practice described in Part IV.A, *infra.* The case at bar is not typical, but one in which it was critical that the jurors "be aware of the moral consequences of their decisions." *Pabon–Cruz,* 255 F.Supp.2d at 214. Such awareness is required, as the *Pabon–Cruz* trial court noted, in the special circumstances there,

> [W]here .... the average juror might well not remotely imagine that advertising child pornography not only carries a harsher penalty than actually delivering it, but that the penalty is a mandatory ten years in prison, even for a defendant who is little more than a child himself.

*Id.* Here the special circumstances include the mandatory minimum sentence unknown to the jury, the need for psychiatric help in view of sexual childhood abuse, the locked door behind which viewing took place, and other factors.

*F. Variability of Results Depending Upon the Informed & Non–Informed Jurors*

Perhaps the most prejudicial aspect of a failure to be candid with the jury on the effect of its decision is that some juries may have a juror who knows the sentencing implications and will accurately inform his or her co-jurors in discussions, others will have no such informed person, and still others will have an ill-informed person with influence on the decision. This kind of exchange undoubtedly occurs frequently in juror deliberations, but is almost impossible to detect or even to investigate. *See* Fed.R.Evid. 606(b).

Disparate impact caused by disparate levels of juror knowledge can lead to serious equal protection and due process issues. *See* Milton Heumann & Lance Cassak, *Not–So–Blissful Ignorance: Informing Jurors About Punishment in Mandatory Sentencing Cases,* 20 Am. Crim. L.Rev. 343 (1983). *See generally* Katherine M. Sullivan & Gerald Gunther, Constitutional Law 467ff. (15th ed.2004) (discussing the origins of the due process clause as incorporating federal rights against the states). The excellent field work and analysis of Heumann and Cas-

sak as well as the reaction of the jurors in the instant case demonstrates that the due process and equal protection dangers both to defendants and the judicial system of silence by the court is substantial. Lack of candor and transparency here, as in so many other aspects of our democracy, creates an unnecessary hazard to justice.

The problem of the misinformed juror is reflected in the trial judge's opinion in *United States v. Buck*, 23 F.Supp. 503 (W.D.Mo.1938), explaining why it was necessary to inform the jury of sentencing ranges because of the special situation in that case.

> In the joint motion of all of the defendants criticism is expressed of the reference in the charge of the court to the fact that in the event any defendant was found guilty by the jury he would receive neither the maximum nor the minimum punishment provided by the statute. It is scarcely necessary, however, to refer to that matter. The very first argument to the jury by any of the attorneys for the defendants, being the argument by Mr. Swanson, began with the reading to the jury of the statute, including that part of the statute setting out the maximum punishment which might be imposed. Counsel then developed his argument by seeking to impress upon the jury that although the statute provided for a minimum punishment of a day in jail or a dollar fine, that no such punishment could be expected from the presiding judge in the event of a verdict of guilty. With the possible exception of counsel representing Mrs. Ryan (who say that they made no reference to the matter of punishment) every one of the six attorneys who argued for the defendants in this case dwelt on the fact that a penitentiary sentence might be imposed upon the defendants by the presiding judge. There was never in any case over which we have presided any

> such enlargement upon the subject of punishment possible under the statute. It is inconceivable that any one can believe that under such circumstances the presiding judge should not have referred at all to that matter in the charge. In what possible way could any defendant have been prejudiced by the fact that the jury was told that if that defendant was found guilty he would receive substantial and not a merely trifling punishment? In what possible way was any defendant prejudiced because the judge told the jury (after attorneys over and over again had referred to the maximum punishment provided in the statute) that the maximum punishment would not be imposed on any defendant?

*Id.* at 505.

Polling evidence suggests that informing juries could cause them to acquit more often, but that any such effect will be relatively slight and will not throw the federal courts into disarray. There are at least two reasons to infer that informing juries of mandatory minimums will cause them to nullify in at least some cases. First, polls that ask generalized questions about jury nullification sometimes show that most Americans are willing to exercise some mercy if they believe it is morally right to do so. *See* Leonard W. Levy, The Palladium of Justice: Origins of Trial by Jury 55 (1999). Second, some public opinion polling data suggests that while jurors are generally supportive of mandatory minimums in the abstract, when forced to analyze how the mandatory minimum statutes apply to some of the individual defendants before them, they become less willing to see doled out the harsh sentences required by such laws. *See* Brandon K. Applegate, et al., *Assessing Public Support for Three–Strikes–and–You're–Out Laws: Global Views Versus Specific Attitudes,* 42 Crime & Delinquency 517 (1996) (finding that when respon-

dents are given descriptions of a crime that would require life terms under three-strikes laws, most would not sentence defendant to life term, and that most favored exceptions to three-strikes laws in many situations, despite fact that eighty-eight percent of respondents said that they wanted the state to adopt a three-strikes law).

If juries use information on mandatory minimum sentences to nullify, they will likely do so judiciously. Notable is Heumann and Cassak's interesting study of the Michigan Felony Firearm Statute. Heumann & Cassak, *supra; see* Mich. Comp. Laws Ann. § 750.2276 (Supp.1982). In 1977, Michigan passed a statute, known colloquially as the "Gun Law," which required that any defendant who possessed a firearm while committing a felony receive a two-year sentence in addition to whatever sentence he otherwise would have received. Heumann & Cassak, *supra,* at 346. At the same time, the state launched a publicity campaign—replete with billboards and bumper stickers announcing that "one with gun gets you two"—to ensure that the public was aware of the new mandatory minimum. *Id.* at 347 & n. 15.

Heumann and Cassak hypothesized that juries would find the mandatory minimum to be unjust in many cases, and that many Michigan juries would be aware of the law even if it was never mentioned at trial due to the widespread publicity that accompanied its enactment. *See id.* at 346–47. They gathered information on how frequently juries acquitted defendants in Gun Law cases before and after the law was enacted. *See id.* at 349–52. Their hypothesis of increased nullification was not supported by the data. *See id.* Prior to 1977, eight of the eleven felonious assault cases that went to the jury resulted in acquittals. *Id.* at 352. After 1977, thirty-two of the forty-three cases that went to juries resulted in acquittals. *Id.* In percentage terms, 72.7% of the cases resulted in acquittals before the Gun Law, while after the Gun Law 74.7% resulted in acquittals. *Id.* at 352 n. 27. This increase is not statistically significant.

But Heumann and Cassak argued that despite this insignificant change in the acquittal rate, the Gun Law did cause some increase in nullification: they noted that their interviews with prosecutors, judges, and defense attorneys suggested that the strict Gun Law sentence caused juries to nullify. *Id.* They also pointed out that even if the acquittal rate did not increase significantly, juries did acquit more defendants, in absolute terms, after the passage of the law than before. Whatever one makes of these arguments, Michigan post-Gun Law juries likely aware of the mandatory minimum did not substantially increase nullification. There is no reason to suspect that informing juries of mandatory minimums in the small number of cases where the defendant requests such a charge will create any crisis in law enforcement.

The Supreme Court's fears of a slippery slope expressed in *Shannon* in giving juries sentencing information are unwarranted:

Moreover, Shannon offers us no principled way to limit the availability of instructions detailing the consequences of a verdict to cases in which an NGI [not guilty by reason of insanity] defense is raised. Jurors may be as unfamiliar with other aspects of the criminal sentencing process as they are with NGI verdicts. But, as a general matter, jurors are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense. *See United States v. Thigpen,* 4 F.3d 1573, 1578 (11th Cir.1993) (en banc), *cert.*

*pending,* 510 U.S. 988, 114 S.Ct. 542, 126 L.Ed.2d 445 (1993); *United States v. Frank,* 956 F.2d 872, 879 (9th Cir.1991), *cert. denied,* 506 U.S. 932, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992). Because it is conceivable that some jurors might harbor misunderstandings with regard to these sentencing options, a district court, under Shannon's reasoning, might be obligated to give juries information regarding these possibilities as well. In short, if we pursue the logic of Shannon's position, the rule against informing jurors of the consequences of their verdicts would soon be swallowed by the exceptions.

*Shannon v. United States,* 512 U.S. 573, 586–87, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994). Our jurors are intelligent and responsible. They can understand complex legal and factual issues that are adequately explained to them with the aid of effective advocates and judges. There is no reason to expect that they will be soft on child pornographers, drug traffickers, repeat offenders, or others subject to mandatory minimums.

### G. Conclusion

Perhaps the issue is as well summed up as it need be by quoting briefly from Professor Roscoe Pound and Judge Learned Hand. Pound referred to jury nullification as "the great corrective of law in its actual administration." Roscoe Pound, *Law in Books and Law in Action,* 44 Am. L.Rev. 12, 18 (1910). And Learned Hand declared that nullification supplies the necessary "slack into the enforcement of law." *United States ex rel. McCann v. Adams,* 126 F.2d 774, 776 (2d Cir.1942). It allows the jury to temper the law's rigor "by the mollifying influence of current ethical conventions." *Id.*; *see, e.g.,* Andrew J. Parmenter, *Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification,* 46 Washburn L.J. 379, 426

(2007) (providing other supporting citations); Appendix A, *infra.*

In Harry Kalven, Jr. and Hans Zeisel's comprehensive and still valid study, The American Jury (1966), the authors concluded that in the relatively rare cases where the jury reaches a "different conclusion from the judge on the same evidence, it does so not because it is a sloppy or inaccurate finder of the facts, but because it gives recognition to values which fall outside the official rules." *Id.* at 495. "It . . . will move where the equities are. And where the equities are at any given time will depend on both the state of the law and the climate of public opinion." *Id. See also, e.g.,* Valerie P. *Hans, Judges, Juries, and Scientific Evidence,* 16 J.L. & Pol'y 19, 23 (2007) ("[M]any disagreements [between judges and juries] are explained by the fact that compared to judges, juries appear to require a stronger case by the prosecution to convict the defendant; or by the fact that juries infuse community notions of justice into their verdicts." (citing, inter alia, Kalven and Zeisel, *supra*)). Above all, the experience of trial judges is that the jury is among our most conservative institutions. When in doubt we should trust its judgment, as did those who adopted the Sixth Amendment.

### V. Defendant's Motion to Inform the Jury of Mandatory Minimum Should Have Been Granted

As noted in Part II.B.4.b, *supra,* defendant repeatedly moved to have the jury informed of something it would not be expected to, and did not, know—the mandatory five-year minimum prison sentence required were it to find the defendant guilty of receiving as charged. It was demonstrated in Part IV, *supra,* that the court's failure constituted a denial of defendant's Sixth Amendment jury rights. Such an instruction is different from one

inviting the jury to nullify. It accords fully with Sixth Amendment rights to a jury which understands the effects and implications of its decision. *See* Part IV.A, *supra.*

 That juries do have the power to refuse to convict or to convict of a lesser offense has been fully established. *See* Part IV, *supra; see, e.g., Neder v. United States,* 527 U.S. 1, 33, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (Scalia, J., concurring in part and dissenting in part) ("A court cannot, no matter how clear the defendant's culpability, direct a guilty verdict."); *United States v. Pabon–Cruz,* 391 F.3d 86, 95 (2d Cir.2004) ("The power of juries to 'nullify' or exercise a power of lenity is just that—a power" (quoting *United States v. Thomas,* 116 F.3d 606, 615 (2d Cir.1997))); *Thomas,* 116 F.3d at 615 (characterizing right of juries to deliver unreviewable, general verdicts—thereby allowing jury nullification to occur, albeit infrequently—as a form of "jury lenity"). Where nullification is suspected, courts may not "intrude upon 'the sanctity of the jury's deliberations' because of their 'strong policy against probing into [a jury verdict's] logic or reasoning.'" *United States v. Mahaffy,* 499 F.Supp.2d 291, 296 (E.D.N.Y.2007) (quoting *United States v. Zane,* 495 F.2d 683, 690 (2d Cir.1974)).

 Pre-*Booker,* the Court of Appeals for the Second Circuit had "categorically reject[ed] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." *Thomas,* 116 F.3d at 614. Both before and after *Booker,* courts are, we assume for the purposes of the instant case, under no obligation to tell the jury that it can nullify. *See United States v. Carr,* 424 F.3d 213, 219–20 (2d Cir.2005) ("Our case law makes clear, as Carr concedes, that a trial court is not required to inform a jury of its power to nullify."); *see*

*also Thomas,* 116 F.3d at 616 n. 9 ("[C]riminal defendants have no right to a jury instruction alerting jurors to this power to act in contravention of their duty." (citing *United States v. Edwards,* 101 F.3d 17, 19 (2d Cir.1996))); *Edwards,* 101 F.3d at 19 ("While juries have the power to ignore the law in their verdicts, courts have no obligation to tell them they may do so. It appears that every circuit that has considered this issue agrees."); *cf.* Essay, *Considering Jury "Nullification": When May and Should a Jury Reject the Law to Do Justice,* 30 Am.Crim. L.Rev. 239, 250 (1993) (noting that nullification instructions should probably not be given routinely because such an "instruction is like telling children not to put beans in their noses. Most of them would not have thought of it had it not been suggested."). Courts may still affirmatively tell the jury "it has a duty to follow the law, even though it may in fact have the power not to." *Carr,* 424 F.3d at 219–20 (disagreeing, post-*Booker,* with appellant that the district court's suggestion to the jury that nullification was not an option was prohibited). But this rule does not prevent telling the jury about minimum sentences where it is appropriate so that it can exercise well-informed judgment and mercy dispensing powers.

The instant decision, requiring notice to the jury of the applicable minimum sentence, does not contravene precedents of the Court of Appeals for the Second Circuit against nullification suggestions to the jury by court and counsel. An instruction informing jurors of the five-year mandatory minimum sentence if the defendant is found guilty is not the same as a pro-nullification instruction. "This is an argument for the right of the jury to have that information necessary to decide whether a sentencing law should be nullified. This is not an argument for the right to have the jury instructed on jury nullification."

*United States v. Datcher,* 830 F.Supp. 411, 412–13 (M.D.Tenn.1993), *criticized by United States v. Chesney,* 86 F.3d 564, 574 (6th Cir.1996). Informing the jury of the mandatory minimum in this case arguably would open the jury to the possibility of mercy, but not nearly to the degree of an actual jury pro-nullification instruction. *But cf. United States v. Johnson,* 62 F.3d 849, 850–51 (6th Cir.1995) ("[T]he only possible purpose that would be served by informing jurors of the mandatory sentence would be to invite jury nullification of the law.").

The right of jurors to be told of the high stakes of their decisions under a mandatory sentencing scheme so that they can decide to find a defendant guilty or innocent or guilty of a lesser crime "is a point independent of the right to nullify." Milton Heumann & Lance Cassak, *Not–So–Blissful Ignorance: Informing Jurors About Punishment in Mandatory Sentencing Cases,* 20 Am.Crim. L.Rev. 343, 388 (1983).

The Supreme Court has suggested in dicta that a defendant is not entitled to an instruction about mandatory minimums. *See Shannon v. United States,* 512 U.S. 573, 586, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) ("[A]s a general matter, jurors are not informed of mandatory minimum or maximum sentences"). This was pre-*Booker.* Aside from *Pabon–Cruz*'s summary order, the Second Circuit has not yet definitively addressed the issue post-*Booker* of whether a defendant is now entitled to an instruction about a mandatory sentence or whether the trial court has discretion to give one. *See* Part IV.E, *supra; see also United States v. Harrison,* 179 Fed.Appx. 411, 412–13 (9th Cir.2006) ("[A]ppellant argues that the district court erred when it refused to instruct the jury that he faced a mandatory sentence of fifteen years to life if convicted. We have repeatedly held, however, that district

judges should not instruct juries on the sentencing consequences of a verdict when the juries have no role in fixing punishment."); *Johnson,* 62 F.3d at 850–51 ("[E]very circuit to address this issue has held that a defendant is not entitled to an instruction about a mandatory sentence."); *United States v. Parrish,* 925 F.2d 1293, 1299 (10th Cir.1991) ("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation in sentencing."), *abrogated on other grounds by United States v. Wacker,* 72 F.3d 1453 (10th Cir.1995); *United States v. Broxton,* 926 F.2d 1180, 1183 (D.C.Cir.1991) ("[T]he district court committed no error in refusing to inform the jury about the mandatory minimum sentence."); *United States v. Thomas,* 895 F.2d 1198, 1200 (8th Cir.1990) ("The court need not instruct the jury that the defendant will receive a mandatory sentence if he or she is found guilty."); *United States v. McCracken,* 488 F.2d 406, 425 (5th Cir. 1974) ("It is error to tell the jury about the consequences of a certain verdict even if they are mandatory."); *United States v. Del Toro,* 426 F.2d 181, 184 (5th Cir.1970).

As of 2006, apparently only one recent federal court published decision approves allowing a defendant to inform the jury of mandatory sentences attendant to conviction. *Datcher,* 830 F.Supp. 411, *criticized by Chesney,* 86 F.3d 564, 574; *see* Chris Kemmitt, *Function over Form: Reviving the Criminal Jury's Historical Role as a Sentencing Body,* 40 U. Mich. J.L. Reform 93 (2006). In *Datcher,* the defendant moved to argue the issue of punishment to the jury. *Datcher,* 830 F.Supp. at 412. The district court granted the motion "[a]fter considering the historical role of the jury in our criminal justice system and the constitutional constraints on sentencing." *Id.* Datcher faced charges of conspiracy to distribute and attempted distribution of a

446

controlled substance as well as the use of a firearm in connection with this attempted distribution. He faced a minimum of ten years, and, if convicted on all counts, a minimum of twenty-five years. *Id.* at nn. 2–3.

▆ As established in Part IV, *supra,* the Supreme Court's new emphasis on colonial and British history contemporaneous with adoption of the Sixth Amendment now requires, in the narrow special group of cases illustrated by the current one, that the jury know of the mandatory minimum if that is what defendant asks for. A well-informed jury responsive to the needs of both society and the defendant might well consider, given the special circumstances of the present case, that intensive psychiatric treatment and control outside of prison is the desirable end to this criminal litigation. Such an approach might, in these unusual circumstances, do more to protect society than a long prison term with the rudimentary psychiatric help likely to be available behind prison walls. It would recognize that ultimately prisoners must be released and that the return of unrehabilitated prisoners to society presents a serious danger. *See Prisoner Reentry,* 20 Fed. Sent'g Rep. (Dec.2007).

A verdict of not guilty by reason of insanity, which might well have resulted from a proper charge, would not have meant release. Rather, it would have led to a suitable institution for treatment—the sensible result suggested by jurors in the instant case. *See* 18 U.S.C. § 4243.

### A. Defendant's Rule 33 Motion Should Be Granted

▆▆ Pursuant to Polizzi's Rule 33 motion, *see* Def.'s Mot. to Vacate J., Docket Entry No. 123, the verdict on Counts One to Twelve is set aside and defendant is granted a new trial on those counts because he was denied his Sixth Amendment right to trial by an informed jury and because the interest of justice so requires. *See* Fed.R.Crim.P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."). Federal Rule of Criminal Procedure 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). "Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." Charles A. Wright et al., Federal Practice and Procedure: Criminal 3d §§ 530, 556 (2004).

▆ Although a Rule 33 motion normally must be filed within seven days of the jury verdict, *see* Fed.R.Crim.P. 33(b)(2) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty."), the seven-day rule may be flexibly applied. *See* Fed.R.Crim.P. 45(b)(1)(B) ("When an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made ... after the time expires if the party failed to act because of excusable neglect.").

Before the 2005 amendments, the Federal Rules did not permit such extensions of time. *See, e.g., Carlisle v. United States,* 517 U.S. 416, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996). "By reason of changes to Rules 29, 33, and 45, which took effect December 1, 2005, the court now has greater latitude to extend the time for such motions." *United States v. Robinson,* 430 F.3d 537, 542 n. 3 (2d Cir.2005) (citing Report of the Advisory Committee on Criminal Rules, May 18, 2004, App. B, at 2, 4, 8); *see also* Mark M. Baker, *Federal Post–Verdict Motions–An Update,*

N.Y.L.J., Feb. 13, 2006, at 4 ("[N]otwithstanding the government's objection, a district court now has the power to grant an extension to file a post-verdict motion at any time prior to sentence."). Neither is the seven-day time limit jurisdictional. *See Eberhart v. United States,* 546 U.S. 12, 19, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005) (per curiam) (denominating it a "claim processing rule[ ]"). Because the interests of justice require a new trial, Polizzi's Rule 33 motion—filed approximately five months after the trial's end, but before sentencing—is arguably timely under Rule 45(b).

▮ Since Polizzi has moved to vacate his guilty verdict under Rule 33, he has waived any possible double jeopardy objections to a retrial. Ordering a new trial without a defense motion could amount to double jeopardy in violation of the Fifth Amendment. *See United States v. Smith,* 331 U.S. 469, 474–75, 67 S.Ct. 1330, 91 L.Ed. 1610 (1974) ("It is not necessary for us now to decide whether his retrial on the court's own motion would amount to double jeopardy. That a serious constitutional issue would be presented by such a procedure is enough to suggest that we avoid a construction that will raise such an issue." (footnote omitted)). Since there is a defense motion in this case, no such constitutional issues are raised.

Had defendant not moved under Rule 33 for a new trial, this court probably could not have set aside the verdict. Courts of Appeal are more or less in agreement that a trial court does not have the power to sua sponte grant a new trial under Rule 33. *See United States v. Vanterpool,* 377 F.2d 32 (2d Cir.1967) (noting that the 1966 amendments to Rule 33 "make it clear that a judge has no power to order a new trial on his own motion, that he can act only in response to a motion timely made by a defendant" because of the potential for double jeopardy (quoting the Note of the Advisory Committee on Rules)); *accord United States v. Navarro Viayra,* 365 F.3d 790, 793, 795 (9th Cir.2004) (holding that a district court may not sua sponte convert a Rule 29 motion for acquittal into a Rule 33 motion for a new trial, despite the fact that "the rules do not explicitly preclude it from doing so," because "Rule 29 prohibits sua sponte conversion of a motion to acquit into a motion for a new trial. Rule 33 precludes a district court from granting a new trial on its own motion. Taken together, the rules permit a judge to order a new trial only in response to a defendant's motion."); *United States v. Wright,* 363 F.3d 237, 248 (3d Cir.2004) (trial judge has "no power to order a new trial on his own motion" (citation omitted)); *United States v. Brown,* 587 F.2d 187, 189 (5th Cir.1979) ("A district court ... is powerless to order a new trial except on the motion of the defendant."). *But see United States v. Taylor,* 176 F.3d 331, 335 (6th Cir.1999) (holding that the district court's decision to convert defendant's motion for acquittal into a motion for a new trial and grant the motion was not an abuse of discretion).

Courts may "suggest[ ] to defense counsel that a motion for a new trial might be appropriate." Wright et al., *supra,* § 551, at 460–61 (citing *Vanterpool,* 377 F.2d 32); *see also United States v. Saban–Gutierrez,* 783 F.Supp. 1538, 1541 (D.P.R.1991), *aff'd,* 961 F.2d 1565 (1st Cir.1992) (per curiam) ("[I]n order to avoid any potential double jeopardy problems, the rationale given for limiting a district court's power under Rule 33, we ORDER defendant, if he seeks a new trial, to file a motion for a new trial ...") (emphasis in original). "There may well be cases in which a new trial should be granted in the interests of justice, but the reason may not be readily apparent to defense counsel or he may be reluctant to raise it, as in the case of ineffective assistance of counsel." 3 Charles Alan Wright et al., *supra,* § 551, at 461 (quoting Daniel

A. Rezneck, *The New Federal Rules of Criminal Procedure,* 54 Geo. L.J. 1276, 1316 (1966)). Such a suggestion may avoid a subsequent habeas corpus petition based on inadequacy of counsel. In Polizzi's case, this discussion is academic: defendant moved under Rule 33 for a new trial and his motion is timely.

### B. Error Was Prejudicial

■ A new trial is required in the interests of justice because the error was not harmless. Not instructing the jury on the statutory minimum sentence prejudiced the defendant. "The propriety of jury instructions is a question of law ... [T]he question is whether the challenged instruction misled the jury as to the correct legal standard or did not adequately inform the jury on the law." *United States v. Goldstein,* 442 F.3d 777, 781 (2d Cir.2006). Here, the court failed to exercise its discretion because it mistakenly believed it had none. The actual charge delivered did not adequately inform the jury of the legally required sentencing consequences of a conviction. The court wrongly believed that it had no discretion to give the requested charge.

■ Unless the error is harmless, the convictions must be vacated. "An erroneous instruction is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* To evaluate harmlessness, the court must "appraise the significance of an error ... by comparing the instructions actually given with those that should have been given." *United States v. Salameh,* 152 F.3d 88, 142 (2d Cir.1998) (quoting *United States v. Dove,* 916 F.2d 41, 45 (2d Cir.1990)). In view of the jurors' post-trial comments after being informed of the mandatory minimum sentence, it is apparent that a properly informed and rational jury would likely have deadlocked on the receiving counts or found Polizzi not guilty by reason of insanity. The error was prejudicial.

A new trial must be granted on the receiving counts in the interests of justice as a result of the court's failure to charge the jury on the mandatory minimum. That the evidence was legally sufficient to support the verdict is irrelevant when a court commits prejudicial error in its jury charge. *See United States v. Casciano,* 927 F.Supp. 54, 58 (N.D.N.Y.1996).

■ No new trial need be granted on the possession counts. There was no spillover effect since the evidence would have been essentially the same if only possession had been charged.

### C. Sentence

The court finds accurate, and adopts, the applicable guideline level of 31 and the criminal history category of I, which results in a guideline range of 108 to 135 months. *See* Addendum to the Presentence Report 2. It applies 18 U.S.C. § 3553(a).

After *Booker,* the Sentencing Guidelines are no longer mandatory. *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). See the memorandum on sentence of Polizzi, explaining applicable Guidelines and analysis of sentence under 18 U.S.C. § 3553(a). Section 3553(b)(2) of Title 18, which mandates the imposition of a guideline sentence on persons convicted of child sex crimes except in very narrow circumstances, is also no longer applicable. *United States v. Selioutsky,* 409 F.3d 114, 117 (2d Cir.2005) ("We conclude that the *Booker* rationale requires us to consider subsection 3553(b)(2) to be excised."). The issue of sentencing is the subject of an extensive sentencing hearing recorded by transcript, on video, and in a sentencing memorandum.

On the possession counts, a concurrent prison term of one year and a day is a sufficient period of incarceration. In light of the specific sentencing factors outlined in 18 U.S.C. § 3553(a), specifically: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant"; [and] "(2) the need for the sentence imposed," a year and a day in prison appropriately reflects the seriousness of the offense, provides just punishment, and satisfies specific and general deterrence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(D). Specific deterrence is satisfied by this term of imprisonment, a large fine, a long period of supervised release, the intense shame created by the felony convictions, and the cost of defense. General deterrence is sufficiently achieved by the serious penalties. Based on Polizzi's lack of criminal history, a higher sentence required by mechanical application of the Sentencing Guidelines, would be excessive. His past as a law-abiding businessman and loving father, and the mental scars he suffers from childhood sexual abuse are given weight by the court in arriving at a reasonable sentence. *See* § 3553(a).

The defendant needs psychiatric treatment while in prison and during a succeeding ten-year period of supervised release. As members of the jury believed, the community will be better served if Polizzi improves with psychiatric care rather than be destroyed by prison. Supervised release is not insignificant. It is a substantial restriction on freedom. *See Gall v. United States,* —— U.S. ——, 128 S.Ct. 586, 595, 169 L.Ed.2d 445 (2007) ("Offenders on probation are ... subject to several standard conditions that substantially restrict their liberty." (citation omitted)). Ten years ensures that Polizzi will receive the supervision and medical care he needs after he leaves prison. Should there be a relapse under supervised release, the supervised release term can be extended or other action taken to ensure safety of the public.

The evidence supports the conclusion that the defendant will not act out by physically interacting sexually with a minor.

Registration as a sex offender and its serious effects provides powerful general deterrence as well as long-term protection of the public; it eliminates some of the need for incapacitation through prison. Forfeiture of defendant's equipment and pornographic pictures also contributes to specific and general deterrence.

This sentence is imposed pursuant to 18 U.S.C. § 3553. The guideline computation by Probation, conceded to be correct by the government, permits a much longer sentence. The court adopts the presentence report computation as correct and does not depart from the Guidelines. *See* §§ 3553(a), (4)(A), and (5). Rather, it applies all elements of section 3553(a) and 3553(b) after full consideration of each element of those provisions. See transcript and videotape of hearing and oral rulings on sentence.

## VI. Conclusion

### A. Constitutionality of Statute

Defendant's motion to declare the statute unconstitutional as written, charged, and applied is denied because of ruling authority. *See* Part III.A, *supra*. Upon appeal, constitutionality and the language of the statute should be reconsidered for the reasons stated in Part III.A, *supra*. The issue of unconstitutionality applies to both the receiving and possessing counts. *Id.* If the statute is ruled unconstitutional, the case should be dismissed.

### B. New Trial as to Counts One Through Twelve

For the reasons stated in Part IV, *supra*—failure to exercise the court's discretion to notify the jury of the mandatory minimum sentence—the verdict is set

**450**

aside on Counts One through Twelve, charging receiving child pornography. A new trial on those counts is granted, unless the statute as to those counts is declared unconstitutional on appeal.

### C. Sentence on Counts Fourteen Through Twenty–Four

On Counts Fourteen through Twenty–Four, defendant will be principally sentenced to one year and one day in prison, a fine of $50,000, a special assessment of $1100, and a supervised release term of ten years. In prison and while on supervised release he shall receive psychiatric treatment. Upon release from prison he shall register as a sex offender.

### D. Stay

No stay is required since the defendant is presently incarcerated. He will remain so pursuant to his sentence while the parties prosecute a possible appeal. Should an appeal not be decided before defendant's term of incarceration ends, a further stay can be sought in the Court of Appeals for the Second Circuit.

SO ORDERED.

### *Appendices*

### A. Selected Bibliography on Historic Powers of Jurors When Sixth Amendment Was Adopted

**Books & Other Nonperiodic Materials**

Neil Vidmar & Valerie P. Hans, American Juries: The Verdict 221–40 (2007).

Jury Ethics: Jury Conduct and Jury Dynamics 93ff., 156, 173–80 (John Klein & James P. Levine eds.2006).

John Hostettler, The Criminal Jury Old and New: Jury Power from Early Times to the Present Day (2004).

Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review 28–29, 38, 70–71, 157 (2004).

William L. Dwyer, In the Hands of the People: The Trial Jury's Origins, Triumphs, Troubles and Future in American Democracy (2004).

John H. Langbein, The Origins of the Adversary Criminal Trial (2003).

Randolph N. Jonakit, The American Jury System (2003).

James Q. Whitman, Harsh Justice: Criminal Punishments and the Widening Divide Between American and Europe 7 (2003).

Paula L. Hannaford–Agor, et al., Nat'l Ctr. for State Cts., Are Hung Juries a Problem?: Executive Summary (2002).

Leonard W. Levy, The Palladium of Justice: Origins of Trial by Jury (1999).

Clay S. Conrad, Jury Nullification: The Evolution of a Doctrine (1998).

R.H. Helmholz, The Privilege Against Self–Incrimination: Its Origins and Development (1997).

ABA Crim. Justice Standards Committee, ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed.1996).

Norman J. Finkel, Commonsense Justice: Jurors' Notions of the Law (1995).

William E. Nelson, Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society 1760–1830 (1994).

Jeffrey Abramson, We, the Jury: The Jury System and the Ideal of Democracy (Harv. Univ. Press 2000) (1994).

Shannon C. Stimson, The American Revolution in the Law: Anglo–American Jurisprudence Before John Marshall 60–62, 142–48 (1990).

Twelve Good Men and True: The Criminal Trial Jury in England 1200–1800, at 206–07, 212–13 (J.S. Cockburn & Thomas A. Green eds., 1988).

Thomas Andrew Green, Verdict According to Conscience: Perspectives on the English Criminal Jury Trial: 1200–1800 (1985).

1 Julius Goebel, Jr., History of the Supreme Court of the United States: Antecedents and Beginnings to 1801, at 86, 746 n. 18 (Paul A. Freund gen. ed., Macmillan Co., 1971).

Harry Kalven, Jr. & Hans Zeisel, The American Jury 306–28, 433, 495 ff. (1966).

1 Julius Goebel, Jr., The Law Practice of Alexander Hamilton 808–11 (1964).

James Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger (1963).

Leon Radzinowicz, A History of English Criminal Law and its Administration from 1750: The Movement for Reform: 1750–1833, at 92–93, 598–99 (1948).

Julius Goebel, Jr., Cases and Materials on the Development of Legal Institutions 298–329 (1946).

Julius Goebel, Jr., Law Enforcement in Colonial New York: A Study in Criminal Procedure (1664–1776) passim (1944).

Arthur P. Scott, Criminal Law in Colonial Virginia 84 (1930).

Charles A. Beard, The Office of Justice of the Peace in England 80 (1904).

2 Frederick Pollock & Frederic William Maitland, The History of English Law Before the Time of Edward I, at 624–32 (2d ed. Little, Brown 1903).

Ernest I. Morgan, Jurors as Judges of the Law, in Civil and Criminal Cases, at Common Law, Prior to Our Revolution, available at The Making of Modern Law (Thomson Gale 2008), http://0–galenet.galegroup.cm.pegasus.law.columbia.edu:80/servlet/MOML?af=RN & ae=F104061642 & srchtp=a & ste=14 (last visited January 24, 2008).

The Three Trials of William Hone (Tegg ed. 1876).

Thomas H. Cornish, The Juryman's Legal Handbook and Manual of Common Law (Longman, Brown, Green, & Longmans 1843).

1 Joseph Chitty, A Practical Treatise on the Criminal Law (1816).

4 William Blackstone, Commentaries on the Laws of England (1759).

Henry Lintot (pr.), The Complete Juryman: A Complete Compendium of the Laws Relating to Jurors 194–203, 246–47, 260–61 (1752).

Richard Fineway (pr.), The English-Man's Right, A Dialogue Between A Barrister at Law and a Jury-Man (1680).

### Periodicals

Laura I. Appleman, *The Lost Meaning of the Jury Trial Right,* http://ssrn.com/abstract=1084960 (Feb. 27, 2008).

Roger A. Fairfax, Jr., *Harmless Constitutional Error and the Institutional Significance of the Jury,* 76 Fordham L.Rev. 2027 (2008).

Lance Cassak & Milton Heumann, *Old Wine in New Bottles: a Reconsideration of Informing Jurors About Punishment in Determinate-and Mandatory–Sentencing Cases,* 4 Rutgers J.L. & Pub. Pol'y 411 (2007).

Robert L. Jones, *Finishing a Friendly Argument: The Jury and the Historical Origins of Diversity Jurisdiction,* 82 N.Y.U. L.Rev. 997 (2007).

Andrew J. Parmenter, *Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification,* 46 Washburn L.J. 379 (2007).

Jack N. Rakove, *The Original Justifications for Judicial Independence,* 95 Geo. L.J. 1061 (2007).

Chris Kemmitt, *Function Over Form: Reviving the Criminal Jury's Historical Role as a Sentencing Body,* 40 U. Mich. J.L. Reform 93 (2006).

452

Arie M. Rubenstein, Note, *Verdicts of Conscience: Nullification and the Modern Jury Trial*, 106 Colum. L.Rev. 959 (2006).

Teresa L. Conaway, Carol L. Mutz, & Joann M. Ross, *Jury Nullification: A Selective, Annotated Bibliography*, 39 Val. U.L.Rev. 393 (2004–05).

Pamela Baschab, *Jury Nullification: The Anti–Atticus*, 65 Ala. Law. 110 (2004).

Thom Brooks, *A Defence of Jury Nullification*, 10 Res Publica 401 (2004) (Netherlands).

Steve J. Shone, *Lysander Spooner, Jury Nullification, and Magna Carta*, 22 Quinnipiac L.Rev. 651 (2004).

Rachel E. Barkow, *Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing*, 152 U. Pa. L.Rev. 33 (2003).

Paula L. Hannaford–Agor & Valerie P. Hans, *Nullification at Work? A Glimpse from the National Center for State Courts Study of Hung Juries*, 78 Chi.-Kent L.Rev. 1249 (2003).

Jenia Iontcheva, *Jury Sentencing as Democratic Practice*, 89 Va. L.Rev. 311 (2003).

Nancy J. King, *The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent L.Rev. 937 (2003).

Nancy S. Marder, *Juries, Drug Laws & Sentencing*, 6 J. Gender Race & Just. 337 (2002).

Simon Stern, *Between Local Knowledge and National Politics: Debating Rationales for Jury Nullification After Bushell's Case*, 111 Yale L.J. 1815 (2002).

Norman J. Finkel, *Is Justice Us? Commonsense Justice, Culpability, and Punishment*, 28 Hofstra L.Rev. 669 (2000).

John Clark, *The Social Psychology of Jury Nullification*, 24 Law & Psych. Rev. 39 (2000).

David A. Pepper, *Nullifying History: Modern–Day Misuse of the Right to Decide the Law*, 50 Case W. Res. L.Rev. 599 (2000).

Matthew P. Harrington, *The Law–Finding Function of the American Jury*, 1999 Wis. L.Rev. 377 (1999).

Ran Zev Schijanovich, Note, *The Second Circuit's Attack on Jury Nullification in United States v. Thomas: In Disregard of the Law and the Evidence*, 20 Cardozo L.Rev. 1275 (1999).

Sherman J. Clark, *The Courage of Our Convictions*, 97 Mich. L.Rev. 2381 (1999).

David C. Brody, *Balancing Jury Secrecy and the Rule of Law: The Second Circuit's Guide to Removing Nullifying Jurors*, 20 Just. Sys. J. 113 (1998).

Stanton D. Krauss, *An Inquiry into the Right of Criminal Juries to Determine the Law in Colonial America*, 89 J.Crim. L. & Criminology 111 (1998).

Elizabeth Haynes, Note & Comment, *United States v. Thomas: Pulling the Jury Apart*, 30 Conn. L.Rev. 731 (1998).

Jeffrey Abramson, *Two Ideals of Jury Deliberation*, 1998 U. Chi. Legal F. 125 (1998).

Jack B. Weinstein, *The Many Dimensions of Jury Nullification*, 81 Judicature 168 (1998).

Darryl K. Brown, *Jury Nullification Within the Rule of Law*, 81 Minn. L.Rev. 1149 (1997).

Lawrence W. Crispo, Jill M. Slanksy & Geanene M. Yriarte, *Jury Nullification: Law Versus Anarchy*, 31 Loy. L.A. L.Rev. 1 (1997).

Richard St. John, *License to Nullify: The Democratic and Constitutional Deficiencies of Authorized Jury Lawmaking*, 106 Yale L.J. 2563 (1997).

Aaron T. Oliver, *Jury Nullification: Should the Type of Case Matter?*, 6 Kan. J.L. & Pub. Pol'y 49 (1997).

W. William Hodes, *Lord Brougham, the Dream Team, and Jury Nullification of the Third Kind,* 67 U. Colo. L.Rev. 1075 (1996).

Andrew D. Leipold, *Rethinking Jury Nullification,* 82 Va. L.Rev. 253 (1996).

John T. Reed, Comment, *Penn, Zenger and O.J.: Jury Nullification–Justice or the "Wacko Fringe's" Attempt to Further its Anti–Government Agenda?,* 34 Duq. L.Rev. 1225 (1995–96).

David C. Brody, Sparf *and* Dougherty *Revisited: Why the Court Should Instruct the Jury of Its Nullification Right,* 33 Am.Crim. L.Rev. 89 (1995).

Paul Butler, *Racially Based Jury Nullification: Black Power in the Criminal Justice System,* 105 Yale L.J. 677 (1995).

Clay S. Conrad, *Jury Nullification as a Defense Strategy,* 2 Tex. F. on C.L. & C.R. 1 (1995).

David N. Dorfman & Chris K. Iijima, *Fictions, Fault, and Forgiveness: Jury Nullification in a New Context,* 28 U. Mich. J.L. Reform 861 (1995).

Gregory Mitchell, Comment, *Against "Overwhelming" Appellate Activism: Constraining Harmless Error Review,* 82 Cal. L.Rev. 1335 (1994).

Anne Bowen Poulin, *The Jury: The Criminal Justice System's Different Voice,* 62 U. Cin. L.Rev. 1377 (1994).

Jack B. Weinstein, *Considering Jury "Nullification": When May and Should a Jury Reject the Law to Do Justice?* 30 Am.Crim. L.Rev. 239 (1993).

Akhil Reed Amar, *The Bill of Rights as a Constitution,* 100 Yale L.J. 1131 (1991).

Alan W. Scheflin & Jon M. Van Dyje, *Merciful Juries: The Resilience of Jury Nullification,* 48 Wash. & Lee L.Rev. 165 (1991).

Chaya Weinberg–Brodt, *Jury Nullification and Jury–Control Procedures,* 65 N.Y.U. L.Rev. 825 (1990).

Richard M. Fraher, *Conviction According to Conscience: The Medieval Jurists' Debate Concerning Judicial Discretion and the Law of Proof,* 7 Law & Hist. Rev. 23 (1989).

John Marshall Mitnick, *From Neighbor–Witness to Judge of Proofs: The Transformation of the English Civil Juror,* 32 Am. J. Legal Hist. 201 (1988).

Phillip B. Scott, *Jury Nullification: An Historical Perspective on a Modern Debate,* 91 W. Va. L.Rev. 389 (1988).

Kenneth A. Krasity, *The Role of the Judge in Jury Trials: The Elimination of Judicial Evaluation of Fact in American State Courts from 1795 to 1913,* 62 U. Det. J. Urb. L. 595 (1984–85).

John H. Langbein, *Shaping the Eighteenth–Century Criminal Trial: A View from the Ryder Sources,* 50 U. Chi. L.Rev. (1983).

Milton Heumann & Lance Cassak, *Not So Blissful Ignorance: Informing Jurors About Punishment in Mandatory Sentencing Cases,* 20 Am.Crim. L.Rev. 243 (1983).

Randall McGowen, *The Image of Justice and Reform of the Criminal Law in Early Nineteenth–Century England,* 32 Buff. L.Rev. 89 (1983).

Douglas Greenberg, *Crime Law Enforcement, and Social Control in Colonial America,* 26 Am. J. Legal Hist. 294, 302, 323, 305–14 (1982).

Deirdre A. Harris, *Jury Nullification in Historical Perspective: Massachusetts as a Case Study,* 12 Suffolk U.L.Rev. 968 (1978).

John H. Langbein, *The Criminal Trial Before the Lawyers*, 45 U. Chi. L.Rev. 263 (1978).

Anthony A. Morano, *Historical Development of the Interrelationship of Unanimous Verdicts and Reasonable Doubt*, 10 Val. U.L.Rev. 223 (1975–76).

Gary J. Simson, *Jury Nullification in the American System: A Skeptical View*, 54 Tex. L.Rev. 488 (1975).

Leo P. Dreyer, *Jury Nullification and the Pro se Defense: The Impact of Dougherty v. United States*, 21 U. Kan. L.Rev. 47 (1972–73).

Alan W. Scheflin, *Jury Nullification: The Right to Say No*, 45 S. Cal. L.Rev. 168 (1972).

Robert J. Stolt, *Jury Nullification: The Forgotten Right*, 7 New Eng. L.Rev. 105 (1971).

William N. Kunstler, *Jury Nullification in Conscience Cases*, 10 Va. J. Int'l L. 71 (1969).

*Book Reviews: Looking Backward: The Early History of American Law*, 33 U. Chi. L.Rev. 867 (1965–66).

Note, *The Changing Role of the Jury in the Nineteenth Century*, 74 Yale L.J. 170 (1964–65).

Milton M. Klein, *Prelude to Revolution in New York: Jury Trials and Judicial Times*, 17 Wm. & Mary Quarterly 439 (1960).

G.D. Nokes, *The English and the Law of Evidence*, 31 Tul. L.Rev. 153 (1956–57).

Mark DeWolfe Howe, *Juries as Judges of Criminal Law*, 52 Harv. L.Rev. 582 (1938–39).

Francis R. Aumann, *The Influence of English and Civil Law Principles Upon the American Legal System During the Critical Post–Revolutionary Period*, 12 U. Cin. L.Rev. 289 (1938).

B. State Statutory Minimums and Child Pornography Statutes

**Overview of State Child Pornography Possession and Receipt Statutes**
**Prescribed Periods of Incarceration for First-Time Offenders**

| | | |
|---|---|---|
| Alabama | knowing possession | 13 months-10 years |
| | knowing possession w/ intent to disseminate | 10 years-10 years |
| Alaska | knowing viewing | 0-2 years |
| | knowing possession | 2-12 years |
| | knowing possession w/ intent to distribute | 5-10 years |
| Arizona | knowing possession | 5 years (child depicted age 15-18), |
| | | 17 years (under 15) |
| | knowing receipt | 5 years (15-18), 17 years (under 15) |
| Arkansas | knowing viewing | 3-10 years |
| | knowing possession | 3-10 years |
| | knowing receipt | 3-10 years |
| | knowing receipt by computer | 5-20 years |
| California | knowing possession | up to 1 year |
| | knowing possession w/ intent to distribute | up to 1 year |
| Colorado | knowing possession | 12-18 months |

| | | |
|---|---|---|
| | knowing possession w/ intent to distribute | 4-12 years |
| Connecticut | knowing possession (fewer than 20 images) | 1-5 years |
| | knowing possession (20-50 images) | 2-10 years |
| | knowing possession (greater than 20 images) | 5-20 years |
| Delaware | knowing possession | Up to 3 years |
| | intentional possession by computer | Up to 8 years |
| | intentional receipt by computer | Up to 8 years |
| Florida | knowing possession | Up to 5 years |
| | knowing receipt | Up to 5 years |
| | possession w/ intent to promote | Up to 15 years |
| Georgia | intentionally or willfully receives | 1-20 years |
| | knowing possession | 5-20 years |
| | knowing possession w/ intent to sell or distribute | 5-20 years |
| Hawaii | knowing possession | Up to 5 years |
| Idaho | knowing and willful possession | Up to 10 years |
| | knowing possession for a commercial purpose | Up to 30 years |
| Illinois | knowing possession | 2-5 years |
| | knowing possession if child depicted under 13 | 3-7 years |
| | knowing possession w/ intent to disseminate | 4-15 years |
| | knowing possession w/ intent to disseminate (child under 13) | 6-30 years |
| Indiana | knowing or intentional possession | 6 months-3 years |
| Iowa | knowing possession | Up to 2 years |
| Kansas | knowing possession | Subject to Kansas Guidelines |
| Kentucky | knowing possession | indeterminate sentence; maximum must be between 1-5 years |
| | knowing possession w/ intent to distribute | indeterminate sentence; maximum must be between 1-5 years |
| Louisiana | intentional possession | 2-10 years |
| | intentional possession w/ intent to sell or distribute | 2-10 years |
| Maine | knowing possession | Up to 1 year |
| | intentional or knowing possession (child under 12) | Up to 5 years |
| | knowing possession w/ intent to disseminate (child under 16) | Up to 5 years |
| | knowing possession w/ intent to disseminate (child under 12) | Up to 10 years |
| Maryland | knowingly possess and intentionally retain | Up to 2 years |
| | knowing possession w/ intent to distribute | Up to 10 years |
| Massachusetts | knowing possession | Up to 5 years (state prison); |

| | | Up to 2.5 years (jail) |
|---|---|---|
| | knowing possession w/ intent to disseminate | 10-20 years |
| Michigan | knowing possession | Up to 4 years |
| | receipt for purpose of distributing or promoting | · Up to 7 years |
| | preparation to receive | Up to 7 years |
| Minnesota | knowing possession | Up to 5 years |
| Mississippi | possession | 5-40 years |
| | knowing receipt | 5-40 years |
| | receipt w/ intent to distribute | 5-40 years |
| Missouri | knowing possession | Up to 4 years |
| | knowing possession w/ intent to promote (minor) | Up to 7 years |
| | knowing possession w/ intent to promote (child) | 5-15 years |
| Montana | knowing possession (child depicted is 16-18) | Up to 100 years or life |
| | knowing possession (child under 16) | 4-100 years |
| | knowing possession (child under 12) | 100 years |
| | possession w/ intent to sell (child is 16-18) | Up to 100 years or life |
| | possession w/ intent to sell (child is under 16) | 4-100 years |
| | possession w/ intent to sell (child is under 12) | 100 years |
| Nebraska | knowing possession w/ intent to rent, sell, deliver, distribute, trade, or provide to any person | .1-5 years |
| Nevada | knowing and willful possession | 1-6 years |
| New Hampshire | knowing possession | Up to 7 years |
| | possession for purposes of sale or other commercial dissemination | Up to 7 years |
| | knowing receipt | Up to 7 years |
| New Jersey | knowingly possession | Up to 18 months |
| | knowing receipt for purpose of selling | 5-10 years |
| New Mexico | intentional possession | 18 months |
| New York | knowing possession (of child pornography) | 1 (or 1/3 of maximum)-4 years |
| | knowing possession (of obscene child pornography) | 1 (or 1/3 of maximum)-4 years |
| North Carolina | knowing possession | 4-6 months |
| | knowing receipt | 13-16 months |
| North Dakota | knowing possession | Up to 5 years Ohio |
| | possession (of material depicting child in state of nudity) | 6-12 months |
| | knowing possession (of obscene material depicting minor) | 6-18 months |
| | knowing receipt | 6-18 months |
| Ohio | possession (of material depicting child in state of nudity) | 6-12 months |
| | knowing possession (of obscene material depicting minor) | 6-18 months |

| | | |
|---|---|---|
| | knowing receipt | 6-18 months |
| Oklahoma | possession | Up to 5 years |
| | knowingly downloads | 30 days-10 years |
| | knowingly keeps for sale | 30 days-10 years |
| | knowing possession | Up to 20 years |
| Oregon | knowing possession | Up to 1 year |
| | knowing possession w/ intent to induce or engage child | Up to 5 years |
| | knowing possession for the purpose of satisfying a sexual desire with knowledge or awareness that creation of material involved child abuse | Up to 5 years |
| | knowing possession to use to induce or engage child | Up to 10 years |
| | knowing possession with the intent to develop, duplicate, publish, print, disseminate, exchange, display or sell with knowledge or awareness that creation of material involved child abuse | Up to 10 years |
| Pennsylvania | knowing possession | Up to 7 years |
| | knowing possession for the purpose of sale, distribution, delivery, dissemination, transfer, display or exhibition to others | Up to 7 years |
| Rhode Island | knowing possession | Up to 5 years |
| South Carolina | knowing possession | Up to 10 years |
| | knowing receipt | 2-10 years |
| South Dakota | knowing possession | Up to 10 years |
| Tennessee | knowing possession (less than 50 images) | 2-12 years |
| | knowing possession (50-100 images) | 3-15 years |
| | knowing possession (greater than 100 images) | 8-30 years |
| | knowing possession w/ with the intent to promote, sell, distribute, transport, purchase or exchange material (under 25 images) | 3-15 years |
| | knowing possession w/ with the intent to promote, sell, distribute, transport, purchase or exchange material (greater than 25 images) | 8-30 years |
| | knowing possession of obscene child pornography (under 25 images) | 3-15 years |
| | knowing possession of obscene child pornography greater than 25 images | 8-30 years |
| Texas | knowing or intentional possession | 2-10 years |
| | knowing possession w/ intent to promote | 2-20 years |
| Utah | knowing possession | 1-15 years |
| | knowing possession w/ intent to distribute | 1-15 years |
| Vermont | knowing possession (of lewd exhibition of genitals) | Up to 2 years |
| | knowing possession (of child engaged in sexual conduct) | Up to 5 years |
| Virginia | knowing possession | 1-5 years |

| | | |
|---|---|---|
| | possession w/ intent to sell, give away, distribute, transmit, or display | 5-20 years |
| Washington | knowing possession | Up to 10 years |
| | possession with intent to develop, duplicate, publish, print, disseminate, exchange, or sell | Up to 5 years |
| West Virginia | knowing possession | Up to 2 years |
| Wisconsin | knowing possession (offender is under 18) | Up to 3 years, 6 months |
| | knowing possession (offender is over 18) | 3-25 years |
| | knowing possession w/ intent to sell or distribute (offender is under 18) | Up to 12 years, 6 months |
| | knowing possession w/ intent to sell or distribute (offender is over 18) | 5-40 years |
| Wyoming | knowing possession | Up to 10 years |
| | knowing receipt | 5-10 years |
| | knowing possession w/ intent to deliver | 5-10 years |

| State Code Section | Description of Crime | Prescribed Term of Incarceration |
|---|---|---|
| Ala. Code § 13A-12-192 (2007) | Any person who *knowingly possesses* any obscene matter that contains a visual depiction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, genital nudity, or other sexual conduct shall be guilty of a (Class C felony). Any person who *knowingly possesses with intent to disseminate* any obscene matter that contains a visual depiction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a (Class B felony) | **13 months - 10 years** (Class C felony) **10 - 20 years** (Class B felony) *See* Ala. Code § 13A-5-6 (2007) |
| Ala. Code § 13A-12-191 (2007) | Any person who shall *knowingly* disseminate or display publicly any obscene matter containing a visual depiction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a (Class B felony) | **10 - 20 years** (Class B felony) *See* Ala. Code § 13A-5-6 (2007) |
| Ala. Code § 13A-12-197 (2007) | Any person who *knowingly* films, prints, records, photographs or otherwise produces any obscene matter that contains a visual depiction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a (Class A felony) | **20 - 99 years** (Class A felony) *See* Ala. Code § 13A-5-6 (2007) |
| Alaska Stat. § 11.61.123 (2008) | A person commits the crime of indecent viewing or photography if, in the state, the person *knowingly views*, or produces a picture of, the private exposure of the genitals, anus, or female breast of another person and the view or production is without the knowledge or consent of the parent or guardian of the person viewed, or *who is shown* in the picture, if the person who is viewed or shown is under 16 years of age; and the person viewed or shown in the picture, if the person viewed or shown is at least 13 years of age (Class C felony) | **0 - 2 years** (Class C felony) *See* Alaska Stat. § 12.55.125(e) (2008) |
| Alaska Stat. § 11.61.127 (2008) | A person commits the crime of possession of child pornography if the person *knowingly possesses* any material that visually or aurally depicts conduct ... *knowing* that the production of the material involved the use of a child under 18 years of age who engaged in the conduct (Class C felony) | **2 - 12 years** *See* Alaska Stat. § 12.55.125(i)(4) (2008) |
| Alaska Stat. § 11.61.125 (2008) | A person commits the crime of distribution of child pornography if the person brings | 5 - 10 years |

| Citation | Conduct | Penalty |
|---|---|---|
| | or causes to be brought into the state for distribution, or in the state distributes, or in the state *possesses*, prepares, publishes, or prints *with intent to distribute*, any [child porn] ... *knowing* that the production of the material involved the use of a child under 18 years of age who engaged in the conduct (Class B felony) | *See* Alaska Stat. § 12.55.125(i)(3) (2008) |
| Ariz. Rev. Stat. Ann. § 13-3553 (2007) | A person commits sexual exploitation of a minor by *knowingly*: Recording, filming, photographing, developing or duplicating any visual depiction in which a minor is engaged in exploitive exhibition or other sexual conduct, or Distributing, transporting, exhibiting, *receiving*, selling, purchasing, electronically transmitting, *possessing* or exchanging any visual depiction in which a minor is engaged in exploitive exhibition or other sexual conduct (Class 2 felony) | **5 years** (Class 2 felony) *See* Ariz. Rev. Stat. Ann. § 13-701 (2007) **10 - 24 years presumptive term of 17 years** (If child is under 15 years of age) *See* Ariz. Rev. Stat. Ann. § 13-604.01(D) (2007) |
| Ark. Code Ann. § 5-27-304 (2008) | With *knowledge of the character* of the visual or print medium involved, no person shall do any of the following: (1) Knowingly advertise *for sale or distribution*, sell, distribute, transport, ship, exhibit, display, or *receive for the purpose of sale or distribution* any visual or print medium depicting a child participating or engaging in sexually explicit conduct; or (2) *Knowingly* solicit, *receive*, purchase, exchange, *possess, view, distribute,* or control any visual or print medium depicting a child participating or engaging in sexually explicit conduct (Class C felony) | **3 -10 years** (Class C felony) *See* Ark. Code Ann. 5-4-401 (2008) |
| Ark. Code Ann. § 5-27-603 (2008) | A person commits computer child pornography if the person *knowingly*: (1) Compiles, enters into, or transmits by means of computer, makes, prints, publishes, or reproduces by other computerized means, *knowingly* causes or allows to be entered into or transmitted by means of computer or buys, sells, *receives*, exchanges, or disseminates any notice, statement, or advertisement or any child's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information for purposes of facilitating, encouraging, offering, or soliciting sexually explicit conduct of or with any child or another individual believed by the person to be a child, or the visual depiction of the conduct; or (2) Utilizes a computer online service, internet service, or local bulletin board service to seduce, solicit, lure, or entice or attempt to seduce, solicit, lure, or entice a child or another individual believed by the person to be a child, to engage in sexually explicit conduct (Class B felony) | **5 - 20 years** (Class B felony) *See* Ark. Code Ann. § 5-4-401(a)(3) (2008) |
| Cal. Penal Code § 311.2(c) (Deering 2008) | Every person who *knowingly* sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state *possesses*, prepares, publishes, produces, develops, duplicates, or prints any representation of information, data, or image, ... that contains or incorporates in any manner, any film | Up to 1 year or fine Cal. Penal Code § 311.2(c) (Deering 2008) |

| | | |
|---|---|---|
| | or filmstrip, *with intent to distribute* or exhibit to, or to exchange with, a person 18 years of age or older, or who offers to distribute, distributes, or exhibits to, or exchanges with, a person 18 years of age or older any matter, knowing that the matter depicts a person under the age of 18 years personally engaging in or personally simulating sexual conduct | |
| Cal. Penal Code § 311.3 (Deering 2008) | A person is guilty of sexual exploitation of a child if he or she *knowingly develops,* duplicates, prints, or exchanges any representation of information, data, or image ... that contains or incorporates in any manner, any film or filmstrip that depicts a person under the age of 18 years engaged in an act of sexual conduct | Up to 1 year or fine *See* Cal. Penal Code § 311.3(d) (Deering 2008) |
| Cal. Penal Code § 311.11 (Deering 2008) | Every person who *knowingly possesses or controls* any matter, representation of information, data, or image ... that contains or incorporates in any manner, any film or filmstrip, the production of which involves the use of a person under the age of 18 years, knowing that the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct ... is guilty of a felony | **Up to 1 year** *See* Cal. Penal Code § 311.11(a) (Deering 2008) |
| Cal. Penal Code § 311.10 (Deering 2008) | Any person who advertises for sale or distribution any obscene matter knowing that it depicts a person under the age of 18 years personally engaging in or personally simulating sexual conduct ... is guilty of a felony | 2 - 4 years in state prison or up to 1 year in county jail *See* Cal. Penal Code § 311.10 (Deering 2008) |
| Colo. Rev. Stat. § 18-6-403 (2007) | A person commits sexual exploitation of a child if, for any purpose, he or she *knowingly:* (a) Causes, induces, entices, or permits a child to engage in, or be used for, any explicit sexual conduct for the making of any sexually exploitative material; (Class 3 felony) or (b) Prepares, arranges for, publishes, including but not limited to publishing through digital or electronic means, produces, promotes, makes, sells, finances, offers, exhibits, advertises, deals in, or distributes, including but not limited to distributing through digital or electronic means, any sexually exploitative material; or (b.5) *Possesses or controls* any sexually exploitative material *for any purpose* ... (Class 6 felony) or (c) *Possesses with the intent to deal in, sell, or distribute,* including but not limited to distributing through digital or electronic means, any sexually exploitative material; (Class 3 felony) or (d) Causes, induces, entices, or permits a child to engage in, or be used for, any explicit sexual conduct for the purpose of producing a performance. (Class 3 felony) | **1 year - 18 months** (Class 6 felony) 4 - 12 years (Class 3 felony) *See* Colo. Rev. Stat. § 18-1.3-401(1)(a)(V)(A) (2007) |
| Conn. Gen. Stat. § 53a-196f (2007) | A person is guilty of possessing child pornography in the third degree when such person *knowingly possesses* fewer than twenty visual depictions of child pornography (Class D felony) | **1-5 years** *See* Conn. Gen. Stat. § 53a-196f(b) (2007); *See* Conn. Gen. Stat. § 53a-35a(7) (2007) |

| | | |
|---|---|---|
| Conn. Gen. Stat. § 53a-196e (2007) | A person is guilty of possessing child pornography in the second degree when such person *knowingly possesses* twenty or more but fewer than fifty visual depictions of child pornography (Class C felony) | **2 - 10 years**<br>*See* Conn. Gen. Stat. § 53a-196e(b) (2007);<br>Conn. Gen. Stat. § 53a-35a(6) (2007) |
| Conn. Gen. Stat. § 53a-196d (2007) | A person is guilty of possessing child pornography in the first degree when such person *knowingly possesses* fifty or more visual depictions of child pornography (Class B felony) | **5 - 20 years**<br>*See* Conn. Gen. Stat. § 53a-196d(b) (2007);<br>Conn. Gen. Stat. § 53a-35a(5) (2007) |
| Conn. Gen. Stat. § 53a-196c (2007) | A person is guilty of importing child pornography when, with intent to promote child pornography, such person knowingly imports or causes to be imported into the state three or more visual depictions of child pornography of known content and character (Class B felony) | 5 - 20 years<br>*See* Conn. Gen. Stat. § 53a-196c(b) (2007);<br>Conn. Gen. Stat. § 53a-35a(5) (2007) |
| Del. Code Ann. tit. 11, § 1111 (2008) | A person is guilty of possession of child pornography when: (1) the person *knowingly possesses* any visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or (2) the person *knowingly possesses* any visual depiction which has been created, adapted, modified or edited so as to appear that a child is engaging in a prohibited sexual act or in the simulation of such an act (Class F felony) | **Up to 3 years**<br>(Class F felony)<br>*See* Del. Code Ann. tit. 11, § 4205 (2008) |
| Del. Code Ann. tit. 11, § 1109 (2008) | A person is guilty of dealing in child pornography when: The person knowingly ships, transmits, mails or transports by any means ... [child pornography]; The person *knowingly receives for the purpose of selling* or sells any ... [visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act]; The person *knowingly* distributes or disseminates, by means of computer or any other electronic or digital method, or by shows or viewings, any motion picture, video or other visual depiction of a child engaging in a prohibited sexual act or the simulation of such an act. *The possession or showing of such motion pictures shall create a rebuttable presumption of ownership thereof for the purposes of distribution or dissemination*; The person, by means of a computer, *intentionally* compiles, enters, accesses, transmits, *receives*, exchanges, disseminates, stores, makes, prints, reproduces or otherwise *possesses* any photograph, image, file, data or other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act...; or The person knowingly advertises, promotes, presents, describes, transmits or distributes any visual depiction, exhibition, display or performance with intent to create or convey the impression that such visual depiction, exhibition, display or performance is or contains a depiction of a child engaging in a prohibited sexual act or in the simulation of such an act (Class D felony) | Up to 8 years<br>(Class D felony)<br>*See* Del. Code Ann. tit. 11, § 4205 (2008) |

| Citation | Description | Penalty |
|---|---|---|
| Del. Code Ann. tit. 11, § 1108 (2008) | A person is guilty of sexual exploitation of a child when: The person knowingly, photographs or films a child engaging in a prohibited sexual act or in the simulation of such an act, or otherwise knowingly creates a visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or The person knowingly, finances or produces any motion picture, video or other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or The person knowingly publishes or makes available for public distribution or sale by any means, … which depicts a child engaging in a prohibited sexual act or in the simulation of such an act, or knowingly publishes or makes available for public distribution or sale by any means, including computer, any other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or (4) The person permits, causes, promotes, facilitates, finances, produces or otherwise advances an exhibition, display or performances of a child engaging in a prohibited sexual act or the simulation of such an act (Class B felony) | 2 - 25 years (Class B felony) *See* Del. Code Ann. tit. 11, § 4205 (2008) |
| Fla. Stat. Ann. § 847.0135 (LexisNexis 2007) | A person who: (a) Knowingly compiles, enters into, or transmits by use of computer; (b) Makes, prints, publishes, or reproduces by other computerized means; (c) Knowingly causes or allows to be entered into or transmitted by use of computer; or (d) *Buys, sells, receives,* exchanges, or disseminates [child pornography or information identifying a minor] [is guilty of a felony] (Third degree felony) | **Up to 5 years** (Third degree felony) *See* Fla. Stat. Ann. § 775.082 (LexisNexis 2007) |
| Fla. Stat. Ann. § 847.0137 (LexisNexis 2007) | A[ny person in this state who knew or reasonably should have known that he or she was transmitting child pornography… to another person in this state or in another jurisdiction…. [or] to any person in this state commits a felony (Third degree felony) | Up to 5 years (Third degree felony) *See* Fla. Stat. Ann. § 775.082 (LexisNexis 2007) |
| Fla. Stat. Ann. § 827.071 (LexisNexis 2007) | It is unlawful for any person to *knowingly possess* a photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child. The possession of each such photograph, motion picture, exhibition, show, representation, or presentation is a separate offense (Third Degree felony) | **Up to 5 years** (Third degree felony) *See* Fla. Stat. Ann. § 775.082 (LexisNexis 2007) |
| | A person is guilty of the use of a child in a sexual performance if, knowing the character and content thereof, he or she employs, authorizes, or induces a child less than 18 years of age to engage in a sexual performance or, being a parent, legal guardian, or custodian of such child, consents to the participation by such child in a sexual performance (Second Degree felony) A person is guilty of promoting a sexual performance by a child when, knowing the character and content thereof, he or she produces, directs, or promotes any performance which includes sexual conduct by a child less than 18 years of age. (Second Degree felony) It is unlawful for any person | Up to 15 years (Second degree felony) *See* Fla. Stat. § 775.082 (LexisNexis 2007) |

| Citation | Description | Penalty |
|---|---|---|
| | to *possess with the intent to promote* any photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, includes any sexual conduct by a child. The possession of three or more copies of such photograph, motion picture, representation, or presentation is prima facie evidence of an intent to promote. (Second degree felony) | |
| Ga. Code Ann. § 16-12-100.2(c)(1) (2007) | A person commits the offense of computer or electronic pornography if such person *intentionally or willfully:* Compiles, enters into, or transmits by computer or other electronic device; Makes, prints, publishes, or reproduces by other computer or other electronic device; Causes or allows to be entered into or transmitted by computer or other electronic device; or *Buys,* sells, *receives,* exchanges, or disseminates [child porn, or information identifying the child] | 1 - 20 years<br>*See* Ga. Code Ann. § 16-12-100.2(c)(2) (2007) |
| Ga. Code Ann. § 16-12-100 (2007) | It is unlawful for any person knowingly to create, reproduce, publish, promote, sell, distribute, give, exhibit, or *possess with intent to sell or distribute* any visual medium which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct. It is unlawful for any person *knowingly* to advertise, sell, *purchase,* barter, or exchange any medium which provides information as to where any visual medium which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct can be found or purchased. It is unlawful for any person knowingly to bring or cause to be brought into this state any material which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct. It is unlawful for any person *knowingly* to *possess* or *control* any material which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct. | 5 - 20 years<br>*See* Ga. Code Ann. § 16-12-100(2)(g)(1) (2007) |
| Haw. Rev. Stat. Ann. § 707-752 (LexisNexis 2007) | A person commits the offense of promoting child abuse in the third degree if, *knowing or having reason to know its character and content,* the person *possesses:* a) Child pornography; (b) Any book, magazine, periodical, film, videotape, computer disk, electronically stored data, or any other material that contains an image of child pornography; or (c) Any pornographic material that employs, uses, or otherwise contains a minor engaging in or assisting others to engage in sexual conduct (Class C felony) | Up to 5 years<br>(Class C felony)<br>*See* Haw. Rev. Stat. Ann. § 706-660 (LexisNexis 2007) |

| Statute | Offense | Penalty |
|---|---|---|
| Haw. Rev. Stat. Ann. § 707-751 (LexisNexis 2007) | A person commits the offense of promoting child abuse in the second degree if, knowing or having reason to know its character and content, the person: (a) Disseminates child pornography; (b) Reproduces child pornography with intent to disseminate; (c) Disseminates any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography; or (d) Disseminates any pornographic material which employs, uses, or otherwise contains a minor engaging in or assisting others to engage in sexual conduct (Class B felony) | Up to 10 years (Class B felony) *See* Haw. Rev. Stat. Ann. § 706-660 (LexisNexis 2007) |
| Haw. Rev. Stat. Ann. § 707-750 (LexisNexis 2007) | A person commits the offense of promoting child abuse in the first degree if, knowing or having reason to know its character and content, the person: (a) Produces or participates in the preparation of child pornography; (b) Produces or participates in the preparation of pornographic material that employs, uses, or otherwise contains a minor engaging in or assisting others to engage in sexual conduct; or (c) Engages in a pornographic performance that employs, uses, or otherwise contains a minor engaging in or assisting others to engage in sexual conduct (Class A felony) | 20 years imprisonment (Class A felony) *See* Haw. Rev. Stat. Ann. § 706-659 (LexisNexis 2007) |
| Idaho Code Ann. § 18-1507A (2007) | Every person who *knowingly and willfully* has in his *possession* any sexually exploitative material … for other than a commercial purpose, is guilty of a felony | **Up to 10 years** *See* Idaho Code Ann. § 18-1507A(2) (2007) |
| Idaho Code Ann. § 18-1507 (2007) | A person commits sexual exploitation of a child if, *for any commercial purpose, he knowingly:* (a) Causes, induces, or permits a child to engage in, or be used for, any explicit sexual conduct; or (b) Prepares, arranges for, publishes, produces, promotes, makes, sells, finances, offers, exhibits, advertises, deals in, *possesses*, or distributes any sexually exploitative material. | Up to 30 years *See* Idaho Code Ann. § 18-1507 (5)(2007) |
| 720 Ill. Comp. Stat. Ann. 5/11-20.1 (LexisNexis 2008) | 1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he knows or reasonably should know to be under the age of 18 or any severely or profoundly mentally retarded person where such child or severely or profoundly mentally retarded person is:[engaged in sexual activity]; or (2) with the knowledge *of the nature or content thereof,* reproduces, disseminates, offers to disseminate, exhibits or *possesses with intent to disseminate* any [child pornography]; or (3) with knowledge of the subject matter or theme thereof, produces any stage play, live performance, film, videotape or other similar visual portrayal or depiction by computer which includes a child whom the person knows or reasonably should know to be under the age of 18 or a severely or profoundly mentally retarded person engaged in any activity described in subparagraphs (I) through (vii) of paragraph (1) of this subsection; or (4) solicits, uses, persuades, induces, entices, or coerces | 4 - 15 years (Class 1 felony) **2 - 5 years** (Class 3 felony) *See* 730 Ill. Comp. Stat. Ann. 5/5-8-1 (LexisNexis 2008) |

| Citation | Offense | Penalty |
|---|---|---|
| 720 Ill. Comp. Stat. Ann. 5/11-20.3 (LexisNexis 2008) | any child ... or a severely or profoundly mentally retarded person to appear in any stage play, live presentation, film, videotape, photograph or other similar visual reproduction or depiction by computer in which the child or severely or profoundly mentally retarded person is or will be depicted, actually or by simulation, in any act, pose or setting described in subparagraphs (1) through (vii) of paragraph (1) of this subsection; or (5) is a parent, step-parent, legal guardian or other person having care or custody of a child whom the person knows or reasonably should know to be under the age of 18 or a severely or profoundly mentally retarded person and who knowingly permits, induces, promotes, or arranges for such child or severely or profoundly mentally retarded person to appear in any stage play, live performance, film, videotape, photograph or other similar visual presenation, portrayal or simulation or depiction by computer of any act or activity described in subparagraphs (I) through (vii) of paragraph (1) of this subsection; or (6) *with knowledge of the nature or content thereof, possesses* any film, videotape, photograph or other similar visual reproduction or depiction by computer of any child or severely or profoundly mentally retarded person whom the person knows or reasonably should know to be under the age of 18 or to be a severely or profoundly mentally retarded person, engaged in any activity described in subparagraphs (I) through (vii) of paragraph (1) of this subsection; (**Class 3 felony**) or (7) solicits, uses, persuades, induces, entices, or coerces a person to provide a child under the age of 18 or a severely or profoundly mentally retarded person to appear in any videotape, photograph, film, stage play, live presenation, or other similar visual reproduction or depiction by computer in which the child or severely or profoundly mentally retarded person will be depicted, actually or by simulation, in any act, pose, or setting described in subparagraphs (I) through (vii) of paragraph (1) of this subsection (**Except (6) all are Class 1 felony**)<br><br>Same as above statute applied to those under the age of 13 (Possession is a Class 2 felony, all others are Class X felony) | 6 - 30 years (Class X felony) 3 - 7 years (Class 2 Felony) *See* 730 Ill. Comp. Stat. Ann. 5/5-8-1 (LexisNexis 2008) |
| Ind. Code Ann. § 35-42-4-4 (LexisNexis 2007) | A person who *knowingly or intentionally possesses:* (1) a picture; (2) a drawing; (3) a photograph; (4) a negative image; (5) undeveloped film; (6) a motion picture; (7) a videotape; (8) a digitized image; or (9) any pictorial representation; that depicts or describes sexual conduct by a child who the person knows is less than sixteen (16) years of age or who appears to be less than sixteen (16) years of age, and that lacks serious literary, artistic, political, or scientific value commits possession of child pornography (Class D felony) | **6 months - 3 years** advisory term of 18 months (Class D felony) *See* Ind. Code Ann. § 35-50-2-7 (LexisNexis 2007) |

| | | |
|---|---|---|
| | A person who knowingly or intentionally: (1) manages, produces, sponsors, presents, exhibits, photographs, films, videotapes, or creates a digitized image of any performance or incident that includes sexual conduct by a child under eighteen (18) years of age; (2) disseminates, exhibits to another person, offers to disseminate or exhibit to another person, or sends or brings into Indiana for dissemination or exhibition matter that depicts or describes sexual conduct by a child under eighteen (18) years of age; or (3) makes available to another person a computer, knowing that the computer's fixed drive or peripheral device contains matter that depicts or describes sexual conduct by a child less than eighteen (18) years of age commits child exploitation (Class C felony) | 2 - 8 years advisory term of 4 years (Class C felony) *See* Ind. Code Ann. § 35-50-2-6 (LexisNexis 2007) |
| Iowa Code § 728.12 (2008) | It shall be unlawful to *knowingly purchase or possess* a negative, slide, book, magazine, computer, computer disk, or other print or visual medium, or an electronic, magnetic, or optical storage system, or any other type of storage system which depicts a minor engaging in a prohibited sexual act or the simulation of a prohibited sexual act (Aggravated misdemeanor) | **Up to 2 years** (Aggravated misdemeanor) *See* Iowa Code § 903.1 (2008) |
| | It shall be unlawful to knowingly promote any material visually depicting a live performance of a minor engaging in a prohibited sexual act or in the simulation of a prohibited sexual act (Class D felony) | Up to 5 years (Class D felony) *See* Iowa Code § 902.9 (2008) |
| Iowa Code § 728.12 (2008) | It shall be unlawful to employ, use, persuade, induce, entice, coerce, solicit, knowingly permit, or otherwise cause or attempt to cause a minor to engage in a prohibited sexual act or in the simulation of a prohibited sexual act. A person must know, or have reason to know, or intend that the act or simulated act may be photographed, filmed, or otherwise preserved in a negative, slide, book, magazine, computer, computer disk, or other print or visual medium, or be preserved in an electronic, magnetic, or optical storage system, or in any other type of storage system | Up to 10 years (Class C felony) *See* Iowa Code § 902.9 (2008) |
| Kan. Stat. Ann. § 21-3516 (2008) | (a) Sexual exploitation of a child is: (1) "Except [when child is under 14 years of age] employing, using, persuading, inducing, enticing or coercing a child under 18 years of age to engage in sexually explicit conduct for the purpose of promoting any performance; (2) *possessing* any visual depiction, including any photograph, film, video picture, digital or computer generated image or picture, whether made or produced by electronic, mechanical or other means, where such visual depiction of a child under 18 years of age is shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender, the child or another; (3) ... knowingly permitting such child to engage | Subject to Kansas Sentencing Guidelines: 50-55 months *See* Kansas Sentencing Guidelines Act, Kan. Stat. Ann. § 21-4701, et seq. (2006) |

| | |
|---|---|
| in, or assist another to engage in, sexually explicit conduct for any purpose described in subsection (a)(1) or (2); (4) except as provided in subsection (a)(6), promoting any performance that includes sexually explicit conduct by a child under 18 years of age, knowing the character and content of the performance; (Level 5 Person Felony)<br><br>(5) employing, using, persuading, inducing, enticing or coercing a child under 14 years of age to engage in sexually explicit conduct for the purpose of promoting any performance; or (6) promoting any performance that includes sexually explicit conduct by a child under 14 years of age, knowing the character and content of the performance. (Off-grid Person Felony) | Subject to Kansas Sentencing Guidelines: *See* Kansas Sentencing Guidelines Act, Kan. Stat. Ann. § 21-4701, *et seq.* (2006) |
| **Ky. Rev. Stat. Ann. § 531.350 (2008)**<br><br>A person is guilty of promoting sale of material portraying a sexual performance by a minor when he knowingly, as a condition to a sale, allocation, consignment, or delivery for resale of any paper, magazine, book, periodical, publication or other merchandise, requires that the purchaser or consignee receive any matter portraying a sexual performance by a minor, or he denies or threatens to deny a franchise, revokes or threatens to revoke, or imposes any penalty, financial or otherwise, by reason of the failure of any person to accept such matter, or by reason of the return of such matter. (Class A misdemeanor) | Determinate sentence declared by judge; No minimum term prescribed; Maximum shall not exceed 12 months *See* Ky. Rev. Stat. Ann. § 532.090 (2008) |
| **Ky. Rev. Stat. Ann. § 531.335 (2008)**<br><br>A person is guilty of *possession* of matter portraying a sexual performance by a minor when, having *knowledge of its content, character, and that the sexual performance is by a minor*, he or she *knowingly has in his or her possession or control* any matter which visually depicts an actual sexual performance by a minor person (Class D Felony) | Indeterminate sentences declared by jury; No minimum term prescribed; Max term must be between 1 and 5 yrs (Class D felony) *See* Ky. Rev. Stat. Ann. § 532.060(2) (2008) |
| **Ky. Rev. Stat. Ann. § 531.340 (2008)**<br><br>(1) A person is guilty of distribution of matter portraying a sexual performance by a minor when, having knowledge of its content and character, he or she: (a) Sends or causes to be sent into this state for sale or distribution; or (b) Brings or causes to be brought into this state for sale or distribution; or (c) In this state, he or she: Exhibits for profit or gain; or Distributes; or Offers to distribute; or Has in his or her possession with intent to distribute, exhibit for profit or gain or offer to distribute, any matter portraying a sexual performance by a minor. (2) Any person who has in his or her possession more than one (1) unit of material coming within the provision of KRS 531.300(2) shall be rebuttably presumed to have such material in his or her possession with the intent to distribute it. (Class D Felony) | Indeterminate sentences declared by jury; No minimum term prescribed; Maximum term must be between 1 and 5 yrs (Class D felony) *See* Ky. Rev. Stat. Ann. § 532.060(2) (2008) |
| **Ky. Rev. Stat. Ann. § 531.360 (2008)**<br><br>A person is guilty of advertising material portraying a sexual performance by a minor when, having knowledge of its content and character thereof, he or she writes | Indeterminate sentences declared by jury; No minimum term prescribed; |

| | | |
|---|---|---|
| | or creates advertising or solicits anyone to publish such advertising or otherwise promotes the sale or distribution of matter portraying a sexual performance by a minor. (Class D felony) | Maximum term must be between 1 and 5 yrs (Class D felony) *See* Ky. Rev. Stat. Ann. § 532.060(2) (2008) |
| Ky. Rev. Stat. Ann. § 531.320 (2008) | A person is guilty of promoting a sexual performance by a minor when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a minor. (Class C Felony if 16-18 years of age, Class B Felony if under 16 years of age, Class A felony if minor incurs injury) | Indeterminate sentences declared by jury; No minimum term prescribed; Max term for Class C felony must be between 5-10 yrs; Max term for Class B felony must be between 10-20 yrs; Max term for Class A felony must be between 20-50 yrs or life *See* Ky. Rev. Stat. Ann. § 532.060 (2008) |
| La. Rev. Stat. Ann. § 14:81.1 (2008) | (A) Pornography involving juveniles is any of the following: (1) The photographing, videotaping, filming, or otherwise reproducing visually of any sexual performance involving a child under the age of seventeen. (2) The solicitation, promotion, or coercion of any child under the age of seventeen for the purpose of photographing, videotaping, filming, or otherwise reproducing visually any sexual performance involving a child under the age of seventeen. (3) The *intentional possession*, sale, distribution, or possession with intent to sell or distribute of any photographs, films, videotapes, or other visual reproductions of any sexual performance involving a child under the age of seventeen. (4) The consent of a parent, legal guardian, or custodian of a child under the age of seventeen for the purpose of photographing, videotaping, filming, or otherwise reproducing visually any sexual performance involving the child. | **2 - 10 years** (punishment for all crimes except below exceptions) 25 years - life (punishment for solicitation, promotion or coercion of any minor under the age of 13) *See* La. Rev. Stat. Ann. § 14:81.1(E) (2008) |
| Me. Rev. Stat. Ann. tit. 17-A, § 284 (2007) | 1. A person is guilty of *possession* of sexually explicit material if that person: A. *Intentionally* or *knowingly* transports, exhibits, purchases or *possesses* any ... material] that the person knows or should know depicts another person engaging in explicit conduct, and: 1) The other person has not in fact attained 16 years of age; or 2) The person knows or has reason to know that the other person not attained 16 years of age. (Class D crime) | **Up to 1 year** (Class D crime) *See* Me. Rev. Stat. Ann. tit. 17-A, § 1252 (2007) |

| Citation | Offense | Penalty |
|---|---|---|
| | *Intentionally* or *knowingly* transports, exhibits, *purchases* or *possesses* any … [material] that the person knows or should know depicts another person engaging in sexually explicit conduct, and: 1) The other person has not in fact attained 12 years of age; or 2) The person knows or has reason to know that the other person has not attained 12 years of age. (Class C Crime) | **Up to 5 years** (Class C crime) *See* Me. Rev. Stat. Ann. tit. 17-A, § 1252 (2007) |
| Me. Rev. Stat. Ann. tit. 17-A, § 283 (2007) | The person *intentionally* or *knowingly* disseminates or possesses *with intent to disseminate* any … material that *depicts any minor who the person knows or has reason to know* is a minor engaging in sexually explicit conduct. (Class C crime; if minor is under 12, Class B crime) | Up to 5 years (Class C crime) Up to 10 years (Class B crime) *See* Me. Rev. Stat. Ann. tit. 17-A, § 1252 (2007) |
| Md. Code Ann., Crim. Law § 11-208 (2008) | A person may not *knowingly possess* and *intentionally retain* a film, videotape, photograph, or other visual representation showing an actual child under the age of 16 years: (1) engaged as a subject of sadomasochistic abuse; (2) engaged in sexual conduct; or (3) in a state of sexual excitement. (Misdemeanor) | **Up to 2 years** *See* Md. Code Ann., Crim. Law § 11-208(b) (2008) |
| Md. Code Ann., Crim. Law § 11-207 (2008) | A person may not: (1) cause, induce, solicit, or knowingly allow a minor to engage as a subject in the production of obscene matter or a visual representation or performance that depicts a minor engaged as a subject in sadomasochistic abuse or sexual conduct; (2) photograph or film a minor engaging in an obscene act, sadomasochistic abuse, or sexual conduct; (3) use a computer to depict or describe a minor engaging in an obscene act, sadomasochistic abuse, or sexual conduct; (4) *knowingly* promote, distribute, or *possess with the intent to distribute* any matter, visual representation, or performance that depicts a minor engaged as a subject in sadomasochistic abuse or sexual conduct; or (5) use a computer to *knowingly* compile, enter, transmit, make, print, publish, reproduce, cause, allow, buy, sell, *receive, exchange,* or disseminate any notice, statement, advertisement, or minor's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information *for the purpose of engaging in, facilitating, encouraging, offering, or soliciting unlawful sadomasochistic abuse or sexual conduct of or with a minor.* (Felony) | **Up to 10 years** *See* Md. Code Ann., Crim. Law § 11-207(b) (2008) |
| Mass. Ann. Laws ch. 272, § 29C (LexisNexis 2008) | Whoever *knowingly purchases* or *possesses* a negative, slide, book, magazine, film, videotape, photograph or other similar visual reproduction, or depiction by computer, of any child whom the person knows or reasonably should know to be under the age of 18 years of age and [the material depicts child pornography] | Up to 5 years in state prison or 2.5 years in jail *See* Mass. Ann. Laws ch. 272, § 29C (LexisNexis 2008) |

| Citation | Description | Penalty |
|---|---|---|
| Mass. Ann. Laws ch. 272, § 29B (LexisNexis 2008) | Whoever, *with lascivious intent, disseminates* any visual material ...[depicting child in a state of nudity or engaged in sexual conduct ], *knowing* the contents ...or has in his possession any such visual material *knowing the contents ... with the intent to disseminate* the same... | 10 - 20 years<br>*See* Mass. Ann. Laws ch. 272, § 29B (LexisNexis 2008) |
| Mich. Comp. Laws § 750.145c (2008) | A person who *knowingly possesses* any child sexually abusive material ... | **Up to 4 years**<br>*See* Mich. Comp. Laws § 750.145c(4) (2008) |
| Mich. Comp. Laws § 750.145c (2008) | A person who distributes or promotes, or finances the distribution or promotion of, or *receives for the purpose of distributing or promoting*, or conspires, attempts, or *prepares to* distribute, *receive*, finance, or promote any child sexually abusive material or child sexually abusive activity is guilty of a felony | **Up to 7 years**<br>*See* Mich. Comp. Laws § 750.145c(3) (2008) |
| Minn. Stat. § 617.247 (2007) | A person who *possesses* a pornographic work or a computer disk or computer or other electronic, magnetic, or optical storage system or a storage system of any other type, containing a pornographic work, *knowing or with reason to know its content and character*, is guilty of a felony | **Up to 5 years**<br>*See* Minn. Stat. § 617.247 (2007) |
| | A person who disseminates pornographic work to an adult or a minor, knowing or with reason to know its content and character, is guilty of a felony | Up to 7 years<br>*See* Minn. Stat. § 617.247 (2007) |
| Minn. Stat. § 617.246 (2007) | A person who, knowing or with reason to know its content and character, disseminates for profit to an adult or a minor a pornographic work, as defined in this section, is guilty of a felony ... | Up to 10 years<br>*See* Minn. Stat. § 617.246 (2007) |
| Miss. Code Ann. § 97-5-33 (2007) | (1) No person shall, by any means including computer, cause, solicit or knowingly permit any child to engage in sexually explicit conduct or in the simulation of sexually explicit conduct for the purpose of producing any visual depiction of such conduct. (2) No person shall, by any means including computer, photograph, film, video tape or otherwise depict or record a child engaging in sexually explicit conduct or in the simulation of sexually explicit conduct. (3) No person shall, by any means including computer, *knowingly* send, transport, transmit, ship, mail or *receive* any photograph, drawing, sketch, film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct. (4) No person shall, by any means including computer, *receive with intent to distribute*, distribute for sale, sell or attempt to sell in any manner any photograph, drawing, sketch, film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct. (5) No person shall, by any means including computer, *possess* any photograph. | **5 - 40 years**<br>*See* Miss. Code Ann. § 97-5-35 (2007) |

| | | |
|---|---|---|
| | drawing, sketch, film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct. (6) No person shall, by any means including computer, knowingly entice, induce, persuade, seduce, solicit, advise, coerce, or order a child to meet with the defendant or any other person for the purpose of engaging in sexually explicit conduct. (7) No person shall by any means, including computer, knowingly entice, induce, persuade, seduce, solicit, advise, coerce or order a child to produce any visual depiction of adult sexual conduct or any sexually explicit conduct | |
| Mo. Rev. Stat. § 573.037 (2007) | A person commits the crime of *possession* of child pornography if, *knowing of its content and character*, such person *possesses* any obscene material that has a child as one of its participants or portrays what appears to be a child as an observer or participant of sexual conduct. (Class D felony; unless the person has pleaded guilty to or has been found guilty of an offense under this section, in which case it is a class C felony) | **Up to 4 years** (Class D felony) Up to 7 years (Class C felony) *See* Mo. Rev. Stat. § 558.011 (2007) |
| Mo. Rev. Stat. § 573.035 (2007) | A person commits the crime of promoting child pornography in the second degree if *knowing of its content and character* such person *possesses with the intent to promote* or promotes child pornography or obscene material that has a minor as one of its participants, or portrays what appears to be a minor as a participant or observer of sexual conduct. (Class C felony; unless the person knowingly promotes such material to a minor, in which case it is a class B felony) | Up to 7 years (Class C felony) 5 - 15 years (Class B felony) *See* Mo. Rev. Stat. § 558.011 (2007) |
| Mo. Rev. Stat. § 573.025 (2007) | A person commits the crime of promoting child pornography in the first degree if, *knowing of its content and character*, such person *possesses with the intent to promote* or promotes obscene material that has a child as one of its participants or portrays what appears to be a child as a participant or observer of sexual conduct. (Class B felony; unless the person knowingly promotes such material to a minor, in which case it is a class A felony) | 5 - 15 years (Class B felony) 10 - 30 years or life (Class A felony) *See* Mo. Rev. Stat. § 558.011 (2007) |
| Mo. Rev. Stat. § 573.023 (2007) | A person commits the crime of sexual exploitation of a minor if, knowing of its content and character, such person photographs, films, videotapes, produces or otherwise creates obscene material with a minor or child pornography. (class B felony; unless the minor is a child, in which case it is a class A felony) | 5 - 15 years (Class B felony) 10 - 30 years or life (Class A felony) *See* Mo. Rev. Stat. § 558.011 (2007) |
| Mont. Code Ann. § 45-5-625 (2007) | A person commits the offense of sexual abuse of children if the person: (a) knowingly employs, uses, or permits the employment or use of a child in an exhibition of sexual conduct, actual or simulated; (b) knowingly photographs, films, videotapes, develops or duplicates the photographs, films, or videotapes, or records a | **Life or up to 100 years** (if child is over 16 years of age) 4 - 100 years |

| Citation | Description | Penalty |
|---|---|---|
| | child engaging in sexual conduct, actual or simulated; (c) knowingly, by any means of communication, including electronic communication, persuades, entices, counsels, or procures a child under 16 years of age or a person the offender believes to be a child under 16 years of age to engage in sexual conduct, actual or simulated; (d) knowingly processes, develops, prints, publishes, transports, distributes, sells, exhibits, or advertises any visual or print medium, including a medium by use of electronic communication in which a child is engaged in sexual conduct, actual or simulated; (e) *knowingly possesses* any visual or print medium, including a medium by use of electronic communication in which a child is engaged in sexual conduct, actual or simulated; (f) finances any of the activities described in subsections (1)(a) through (1)(d) and (1)(g), knowing that the activity is of the nature described in those subsections; or (g) *possesses with intent to sell* any visual or print medium, including a medium by use of electronic communication in which a child is engaged in sexual conduct, actual or simulated. | (if child is under 16 years of age) **100 years** (if child is under 12 years of age) *See* Mont. Code Ann. § 45-5-625 (2007) |
| Neb. Rev. Stat. § 28-1463.05 (2007) | It shall be unlawful for a person to *knowingly possess with intent to rent, sell, deliver, distribute, trade, or provide to any person* any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers (Class IIIA felony) | 1 - 5 years (Class IIIA felony) *See* Neb. Rev. Stat. § 28-105 (2007) |
| Neb. Rev. Stat. § 28-1463.03 (2007) | (1) It shall be unlawful for a person to knowingly make, publish, direct, create, provide, or in any manner generate any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. (2) It shall be unlawful for a person knowingly to purchase, rent, sell, deliver, distribute, display for sale, advertise, trade, or provide to any person any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. (3) It shall be unlawful for a person to knowingly employ, force, authorize, induce, or otherwise cause a child to engage in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. (4) It shall be unlawful for a parent, stepparent, legal guardian, or any person with custody and control of a child, knowing the content thereof, to consent to such child engaging in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. (Class III Felony) | 1 - 20 years (Class III felony) *See* Neb. Rev. Stat. § 28-105 (2007) |
| Nev. Rev. Stat. § 200.730 (2007) | A person who *knowingly* and *willfully* has in his *possession for any purpose* any film, photograph or other visual presentation depicting a person under the age of 16 years as the subject of a sexual portrayal or engaging in or simulating, or assisting others to engage in or simulate, sexual conduct (Category B felony) | 1 - 6 years *See* Nev. Rev. Stat. § 200.730 (2007) |

| Citation | Offense | Penalty |
|---|---|---|
| Nev. Rev. Stat. § 200.725 (2007) | A person who knowingly prepares, advertises or distributes any item or material that depicts a minor engaging in, or simulating, or assisting others to engage in or simulate, sexual conduct (Category B felony) | 1 - 15 years<br>*See* Nev. Rev. Stat. § 200.725 (2007) |
| Nev. Rev. Stat. § 200.720 (2007) | A person who knowingly promotes a performance of a minor: Where the minor engages in or simulates, or assists others to engage in or simulate, sexual conduct; or Where the minor is the subject of a sexual portrayal | Minimum 5 years<br>(if child is over 14 years of age)<br>Minimum 10 years<br>(if child is under 14 years of age)<br>*See* Nev. Rev. Stat. § 200.750 (2007) |
| N.H. Rev. Stat. Ann. § 649-A:3 (2008) | A person is guilty of a felony if such person: (a) Sells, delivers or provides, or offers or agrees to sell, deliver or provide, any visual representation of a child engaging in sexual activity; or (b) Presents or directs a visual representation of a child engaging in sexual activity, or participates in that portion of such visual representation which consists of a child engaging in sexual activity; or (c) Publishes, exhibits or otherwise makes available any visual representation of a child engaging in sexual activity; or (d) *Possesses* any visual representation of a child engaging in sexual activity *for purposes of sale or other commercial dissemination*; or (e) *Knowingly buys, procures, possesses, or controls* any visual representation of a child engaging in sexual activity; or (f) Knowingly brings or causes to be brought into this state any visual representation of a child engaging in sexual activity. (Class B felony) | Up to 7 years<br>(Class B felony)<br>*See* N.H. Rev. Stat. Ann. § 651-2 (2008) |
| N.H. Rev. Stat. Ann. § 649-B:3 (2008) | No person shall *knowingly*: (a) Compile, enter into, or transmit by means of computer; (b) Make, print, publish, or reproduce by other computerized means; (c) Cause or allow to be entered into or transmitted by means of computer; or (d) Buy, sell, *receive*, exchange, or disseminate by means of computer, any notice, statement, or advertisement, or any minor's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information, for purposes of facilitating, encouraging, offering, or soliciting sexual conduct of or with any child, or the *visual depiction of such conduct*. (Class B felony) | Up to 7 years<br>(Class B felony)<br>*See* N.H. Rev. Stat. Ann. § 651-2 (2008) |
| N.J. Rev. Stat. § 2C:24-4 (2007) | Any person who *knowingly possesses or knowingly views* any photograph, film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act, including on the Internet, is guilty of a crime. (Fourth degree crime) | Up to 18 months<br>(Fourth degree crime)<br>*See* N.J. Rev. Stat. § 2C:43-6 (2007) |
| N.J. Rev. Stat. § 2C:24-4 (2007) | Any person who *knowingly receives for the purpose of selling* or who knowingly sells, procures, manufactures, gives, provides, lends, trades, mails, delivers, transfers, publishes, distributes, circulates, disseminates, presents, exhibits, | 5 - 10 years<br>(Second degree crime)<br>*See* N.J. Rev. Stat. § 2C:43-6 (2007) |

| Citation | Offense | Penalty |
|---|---|---|
| | advertises, offers or agrees to offer, through any means, including the Internet, any photograph, film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act is guilty of a crime. (Second degree crime) | |
| | Any person who photographs or films a child in a prohibited sexual act or in the simulation of such an act or who uses any device, including a computer, to reproduce or reconstruct the image of a child in a prohibited sexual act or in the simulation of such an act is guilty of a crime. (Second degree crime) | 5 - 10 years (Second degree crime) *See* N.J. Rev Stat. § 2C:43-6 (2007) |
| N.M. Stat. § 30-6A-3 (2007) | It is unlawful for a person to *intentionally possess* any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age. (Fourth degree felony) | **18 months** (Fourth degree felony) *See* N.M. Stat. § 31-18-15 (2007) |
| | It is unlawful for a person to intentionally distribute any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age. (Third degree felony) | 6 years (Third degree felony) *See* N.M. Stat. § 31-18-15 (2007) |
| N.M. Stat. § 30-6A-3 (2007) | It is unlawful for a person to intentionally distribute any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts a prohibited sexual act or simulation of such an act and if that person knows or has reason to know that a real child under eighteen years of age, who is not a participant, is depicted as a participant in that act. (Third degree felony) | 6 years imprisonment *See* N.M. Stat. § 31-18-15 (2007) |
| N.Y. Penal Law § 263.16 (2007) | A person is guilty of possessing a sexual performance by a child when, knowing the character and content thereof, he *knowingly* has in his *possession or control* any performance which includes sexual conduct by a child less than sixteen years of age (Class E felony) | **1 (or 1/3 of maximum) - 4 years** (Class E felony) *See* N.Y. Penal Law § 70.00 (2008) |
| N.Y. Penal Law § 263.11 (2007) | A person is guilty of possessing an obscene sexual performance by a child when, knowing the character and content thereof, he *knowingly* has in his *possession or control* any obscene performance which includes sexual conduct by a child less than sixteen years of age (Class E felony) | **1 (or 1/3 of maximum) - 4 years** (Class E felony) *See* N.Y. Penal Law § 70.00 (2008) |

| Statute | Offense | Penalty |
|---|---|---|
| N.Y. Penal Law § 263.11 (2007) | A person is guilty of promoting a sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than seventeen years of age. (Class D felony) | 1 (or 1/3 of maximum) - 7 years (Class D felony) *See* N.Y. Penal Law § 70.00 (2008) |
| N.Y. Penal Law § 263.10 (2007) | A person is guilty of promoting an obscene sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any obscene performance which includes sexual conduct by a child less than seventeen years of age (Class D Felony) | 1 (or 1/3 of maximum) - 7 years (Class D felony) *See* N.Y. Penal Law § 70.00 (2008) |
| N.C. Gen. Stat. § 14-190.17A (2007) | A person commits the offense of third degree sexual exploitation of a minor if, *knowing the character or content of the material*, he *possesses* material that contains a visual representation of a minor engaging in sexual activity (Class I felony) | **4 - 6 months** (Class I felony, no criminal history, no aggravating or mitigating factors) *See* N.C. Gen. Stat. § 15A-1340.17 (2007 |
| N.C. Gen. Stat. § 14-190.17 (2007) | A person commits the offense of second degree sexual exploitation of a minor if, *knowing the character or content of the material*, he: (1) Records, photographs, films, develops, or duplicates material that contains a visual representation of a minor engaged in sexual activity; or (2) Distributes, transports, exhibits, *receives*, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity (Class F Felony) | **13 - 16 months** (Class F felony, no criminal history, no aggravating or mitigating factors) *See* N.C. Gen. Stat. § 15A-1340.17 (2007) |
| | A person commits the offense of first degree sexual exploitation of a minor if, knowing the character or content of the material or performance, he: (1) Uses, employs, induces, coerces, encourages, or facilitates a minor to engage in or assist others to engage in sexual activity for a live performance or for the purpose of producing material that contains a visual representation depicting this activity; or (2) Permits a minor under his custody or control to engage in sexual activity for a live performance or for the purpose of producing material that contains a visual representation depicting this activity; or (3) Transports or finances the transportation of a minor through or across this State with the intent that the minor engage in sexual activity for a live performance or for the purpose of producing material that contains a visual representation depicting this activity; or (4) Records, photographs, films, develops, or duplicates for sale or pecuniary gain material that contains a visual representation depicting a minor engaged in sexual activity. (Class D felony) | 51 - 64 months (Class D felony, no criminal history, no aggravating or mitigating factors) *See* N.C. Gen. Stat. § 15A-1340.17 (2007 |
| N.D. Cent. Code § 12.1-27.2-04.1 (2007) | A person is guilty of a class C felony if, *knowing of its character and content,* that person *knowingly possesses* any motion picture, photograph, or other visual representation that includes sexual conduct by a minor | **Up to 5 years** (Class C felony) *See* N.D. Cent. Code § 12.1-32-01 (2007 |
| N.D. Cent. Code § 12.1-27.2-04 (2007) | A person is guilty of a class C felony if, knowing the character and content of a performance, that person produces, directs, or promotes any performance which | Up to 5 years |

| Citation | Offense | Penalty |
|---|---|---|
| | ...includes sexual conduct by a person who was a minor at the time of the performance | (Class C felony) *See* N.D. Cent. Code § 12.1-32-01 (2007) |
| N.D. Cent. Code § 12.1-27.2-03 (2007) | A person is guilty of a class B felony if, knowing the character and content of a performance, that person produces, directs, or promotes any obscene performance which includes sexual conduct by a person who was a minor at the time of the performance. | Up to 10 years (Class B felony) *See* N.D. Cent. Code § 12.1-32-01 (2007) |
| Ohio Rev. Code Ann. § 2907.321 (LexisNexis 2008) | *Possess* or view any material or performance that shows a minor who is not the person's child or ward in a state of nudity, unless [material has a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose...] or [person is aware of consent in writing by parent, guardian, or custodian] (Fifth degree felony) | **6 - 12 months** (Fifth degree felony) *See* Ohio Rev. Code Ann. § 2929.14 (LexisNexis 2008) |
| | No person shall do any of the following: (1) Photograph any minor who is not the person's child or ward in a state of nudity, or create, direct, produce, or transfer any material or performance that shows the minor in a state of nudity, unless both of the following apply: [material has a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose...] and [parent, guardian, or custodian has given consent in writing] (Second degree felony) | 2 - 8 years (Second degree felony) *See* Ohio Rev. Code Ann. § 2929.14 (LexisNexis 2008) |
| Ohio Rev. Code Ann. § 2907.321 (LexisNexis 2008) | No person, with knowledge of the character of the material or performance involved, shall do any of the following: (5) Buy, procure, *possess*, or control any obscene material, that has a minor as one of its participants (Fourth degree felony) | **6 - 18 months** (Fourth degree felony) *See* Ohio Rev. Code Ann. § 2929.14 (LexisNexis 2008) |
| Ohio Rev. Code Ann. § 2907.321 (LexisNexis 2008) | No person, with knowledge of the character of the material or performance involved, shall do any of the following: (1) Create, reproduce, or publish any obscene material that has a minor as one of its participants or portrayed observers; (2) Promote or advertise for sale or dissemination; sell, deliver, disseminate, display, present, rent, or provide; or offer or agree to sell, deliver, disseminate, display, exhibit, present, rent, or provide, any obscene material that has a minor as one of its participants or portrayed observers; (3) Create, direct, or produce an obscene performance that has a minor as one of its participants; (4) Advertise or promote for presentation, present, or participate in presenting an obscene performance that has a minor as one of its participants; (6) Bring or cause to be brought into this state any obscene material that has a minor as one of its participants or portrayed observers. Second degree felony) | 2 - 8 years (Second degree felony) *See* Ohio Rev. Code Ann. § 2929.14 (LexisNexis 2008) |

| Citation | Offense | Penalty |
|---|---|---|
| Ohio Rev. Code Ann. § 2907.321 (LexisNexis 2008) | No person, with knowledge of the character of the material or performance involved, shall do any of the following: *Knowingly* solicit, *receive,* purchase, exchange, possess, or control any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality (Fourth degree felony) | 6 - 18 months (Fourth degree felony) *See* Ohio Rev. Code Ann. § 2929.14 (LexisNexis 2008) |
| | No person, with *knowledge of the character of the material or performance involved,* shall do any of the following: (1) Create, record, photograph, film, develop, reproduce, or publish any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality; (2) Advertise for sale or dissemination, sell, distribute, transport, disseminate, exhibit, or display any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality;(3) Create, direct, or produce a performance that shows a minor participating or engaging in sexual activity, masturbation, or bestiality; (4) Advertise for presentation, present, or participate in presenting a performance that shows a minor participating or engaging in sexual activity, masturbation, or bestiality;*....(6) Bring or cause to be brought into this state any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality, or bring, cause to be brought, or finance the bringing of any minor into or across this state with the intent that the minor engage in sexual activity, masturbation, or bestiality in a performance or for the purpose of producing material containing a visual representation depicting the minor engaged in sexual activity, masturbation, or bestiality. (Second degree felony) | 2 - 8 years (Second degree felony) *See* Ohio Rev. Code Ann. § 2929.14 (LexisNexis 2008) |
| Okla. Stat. Ann. tit. 21, § 1040.8 (2007) | No person shall knowingly photograph, act in, pose for, model for, print, sell, offer for sale, give away, exhibit, publish, offer to publish, or otherwise distribute, display, or exhibit any book, magazine, story, pamphlet, paper, writing, card, advertisement, circular, print, picture, photograph, motion picture film, electronic video game or recording, image, cast, slide, figure, instrument, statue, drawing, presentation, or other article which is obscene material or child pornography | Up to 1 year in county jail *See* Okla. Stat. Ann. tit. 21, § 1040.8 (2007) |
| Okla. Stat. Ann. tit. 21, § 1024.2 (2007) | It shall be unlawful for any person to buy, procure or *possess* child pornography | Up to 5 years *See* Okla. Stat. Ann. tit. 21, § 1024.2(B) (2007) |

| Statute | Offense | Penalty |
|---|---|---|
| Okla. Stat. Ann. tit. 21, § 1021 (2007) | Every person who *willfully and knowingly* either: …. 3. Writes, composes, stereotypes, prints, photographs, designs, copies, draws, engraves, paints, molds, cuts, or otherwise prepares, publishes, sells, distributes, keeps for sale, *knowingly downloads on a computer*, or exhibits any obscene material or child pornography; or 4. Makes, prepares, cuts, sells, gives, loans, distributes, *keeps for sale*, or exhibits any disc record, metal, plastic, or wax, wire or tape recording, or any type of obscene material or child pornography | **30 days - 10 years** *See* Okla. Stat. Ann. tit. 21, § 1021(A) (2007) |
| | Every person who: 1. Willfully solicits or aids a minor child to perform; or 2. Shows, exhibits, loans, or distributes to a minor child any obscene material or child pornography for the purpose of inducing said minor to participate in, any act specified in paragraphs 1, 2, 3 or 4 of subsection A of this section shall be guilty | 10 – 30 years *See* Okla. Stat. Ann. tit. 21, § 1021(B) (2007) |
| Okla. Stat. Ann. tit. 21, § 1021.2 (2007) | Any person who shall procure or cause the participation of any minor under the age of eighteen (18) years in any child pornography or who *knowingly possesses*, procures, or manufactures, or causes to be sold or distributed any child pornography shall be guilty, upon conviction, of a felony | Up to 20 years *See* Okla. Stat. Ann. tit. 21, § 1021.2 (2007) |
| Or. Rev. Stat. § 163.687 (2005) | A person commits the crime of encouraging child sexual abuse in the third degree if the person: (a)(A)(I) *Knowingly possesses or controls* any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person; or (ii) Knowingly pays, exchanges or gives anything of value to obtain or view a photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person; *and* (B) *Knows or fails to be aware of a substantial and unjustifiable risk that the creation of the visual recording of sexually explicit conduct involved child abuse*; or (b)(A) Knowingly pays, exchanges or gives anything of value to observe sexually explicit conduct by a child or knowingly observes, for the purpose of arousing or gratifying the sexual desire of the person, sexually explicit conduct by a child; and (B) Knows or fails to be aware of a substantial and unjustifiable risk that the conduct constitutes child abuse. (Class A misdemeanor) | Up to 1 year (Class A misdemeanor) *See* Or. Rev. Stat. § 161.615 (2005) |

| | | |
|---|---|---|
| Or. Rev. Stat. §163.689 (2005) | A person commits the crime of possession of materials depicting sexually explicit conduct of a child in the second degree if the person: (a) *Knowingly possesses any visual depiction of sexually explicit conduct involving a child or any visual depiction of sexually explicit conduct that appears to involve a child; and (b) Intends to use the visual depiction to induce a child to participate or engage in sexually explicit conduct.* (Class C felony) | Up to 5 years (Class C felony) *See* Or. Rev. Stat. § 161.605 (2005) |
| Or. Rev. Stat. §163.686 (2005) | A person commits the crime of encouraging child sexual abuse in the second degree if the person: (a)(A)(I) *Knowingly possesses or controls* any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child *for the purpose of arousing or satisfying the sexual desires of the person or another person*; or (ii) Knowingly pays, exchanges or gives anything of value to obtain or view a photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person; *and* (B) *Knows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse;* or (b)(A) Knowingly pays, exchanges or gives anything of value to observe sexually explicit conduct by a child or knowingly observes, for the purpose of arousing or gratifying the sexual desire of the person, sexually explicit conduct by a child; and (B) Knows or is aware of and consciously disregards the fact that the conduct constitutes child abuse. (Class C felony) | up to 5 years (Class C felony) *See* Or. Rev. Stat. § 161.605 (2005) |
| Or. Rev. Stat. §163.688 (2005) | A person commits the crime of possession of materials depicting sexually explicit conduct of a child in the first degree if the person: (a) *Knowingly possesses any visual depiction of sexually explicit conduct involving a child or any visual depiction of sexually explicit conduct that appears to involve a child; and (b) Uses the visual depiction to induce a child to participate or engage in sexually explicit conduct.* (Class B felony) | up to 10 years (Class B felony) *See* Or. Rev. Stat. § 161.605 (2005) |

| Citation | Offense | Penalty |
|---|---|---|
| Or. Rev. Stat. §163.684 (2005) | A person commits the crime of encouraging child sexual abuse in the first degree if the person: (a)(A) Knowingly develops, duplicates, publishes, prints, disseminates, exchanges, displays, finances, attempts to finance or sells any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child or possesses such matter with the intent to develop, duplicate, publish, print, disseminate, exchange, display or sell it; or (B) Knowingly brings into this state, or causes to be brought or sent into this state, for sale or distribution, any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child; and (b) Knows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse. (Class B felony) | up to 10 years (Class B felony) See Or. Rev. Stat. § 161.605 (2005) |
| 18 Pa. Cons. Stat. § 6312 (2007) | Any person who knowingly possesses or controls any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such act commits an offense. (Third degree felony) | Up to 7 years (Third degree felony) See 18 Pa. Cons. Stat. § 1103 (2007) |
| | Any person who knowingly sells, distributes, delivers, disseminates, transfers, displays or exhibits to others, or who possesses for the purpose of sale, distribution, delivery, dissemination, transfer, display or exhibition to others, any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such act commits an offense. (Third degree felony) | Up to 7 years (Third degree felony) See 18 Pa. Cons. Stat. § 1103 (2007) |
| 18 Pa. Cons. Stat. § 6312 (2007) | Any person who causes or knowingly permits a child under the age of 18 years to engage in a prohibited sexual act or in the simulation of such act is guilty of a felony of the second degree if such person knows, has reason to know or intends that such act may be photographed, videotaped, depicted on computer or filmed. Any person who knowingly photographs, videotapes, depicts on computer or films a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such an act [is guilty] (Second degree felony) | Up to 10 years (Second degree felony) See 18 Pa. Cons. Stat. § 1103 (2007) |
| R.I. Gen. Laws § 11-9-1.3 (2007) | It is a violation of this section for any person to: Knowingly possess any book, magazine, periodical, film, videotape, computer disk, computer file or any other material that contains an image of child pornography. | Up to 5 years See R.I. Gen. Laws § 11-9-1.3(b)(2) (2007) |

| | | |
|---|---|---|
| | It is a violation of this section for any person to: (1) Knowingly produce any child pornography; (2) Knowingly mail, transport, deliver or transfer by any means, including by computer, any child pornography; (3) Knowingly reproduce any child pornography by any means, including the computer. | Up to 15 years *See* R.I. Gen. Laws § 11-9-1.3(b)(1) (2007) |
| R.I. Gen. Laws § 11-9-1.1 (2007) | Every person, firm, association, or corporation which shall publish, sell, offer for sale, loan, give away, or otherwise distribute any book, magazine, pamphlet, or other publication, or any photograph, picture, or film which depicts any child, or children, under the age of eighteen (18) years and known to be under the age of eighteen (18) years of age by the person, firm, association, or corporation in a setting which taken as a whole suggests to the average person that the child, or children, is about to engage in or has engaged in, any sexual act, or which depicts any child under eighteen (18) years of age performing sodomy, oral copulation, sexual intercourse, masturbation, or bestiality. | Up to 10 years *See* R.I. Gen. Laws § 11-9-1.1 (2007) |
| S.C. Code Ann. § 16-15-410 (2007) | An individual commits the offense of third degree sexual exploitation of a minor if, *knowing the character or content of the material*, he *possesses* material that contains a visual representation of a minor engaging in sexual activity. | **Up to 10 years** *See* S.C. Code Ann. § 16-15-410 (2007) |
| S.C. Code Ann. § 16-15-405 (2007) | An individual commits the offense of second degree sexual exploitation of a minor if, *knowing the character or content of the material*, he: (1) records, photographs, films, develops, duplicates, produces, or creates digital electronic file material that contains a visual representation of a minor engaged in sexual activity; or (2) distributes, transports, exhibits, *receives*, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity. | **2 - 10 years** *See* S.C. Code Ann. § 16-15-405 (2007) |

| Statute | Description | Penalty |
|---|---|---|
| S.C. Code Ann. § 16-15-395 (2007) | An individual commits the offense of first degree sexual exploitation of a minor if, knowing the character or content of the material or performance, he: (1) uses, employs, induces, coerces, encourages, or facilitates a minor to engage in or assist others to engage in sexual activity for a live performance or for the purpose of producing material that contains a visual representation depicting this activity; (2) permits a minor under his custody or control to engage in sexual activity for a live performance or for the purpose of producing material that contains a visual representation depicting this activity; (3) transports or finances the transportation of a minor through or across this State with the intent that the minor engage in sexual activity for a live performance or for the purpose of producing material that contains a visual representation depicting this activity; or (4) records, photographs, films, develops, duplicates, produces, or creates a digital electronic file for sale or pecuniary gain material that contains a visual representation depicting a minor engaged in sexual activity. | 3 - 20 years<br>*See* S.C. Code Ann. § 16-15-395 (2007) |
| S.D. Codified Laws § 22-24A-1 (2008) | Any person who sells, or displays for sale, any book, magazine, pamphlet, slide, photograph, film, or electronic or digital media image depicting a minor engaging in a prohibited sexual act, or engaging in an activity that involves nudity, or in the simulation of any such act is guilty (Class 6 felony) | Up to 2 years (Class 6 felony)<br>*See* S.D. Codified Laws § 22-6-1 (2008) |
| S.D. Codified Laws § 22-24A-3 (2008) | A person is guilty of possessing, manufacturing, or distributing child pornography if the person: (1) Creates any visual depiction of a minor engaging in a prohibited sexual act, or in the simulation of such an act; (2) Causes or knowingly permits the creation of any visual depiction of a minor engaged in a prohibited sexual act, or in the simulation of such an act; or (3) *Knowingly possesses*, distributes, or otherwise disseminates any visual depiction of a minor engaging in a prohibited sexual act, or in the simulation of such an act (Class 4 felony) | Up to 10 years (Class 4 felony)<br>*See* S.D. Codified Laws § 22-6-1 (2008) |
| Tenn. Code Ann. § 39-17-1003 (2008) | It is unlawful for any person to *knowingly possess* material that includes a minor engaged in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive (Class D felony, if less than 50 images; Class C felony, if 50 – 100 images; Class B felony, if over 100 images) | 2 - 12 years (Class D felony)<br>3 - 15 years (Class C felony)<br>8 - 30 years (Class B felony)<br>*See* Tenn. Code Ann. § 40-35-111 (2008) |

| Citation | Offense | Penalty |
|---|---|---|
| Tenn. Code Ann. § 39-17-1004 (2008) | It is unlawful for a person to *knowingly* promote, sell, distribute, transport, purchase or exchange material, or *possess with the intent to promote, sell, distribute, transport, purchase or exchange material,* that includes a minor engaged in: (A) Sexual activity; or (B) Simulated sexual activity that is patently offensive (Class C felony, if under 25 images; Class B felony, if over 25 images) | 3 - 15 years (Class C felony) 8 - 30 years (Class B felony) *See* Tenn. Code Ann. § 40-35-111 (2008) |
| Tenn. Code Ann. § 39-17-1004 (2008) | It is unlawful for a person to *knowingly* promote, sell, distribute, transport, purchase or exchange material that is obscene ... or *possess material that is obscene*, with the intent to promote, sell, distribute, transport, purchase or exchange the material, which includes a minor engaged in: (A) Sexual activity; or (B) Simulated sexual activity that is patently offensive (Class C felony if under 25 images; Class B felony if over 25 images) | **3 - 15 years** (Class C felony) **8 - 30 years** (Class B felony) *See* Tenn. Code Ann. § 40-35-111 (2008) |
| Tenn. Code Ann. § 39-17-1005 (2008) | It is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive (Class B felony) | 8 - 30 years (Class B felony) *See* Tenn. Code Ann. § 40-35-111 (2008) |
| Tex. Penal Code Ann. § 43.26(e) (2007) | A person commits an offense if: (1) the person *knowingly or intentionally possesses* visual material that visually depicts a child younger than 18 years of age at the time the image of the child was made who is engaging in sexual conduct; and (2) *the person knows that the material depicts the child* as described by Subdivision (1) (Third degree felony) | **2 - 10 years** (Third degree felony) *See* Tex. Penal Code Ann. § 12.34 (2007) |
| Tex. Penal Code Ann. § 43.25(d) (2007) | A person commits an offense if, *knowing the character and content of the material,* he produces, directs, or promotes a performance that includes sexual conduct by a child younger than 18 years of age (Third degree felony if child is between 14 and 18 years of age, and second degree felony if child is below 14 years of age) | 2 - 10 years (Third degree felony) *See* Tex. Penal Code Ann. § 12.34 (2007) 2 - 20 years (Second degree felony) *See* Tex. Penal Code Ann. § 12.33 (2007) |
| Tex. Penal Code Ann. § 43.26(a) (2007) | A person commits an offense if: (1) the person *knowingly or intentionally promotes or possesses with intent to promote* material described by Subsection (a)(1); *and (2) the person knows that the material depicts the child* as described by Subsection (a)(1) (Second degree felony) | 2 - 20 years (Second degree felony) *See* Tex. Penal Code Ann. § 12.33 (2007) |

| Citation | Offense | Penalty |
|---|---|---|
| Utah Code Ann. § 76-5a-3 (2007) | A person is guilty of sexual exploitation of a minor: (a) when the person *knowingly produces, distributes, possesses, or possesses with intent to distribute,* child pornography; or (b) if the person is a minor's parent or legal guardian and knowingly consents to or permits that minor to be sexually exploited under Subsection (1)(a). (Second degree felony) | **1 - 15 years**<br>*See* Utah Code Ann. § 76-3-203 (2007) |
| Vt. Stat. Ann. tit. 13, § 2827 (2007) | No person shall, *with knowledge of the character and content, possess any* photograph, film or visual depiction, including any depiction which is stored electronically, of sexual conduct by a child or of a clearly lewd exhibition of a child's genitals or anus. | **Up to 2 years**<br>(if the depiction constitutes "a clearly lewd exhibition of a child's genitals or anus, other than a depiction of sexual conduct by a child")<br>**Up to 5 years**<br>(if the depiction constitutes "sexual conduct by a child")<br>*See* Vt. Stat. Ann. tit. 13, § 2825 (2007) |
| Vt. Stat. Ann. tit. 13, § 2824 (2007) | No person may, *with knowledge of the character and content,* promote any photograph, film or visual recording of sexual conduct by a child, or of a lewd exhibition of a child's genitals or anus. This subsection does not apply to paintings, drawings, or to non-visual or written descriptions of sexual conduct. | **Up to 10 years**<br>*See* Vt. Stat. Ann. tit. 13, § 2825 (2007) |
| Va. Code Ann. § 18.2-374.1:1 (2008) | Any person who *knowingly possesses* child pornography [is guilty of a] (Class 6 felony) | **1 - 5 years**<br>*See* Va. Code Ann. § 18.2-10 (2008) |
| | Any person who reproduces by any means, including by computer, sells, gives away, distributes, electronically transmits, displays with lascivious intent, purchases, or *possesses with intent to sell, give away, distribute, transmit, or display* child pornography with lascivious intent | **5 - 20 years**<br>*See* Va. Code Ann. § 18.2-374.1:1(C) (2008) |
| Va. Code Ann. § 18.2-374.1 (2008) | A person shall be guilty of production of child pornography who: 1. Accosts, entices or solicits a person less than 18 years of age with intent to induce or force such person to perform in or be a subject of child pornography; or 2. Produces or makes or attempts or prepares to produce or make child pornography; or 3. Who knowingly takes part in or participates in the filming, photographing, or other production of child pornography by any means; or 4. Knowingly finances or attempts or prepares to finance child pornography | **5 - 30 years**<br>(if child is under 15 years of age)<br>**1 - 20 years**<br>(if child is between 15 and 18 years of age)<br>*See* Va. Code Ann. §§ 18.2-374.1(C1), (C2) (2008) |

| Citation | Offense | Penalty |
|---|---|---|
| Wash. Rev. Code § 9.68A.060 (2008) | A person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, any visual or printed matter that depicts a minor engaged in sexually explicit conduct (Class C felony) | Up to 5 years<br>*See* Wash. Rev. Code § 9A.20.021 (2008) |
| Wash. Rev. Code § 9.68A.050 (2008) | A person who: (1) Knowingly develops, duplicates, publishes, prints, disseminates, exchanges, finances, attempts to finance, or sells any visual or printed matter that depicts a minor engaged in an act of sexually explicit conduct; or (2) *Possesses with intent to develop, duplicate, publish, print, disseminate, exchange, or sell any visual or printed matter that depicts a minor engaged in an act of sexually explicit conduct* (Class C felony) | Up to 5 years<br>*See* Wash. Rev. Code § 9A.20.021 (2008) |
| Wash. Rev. Code § 9.68A.070 (2008) | A person who *knowingly possesses* visual or printed matter depicting a minor engaged in sexually explicit conduct (Class B felony) | **Up to 10 years**<br>*See* Wash. Rev. Code § 9A.20.021 (2008) |
| W. Va. Code § 61-8C-3 (2007) | Any person who, *with knowledge*, sends or causes to be sent, or distributes, exhibits, *possesses* or displays or transports any material visually portraying a minor engaged in any sexually explicit conduct is guilty of a felony | **Up to 2 years**<br>*See* W. Va. Code § 61-8C-3 (2007) |
| Wis. Stat. § 948.12 (2007) | (1m) Whoever *possesses* any undeveloped film, photographic negative, photograph, motion picture, videotape, or other recording of a child engaged in sexually explicit conduct under all of the following circumstances may be penalized under sub. (3): (a) *The person knows that he or she possesses the material.* (b) *The person knows the character and content of the sexually explicit conduct in the material.* (c) *The person knows or reasonably should know that the child engaged in sexually explicit conduct has not attained the age of 18 years.* (2m) Whoever exhibits or plays a recording of a child engaged in sexually explicit conduct, if all of the following apply, may be penalized under sub. (3): (a) The person knows that he or she has exhibited or played the recording. (b) Before the person exhibited or played the recording, he or she knew the character and content of the sexually explicit conduct. (c) Before the person exhibited or played the recording, he or she knew or reasonably should have known that the child engaged in sexually explicit conduct had not attained the age of 18 years. (Class D felony if offender is an adult, Class I felony if offender is under the age of 18) | Up to 3 years, 6 months (Class I felony)<br>**3 - 25 years**<br>(Class D felony)<br>*See* Wis. Stat. § 939.50 (2007); Wis. Stat. § 939.617 (2007) (noting that the court can sentence below the mandatory minimum if it "finds that the best interests of the community will be served and the public will not be harmed and if the court places its reasons on the record.") |

| Statute | Offense | Penalty |
|---|---|---|
| Wis. Stat. § 948.05 (2007) | 1) Whoever does any of the following with *knowledge of the character and content of the sexually explicit conduct involving the child may be penalized under sub.* (2p): (a) Employs, uses, persuades, induces, entices, or coerces any child to engage in sexually explicit conduct for the purpose of recording or displaying in any way the conduct. (b) Records or displays in any way a child engaged in sexually explicit conduct. (1m) Whoever produces, performs in, profits from, promotes, imports into the state, reproduces, advertises, sells, distributes, or *possesses with intent to sell or distribute,* any recording of a child engaging in sexually explicit conduct may be penalized under sub. (2p) *if the person knows the character and content of the sexually explicit conduct involving the child and if the person knows or reasonably should know that the child engaging in the sexually explicit conduct has not attained the age of 18 years.* (2) A person responsible for a child's welfare who knowingly permits, allows or encourages the child to engage in sexually explicit conduct for a purpose proscribed in sub. (1) (a) or (b) or (1m) may be penalized under sub. (2p) (Class C felony if offender is an adult, Class F felony if offender is under 18 years of age) | Up to 12 years, 6 months (Class I felony) <br> 5 - 40 years (Class C felony) <br> *See* Wis. Stat. § 939.50 (2007); Wis. Stat. § 939.617 (2007) (noting that the court can sentence below the mandatory minimum if "finds that the best interests of the community will be served and the public will not be harmed and if the court places its reasons on the record.") |
| Wyo. Stat. Ann. § 6-4-303 (2007) | A person is guilty of sexual exploitation of a child if, for any purpose, he *knowingly* ... *Possesses* child pornography | **Up to 10 years** <br> *See* Wyo. Stat. Ann. § 6-4-303(d) (2007) |
| | A person is guilty of sexual exploitation of a child if, for any purpose, he *knowingly:* Causes, induces, entices, coerces or permits a child to engage in, or be used for, the making of child pornography; Causes, induces, entices or coerces a child to engage in, or be used for, any explicit sexual conduct; Manufactures, generates, creates, receives, distributes, reproduces, delivers or *possesses with the intent to deliver,* including through digital or electronic means, whether or not by computer, any child pornography | **5 - 12 years** <br> *See* Wyo. Stat. Ann. § 6-4-303(c) (2007) |

*C. Federal Statutory Minimums*

(Source: Ricardo H. Hinojosa, Chair, United States Sentencing Commission, Statement Before the House Judiciary Committee Subcommittee on Crime, Ter-

rorism and Homeland Security (June 26, 2007).)

Statutory Provisions Requiring Mandatory Minimum Terms of Imprisonment *

| U.S. Code Section | Description of Crime | Minimum Term of Imprisonment |
|---|---|---|
| 2 U.S.C. § 192 | Refusing to testify before Congress | 1 month |
| 2 U.S.C. § 390 | Failure to appear, testify, or produce documents when subpoenaed for contested election case before Congress | 1 month |
| 7 U.S.C. § 13a | Disobeying cease and desist order by registered entity | 6 months |
| 7 U.S.C. § 13b | Disobeying cease and desist order by person other than a registered entity | 6 months |
| 7 U.S.C. § 15b(k) | Violating provisions of cotton futures contract regulation | 30 days |
| 7 U.S.C. § 195(3) | Violation of court order by packer or swine contractor concerning packers and stockyards | 6 months |
| 7 U.S.C. § 2024(b)(1) | Second and subsequent offense; illegal food stamp activity; value of $100 to $4,999 | 6 months |
| 7 U.S.C. § 2024(c) | Second and subsequent offense; presentation of illegal food stamp for redemption; value of $100 or more | 1 year |
| 8 U.S.C. § 1324(a)(2)(B)(I) | First or second offense, bringing in or harboring certain aliens where the offense was committed with the intent or with reason to believe that the unlawful alien will commit a felony | 3 years |
| 8 U.S.C. § 1324(a)(2)(B)(I) | Third or subsequent offense, bringing in or harboring certain aliens where the offense was committed with the intent or with reason to believe that the unlawful alien will commit a felony | 5 years |
| 8 U.S.C. § 1324(a)(2)(B)(ii) | First or second offense, bringing in or harboring certain aliens where the offense was committed for the purpose of commercial advantage or private financial gain | 3 years |
| 8 U.S.C. § 1324(a)(2)(B)(ii) | Third or subsequent offense, bringing in or harboring certain aliens where the offense was committed for the purpose of commercial advantage or private financial gain | 5 years |
| 8 U.S.C. § 1326(b)(3) | Reentry of an alien removed on national security grounds | 10 years |
| 12 U.S.C. § 617 | Commodities price fixing | 1 year |
| 12 U.S.C. § 630 | Embezzlement, fraud, or false entries by banking officer | 2 years |
| 15 U.S.C. § 8 | Trust in restraint of import trade | 3 months |
| 15 U.S.C. § 1245(b) | Possession/use of a ballistic knife during commission of federal crime of violence | 5 years |
| 15 U.S.C. § 1825(a)(2)(c) | Killing of horse official | Death or life |
| 16 U.S.C. § 414 | Trespassing on federal land for hunting or shooting | 5 days |
| 18 U.S.C. § 33(b) | Damage to or destruction of a motor vehicle carrying high level radioactive waste or spent nuclear fuel with intent to endanger safety of person | 30 years |
| 18 U.S.C. § 115(b)(3) | First degree murder of a federal official's family member | Death or life |
| 18 U.S.C. § 225(a) | Organizes/manages/supervises a continuing financial crime enterprise which receives $5M or more within any 24–month period | 10 years |
| 18 U.S.C. § 229A(a)(2) | Develop/produce/acquires/transfer/possess/use any chemical weapon that results in the death of another person | Death or life |
| 18 U.S.C. § 351(a) | First degree murder of a member of Congress, Cabinet, or Supreme Court | Life |

| | | |
|---|---|---|
| 18 U.S.C. § 844(f) | Maliciously damages, or attempts to damage, property of the U.S. by means of fire or explosives | 5 years |
| 18 U.S.C. § 844(h) | First offense involving the use of fire or explosives to commit a felony; penalty enhancement | 10 year enhancement |
| 18 U.S.C. § 844(h) | Second or subsequent offense involving the use of fire or explosives to commit a felony; penalty enhancement | 20 year enhancement |
| 18 U.S.C. § 844(I) | Use of fire or explosives to destroy property used in interstate commerce | 5 years |
| 18 U.S.C. § 844(o) | First offense involving the transfer of explosive materials to be used to commit crime of violence or drug trafficking crime | 10 year enhancement |
| 18 U.S.C. § 844(o) | Second or subsequent offense involving the transfer of explosive materials to be used to commit crime of violence or drug trafficking crime | 20 year enhancement |
| 18 U.S.C. § 924(c)(1)(A)(I) | First offense, using or carrying a firearm during a crime of violence or drug trafficking crime; penalty enhancement provision | 5 years |
| 18 U.S.C. § 924(c)(1)(A)(ii) | First offense, brandishing a firearm during a crime of violence or drug trafficking crime; penalty enhancement provision | 7 years |
| 18 U.S.C. § 924(c)(1)(A)(iii) | First offense, discharging a firearm during a crime of violence or drug trafficking crime; penalty enhancement provision | 10 years |
| 18 U.S.C. § 924(c)(1)(B)(I) | First offense, firearm is a short-barreled rifle, short-barreled shotgun | 10 years |
| 18 U.S.C. § 924(c)(1)(B)(ii) | First offense, firearm is a machinegun or destructive device or the firearm is equipped with a silencer or muffler | 30 years |
| 18 U.S.C. § 924(c)(1)(C)(I) | Second or subsequent conviction under § 924(c)(1)(A) | 25 years |
| 18 U.S.C. § 924(c)(1)(C)(ii) | Second or subsequent conviction under § 924(c)(1)(A) and firearm is a machinegun or destructive device or the firearm is equipped with a silencer or muffler | Life |
| 18 U.S.C. § 924(c)(5)(A) | Possession or use of armor piercing ammunition during a crime of violent or drug trafficking crime; penalty enhancement provision | 15 years |
| 18 U.S.C. § 924(e)(1) | Possession of a firearm or ammunition by a fugitive or addict who has three convictions for violent felonies or drug offenses | 15 years |
| 18 U.S.C. § 929(a)(1) | Carrying firearm during violent crime/drug trafficking, penalty enhancement | 5 year enhancement |
| 18 U.S.C. § 930(c) | First degree murder involving the possession or use of a firearm or other dangerous weapon in a Federal Facility. | Death or life |
| 18 U.S.C. § 1028A(a)(1) | Aggravated identity theft | 2 years |
| 18 U.S.C. § 1028A(a)(2) | Aggravated identity theft in relation to any offense listed at 18 U.S.C. 2332b(g)(5)(B) (Federal Crime of Terrorism) | 5 years |
| 18 U.S.C. § 1111(a) | First degree murder | Death or life |
| 18 U.S.C. § 1114 | First degree murder of federal officers | Death or Life |
| 18 U.S.C. § 1116 | First degree murder of foreign officials, official guests, or internationally protected persons | Death or Life |
| 18 U.S.C. § 1118 | Murder in a federal correctional facility by inmate sentenced to a term of life imprisonment | Death or life |

| | | |
|---|---|---|
| 18 U.S.C. § 1119(b) | First degree murder of a U.S. national by a U.S. national while outside the United States | Death or Life |
| 18 U.S.C. § 1120 | Murder committed by a person who escaped from a Federal correctional institute | Death or Life |
| 18 U.S.C. § 1121(a)(1) | First degree murder of a state or local law enforcement officer or any person assisting in a federal criminal investigation | Death or Life |
| 18 U.S.C. § 1121(b)(1) | Killing of a state correctional officer by an inmate | 20 years |
| 18 U.S.C. § 1122 | Selling or donating, or the attempt to do so, of HIV positive tissue or bodily fluids to another person for subsequent use other than medical research | 1 year |
| 18 U.S.C. § 1201(g)(1) | Kidnapping of a minor (under the age of eighteen) | 20 years |
| 18 U.S.C. § 1203(a) | Hostage taking resulting in the death of any person | Death or life |
| 18 U.S.C. § 1466A(a) | Production/possession/receipt/transport of obscene visual representations of the sexual abuse of children | Mandatory minimum term of imprisonment specified at section 2252A(b)(1) |
| 18 U.S.C. § 1503(b)(1) | First degree murder of an officer of the court or a juror | Death or life |
| 18 U.S.C. § 1512(a)(1) | First degree murder of any person with the intent to prevent their attendance or testimony in an official proceeding | Death or life |
| 18 U.S.C. § 1512(a)(2) | Obstructing justice by using, or attempting to use, physical force against another | Death or life |
| 18 U.S.C. § 1512(a)(3)(A) | Obstructing justice by tampering with a witness, victim, or an informant | Death or life |
| 18 U.S.C. § 1591(b)(1) | Sex trafficking of children under the age of 14 by force, fraud or coercion | 15 years |
| 18 U.S.C. § 1591(b)(2) | Sex trafficking of children, over the age of 14 but below the age of 18, by force, fraud or coercion | 10 years |
| 18 U.S.C. § 1651 | Piracy under the laws of nations | Life |
| 18 U.S.C. § 1652 | Piracy by a citizen of the United States | Life |
| 18 U.S.C. § 1653 | Piracy against the United States by an alien | Life |
| 18 U.S.C. § 1655 | Piracy in the form of assault on a commander | Life |
| 18 U.S.C. § 1658(b) | Preventing escape from a sinking vessel OR holding out a false light, or extinguishing a true light with intent to cause distress to a sailing vessel | 10 years |
| 18 U.S.C. § 1661 | Robbery ashore by a pirate | Life |
| 18 U.S.C. § 1751(a) | Killing the President of the United States, the next in the order of succession to the Office of the President, or any person who is acting as the President of the United States; or any person employed in the Executive Office of the President or Office of the Vice President | Life |
| 18 U.S.C. § 1917 | Interference with Civil Service Examinations | 10 days |
| 18 U.S.C. § 1956(h) | Racketeering; conspiracy to commit any offense listed in sections 1956 or 1957 | Mandatory minimum term of imprisonment applicable to the underlying offense |
| 18 U.S.C. § 1958(a) | Causing death through the use of interstate commerce facilities in the commission of a murder-for-hire | Death or life |

| | | |
|---|---|---|
| 18 U.S.C. § 2113(e) | Bank robbery; avoiding apprehension for bank robbery; escaping custody after a bank robbery; causing death in the course of a bank robbery | 10 years; but if death results, death or life |
| 18 U.S.C. § 2241(c) | First offense, engaging in a sexual act with a child under the age of 12, or engaging in a sexual act by force with a child who is above the age of 12, but under the age of 16 | 30 years |
| 18 U.S.C. § 2241(c) | Second or subsequent offense, engaging in a sexual act with a child under the age of 12, or engaging in a sexual act by force with a child who is above the age of 12, but under the age of 16 | Life |
| 18 U.S.C. § 2250(c) | Fails to register as a sex offender and commits a crime of violence | 5 years |
| 18 U.S.C. § 2251(a) | Engaging in explicit conduct with a child for the purpose of producing any visual depiction of such conduct | 15 years; if the offender has one prior conviction for sexual exploitation, 25 years; if the offender has two or more prior convictions for sexual exploitation, 35 years; if death results, 30 years |
| 18 U.S.C. § 2251(b) | Engagement in explicit conduct by a parent or legal guardian with a child for the purpose of producing any visual depiction of such conduct | 15 years; if the offender has one prior conviction for sexual exploitation, 25 years; if the offender has two or more prior convictions for sexual exploitation, 35 years; if death results, 30 years |
| 18 U.S.C. § 2251(c) | Enticing a minor to engage in explicit conduct for the purpose of producing any visual depiction of such conduct | 15 years; if the offender has one prior conviction for sexual exploitation, 25 years; if the offender has two or more prior convictions for sexual exploitation, 35 years; if death results, 30 years |
| 18 U.S.C. § 2251(d) | Producing or publishing a notice or advertisement seeking or offering a visual depiction of a child engaging in an elicit sexual act | 15 years; if the offender has one prior conviction for sexual exploitation, 25 years; if the offender has two or more prior convictions for sexual exploitation, 35 years; if death results, 30 years |
| 18 U.S.C. § 2251(e) | Sexual exploitation of children, penalties | 15 years; if the offender has one prior conviction for sexual exploitation, 25 years; if the offender has two or more prior convictions for sexual exploitation, 35 years; if death results, 30 years |
| 18 U.S.C. § 2251A(a) | Sale of a child by a parent or legal guardian for the purpose of sexual exploitation | 30 years |
| 18 U.S.C. § 2251A(b) | Purchasing a child for the purpose of sexual exploitation | 30 years |
| 18 U.S.C. §§ 2252(a)(1)-(3) | Interstate transportation of visual depictions of a minor engaging in sexually explicit conduct; receipt; sale, or possession with intent to sell visual depictions of a minor engaging in sexually explicit conduct | 5 years; if the offender has a prior conviction for sexual exploitation of children, 15 years |

| | | |
|---|---|---|
| 18 U.S.C. § 2252(a)(4) | Possession of visual depictions of a minor engaging in sexually explicit conduct | 10 years if the offender has a prior conviction for sexual exploitation of children |
| 18 U.S.C. § 2252(b) | Certain activities relating to material involving the sexual exploitation of minors; penalties | 5 years for violations of sections 2252(1)(3); 15 years for a second or subsequent violation of section 2252(1)-(3); 10 years for a second or subsequent violation of section 2252(4) |
| 18 U.S.C. §§ 2252A(a)(1)-(4), (6) | Interstate transportation of child pornography | 5 years; 15 years for a second or subsequent violation |
| 18 U.S.C. § 2252A(a)(5) | Possession of child pornography | 10 years if the offender has a prior conviction for possession of child pornography |
| 18 U.S.C. § 2252A(b) | Child pornography, penalties | 5 years for violations of sections 2252A(1)-(4),(6); 15 years for second or subsequent violations of sections 2252A(1)-(4), (6); 10 years for second or subsequent violations of section 2252A(5) |
| 18 U.S.C. § 2252A(g) | Child exploitation enterprise | 20 years |
| 18 U.S.C. § 2257(I) | Failure to keep records of sexually explicit depictions | 2 years |
| 18 U.S.C. § 2260(a) | Use of a minor in the production of sexually explicit depictions of a minor for importation into the United States | Mandatory minimum term of imprisonment specified at section 2251(e) |
| 18 U.S.C. § 2260(b) | Use of a visual depiction of a minor engaging in sexually explicit conduct with the intent of importing the visual depiction into the United States | Mandatory minimum term of imprisonment specified at section 2252(b)(1) |
| 18 U.S.C. § 2260A | Penalty enhancement for registered sex offenders who commit specified offenses involving a minor | 10 year enhancement |
| 18 U.S.C. § 2261(b)(6) | Stalking in violation of a restraining order, or other order described in 18 U.S.C. § 2266 | 1 year |
| 18 U.S.C. § 2381 | Treason | 5 years |
| 18 U.S.C. § 2422(b) | Coercion, via mail or any facility of interstate commerce, of a minor for illegal sexual activity | 10 years |
| 18 U.S.C. § 2423(a) | Transporting a minor across state lines for the purpose of prostitution or another sexual activity which can be charged as a criminal offense | 10 years |
| 18 U.S.C. § 2423(e) | Attempt or conspiracy to transport a minor across state lines for the purpose of prostitution or another sexual activity which can be charged as a criminal offense | 10 years |
| 18 U.S.C. § 3559(c)(1) | Sentence enhancement; upon conviction for a serious violent felony, if offender has two or more prior serious violent felony convictions, or one or more prior serious violent felony convictions and one or more prior serious drug offense convictions, apply enhancement | Life |
| 18 U.S.C. § 3559(d)(1) | Sentence enhancement; if the death of a child of less than 14 years results from a serious violent felony as described in section 3591(a)(2), apply enhancement | Life |

| | | |
|---|---|---|
| 18 U.S.C. § 3559(e)(1) | Sentence enhancement; where a federal sex offense committed against a minor and the offender was has a prior sex conviction in which a minor was the victim, apply enhancement | Life |
| 18 U.S.C. § 3559(f)(1) | Sentence enhancement; murder of child less than 18 | 30 years |
| 18 U.S.C. § 3559(f)(2) | Sentence enhancement; kidnapping or maiming of child less than 18 | 25 years |
| 18 U.S.C. § 3559(f)(3) | Sentence enhancement; crime of violence resulting in serious bodily injury or if a dangerous weapon is used during and in relation to the crime of violence | 10 years |
| 19 U.S.C. § 283 | Failure to report seaboard saloon purchases to customers | 3 months |
| 21 U.S.C. § 212 | Practice of pharmacy and sale of poisons in China | 1 month |
| 21 U.S.C. § 461(c) | Killing any person engaged in or on account of performance of his official duties as a poultry or poultry products inspector | Death or life |
| 21 U.S.C. § 622 | Bribery of meat inspectors and acceptance of bribes | 1 year |
| 21 U.S.C. § 675 | Killing any person engaged in or on account of performance of his official duties as a meat inspector | Death or life |
| 21 U.S.C. § 841(a) | Manufacturing, distributing, dispensing, or possessing a controlled substance or counterfeit substance with intent to distribute | Mandatory minimum term of imprisonment specified at section 841(b) |
| 21 U.S.C. § 841(b)(1)(A) | Third offense, manufacturing, distributing, or possessing with intent to distribute | Life |
| 21 U.S.C. § 841(b)(1)(A) | Second offense; manufacturing, distributing, or possessing with intent to distribute, death or serious bodily injury results | Life |
| 21 U.S.C. § 841(b)(1)(A) | Second offense; manufacturing, distributing, or possessing with intent to distribute; no death or serious bodily injury | 20 years |
| 21 U.S.C. § 841(b)(1)(A) | First offense; manufacturing, distributing, or possessing with intent to distribute; death or serious bodily injury results | 20 years |
| 21 U.S.C. § 841(b)(1)(A) | First offense, manufacturing, distributing, or possessing with intent to distribute; no death or serious bodily injury | 10 years |
| 21 U.S.C. § 841(b)(1)(B) | Second or any subsequent offense; manufacturing, distributing, or possessing with intent to distribute, death or serious bodily injury results | Life |
| 21 U.S.C. § 841(b)(1)(B) | First offense; manufacturing, distributing, or possessing with intent to distribute, death or serious bodily injury results | 20 years |
| 21 U.S.C. § 841(b)(1)(B) | Second and all subsequent offenses; manufacture, distribution, or possession with intent to distribute, no death or serious bodily injury results | 10 years |
| 21 U.S.C. § 841(b)(1)(B) | First offense; manufacture, distribution, or possession with intent to distribute, no death or serious bodily injury results | 5 years |
| 21 U.S.C. § 841(b)(1)(C) | Second or any subsequent offense; manufacturing, distributing, or possessing with intent to distribute, death or serious bodily injury results from use | Life, fine |
| 21 U.S.C. § 841(b)(1)(C) | First offense; manufacturing, distributing, or possessing with intent to distribute, death or serious bodily injury results from the use | 20 years |

| 21 U.S.C. § 844(a) | First offense; simple possession of a controlled substance, substance contains cocaine base and weighs more than 5 grams | 5 years |
| --- | --- | --- |
| 21 U.S.C. § 844(a) | Second offense; simple possession, substance contains cocaine base and weighs more than 3 grams | 5 years |
| 21 U.S.C. § 844(a) | Third and all subsequent offenses; simple possession, substance contains cocaine base and weighs more than 1 gram | 5 years |
| 21 U.S.C. § 844(a) | Third and all subsequent offenses, simple possession (other than cocaine base) | 90 days |
| 21 U.S.C. § 844(a) | Second offense; simple possession (other than cocaine base) | 15 days |
| 21 U.S.C. § 846 | Attempt and conspiracy under Chapter 13—Drug Abuse Prevention and Control: SubchapterOffenses and Penalties | Mandatory minimum term of imprisonment applicable to the underlying offense |
| 21 U.S.C. § 848(a) | Second and all subsequent convictions; continuing criminal enterprise | 30 years |
| 21 U.S.C. § 848(a) | First offense; continuing criminal enterprise | 20 years |
| 21 U.S.C. § 848(b) | Any offense; principal administrator, organizer, or leader ("kingpin") of continuing criminal enterprise | Life |
| 21 U.S.C. § 848(e)(1) | Engaged in a continuing criminal enterprise and intentionally kills an individual or law enforcement officer | 20 years |
| 21 U.S.C. § 851 | Proceedings to establish prior convictions; sentence enhancement provisions | 1 year |
| 21 U.S.C. § 859(a) | First offense; distribution to persons under the age of 21 years | 1 year |
| 21 U.S.C. § 859(b) | Second and subsequent offenses; distribution to persons under the age of 21 years | 1 year |
| 21 U.S.C. § 860(a) | First offense; distribution of a controlled substance near a school or similar facility | 1 year |
| 21 U.S.C. § 860(b) | Second offense; distribution of a controlled substance near a school or similar facility | 3 years |
| 21 U.S.C. § 860(b) | Third offense; distribution of a controlled substance near a school or similar facility | Mandatory minimum term of imprisonment specified at section 841(b)(1)(A) |
| 21 U.S.C. § 861(a) | Employment or use of persons under 18 years of age in drug operations | Mandatory minimum term of imprisonment specified at section 841(b) |
| 21 U.S.C. § 861(b) | First offense; knowingly and intentionally employing or using a person under 18 years of age in drug operations | 1 year |
| 21 U.S.C. § 861(c) | Second and subsequent offense; knowingly and intentionally employing or using a person under 18 years of age in drug operations | 1 year |
| 21 U.S.C. § 861(c) | Third offense; knowingly and intentionally employing or using a person under 18 years of age in drug operations | Mandatory minimum term of imprisonment specified at section 841(b)(1)(A) |
| 21 U.S.C. § 861(f) | Knowingly or intentionally distributing a controlled substance to a pregnant individual | 1 year |
| 21 U.S.C. § 960(a) | Importing or exporting controlled substances | Mandatory minimum term of imprisonment specified at section 960 |

| | | |
|---|---|---|
| 21 U.S.C. § 960(b)(1) | Second or any subsequent offense; unlawful import or export, death or serious bodily injury results | Life |
| 21 U.S.C. § 960(b)(1) | Second or any subsequent offense; unlawful import or export, no death or serious bodily injury results | 20 years |
| 21 U.S.C. § 960(b)(1) | First offense; unlawful import or export, death or serious bodily injury results | 20 years |
| 21 U.S.C. § 960(b)(1) | First offense; unlawful import or export, no death or serious bodily injury results | 10 years |
| 21 U.S.C. § 960(b)(2) | Second or any subsequent offense; unlawful import or export, death or serious bodily injury results | Life, fine |
| 21 U.S.C. § 960(b)(2) | Second or any subsequent offense; unlawful import or export, no death or serious bodily injury results | 10 years |
| 21 U.S.C. § 960(b)(2) | First offense; unlawful import or export, death or serious bodily injury results | 20 years |
| 21 U.S.C. § 960(b)(2) | First offense; unlawful import or export, no death or serious bodily injury results | 5 years |
| 21 U.S.C. § 960(b)(3) | Second or any subsequent offense; unlawful import or export, death or serious bodily injury results | Life |
| 21 U.S.C. § 960(b)(3) | First offense; unlawful import or export, death or serious bodily injury results | 20 years |
| 21 U.S.C. § 963 | Attempt and conspiracy under Chapter 13—Drug Abuse Prevention and Control: Subchapter—Import and Export | Mandatory minimum term of imprisonment applicable to the underlying offense |
| 21 U.S.C. § 1041(b) | Killing any person engaged in or on account of performance of his official duties under Chapter 15—Egg Products Inspection | Death or life |
| 22 U.S.C. § 4221 | Forgery of notary seal | 1 year |
| 33 U.S.C. § 410 | Navigable water regulation violation | 30 days |
| 33 U.S.C. § 411 | Deposit of refuse or obstruction of navigable waterway | 30 days |
| 33 U.S.C. § 441 | New York and Baltimore harbors, deposit of refuse | 30 days |
| 33 U.S.C. § 447 | Bribery of inspector of New York or Baltimore harbors | 6 months |
| 42 U.S.C. § 2272(b) | Violation of prohibitions governing atomic weapons; no death resulting | 25 years |
| 42 U.S.C. § 2272(b) | Using, attempting to use, or threatening while possessing, an atomic weapon | 30 years |
| 42 U.S.C. § 2272(b) | Violation of prohibitions governing atomic weapons; death of another resulting | Life |
| 46 U.S.C. § 58109(a) | Individual convicted of violating merchant marine act | 1 year |
| 47 U.S.C. § 13 | Refusal to operate railroad or telegraph lines | 6 months |
| 47 U.S.C. § 220(e) | Falsely entering or destroying books or accounts of common carrier | 1 year |
| 49 U.S.C. § 46502(a)(2)(A) | Committing or attempting to commit aircraft piracy in special aircraft jurisdiction of the United States; no death of another individual | 20 years |
| 49 U.S.C. § 46502(a)(2)(B) | Committing or attempting to commit aircraft piracy in special aircraft jurisdiction of the United States; resulting in death of another individual | Death or life |

| | | |
|---|---|---|
| 49 U.S.C. § 46502(b)(1)(A) | Violation of Convention for the Suppression of Unlawful Seizure of Aircraft outside special aircraft jurisdiction of United States; no death of another individual | 20 years |
| 49 U.S.C. § 46502(b)(1)(B) | Violation of Convention for the Suppression of Unlawful Seizure of Aircraft outside special aircraft jurisdiction of United States; resulting in death of another individual | Death or life |
| 49 U.S.C. § 46506(1) | Application of certain criminal laws to acts on aircraft if in special maritime and territorial jurisdiction of the United States | Mandatory minimum term of imprisonment applicable to the underlying offense |